Peggy Hunt (Utah State Bar No. 6060)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
         armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br>     v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>                              Defendants. | **INITIAL REPORT AND LIQUIDATION PLAN OF R. WAYNE KLEIN, RECEIVER**<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as forty-one subsidiaries and entities affiliated with National Note ("Related Entities"),[1] and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this Initial Report and Liquidation Plan for the period June 25, 2012 through September 30, 2012 (the "Reporting Period").

---

[1]    A list of the Related Entities is attached hereto as **Exhibit 1**.

# TABLE OF CONTENTS

**Page**

I. PROCEDURAL HISTORY ........................................................................................... 1

II. OVERVIEW OF PLAN OF LIQUIDATION .......................................................... 2

    A.    Business Not Viable........................................................................................ 2
    B.    Interim and Limited Operation Businesses Included in Receivership Estate ........ 5
    C.    Liquidation Plan............................................................................................ 5

III. INITIAL ACTIONS TAKEN BY THE RECEIVER ........................................... 7

    A.    Closing and Securing of the NNU Office ..................................................... 7
    B.    Notice of Receivership................................................................................... 7
    C.    Litigation Stay ............................................................................................... 8
    D.    Ongoing Business Operations of Related Entities ....................................... 8
    E.    Securing Books and Records ........................................................................ 12
    F.    Communications with Investors ................................................................... 13
    G.    Communications with Other Parties ............................................................ 14
    H.    Corporate and Ownership Structure............................................................. 14
    I.    Securing of Bank Accounts and Funds ....................................................... 14

IV. ASSET RECOVERY ............................................................................................. 18

    A.    Palmer's Inaccurate Asset Valuations ........................................................ 18
    B.    Note Portfolio............................................................................................... 20
        1.    Intercompany Receivables ................................................................ 21
        2.    Third Party Receivables .................................................................... 22
    C.    Minerals Assets............................................................................................ 23
    D.    Real Estate Holdings.................................................................................... 24
        1.    Middleton, Idaho: River Run Subdivision ....................................... 25
        2.    Malad, Idaho: Elkhorn Ridge Estates ............................................. 26
        3.    Manhattan, Montana: Manhattan Grille Condo ............................... 28
        4.    Brigham City, Utah: Twin Pines Apartments .................................. 29
        5.    Ogden, Utah: Office Building ........................................................... 30
        6.    Summit, Utah: Summit Park Lot ...................................................... 32
        7.    Fruitland, Utah: Bandana Cabin ...................................................... 32
        8.    Duchesne County, Utah: Deer Meadows .......................................... 33
        9.    Duchesne, Utah: Outpost/Indian Canyon ........................................ 33
        10.    Vernal, Utah: East Meadows Trailer Park ....................................... 34
        11.    Vernal, Utah: Quail Hollow Apartments ......................................... 35
        12.    Salt Lake City, Utah: Residential Building Lots ...................................... 36
        13.    Salt Lake City, Utah: Cottonwood Road .......................................... 36
        14.    Salt Lake City, Utah: NNU Office.................................................... 38

15. West Jordan, Utah: Palmer Residence ........................................................ 38
16. Salt Lake County, Utah: Star Pointe Development ................................. 39
17. Eagle Mountain City, Utah: Autumn Ridge ........................................... 40
18. Eagle Mountain City, Utah: Overland Trails ......................................... 41
19. Fairfield, Utah: Cedar Fort Land ............................................................ 42
20. Spanish Fork, Utah: Expressway Business Park ..................................... 42
a. Expressway Unit #109 .............................................................................. 43
b. Expressway Unit # 204 ............................................................................ 44
c. Expressway Unit # 215 ............................................................................ 44
d. Expressway Unit # 305 ............................................................................ 45
21. Expressway Land ...................................................................................... 46
22. Sanpete County, Utah: Gooseberry Cabin .............................................. 46
23. Toquerville, Utah: Almond Heights Subdivision ................................... 47
24. Kanab, Utah: Kanab Cabin ...................................................................... 48
25. Gilbert, Arizona: Farrell Business Park ................................................... 48
26. Mesa, Arizona: Clearview Business Park ................................................ 49
27. Byron, Minnesota: Bear Grove Industrial Park ...................................... 50
28. Temple, Georgia: Georgia Single Family Residence .............................. 51
29. Chicago, Illinois: Chicago Single Family Home ..................................... 51
30. Cleveland, Ohio: Single Family Home ..................................................... 52
31. Cleveland, Ohio: Building Lot .................................................................. 52
32. Toledo, Ohio: Toledo Single Family Home ............................................. 53

V. FINANCIAL .......................................................................................................... 53

A. Receivership Bank Accounts .................................................................... 53
B. Operating Expenses of Receivership Entities ......................................... 54
C. Current Bank Balances ............................................................................. 56
D. Old Glory Minting Company .................................................................... 57
E. Fees and Expenses of the Receiver and Counsel ................................... 58

VI. NEXT STEPS ....................................................................................................... 59

A. Actions to be Taken .................................................................................. 59
B. Timetable .................................................................................................... 61
C. Expected Recovery .................................................................................... 61

VII. CONCLUSION .................................................................................................... 62

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[2]  The SEC alleges, among other things, that Defendants Palmer and National Note engaged in securities fraud and operated a Ponzi scheme that took over $100 million from more than 600 investors.

The SEC filed several *ex parte* motions with its Complaint on June 25, 2012, all of which were granted by the Court.  In particular, the Court entered a Temporary Restraining Order and Order to Show Cause (the "TRO")[3], an Order Freezing Assets and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[4] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[5]  As part of the TRO, the Court scheduled a hearing for July 9, 2012, to allow Palmer an opportunity to contest the relief that had been afforded to the SEC.[6]  As this hearing date approached, Palmer decided not to challenge the orders obtained by the SEC; on July 5, 2012, Palmer consented to the continuation of the TRO, and the Court scheduled a hearing for August 24, 2012 to address the SEC's request for a preliminary injunction.[7]  Palmer also decided not to contest this motion; on August 15, 2012, Palmer

---

[2]   Docket No. 1.

[3]   Docket No. 7.

[4]   Docket No. 8.

[5]   Docket No. 9, *as amended*, Docket No. 50.

[6]   Docket No. 7 (TRO) at p. 3.

[7]   Docket No. 19.

stipulated to the imposition of the preliminary injunction sought by the SEC and to continuation of the orders that the Court previously entered.[8]

 As a result of the Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **Exhibit 1**.  The Receiver is required to submit this Initial Report and Plan of Liquidation under the Receivership Order.[9]

**II.**

**OVERVIEW OF PLAN OF LIQUIDATION**

**A.** **Business Not Viable**

 As a result of his investigation discussed below,[10] the Receiver has determined that the Receivership Entities, including National Note, did not engage in business or had been engaging in a business that was not viable.  This conclusion is demonstrated by at least the following:

- National Note represented that it was a company engaged in the acquisition and development of real estate. Yet, based on his initial investigation, the Receiver has determined that absent the use of investor funds, National Note did not have sufficient income to pay expenses associated with the assets that it had acquired or other operating expenses.[11]

- The company's financial records show that from January 1, 2012 to June 25, 2012, National Note had income totaling $835,721.23, three-fourths of which came from

---

[8] Docket Nos. 41 and 42.

[9] Docket No. 9 (Receivership Order) at pp.18-20.

[10] *See infra,* Sections III.I and IV.B.

[11] The SEC alleges that in the last three years, more than 80% of the monies raised by National Note from investors have been used to make payments to other investors, rather than to purchase real estate notes or develop real estate.

investors.

- During that same time, National Note had a net loss of $951,233.46. Specifically, it incurred $770,067.85 in losses on properties it disposed of, paid $761,571.96 in interest to investors and financial institutions, and spent $255,494.88 on its operations.

- Given the size of the National Note enterprise, the properties held by it or its affiliates, and its representations of being a $114 million company, the Receivership Entities' thirty-five bank accounts had total cash deposits of less than $40,000.00, with sixteen holding less than $50.00.[12] Such funds are woefully inadequate to maintain, much less develop, real estate.

- National Notes' cash problems have been ongoing for some time.

- In September 2011, it stopped making payments to investors.

- The Receivership Entities had significant debts that were billed to and unpaid by National Note as of the date of the Receiver's appointment. Claims had been made by the Utah Labor Commission and employees for unpaid wages. In many cases, property taxes were two to three years delinquent, and insurance policies had been allowed to lapse.[13]

- National Note appears to have additional liabilities not reflected on its balance sheet, such as a letter of credit for one million dollars that National Note issued to Middleton City, Idaho in connection with its purported development of a project known as "Riverbend Estates."[14]

---

[12] There are several additional bank accounts with relatively nominal funds on deposit which have not been paid to the Receiver as of September 30, 2012. The Receiver has requested the funds, and anticipates receiving them in the future. *See infra*, Section III.I.

[13] Two homes for which there was no insurance coverage were destroyed by fire.

[14] *See infra*, Section IV.D.1.

- Many of National Notes' affiliated companies are insolvent; with their balance sheets showing liabilities greatly exceeding their assets.  Related is the fact that may of these companies were never or were inadequately capitalized from their formation.

- The $105 million in "notes receivable" listed as assets on National Note's balance sheet are illusory.  More than $104 million of these notes receivable are owed to National Note by its affiliated companies, including Receivership Entities – many of which, as discussed above, have never been capitalized and are insolvent.  Thus, it appears very likely that this money cannot be "collected."

- National Note's valuation of its real estate holdings was dramatically inflated, often having no realistic basis in the relevant market, and the values do not reflect interests against and debts related to the properties or various other factors that may adversely affect their value to the receivership estate.  Some properties have little or no equity.

- Many of the businesses that were operated as part of the National Note enterprise are not profitable and cannot be profitable given the assets and debts of the enterprise.[15]

Considering all these factors, the Receiver has concluded that continuing the business of the National Note enterprise is not a viable option.  Thus, with the exception of maintaining and managing properties with income, along with the Old Glory Mint,[16] for a limited time, he cannot, given the assets at hand, and will not be developing real estate.  Simply, based on the state of the assets existing when he was appointed and evaluating sources of non-investor income, there are not sufficient funds to engage in development projects, and proceeds obtained from the

---

[15]   *See, e.g., infra,* Section IV.D.11 (discussing Quail Hollow Apartments) & Section V.D. (discussing Old Glory Mint).

[16]   *See infra*, Section III.D.2.

liquidation of assets should and will be used to pay those investors who suffered net losses, not be subject to the risks inherent in real estate development.

**B.      Interim and Limited Operation Businesses Included in Receivership Estate**

In light of the factors described in Section A above, the Receiver has discontinued the operations of National Note and most of its affiliated entities, except on the limited basis discussed below.[17]  He has attempted to minimize the enterprise's historically high operating expenses  going forward.  All employees have been terminated, except for employees of Old Glory Mint,[18] an airplane that Palmer was leasing, has been abandoned to its owners in exchange for a release of claims so as to relieve the estate of the significant expense associated with maintenance and storage of that property, and the Receiver intends to sell the building from which the enterprise was operated,[19] management contracts that were wholly unprofitable have been terminated, and tenants of properties who had been allowed to use the property rent free have vacated the properties.[20]  Thus, the Receiver is managing the receivership estate with the goal of maximizing the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those investors who have not received a return of their principal investment in whole or part.

**C.      Liquidation Plan**

The Receiver intends to collect and liquidate all assets of the receivership estate, and retain all net proceeds in a receivership bank account until the Court enters an Order approving a

---

[17]   *See infra,* Section III.D.

[18]   The Receiver did enter into a short-term contract with a former employee relating to Expressway Business Park. That contract has now been terminated.

[19]   *See infra*, Section III.D.1.

[20]   *See infra*, Section IV.D.5 (discussing Ogden Office Building).

claims process and authorizing the Receiver to distribute the funds to those persons holding allowable claims. A list of all assets discovered by the Receiver as of September 30, 2012 is attached hereto as **Exhibit 2**. Due to the nature of the assets, the Receiver does not anticipate making distributions to those holding allowed claims until at least 2013.

At this early stage, it appears that one of the primary assets of the Receivership Entities is real estate holdings. A list of the properties is included as part of **Exhibit 2**, and a discussion of each of the properties is set forth below.[21] The Receiver has been researching and continues to research the values of these properties, including by identifying liens and interests against the real estate, and determining issues needed to be addressed to permit valuation and/or marketing of the properties. Properties with no equity will be abandoned. Absent compelling circumstances, properties with equity, will not be sold for a "liquidation" value, but rather are being or will be listed for sale and marketed at their fair market value, which will include consideration of numerous factors, including the nature of the market in question, demand for the type of property involved, and national and local economic conditions. While this approach is expected to bring higher sale prices, it likely will take a longer period of time to complete.

In addition to real property, the receivership estate included numerous other types of assets as listed in **Exhibit 2**, including mineral ores, accounts and notes receivable, vehicles, personal property, such as office furniture and equipment, and claims and causes of action related to, among other things, transfers of assets and investor funds to third parties. The Receiver's analysis of these assets continues, and like the real property, the Receiver intends to liquidate the assets through appropriate means given the nature of the asset in question.

**III.**

---

21    *See infra,* Section IV.D.

## INITIAL ACTIONS TAKEN BY THE RECEIVER

### A.    Closing and Securing of the NNU Office

National Note and most of the affiliated Receivership Entities conducted business at an office located in West Jordan, Utah (the "NNU Office").  On June 25, 2012, immediately after being appointed by the Court, the Receiver and his staff went to the NNU Office and served copies of the Receivership Order on Palmer and the six employees located at the Office on that day.  The Receiver took control of the operations, assets, and records of National Note and many of the Related Entities, including by changing the locks on the doors at the NNU Office so as to secure assets and records of the Receivership Entities.

The Receiver attempted to interview employees about the records and whereabouts of assets, but Palmer instructed them not to talk to the Receiver.  Before leaving, Palmer and the employees removed their personal effects from the NNU Office under the Receiver's supervision.  Palmer took a bag of silver coins, over the protests of the Receiver, stating that the coins belonged to his mother and were necessary to pay her mortgage.

### B.    Notice of Receivership

On June 25, 2012, the Receiver posted a notice on the public door of the NNU Office, informing those who arrived at the Office that the Receivership Entities had been placed in receivership.  A copy of the Receivership Order also was delivered to the United States Postal Service and, since June 25, 2012, the Receiver has taken control of all mail addressed to Receivership Entities.  The Receiver also has posted the Receivership Order, as well as other orders and information about the receivership on his website, www.kleinutah.com/index.php/receiverships/national-note-of-utah-lc.

Within ten days of his appointment, the Receiver filed Notices of Receivership in all

jurisdictions in which National Note or the Related Entities are believed to have interests in real property, including in Utah, Montana, Alaska, Minnesota, Idaho, California, and Arizona.

**C.**     **Litigation Stay**

Prior to June 25, 2012, several lawsuits had been filed against National Note. Continuation of these lawsuits is stayed by the Receivership Order,[22] and the Receiver has filed a Notice of Stay in each court in which these lawsuits are pending, advising them of the receivership.  Specifically, Notices of Stay were filed in:

- *PCFI Enterprise Management v. National Note of Utah*, Case No.3:12-cv-00088-TMB (D. Alaska);

- *Teixeira-McRay v. National Note of Utah*, Case No. 3:12-cv-00089-RRB (D. Alaska);

- *Metzger v. National Note of Utah*, Case No. 2:12-cv-00700-WBS-KJN (E.D. Cal.); and

- *Thomson v. National Note of Utah,* Case No. 120406172 (3d D. Ct. Utah).

**D.**     **Ongoing Business Operations of Related Entities**

Some of the Related Entities have ongoing business operations, including ownership of properties generating income, companies being managed for others, and a manufacturing business.  One of the Receiver's most immediate challenges was to evaluate the best way to maximize the value of these operations for the benefit of the receivership estate and minimize costs, including by determining the extent of the estate's interest in the businesses, whether to continue operations, and how to do so.

Among the businesses that the Receiver has evaluated are the following:

1. Top Flight, LLC:  Initially, it appeared that an entity named "Top Flight, LLC," which owns an airplane that was being used by Palmer, was a Receivership Entity.  Upon investigation,

---

[22]     Docket No. 9 (Receivership Order) at pp 13-14.

however, it was determined that Top Flight, LLC should not have been designated as a Receivership Entity, because neither Palmer nor any affiliates had any ownership interest in Top Flight, LLC and the receivership estate did not have an interest in the airplane, other than as a lessee.  As a result, the receivership faced potentially significant costs, including lease payments, airplane storage and maintenance costs, and insurance premiums.  To avoid these costs, the Receiver succeeded in obtaining the agreement of Top Flight, LLC to assume responsibility for all expenses relating to the airplane from the date the Receiver was appointed and to waive any claim against the receivership estate that may have existed for the lease.  This agreement has been approved by the Court.[23]

2.  Old Glory Mint:  The Receivership Entities include an entity named Old Glory Minting Company, LLC that mints precious metal coins ("Old Glory Mint" or the "Mint").  The Receiver has temporarily decided to keep operating the Mint so as to determine the best way to maximize the value of this asset for the receivership estate.

Based on his initial investigation, the Receiver has discovered that as of his appointment on June 25, 2012, the Mint owed approximately $230,000.00 worth of silver and gold product to customers, in excess of assets of the mint.  In addition, the Receiver learned that most of the Mint's operating equipment previously had been sold to others and then leased back to the Mint at above-market rates.  Furthermore, National Note appears to have obligated the Mint to pay rents to its landlord at substantially above market rates.  In some instances, National Note entered into agreements with Mint customers, "leasing" the metals from the purchasers and promising to pay them interest. These "leased" metals may have been sold, with the proceeds loaned to National Note.

---

[23]   Docket No. 38 (Order), at p. 2.

A summary of the Mint's financial operations since the Receiver's appointment is included later in this Report, but the following is a brief summary. Since the Receiver's appointment, the Mint has been operating at a higher volume than in preceding months, but not as high as in some past years. This may be attributed, in part, to the fact that some regular customers ceased placing orders when they did not receive the products they purchased before the commencement of the receivership and the asset freeze. Nevertheless, sales volume is increasing. The Mint's expenses have been greater than its historical averages which may, in part, be due to the fact that some longstanding suppliers have declined to do business with the Mint out of continuing fear their assets will be subject to an asset freeze. At this time, the Receiver is evaluating options for future operations of the Mint.

The Receiver has initiated contempt proceedings against Wayne Scholle, the Mint's former sales manager, alleging that Mr. Scholle sold coins belonging to the Mint and kept the proceeds. The Court has issued an Order to Show Cause against Mr. Scholle, and held a hearing on November 7, 2012.[24]

3. Expressway Business Park: National Note and/or an affiliate purchased land located in Spanish Fork, Utah, and built the "Expressway Business Park" on some of the property. This Expressway Business Park is comprised of warehouse condominium units. Over time, most of the units were sold, but National Note or its affiliates continue to own four warehouse condominium units, twenty lots where additional units could be built, and vacant land. These properties are described in more detail below.[25]

Prior to the Receiver's appointment, National Note acted as the sales and leasing agent

---

[24]   Docket No. 59 (Order).

[25]   *See infra*, Section IV.D.20.

for the Expressway Business Park, and controlled the owners' association for the Expressway Business Park.  In several cases, National Note (a) guaranteed rent to the unit owners, even though the units had not been leased; and/or (b) sold units, promising to repurchase them at the original purchase price if the buyer wanted to "put back" the property.

For the three-month period following his appointment, the Receiver continued to manage the Expressway Business Park and its owners' association.  To minimize costs, he met with other unit owners in August, to urge them to take steps to assume control over the owners' association, and as of October 1, 2012, the owners' association is being managed by a new board.  The Receiver has worked with the new board to facilitate the transition.

4.  <u>Farrell Business Park</u>:  One of the Receivership Entities purchased land and built the "<u>Farrell Business Park</u>," located in Gilbert, Arizona, consisting of twelve warehouse condominium units.  Prior to the Receiver's appointment, National Note acted as the sales agent for the Farrell Business Park, sold six of the units, and controlled the Farrell Business Park owners' association.

At this time, the receivership estate owns six of the Farrell Business Park units, and the Receiver continues to manage those units.[26]  To minimize costs, the Receiver is urging the other unit owners to take steps to assume control over the owners' association.  These discussions are ongoing.

5.  <u>Rental Properties</u>:  The Receivership Entities own six properties that generate rental income.  Since his appointment, the Receiver has continued to control these properties for the benefit of the receivership estate.  A seventh property, that was being managed by National Note, but which was losing money, has been returned to the owners.  These properties, which are

---

[26]  *See infra,* Section IV.D.25.

described in more detail below,[27] are as follows:

    a.  Twin Pines Apartments, located in Brigham City, Utah;

    b.  An office building, located in Ogden, Utah;

    c.  East Meadows Trailer Park, located in Vernal, Utah;

    d.  Montana Grille Condominium, located in Manhattan, Montana;

    e.  Residence, located in Temple, Georgia;

    f.  Two residences, located in Middleton, Idaho; and

    g.  Quail Hollow Apartments, located in Vernal, Utah .[28]

**E.**    **Securing Books and Records**

As discussed above,[29] immediately upon his appointment, the Receiver took steps to secure the books and records of the Receivership Entities.  The books and records that the Receiver has secured to date include the following:

- Books and records located at the NNU Office in West Jordan, Utah, including seizing computers located at the Office and obtaining a forensic image of the hard drives of the computers used as servers;

- Books and records located in a portable storage unit in West Jordan, Utah;

- Books and records stored in a warehouse at the Expressway Business Park in Spanish Fork, Utah;

- The hard drives of laptops used by Palmer and a business associate, Reed Larsen ("Larsen"); and

---

[27]  *See infra,* Section IV.D.

[28]  National Note did not own this property, but leased it from the owner.

[29]  *See supra,* Section III.A.

- A significant amount of mail addressed to the Receivership Entities, which has been a key source of information about the Receivership Entities' assets and debts, as well as entities that were doing business with the Receivership Entities.[30]

In addition to the information that has been secured, the Receiver continues to learn of and obtain new information as his investigation continues. Where possible, to minimize costs, the Receiver has coordinated his discovery efforts with the SEC. Relevant to the receivership estate is the SEC's issuance of subpoenas to financial institutions and credit card companies to obtain copies of the voluminous records related to the Receivership Entities' bank accounts and credit card accounts. The Receiver expects to receive a copy of these records from the SEC.

## F.   **Communications with Investors**

Upon the commencement of the receivership, the Receiver and his staff spent a significant amount of time communicating with hundreds of investors who have called or sent letters or e-mails seeking information. In addition to these communications, the Receiver has taken a number of steps to help investors remain informed about developments in the receivership:

- A website has been established with information about this case. The website can be found at: http://www.kleinutah.com/index.php/receiverships/national-note-of-utah-lc . The website has (1) general information about receiverships, (2) answers to "Frequently Asked Questions," (3) copies of papers filed with the Court, and (4) periodic updates describing developments related to the receivership estate and the SEC's case.

- An Investor Questionnaire was developed, in cooperation with the SEC, to gather information from investors. The questionnaire, which is posted on the website, gives the

---

[30]   Personal mail addressed to Palmer and Larsen being delivered to the NNU Office is being forwarded to them.

Receiver contact information for the investors and background information on their transactions with Receivership Entities.  As of September 30, 2012, more than 270 questionnaires have been received.

**G.      Communications with Other Parties**

Former employees, persons affiliated with the Receivership Entities, and creditors have contacted the Receiver to obtain information about the receivership.  Some report that they are employees who have reported that back wages or other payments were owed to them as of the date of the receivership, and the Receiver has been contacted by the Utah Labor Commission seeking penalties for late payment of salaries owed to former employees.

**H.      Corporate and Ownership Structure**

The Receiver's investigation has included his review of the corporate organization of National Note and the numerous Related Entities.  While the Receiver's investigation is ongoing, a corporate ownership chart found at the National Note office as determined at this time is attached hereto as **Exhibit 3**.

Ownership of these companies appears to vary widely.  For example, it appears that 30% of Expressway Business Park, LLC and 20% of Montana One, LLC are owned by third persons.  Palmer and Larsen appear to be owners of some of the entities known as the "Homeland Companies," while National Note is the owner of other Receivership Entities.  Palmer has promised to explain the ownership structure of the various companies, but has not yet provided this information to the Receiver.

**I.      Securing of Bank Accounts and Funds**

As discussed above,[31] on June 25, 2012, the Court entered the Asset Freeze Order,

---

[31]     *See supra* at Section I.

freezing all assets of the Receivership Entities, and specifically requiring financial institutions to freeze the balances in any bank accounts in the name of the Receivership Entities.[32]   For the most part, the financial institutions have been cooperative, and the monies in most of the frozen accounts have been delivered to the Receiver.   As of September 30, 2012, only a few of the frozen funds had not been delivered, but the Receiver expects to receive them soon.[33]

The bank balances recovered by the Receiver as of September 30, 2012 are as follows:

---

[32]   Docket No. 8 (Asset Freeze Order) at pp. 2-3.

[33]   One of the banks erroneously paid out to the Receiver the $547.82 balance of an account in the name of American Gold Reserve ("AGR").   AGR is a company apparently controlled by Palmer, Larsen, and others. AGR is not named as a "Receivership Entity" in the Receivership Order, and at this time, the Receiver does not consider AGR to be part of the receivership estate.   The Receiver has offered to pay over this amount to AGR.

| Receivership Entity | Financial Institution | Delivery Date | Amount Delivered to Receiver |
|---|---|---|---|
| DPLM LLC | Key Bank | 8/07/12 | $10.55 |
| Elkhorn Ridge, LLC (2262) | Key Bank | 8/07/12 | $15,317.04 |
| Elkhorn Ridge, LLC (5462) | Key Bank | 8/07/12 | $54.83 |
| Expressway Business Park Owners Organization, LLC | Key Bank | 8/07/12 | $217.47 |
| Expressway Business Park Owners Organization, LLC | Central Bank | 8/15/12 | $3,006.84 |
| Farrell Business Park Association | Key Bank | 9/17/12 | $15.68 |
| HSB Technologies, LLC | Key Bank | 8/07/12 | $20.69 |
| Homeland Development I, LLC | Key Bank | 8/07/12 | $9.14 |
| Homeland Development II, LLC | Key Bank | 8/07/12 | $33.36 |
| Homeland Funding Corp. | Key Bank | 8/07/12 | $1,955.91 |
| Homeland Holding Corp. (0136) | Key Bank | 8/07/12 | $131.15 |
| Homeland Holding Corp. (6158) | Key Bank | 8/07/12 | $1,025.14 |
| Homeland Minerals, LLC (1803) | Key Bank | 8/07/12 | $26.13 |
| Homeland Minerals, LLC (1829) | Key Bank | 8/07/12 | $5.92 |
| Homeland Mortgage, Inc. | Key Bank | 8/07/12 | $0.00 |
| Land, Utah, LC | Wells Fargo | 9/21/12 | $64.98 |
| Montana One, LLC | Key Bank | 8/07/12 | $2.09 |
| National Note (0702) | Chase Bank | 7/23/12 | $963.33 |
| National Note (1530) | Chase Bank | 7/23/12 | $148.15 |
| National Note (3907) | Chase Bank | 7/23/12 | $2,048.69 |
| National Note (5954) | Wells Fargo | 9/21/12 | $3,773.88 |
| National Note (7550) | Wells Fargo | 9/21/12 | $827.71 |
| NPL America LLC | Chase Bank | 9/17/12 | $24.03 |
| Old Glory Mint (2090) | Key Bank | 8/07/12 | $0.00 |
| Old Glory Mint (6133) | Key Bank | 8/07/12 | $7,438.93 |
| Wayne Palmer, personal | Key Bank | 8/07/12 | $8.84 |
| Passport Properties, L.C. | Wells Fargo | 9/21/12 | $531.35 |
| Presidential Utah Properties LC | Key Bank | 8/07/12 | $122.55 |
| The Property Company, LLC (3215) | Wells Fargo | 9/21/12 | $17.33 |
| The Property Company, LLC (9756) | Wells Fargo | 9/21/12 | $364.25 |
| Quail Hollow Apartments | Holladay B. & T. | 8/07/12 | $69.97 |
| Riverbend Estates LC | Key Bank | 9/17/12 | $261.08 |
| Top Flight, LLC | Key Bank | 8/07/12 | $8.12 |
| Twin Pines Property, LC | US Bank | 8/30/12 | $5.05 |
| Vision Land, LLC | Key Bank | 8/07/12 | $48.24 |
| **Total** | | | $38,558.42 |

Most notable is how little cash was in these accounts.  Many of these accounts were in

the name of entities operating businesses that managed assets worth hundreds of thousands of dollars, or that were in process of developing properties where millions of dollars had already been spent. For example, the Receivership Entity Homeland Development I, LLC is the owner of a business park located in Mesa, Arizona with an assessed value of $862,000.00, but it had less than $10.00 in its bank account. Homeland Minerals, LLC is the company holding ore that was to be processed to extract platinum or other precious metals that would supposedly yield hundreds of millions of dollars. Homeland Minerals had already taken $4 million from a separate group of investors and had promised to contribute another $8 million to the joint venture, yet it had only $32.05 in its bank accounts. Riverbend Estates was developing a project supposedly worth $30 million, but it had only $261.08 in its bank account.

The bank accounts used for rental properties had no money reserved to repay security deposits for tenants. There were no reserve accounts to fund maintenance expenses or pay for upgrades, such as parking lot repairs or roof replacements. The bank account for the Twin Pines apartments in Brigham City had a balance of $5.05. In at least one case, the amount in the bank account was substantially less than had been promised to governmental bodies. Members of the Oneida County, Idaho, Planning and Zoning Commission told the Receiver that National Note had pledged to maintain a $165,000.00 bank account balance as a reserve for development expenses for the Elkhorn Ridge development. That bank account had a balance of less than a tenth of that amount: $15,317.04.

The Receiver has established separate bank accounts for those Receivership Entities that have ongoing deposits and expenditures. These are summarized below.

## IV.

## ASSET RECOVERY

The identification and securing of, assertion of control of, maintenance related to, and recovery of assets of the receivership estate has dominated the Receiver's work during this Reporting Period.   These assets include monies owed to the Receivership Entities, mineral holdings, real estate holdings, personal property such as vehicles and furnishings, and income from limited business operations.[34]   A list of identified assets as of this date held by the Receivership Entities is attached hereto as **Exhibit 2**.

A.   **Palmer's Inaccurate Asset Valuations**

Palmer identified three significant categories of assets: (1) the company's note portfolio, (2) minerals holdings, and (3) real estate.   According to information that Palmer provided to the SEC, Palmer values these assets as follows:

---

[34]   *See supra* at Section III.D.

| NOTE PORTFOLIO | |
|---|---|
| Notes Receivable | *$114,000,000.00* |
| **MINERALS** | |
| Homeland Minerals | $15,700,000.00 |
| Freedom Minerals | $794,000,000.00 |
| Bonneville Ores | $1,200,000,000.00 |
| Purple Ores | $142,500,000.00 |
| *Total Minerals* | *$2,152,200,000.00* |
| **REAL ESTATE** | |
| Elkhorn Ridge | $7,300,000.00 |
| Outpost on the Strawberry | $300,000.00 |
| Buffalo Canyon/Toquerville | $2,000,000.00 |
| Ovation Villas | $5,100,000.00 |
| Land Utah/East Meadows | $5,000,000.00 |
| Twin Pines Apartments | $560,000.00 |
| Coeur Ame/Cottonwood | $8,000,000.00 |
| Cabins (2) | $1,000,000.00 |
| River Run | $30,000,000.00 |
| Expressway Business Park | $9,000,000.00 |
| Bear Grove Industrial Park | $6,000,000.00 |
| Farrell Business Park | $3,200,000.00 |
| Clearview Business Park | $3,000,000.00 |
| Autumn Ridge Subdivision | $2,500,000.00 |
| Fairfield Land | $1,000,000.00 |
| PMR | $1,000,000.00 |
| *Total Real Estate* | *$84,960,000.00* |
| **PALMER'S VALUATION** | *$2,351,160,000.00* |

From Palmer's valuation of these assets, there would appear to be sufficient assets to pay all investors in this case in full. However, in reality, the assets appear to be worth only a fraction of these amounts.

Based on his investigation to date, including a review of books and records that he has secured, the Receiver has determined that many of the notes receivable may be uncollectible inasmuch as they are intercompany notes, between National Note and insolvent Related Entities. In the limited number of cases where the notes receivable are from third parties, the Receiver will use his best efforts to collect on them.

Furthermore, based on a review of the books and records as well as independent market information, most, if not all, of the mineral and real property assets have market values substantially lower than those claimed by Palmer, some of the real property appears to be encumbered by substantial liens, and some of the assets that were assumed or claimed to be owned by Palmer or a Receivership Entity were in fact not owned by them or have been transferred.  It was not uncommon for Palmer to inflate the asking price of real properties, causing properties to sit on the market unsold for extended periods of time.  For example, while National Note was successful in selling one lot in the Elkhorn Ridge development located near Malad, Idaho for $115,000.00, no other lots have been sold at similar offering prices inasmuch as comparable properties in the immediate area are selling for $35,000.00 per lot, not the offering prices of $115,000.00 and more.[35]

The value of many of the real property assets has been further diminished in many cases by Palmer's encumbrances of the property or interests in trust deeds related to the property,[36] and his failure to pay taxes, insurance and related debts.  In many instances, routine maintenance of the properties was ignored, leading to property damage from leaking roofs or unsecured buildings under construction.

## B.    Note Portfolio

National Note's books and records list its accounts receivable in the amount of $104,957,162.97[37] based on loans made by it to others[38] or debts owed to it for other reasons,

---

[35]    *See infra*, Section IV.D.2 (discussing Elkhorn Ridge, and the fact that the Receiver obtained an appraisal that placed the value of these non-cabin lots at approximately $35,000.00).

[36]    Palmer often provided investors Assignments of Beneficial Interests in Trust Deeds on real property.  The Receiver believes these Assignments might not be valid liens on the underlying property and may ask the Court to determine their validity.  The estate will incur costs in obtaining rulings on the validity of the Assignments.

[37]    *Compare* Note Portfolio value cited *supra* at Section IV.A (Palmer values Note Portfolio in the amount of

such as rent on property owned by it or a Related Entity.  The value of the note portfolio is greatly inflated for numerous reasons and these issues are discussed below.

  1. <u>Intercompany Receivables</u>

  Of the total note portfolio—$104,097,864.00—99.18% is owed by National Note's affiliated companies that are part of the receivership estate or otherwise (the '<u>Intercompany Receivables</u>").  These Intercompany Receivables are not only not collectable, but they represent a significant degree of double counting of assets, as National Note counts as assets both the real estate properties owned by these affiliated companies and the related accounts receivable for monies National Note "loaned" these companies to buy the properties.

  At this time, the Receiver does not anticipate that the Intercompany Receivables are collectable based on the net worth of the entities owing the Receivables – all of which are Related Entities and subject to this action.  For example, the National Note's books and records show the following financial status for affiliated companies that owe money to National Note:

---

$114,000,000.00, approximately $8 million more than that shown in books and records in the Receiver's custody).

[38] It is worth noting that many of these loans, whose 12% interest rate was the same as that paid to investors whose money was used to fund the loans, would have generated no profits for National Note.

| National Note Affiliate | Amount owed to National Note | Net Worth of the Company | Assets of the Company[39] |
|---|---|---|---|
| Homeland Funding Corp. | $11,813,012.44 | -$11,456,004.87 | $1,693,795.93 |
| Homeland Holding Corp | $4,762,693.47 | -$3,589,850.68 | $3,057,605.18 |
| Homeland Development I, LLC | $7,952,320.77 | -$3,224,522.73 | $4,850,927.30 |
| Homeland Development II, LLC | $5,914,289.55 | -$2,636,700.18 | $3,282,503.98 |
| Riverbend Estates LC | $23,349,928.65 | -$5,670,955.22 | $21,572,243.19 |
| Presidential Utah Properties LC | $1,523,781.28 | -$1,294,031.32 | $317,945.60 |
| Expressway Business Park Owners Organization, LLC | $13,545,800.87 | -$10,486,066.75 | $3,949,150.42 |
| DPLM LLC | $3,239,030.61 | -$2,446,411.36 | $1,651,149.55 |
| Bonneville Minerals, LLC | $144,436.90 | $0.00 | $144,436.90 |

The information in this table demonstrates that these National Note affiliates lack the financial ability to pay the monies they owe to National Note.

2.    Third Party Receivables

The remaining accounts receivable in note portfolio in the amount of $859,298.97 are listed in National Note's books and records as being owed based on loans made to or debts owed by non-affiliated persons (the "Third Party Receivables").  The Receiver has sent demand letters to most of these persons, as well as others who may owe money to National Note, for payment, but at this time the prospect of collecting many of these Third Party Receivables is not encouraging for several reasons, including as follows:

- Some of the demand letters sent by the Receiver have been returned as undeliverable at the known address.

- Of the twenty-four non-affiliated debtors listed as owing accounts receivable to National Note, thirteen are or were tenants at National Note's mobile home park located in Vernal, Utah.

---

[39]    In many cases, most of the assets of these companies consist of the value of real estate held by these companies. Actual market values of these properties are substantially lower than the values that National Note has assigned to these properties  noted here.  *See infra*, Section IV.D (discussing real property holdings).

- In some instances, the company's books and records have not been accurate inasmuch as several of the persons on whom demand has been made have provided the Receiver proof that their debts were paid off and that National Note acknowledged that the debts were satisfied.

- Persons owing debts have filed for bankruptcy or have no money.  For example, one debtor who is listed in the books and records as owing $261,143.55 to National Note for the purchase of real property in Summit Park, Utah has filed bankruptcy.  While the Summit Park property has been recovered through foreclosure, its value is significantly less than the amount of the debt owed.

In light of these facts, it is unlikely that the Third Party Receivables will yield significant sums for the receivership estate.  While the Receiver is using his best efforts to maximize the value of the Third Party Receivables for the benefit of investors, he faces significant challenges for the reasons above, as well as due to doubts about the accuracy and completeness of the company's books and records.

## C.    Minerals Assets

One of the assets of the receivership estate are mineral holdings.[40]  Palmer has valued mineral holdings as being worth approximately $2.1 billion.  However, based on the Receiver's initial investigation, this valuation appears to be greatly inflated and not based on objective data.

For example, the Receiver has possession of 60 tons of ore that were being held for processing.  National Note has asserted that this ore has $200 million in recoverable precious metals.  However, previous assays apparently performed on this ore have found no recoverable precious metals in the ore.  Palmer told the Receiver that the reason the assays did not detect the

---

[40]    *See* **Exhibit 2**.

23

recoverable precious metals is because the metals are attached to other portions of the ore "at a molecular level," and is undetectable using traditional assay methods.  Palmer says that the precious metals can be recovered only using a new proprietary refining method being developed by National Note and joint venture partners.

The Receiver is in discussion with a group of investors who own special "profit participation rights" in this ore.  The objective of these discussions is to allow this group to process the ore.  Release of the ore will be on the condition that the receivership estate receives its share of any profits from processing of the ore.  The Receiver wants to ensure that investors will be the beneficiaries if precious metals are found in this ore, but that no more National Note monies will be expended on the new refining process.

D.   **Real Estate Holdings**

The Receivership Entities own and hold interests in a substantial number of real properties in various locations.  A summary list of the properties is included as part of **Exhibit 2** to this Report.  Below is a general description of each of the properties and information about the properties to aid the Court and investors.  Some of the information may be incomplete inasmuch as it is based on the Receiver's initial investigation during the Reporting Period, and his investigation is ongoing.  This investigation to date has been hampered due to the fact that the Receivership Entities' records are often incomplete and Palmer has failed to provide relevant information related to many of the properties.  Given his continuing investigation, however, all statements made herein are subject to qualification and modification.  No statement should be considered to be an admission of any kind, or a waiver of any rights, claims or defenses.

The discussion below will include references to "Assignments of Beneficial Interests" in Deeds of Trust associated with the various properties ("ABIs").  It was not uncommon for

Palmer to afford investors ABIs to "secure" their investments.  Yet, it is the Receiver's position

that an interest in a Deed of Trust is illusory as a matter of law, and especially given the facts

here where the Deed of Trust in which the interest is afforded is based on an insider transaction

between National Note and one of it affiliated entities, both of which were controlled by Palmer.

Thus, the Receiver intends to challenge all ABIs that are not voluntarily released.  It is uncertain

at this time, however, whether the ABIs, when challenged, will be removed as interests against

the properties in question.

      1.    <u>Middleton, Idaho: River Run Subdivision</u>

| Property Name | River Run Subdivision |
|---|---|
| **Location** | Middleton, Idaho |
| **Title Owner** | Riverbend Estates, LC |
| **Size** | 172.48 acres, 2 homes (.83 acres) |
| **Assessed Value** | $405,370.00 |
| **Appraised Value** | $1.0 million (approx.) |
| **Asserted Liens** | $3.7 million (approx.) |
| **Property Taxes** | $36,977.43 (delinquent) |
| **Status** | No equity, except for 2 homes which are currently leased, and will be listed for sale |

The Riverbend Subdivision located in Middleton, Idaho, which is comprised of nine lots,

was purchased in 2006-2007, at the height of the property boom for approximately $10.9 million.

One additional small lot was acquired in 2012.  Palmer informed the Receiver that this property

could have sold for $40 to $50 million when the real estate market was still booming, and that

the property should be worth $25 million currently.  All objective evidence indicates that

Palmer's valuation is unjustified, and that significant expenses incurred by the Receivership

Entities to improve the lots will not be recoverable.[41]

---

[41]    The Receiver met with the property development team in Idaho.  The project engineer estimates that $20,000.00 in improvements have been made per lot, but that none of the cost of those improvements can be recovered.

A financial institution asserts a lien against the property, securing a debt claimed to be in the amount of approximately $3.7 million.  In addition, property taxes related to this property are delinquent, and National Note provided a $1.0 million guarantee to the City of Middleton, Idaho as security for its development of the subdivision.

The lending institution's appraisal of the property indicates that the property has an approximate value of $1.0 million.  Accordingly, pending further review of the validity and perfection of the liens in question, the Receiver anticipates abandoning the property subject to the liens to the lender.  The Receiver has formally notified the City of Middleton, Idaho that National Note will not develop the property, and that the $1 million guarantee has no value.

Included as part of this property are two homes adjacent to the River Run Subdivision, which are not subject to the lender's lien.  These homes are currently rented, and the receivership estate is collecting income from the rentals.  The Receiver intends to sell these homes.

2.      Malad, Idaho: Elkhorn Ridge Estates

| Property Name | Elkhorn Ridge Estates |
|---|---|
| Location | Malad, Idaho |
| Title Owner | Elkhorn Ridge, LLC |
| Size | 47 lots, including 3 lots with partially-built homes (152.5 acres); 5 undeveloped parcels (278.06 acres). |
| Assessed Value | $107,726.00 |
| Appraised Value | Lots = $35,000; homes = $80-135,000 |
| Asserted Liens | Lien by seller on two of the undeveloped parcels, and ABIs |
| Property Taxes | Delinquent (2010 – 2012) |
| Status | Listed for sale, zoning variance allows only 1 sale until subdivision conditions are met.  Pending sale will allow Receiver to meet conditions and list other properties for sale |

Elkhorn Ridge Estates is a principally undeveloped "resort" property located in Malad, Idaho.  The property consists of (a) forty-seven lots, each comprised of between 2.5 and 5 acres,

with total acreage of 152.5 acres (the "Building Lots"), including three Building Lots with partially built homes (the "Cabin Lots"); and (b) contracts related to five undeveloped parcels with a total of 278 acres adjacent to the Building Lots (the "Parcels"). Of the Parcels, three had been paid for before the Receiver's appointment, and partial payments had been made to purchase the fourth.

Prior to the Receiver's appointment, the Building Lots were listed for sale for approximately $115,000.00 each, and one lot sold at that price several years ago. But, no other lots have sold since. The Receiver's appraisals of the Building Lots show, that with the exception of the Cabin Lots, many of the Building Lots have a value of approximately $35,000.00. The Cabin Lots have been appraised with values of between $80,000.00 and $135,000.00.

ABIs have been recorded against many of the Building Lots, and property taxes assessed against the property have not been paid. Insurance coverage on the Cabin Lots had expired prior to the Receiver's appointment, and he has had it reinstated. There have been several issues related to the upkeep of the homes on the Cabin Lots that have required the use of funds to repair: the external door on one of the homes had been blown off the hinges by wind; and one had openings that allowed birds to enter and roost. To preserve these assets of the receivership estate, the Receiver has arranged for a new door to be made, and plugged the openings in and cleaned the home which had been inhabited by birds.

Prior to the sale of any Building Lots, the Oneida County, Idaho Planning and Zoning Commission ("Zoning Commission") had required the building of a fence around the perimeter of the planned subdivision, which had not been commenced prior to the Receiver's appointment. The Receiver has obtained a variance from the Zoning Commission, permitting him to sell one of

the Building Lots so as to obtain funds to build the fence and pay taxes.  Accordingly, the Receiver has listed some of the Building Lots for sale at fair market price through a real estate broker.  The sale of this property will face challenges in light of its location and demand in for residential homes in that area.

As for the Parcels, the seller of those properties, who has a lien against some of the Parcels, initiated foreclosure proceedings related to its lien in August, but abandoned that action when he learned about the Receivership Order.  At this time, the Receiver anticipates working with the seller-lien holder to sell the Parcels and come to an agreement related to the division of sale proceeds.  The sale of the Parcels will face similar challenges as those related to the Building Lots given the location and nature of the property.

      3.    <u>Manhattan, Montana: Manhattan Grille Condo</u>

| Property Name | Manhattan Grille Condo |
|---|---|
| Location | Manhattan, Montana |
| Title Owner | Montana One, LLC |
| Size | 1 unit condominium |
| Assessed Value | $27,893.00 |
| Appraised Value | -- |
| Asserted Liens | None at this time |
| Property Taxes | 2010 to present are due |
| Status | Property has been rented, and property manager is in place.  Property also has been listed for sale in anticipation of tenant vacating property. |

The Manhattan Grille Condo, is a small condominium, located in Manhattan, Montana. The property does not appear to have any liens asserted against it, but property taxes have not been paid for at least three years.

Currently, the property is managed by a property manager and leased to a third party, and the receivership estate is generating a positive cash flow from the rental income.  However, the tenant has given notice of his intent to vacate.  Accordingly, the Receiver has listed the

condominium for sale.

    4.    <u>Brigham City, Utah: Twin Pines Apartments</u>

| Property Name | Twin Pines Apartments |
|---|---|
| Location | Brigham City, Utah |
| Title Owner | National Note |
| Size | 20 apartments on .82 acres |
| Assessed Value | $315,000.00 |
| Appraised Value | $330,000.00 |
| Asserted Liens | $400,000.00 (approx. and disputed) |
| Property Taxes | 2012 tax is $2,474.53; 2011 taxes are unpaid |
| Status | Rental property managed by property manager; sale anticipated depending on outcome of dispute with investor-lien holder |

Twin Pines Apartments are three buildings with twenty apartments located in Brigham City, Utah, which are leased to lower income tenants. Currently, a National Note investor is asserting a lien, based on a Deed of Trust that was recorded against the property, purporting to secure a debt of approximately $400,000.00. Property taxes in 2011 and 2012 have not been paid. Furthermore, National Note failed to hold tenant security deposits in trust, and debts related thereto have arisen as a result.

An appraisal of the property obtained by the investor-lien holder indicates that the property is worth $330,000.00, but the Receiver believes that it may in fact be worth more based on the improving real estate market, and improvements he has made to the facility and its management. Specifically, although the buildings, which were constructed in the 1940s as a motel and later converted to apartments, are showing the effects of age and had not been kept up by National Note, since his appointment, the Receiver has employed a property manager, caused the roof of one of the buildings to be repaired and made improvements to multiple apartments. The improvements to the property and its management have resulted in increased rents, rents

actually being collected, and a rise in occupancy rates.

Thus, this property is currently generating positive cash flow – although the cash flow is insufficient to service all asserted debts.  Given an initial impression that the property lacked equity, the Receiver planned to abandon it to the investor-lien holder.  However, upon further review, the Receiver has determined that the asserted lien and the amount of the investor's debt related thereto are subject to challenge.  The investor-lien holder disagrees with the Receiver's position.  The parties are currently in discussions to attempt to resolve their respective disputes. The Receiver intends to continue managing the property and collecting rents until the disputes related to the asserted lien and underlying claim are resolved.  In the event that the receivership estate is ultimately determined to have an interest in the property, either through settlement or litigation, the Receiver will list this property for sale.

5.      Ogden, Utah: Office Building

| Property Name | Office Building |
|---|---|
| Location | Ogden, Utah |
| Title Owner | Presidential Utah Properties, LC & Co-Owner |
| Size | 18,000 s.f. on .5 acres. |
| Assessed Value | $769,039.00 |
| Appraised Value | -- |
| Asserted Liens | ABIs |
| Property Taxes | Taxes for 2009 to 2011 have not been paid ($47,380.21) |
| Status | Negotiating with Co-Owner for authority to sell property |

The Office Building is a three-story commercial office building located in Ogden, Utah that is co-owned with a third party (the "Co-Owner").  A Receivership Entities owns a 49.2% interest in the Office Building, and the Co-Owner owns a 50.8% interest.  In addition, Palmer provided certain investors interests in a Deed of Trust related to the Office Building held by an insider affiliate.  National Note apparently had planned to convert the Office Building into an

assisted living facility, and it recorded significant capitalized expenses associated with its plans for this facility—which were not fulfilled in any meaningful way when the Receiver was appointed.

The Office Building was built in 1916, and has a tax assessed value of $769,039.00. There are three tenants, using approximately one-half of the office space, but paying below market rent. A portion of the third floor had been remodeled as a residential apartment, and for a time was occupied by a friend of Palmer, but it is currently unoccupied. The Receiver also discovered that a community church had been using the second floor of the Office Building for its weekly church services rent free, in exchange for repairs it may have made to an air conditioning unit. The Receiver informed the church that it would be required to pay market-based rent, and the church has since moved out of the Office Building.

Given the Office Building's age and state of repair, it has been costly to maintain, and these factors will ultimately impact its value. The receivership estate has incurred necessary costs repairing plumbing and a roof leak.

The Receiver intends to sell the Office Building, or whatever interest the receivership estate has in the Office Building. To date, the Co-Owner has been unwilling to agree to sell the Office Building, which it is believed would bring the most value to the receivership estate. Negotiations continue, and the Receiver is considering other options that may exist.

6.      <u>Summit, Utah: Summit Park Lot</u>

| Property Name | Summit Park Lot |
|---|---|
| Location | Summit Park, Utah |
| Title Owner | National Note |
| Size | .61 acres |
| Assessed Value | $40,000.00 |
| Appraised Value | $38,000.00 |
| Asserted Liens | None identified to date |
| Property Taxes | 2012 ($394.36) (approx.) |
| Status | Offer for sale |

The Summit Park Lot is a building lot near Park City, Utah, suitable for the construction of a home. The Receiver has listed this property for sale, and has received an offer that he has accepted pending Court approval. A motion seeking approval of this sale will be filed shortly.

7.      <u>Fruitland, Utah: Bandana Cabin</u>

| Property name | Bandana Cabin |
|---|---|
| Location | Fruitland, Utah |
| Title Owner | National Note |
| Size | 5 acres |
| Assessed Value | $213,262.00 |
| Appraised Value | -- |
| Asserted Liens | None identified to date |
| Property Taxes | -- |
| Status | Listing agreement has been negotiated, property prepared for sale |

The Bandana Cabin is a cabin located in Fruitland, Utah, that was built as a model home for Whisperwood cabins.[42]  Palmer reports that National Note spent over $500,000 on constructing the Bandana Cabin and furnishing it. It was used by Palmer as a model home and for his personal use. Off-road vehicles are stored at the Bandana Cabin. At this time, there do not appear any interests against the property, and the Receiver has listed it for sale with an agent.

---

[42]     For a time, National Note was a dealer for Whisperwood cabins.

8.      Duchesne County, Utah: Deer Meadows

| Property Name | Deer Meadows |
|---|---|
| Location | Duchesne County, Utah |
| Title Owner | National Note |
| Size | 89.6 acres |
| Assessed Value | $42,040.00 |
| Appraised Value | -- |
| Asserted Liens | $40,000 |
| Property Taxes | -- |
| Status | Listing agreement has been negotiated, property prepared for sale |

Deer Meadows consists of acreage located in Duchesne County, Utah.  An investor asserts a lien against the property, claiming to secure a debt in the amount of $40,000.00.  He had initiated a foreclosure action, but this action was stayed by the Receivership Order.

Assuming that the investor's lien against Deer Meadows is valid and perfected, there is very little equity in the property for the receivership estate.  The Receiver, however, has listed it for sale with an agent, and he has commenced discussions with the investor-lien holder about purchasing the receivership estate's equity to be determined by an independent appraisal.

9.      Duchesne, Utah: Outpost/Indian Canyon

| Property Name | Outpost/Indian Canyon |
|---|---|
| Location | Duchesne, Utah |
| Title Owner | Indian Canyon, LLC |
| Size | 32.19 acres |
| Assessed Value | $202,272.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | $13,517.75 delinquent |
| Status | In discussions to sell to Duchesne County |

Outpost/Indian Canyon is real property located in Duchesne, Utah that was originally a mobile home park.  National Note marketing materials stated that the property was to be subdivided and sold as plots on which owners could park their recreational vehicles.  No liens

have been identified against the property, but property taxes are owed.

The Receiver is in discussions to sell Outpost/Indian Canyon to Duchesne County.  At this time, the only valuation of the property is based on the tax assessment value.  But, the Receiver has ordered an appraisal, and he will use that valuation to attempt to negotiate a sale to the County.

      10.    <u>Vernal, Utah: East Meadows Trailer Park</u>

| Property name | East Meadows |
|---|---|
| Location | Vernal, Utah |
| Title Owner | Land, Utah, LC |
| Size | 19.76 acres – 86 lots. |
| Assessed Value | $879,984.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | $10,623.24 delinquent |
| Status | Temporary property manager in place, new manager will be engaged |

East Meadows is a mobile home park located in Vernal, Utah, with eighty-six lots and a large park area.  Mobile homes owned by Land, Utah, LC are parked on forty-five of these lots (the "<u>LU Homes</u>"), and twenty-eight of the LU Homes are rented to tenants.  Another eight lots have mobile homes owned by the tenants.  A property manager has been employed and is collecting (1) rent for lease of the twenty-eight rented LU Homes, and (2) lot rent from eight mobile home owners.  An office and garage are located on one of the remaining thirty-three lots, with the rest being empty.

There do not appear to be any liens against this East Meadows property, but the operating expenses have historically been very high due to at least the following: (a) large areas that are unused, but still need regular watering and lawn care; (b) high water bills that appear to be a result of broken water pipes that have not been repaired; and (c) the Receivership Entities' past

practice of allowing the property manager to spend liberally to build porches and remodel homes. The Receiver is in the process of employing a new property manager, and he believes the past excessive expenses can be reduced.

The Receiver has received an offer to purchase East Meadows at its assessed value. An appraisal has been ordered to allow the Receiver to evaluate whether this offer represents fair market value.

11. Vernal, Utah: Quail Hollow Apartments

| Property Name | Quail Hollow Apartments |
|---|---|
| Location | Vernal, Utah |
| Title Owner | Kempley |
| Size | 25 units |
| Assessed Value | $445,728.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | -- |
| Status | Not owned by receivership entity |

Quail Hollow Apartments, is a 25-unit apartment building, located in Vernal, Utah. At the time the Receiver was appointed, National Note was managing Quail Hollow Apartments. Rents were collected and the Receiver was in the process of taking control of the building when he discovered that National Note was leasing the building from its out-of-state owners pursuant to an expired lease. National Note was required to pay $9,333.34 monthly in rent under the lease, as well as pay property tax, water, sewer, trash, and electricity bills. Rental income from Quail Hollow Apartments' tenants, however, only yielded monthly rent of $8,000.00, resulting in a monthly net loss.

The Receiver has turned control of Quail Hollow Apartments over to the owners on a temporary basis while the Receiver and the owners discuss terms for release of this property from the receivership estate.

12.     <u>Salt Lake City, Utah: Residential Building Lots</u>

| | |
|---|---|
| **Property Name** | 2 Building Lots at 900 West |
| **Location** | Salt Lake City, Utah |
| **Title Owner** | Land, Utah, LC |
| **Size** | .25 acres |
| **Assessed Value** | $71,900.00 |
| **Appraised Value** | -- |
| **Asserted Liens** | ABIs |
| **Property Taxes** | $2,200.13 delinquent |
| **Status** | In discussion to sell to adjacent owner |

These vacant Building Lots are located in Salt Lake City, Utah, adjacent to a Salvation Army facility.  The Receiver understands that the Building Lots previously had homes erected on them that were destroyed by fire for which there was no property insurance. The Building Lots are subject to ABIs, which he intends to challenge.[43]   In part as a result of suggestions made by Palmer, the Receiver has entered into discussions to sell the Building Lots to the Salvation Army.  The Receiver has ordered an appraisal of this property to allow him to negotiate a sale at fair market value.

13.     <u>Salt Lake City, Utah: Cottonwood Road</u>

| | |
|---|---|
| **Property Name** | Cottonwood Road Compound |
| **Location** | Salt Lake City, Utah |
| **Title Owner** | Vision Land, LLC |
| **Size** | 4.9 acres |
| **Assessed Value** | $1,962,890.00 (for 4.9 acres) |
| **Appraised Value** | $1,100,000.00 (for 3.94 acres) |
| **Asserted Liens** | $1.6 million (approx.) lien on 3.94 acres, and ABIs. |
| **Property Taxes** | -- |
| **Status** | Receiver is in discussions with lien holder, and is preparing the property not subject to the lien for sale in conjunction with lien holder |

The Cottonwood Road Compound is comprised of seven parcels located in Salt Lake

---

[43]   *See supra*, Section IV.D.

City, Utah, near the mouth of Little Cottonwood Canyon that National Note planned to develop and call "Coeur Ame."  There are several buildings on this property, which are mostly vacant and unsuitable for occupancy.  Of the seven total parcels, two are contiguous large parcels, constituting 3.94 acres (the "3.94 Acres"), and five are contiguous parcels constituting approximately one acre (the "1 Acre Parcels").  The two property groups are near each other, but not contiguous, and they are separated by land that was owned by National Note at one time, but which apparently was repossessed prior to the Receiver's appointment.

First National Bank of Layton ("FNB") has a first lien against the 3.94 Acres, securing a debt in the approximate amount of $1.6 million, and FNB's recent appraisal indicates that the value of this property is $1.1 million, thus resulting in no equity to the receivership estate.  FNB has intervened in this case, seeking to protect its interest the 3.94 Acres, and the Receiver is in discussions with it regarding abandoning that property to it, and cooperating in marketing the 3.94 Acres with 1 Acre Parcels held by the receivership estate so as to maximize the value of all parcels.

The Receiver has engaged a real estate agent to market the 1 Acre Parcels at their fair market value.  ABIs have been recorded against the 1 Acre Parcels.  Unless these ABIs are released or found invalid through litigation prior to sale, the Receiver will seek authorization to sell the 1 Acre Parcels free and clear of these interests, with any interests that may exist attaching to the net sale proceeds.

14.   Salt Lake City, Utah: NNU Office

| Property Name | NNU Office |
|---|---|
| Location | 7800 South, West Jordan, Utah |
| Title Owner | The Property Company, LLC |
| Size | 3,094 s.f. on .53 acres |
| Assessed Value | $302,600.00 |
| Appraised Value | $285,000.00 |
| Asserted Liens | $174,000.00 (approx.) |
| Property Taxes | 2009 – 2012 taxes are unpaid |
| Status | Listed for sale |

The NNU Office is the building where National Note, most of the other affiliated Receivership Entities and other companies tied to Palmer (but which are not in the receivership estate) operated their business.  A discussion of this property is set forth above in Section III.A of this Report.

While Palmer has informed the Receiver that he believes the property is worth $500,000.00, the NNU Office has an appraised value of $285,000.00.  There appears to be a valid lien against the property securing a debt in the amount of approximately $174,000.00, and property taxes on the NNU Office have not been paid in the last four years.

The Receiver has engaged a real estate agent to sell the property.  At this time, the NNU Office has been listed for sale at its fair market value and is being marketed by the agent.

15.   West Jordan, Utah: Palmer Residence

| Property Name | Palmer Residence |
|---|---|
| Location | West Jordan, Utah |
| Title Owner | -- |
| Size | -- |
| Assessed Value | -- |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | -- |
| Status | Palmer has been allowed to remain in this property temporarily |

The Palmer Residence is an asset of the receivership estate.  The Court has granted Palmer's request that he be permitted to remain in the home on a temporary basis.  As a result, at this time, the Receiver has not determined the status of this property, or listed it for sale.

16.    <u>Salt Lake County, Utah: Star Pointe Development</u>

| Property Name | Star Pointe Development |
|---|---|
| Location | Salt Lake City, Utah |
| Title Owner | Star Pointe Development, LLC |
| Size | Unknown at this time |
| Assessed Value | $4,050,000 (2007) |
| Appraised Value | Unknown at this time |
| Asserted Liens | $2.4 million (approx.) |
| Property Taxes | Unknown at this time |
| Status | Lien holder has agreed to stay its foreclosure proceeding pending the Receiver's investigation of the receivership estate's interest in property |

Star Pointe Development is comprised of raw land located in the south end of Salt Lake County.  There are purportedly plans to build a $77 million mixed use development on this property, but no construction has commenced in the six years that the project has been in existence.

Title to the property is held by Star Pointe Development, LLC ("<u>SPD</u>"), an entity that is not part of the receivership estate.  But, Ovation 106, LLC, which is one of the Receivership Entities, appears to have a membership interest in SPD.  The Receiver currently does not have sufficient information to determine the receivership estate's resulting interest in Star Pointe Development, and he has commenced discovery to obtain such information.

SPD obtained a loan in the principal amount of $2.4 million from American West Bank ("<u>AWB</u>"), and AWB appears to have a first lien against Star Pointe Development to secure this debt.  Palmer has stated that for a period of time, National Note made payments to AWB on this

debt for SPD, and this statement is being investigated.  Shortly after this case was commenced, AWB initiated foreclosure proceedings against the property.  Based on discussions with the Receiver, AWB has agreed to stay its foreclosure pending the Receiver's investigation of the receivership estate's interest in the Star Pointe Development.

17.   <u>Eagle Mountain City, Utah: Autumn Ridge</u>

| Property Name | Autumn Ridge |
|---|---|
| Location | Eagle Mountain, Utah |
| Title Owner | Homeland Holding Corp. |
| Size | 19 lots in Phase I, 62 lots in Phase II |
| Assessed Value | $653,200.00 |
| Appraised Value | -- |
| Asserted Liens | ABIs |
| Property Taxes | Unpaid in 2008-2011; Phase I--$25,647.43 delinquent; Phase II--$31,429.70 delinquent |
| Status | Listed for sale |

Autumn Ridge is a residential subdivision project located in Eagle Mountain, Utah.  At the time of the Receiver's appointment, development of certain portions of Autumn Ridge was well-advanced.  Development is in two phases.  There are nineteen lots available for sale in the "Phase I" subdivision, and sixty-two lots in the "Phase II" subdivision. The Phase I subdivision has been approved and homes have been built on a number of lots.  Phase II still has numerous conditions associated with it prior to any development or lot sales, and water rights need to be obtained at an estimated costs of approximately $500,000.00.

Certain costs associated with this property have arisen that have required the Receiver's attention.  National Note had posted a development bond to Eagle Mountain City (the "<u>City</u>"), that was being drawn down as construction work was completed.  The City had indicated an intent to withhold release of the remaining $16,000.00 bond amount unless a slurry seal was applied to the roads.  Also, the City states that it wants the roads in Phase II to be roto-milled, at

an expected cost of more than $60,000.00.  The Receiver and the real estate broker met with the City engineer and reached tentative agreements that are expected to allow sales to move forward. Under the agreements, National Note will relinquish the bond on Phase I.  The City will use those funds to apply a slurry seal to the roads in Phases I and II, saving the receivership estate approximately $61,000.00, and also increasing the value of the lots in Phase II.

A real estate agent has the lots in Phase I listed for sale at their fair market value.  Lots in Phase II cannot be marketed until certain development conditions have been met.  Eventually, the Receiver will be required to decide whether to sell Phase II to a developer as is, or to use the net sale proceeds from the sale of the Phase I lots to satisfy the conditions and expense of developing the Phase II lots.

18.   Eagle Mountain City, Utah: Overland Trails

| Property Name | Overland Trails |
|---|---|
| Location | Eagle Mountain, Utah |
| Title Owner | -- |
| Size | 12 acres |
| Assessed Value | -- |
| Appraised Value | -- |
| Asserted Liens | $247,000.00 (approx.) |
| Property Taxes | Amount unknown at this time |
| Status | Listing agreement has been negotiated, property being prepared for sale |

Overland Trails is a twelve-acre parcel of real property, located in Eagle Mountain, Utah. National Note's planned to develop this parcel of property for residential use, but it has not yet been developed.

Liens have been asserted against this property, purportedly securing debt in the approximate amount of $247,000.00.  Also, the Receiver is aware that property taxes have not been paid on the property for several years.

The Receiver has arranged to have this property listed for sale.  But, whether equity exists for the receivership estate is uncertain in light of the asserted liens and unpaid taxes, and certain market conditions in this geographic region that may adversely affect the property's value.  The Receiver is investigating the option of abandoning the property to the lien holders, provided that they hold valid liens.

19. <u>Fairfield, Utah: Cedar Fort Land</u>

| Property Name | Cedar Fort Land |
|---|---|
| Location | Fairfield, Utah |
| Title Owners | Homeland Funding Corp.; Spanish Fork Development, LLC; National Note |
| Size | 108.43 acres |
| Assessed Value | $301,113.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | -- |
| Status | Listing agreement has been negotiated, property is being prepared for sale |

The Cedar Fort Land is a large parcel of real estate located in Fairfield, Utah.  It appears to consist of four undeveloped parcels of land which are not connected to each other.  Roads providing access to these parcels do not exist, and there may be environmental damage associated with the property.  The Receiver is investigating if National Note had an environmental mitigation plan in place.

The Cedar Fort Land has been listed for sale.  Marketing of this property, however, will be difficult given challenges related to the property's location, lack of access and environmental issues.

20. <u>Spanish Fork, Utah: Expressway Business Park</u>

Expressway Business Park is located in Spanish Fork, Utah, containing 48 business

condominium units that were built by National Note.  Out of forty-eight units, forty-four have been sold, and a owners' association exists to manage the Business Party's common areas, called "Expressway Business Park Owners' Association, LLC" ("EBPOA")  At the time of the Receiver's appointment, National Note controlled EBPOA, and EBPOA was named as a Receivership Entity.  The Receiver has since negotiated with other owners, and as of October 1, 2012, other owners have taken over management of the EBPOA so that the Receiver is not expending estate assets on these tasks.

The Receiver discovered that Spanish Fork City holds a $10,000.00 construction bond related to this property.  Initially, the Receiver determined that the bond was recoverable.  But, the costs of performing the work that still needs to be done on the property to obtain a release of the bond will cost significantly more than $10,000.00 and, therefore, the Receiver has determined that abandoning the bond will be more beneficial to the receivership estate.

There are some issues with the Expressway Business Park related to its having been built on a former landfill.  Four of the Expressway Business Park units are property of the receivership estate.  Below is a short description of each.

> a.   Expressway Unit #109

| Property name | Expressway Unit # 109 |
|---|---|
| Location | Spanish Fork, Utah |
| Title Owner | Expressway Business Park Owners Organization, LLC |
| Size | .05 acres |
| Assessed Value | $175,600.00 |
| Appraised Value | $140,000.00 |
| Asserted Liens | $143,000.00 |
| Property Taxes | -- |
| Status | Unoccupied, potentially no equity |

Expressway Unit # 109 is currently unoccupied, and the Receiver is paying owners'

association dues and basic utilities.  It appears that a National Note investor may have a lien against Expressway Unit #109, securing a debt in the amount of $143,000.00.  That investor obtained an appraisal of the property, indicating a value of $140,000.00.  The Receiver is investigating the value of the property and the validity of the lien.

b.    Expressway Unit # 204

| Property Name | Expressway Unit #204 |
|---|---|
| Location | Spanish Fork, Utah |
| Title Owner | Expressway Business Park Owners Organization, LLC |
| Size | .04 acres |
| Assessed Value | $121,400.00 |
| Appraised Value | -- |
| Asserted Liens | $110,000.00 |
| Property Taxes | Delinquent |
| Status | Rented, potential no equity |

Expressway Unit # 204 currently is being leased to a tenant who is paying $1,000.00 per month in rent, plus the owners' association dues.  A lien allegedly securing a debt in the amount of $110,000.00 is asserted against the property.  The Receiver is investigating the value of the property and the validity of the lien.  Until then, Expressway Unit # 204 is generating sufficient income to cover ongoing operating costs.

c.    Expressway Unit # 215

| Property Name | Expressway Unit # 215 |
|---|---|
| Location | Spanish Fork, Utah |
| Title Owner | Expressway Business Park Owners Organization, LLC |
| Size | .05 acres |
| Assessed Value | $147,800.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | Delinquent |
| Status | Rented, considering potential sale |

Expressway Unit # 215 currently is being leased to a tenant who is paying $580.65 per

month in rent, plus the owners' association dues.  This Unit does not appear to have any interests asserted against it, and the Receiver has had discussions with a party interested it.  In the event that a sale is not negotiated, the Receiver will list this Unit for sale.  Until then, Expressway Unit # 215 is generating sufficient income to cover ongoing operating costs.

      d.    <u>Expressway Unit # 305</u>

| Property Name | Expressway Unit # 305 |
|---|---|
| Location | Spanish Fork, Utah |
| Title Owner | Expressway Business Park Owners Organization, LLC |
| Size | .04 acres |
| Assessed Value | $122,600.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | Delinquent |
| Status | Property is unfinished, informal discussions with potential buyer |

Construction of Expressway Unit # 305 has not been completed.  It has no floor, there is no wall separating it from the adjacent unit,[44]  and there is no plumbing or other improvements.  It does not appear that there are any liens against this property, with the exception of potential claims of taxing entities.  The Receiver will sell this property, and has had interest in it expressed by a potential buyer.

---

[44]    The owner of the adjacent Expressway Unit # 306 asserts that he purchased his Unit as a completed unit, with National Note promising to install the floor and the dividing wall as part of the purchase price.

21.   Expressway Land

| Property Name | Expressway Land |
|---|---|
| Location | Spanish Fork, Utah |
| Title Owners | Expressway Business Park Owners Organization, LLC and Spanish Fork Development, LLC |
| Size | 1.0 acres platted (20 business condo units); 26.2 acres undeveloped |
| Assessed Value | $2,769,000.00 |
| Appraised Value | -- |
| Asserted Liens | ABIs |
| Property Taxes | Delinquent |
| Status | Listed for sale |

Connected to the Expressway Business Park are to separate parcels of yet undeveloped land, known as the "Expressway Land."   A one-acre parcel of the Expressway Land has been platted for an additional 20 warehouse condominiums, but no construction has commenced.   The other 27-acre parcel is undeveloped.   There are numerous ABIs recorded against this property, but no other interests are known at this time.

The Trustee has listed the Expressway Land for sale.   But, it is unclear what value will be obtained at this time inasmuch as the Expressway Land is located on a former landfill and some of the boundaries of the parcels are irregular.

22.   Sanpete County, Utah: Gooseberry Cabin

| Property Name | Gooseberry Cabin |
|---|---|
| Location | Fairview, Utah |
| Title Owner | National Note |
| Size | 5 acres |
| Assessed Value | $94,794.00 |
| Appraised Value | $115,000.00 |
| Asserted Liens | $265,489.64 |
| Property Taxes | Delinquent (2006 to present) |
| Status | No equity |

The Gooseberry Cabin is located in a real estate development in Sanpete County, Utah. National Note purchased the Gooseberry Cabin from its prior owners, and allowed the owners to

live in it in exchange for taking care of the property.  A Deed of Trust securing a debt in the amount of $255,000.00 to National Note investors has been recorded against the property, and property taxes are owing from 2006 to present.  An appraisal of the property values it at $115,000.00.  Given the apparent lack of equity in the Gooseberry Cabin, the Receiver has agreed to relinquish title to the property in exchange for a release of all claims that the investors may have against the receivership estate.  This agreement will be presented to the Court for approval.

      23.      <u>Toquerville, Utah: Almond Heights Subdivision</u>

| Property Name | Almond Heights Subdivision |
|---|---|
| Location | Toquerville, Utah |
| Title Owner | National Note |
| Size | 22 building lots, total 12.15 acres |
| Assessed Value | $699,000.00 |
| Appraised Value | -- |
| Asserted Liens | $363,655.62 |
| Property Taxes | $9,623.21 (2012) |
| Status | Evaluating interests against the property and potential sale |

The Almond Heights Subdivision is located in Toquerville, Utah, a town with a population of approximately 1,400 people in Southwestern Utah.  At the time of the Receiver's appointment, National Note was in the process of re-branding this property as "Buffalo Canyon."

As of this time, some of the Almond Heights Subdivision lots have been sold and a few houses have been built.  It appears that 12.15 acres, comprising twenty-two building lots, have not been sold and are property of the receivership estate.  These lots have a combined assessed value of $699,000.00.

Of these twenty-two remaining lots, fifteen appear to be encumbered with Deeds of Trust, securing alleged claims in the approximate total amount of $363,655.62.  While there may

be equity in this property, sale of the lots in the Almond Heights Subdivision may be challenging given the location and the history of development in the area.  It does not appear, or it is at least questionable, whether the amount invested in this property by National Note prior to the Receiver's appointment will be recouped from sale of the lots inasmuch as company records show a cost basis in the land alone being $1,051,416.00.

24.   Kanab, Utah: Kanab Cabin

| Property Name | Kanab Cabin |
|---|---|
| Location | Kanab, Utah |
| Title Owner | National Note |
| Size | 2.2 acres |
| Assessed Value | $188,923.00 |
| Appraised Value | $200,000.00 |
| Asserted Liens | $162,000.00 |
| Property Taxes | Delinquent (2011 and 2012) |
| Status | Listing agreement negotiated, will be listed for sale |

Kanab Cabin is an uncompleted located in Kanab, Utah.  Although Palmer has stated that this property has a value of $400,000.00, a recent appraisal shows that the value is approximately $200,000.00.  Additionally, FNB has recorded a lien against Kanab Cabin, securing a debt in the approximate amount of $162,000.00.  The Receiver is in discussions with the FNB regarding the sale of this property.

25.   Gilbert, Arizona: Farrell Business Park

| Property Name | Farrell Business Park |
|---|---|
| Location | Gilbert, Arizona |
| Title Owner | Homeland Development II, LLC |
| Size | 12 business condominiums |
| Assessed Value | $1,510,500.00 |
| Appraised Value | -- |
| Asserted Liens | ABIs |
| Property Taxes | $174,118.74 (2009-2012) |
| Status | Preparing property to be listed for sale |

The Farrell Business Park consists of twelve business condominium units built by National Note located in Gilbert, Arizona. Of the twelve units, six of the units have been sold, with the remaining six units being owned by the receivership estate. These six units have no tenant improvements and are vacant. Although insurance on six units had lapsed when the Receiver was appointed, he has now arranged to have it reinstated.

Palmer or an associate managed the owners' association for the Farrell Business Park prior to the Receiver's appointment. Since his appointment, the Receiver has negotiated with the owners of the some of the sold units to take over management of the facility, thus conserving the receivership estate's resources. A temporary property manager has been employed to manage the units owned by the receivership estate.

Many ABIs have been recorded against the Farrell Business Park. In addition, the unpaid property taxes that have been assessed on this property are significant.

The Receiver intends to list the unsold six units for sale on an "as is" basis—no tenant improvements will be made prior to sale. At this time, the amount of net sale proceeds that will be obtained is uncertain given Arizona's commercial real estate market.

26.   Mesa, Arizona: Clearview Business Park

| Property Name | Clearview Business Park |
|---|---|
| Location | Mesa, Arizona |
| Title Owner | Homeland Development I, LLC |
| Size | 8 business condominiums under construction |
| Assessed Value | $862,333.00 |
| Appraised Value | -- |
| Liens | ABIs |
| Property Taxes | $79,822.82 (2009-2012) |
| Status | Preparing property to be listed for sale |

Clearview Business Park consists of eight business condominiums located in Mesa,

Arizona.  This property is newly constructed and vacant, with no tenant improvements.  Upon being appointed, the Receiver discovered significant water damage to the property caused by holes in the roof where openings for installation of HVAC equipment were left uncovered.  The original construction manager has reported to the Receiver that she requested funding from National Note to cover the HVAC openings, but never received monies to protect against damage.  The roof also has significant wind damage, which is estimated to cost $55,000.00 to repair.  Utilities associated with the property had not been paid by National Note prior to the Receiver's appointment.

Multiple ABIs are recorded against the Clearview Business Park, and significant property taxes have been assessed against the property.

To preserve this property for the benefit of the receivership estate, the Receiver has paid a contractor to perform temporary repairs – covering the HVAC openings, replacing rotted roofing plywood, and covering exposed roofing areas.  He has also employed a temporary property manager to manage the property pending sale.  The Receiver intends to sell this property "as is," rather than expending $55,000.00 to make permanent repairs to the roof.

27.   Byron, Minnesota: Bear Grove Industrial Park

| Property Name | Byron West Industrial Park |
|---|---|
| Location | Byron, MN |
| Title Owner | DPLM, LLC |
| Size | 34.5 acres (6 lots) |
| Assessed Value | $987,700.00 |
| Appraised Value | -- |
| Asserted Liens | $571,046.73 |
| Property Taxes | Delinquent: $55,675.42 |
| Status | Listed for sale |

Bear Grove Industrial Park is comprised of six lots for a total of 34.5 acres located in Byron, Minnesota.   Although Palmer has represented that this property has a value of

approximately $6 million, it has an assessed value of $987,700.00. A bond in the amount of $571,046.73 exists in conjunction with this property, and over $55,000.00 in taxes appear to be owed on the property. The Receiver has listed Bear Grove Industrial Park for sale through a real estate agent.

28.   Temple, Georgia: Georgia Single Family Residence

| Property Name | Georgia Single Family Residence |
|---|---|
| Location | Temple, Georgia |
| Title Owner | ND 1, LLC |
| Size | 2,132 s.f., .67 acres. |
| Assessed Value | $184,212.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | -- |
| Status | Property manager is in place, intent to list property for sale |

This Georgia Single Family Residence is located near Atlanta, in Temple, Georgia. The property is currently leased to tenants, and receivership estate receives $945.00 per month in rent, not including property taxes. The property is being managed by a temporary manager, and the Receiver intends to list it for sale.

29.   Chicago, Illinois: Chicago Single Family Home

| Property Name | Chicago Single Family Home |
|---|---|
| Location | Chicago, Illinois |
| Title Owner | NPL America, LLC |
| Size | 1,536 s.f., .08 acres. |
| Assessed Value | $87,460.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | Unknown at this time |
| Status | Given condition, property appears to have no equity and considering abandonment |

The Chicago Single Family Home is one of four residential homes purchased by National Note as part of a package, all of which are inner city homes with apparent marketing issues.

Palmer informed the Receiver that these properties likely have no value.   The Receiver is attempting to find a broker who will market the property.

30.   <u>Cleveland, Ohio: Single Family Home</u>

| Property Name | Cleveland Single Family Home |
|---|---|
| Location | Cleveland, Ohio |
| Title Owner | NPL America, LLC |
| Size | 2,016 s.f., .10 acre. |
| Assessed Value | $38,100.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | $7,315.26 (2008 – 2011) |
| Status | Given condition, property appears to have no equity and considering abandonment |

The Cleveland Single Family Residence is part of the package of residential homes that are described above.   The Receiver is attempting to find a broker who will market this inner city property.

31.   <u>Cleveland, Ohio: Building Lot</u>

| Property name | Cleveland Building Lot |
|---|---|
| Location | Cleveland, Ohio |
| Owner | NPL America, LLC |
| Size | .07 acres |
| Assessed Value | $7,700.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | $3,706.04 (2008 – 2011) |
| Status | Given condition, property appears to have no equity and considering abandonment |

The Cleveland Building Lot is part of the package of inner city properties described above.   The Receiver believes that a home had existed on this property, but the home was demolished by Cleveland.   Apparently, Cleveland has attempted to recover the demolition costs from National Note.

32.   Toledo, Ohio: Toledo Single Family Home

| Property Name | Toledo Single Family Home |
|---|---|
| Location | Toledo, Ohio |
| Title Owner | NPL America, LLC |
| Size | 3,017 s.f. |
| Assessed Value | $42,600.00 |
| Appraised Value | -- |
| Asserted Liens | -- |
| Property Taxes | $4,471.93 |
| Status | Given condition, property appears to have no equity and considering abandonment |

The Toledo Single Family Home is the last of the inner city homes purchased as part of the package described above.  The Receiver is attempting to find a broker who will market this inner city property.

## V.

## FINANCIAL

### A.   Receivership Bank Accounts

As discussed above,[45] upon his appointment, the Receiver took control of and closed the bank accounts that had been held in the name of Receivership Entities.  Since, the Receiver has opened fourteen bank accounts for the operations of the receivership estate, which reflect the business activities that are generating income.  The sources and amounts of deposits into these bank accounts during Reporting Period, not including Old Glory Mint,[46] are shown in the following table:

---

[45]   *See supra*, Section III.I.

[46]   *See infra*, Section V.D (discussing operations of Old Glory Mint).

| Entity | Frozen Bank Balance | Rent Received | Owners Dues | Other[47] | Advances by Receiver | Total |
|---|---|---|---|---|---|---|
| East Meadows[48] | | 20,070.00 | | | | 20,070.00 |
| Land, Utah, LC | 64.98 | 2,250.00 | | | | 2,314.98 |
| EBPOA[49] | 3,006.84 | | 2,828.00 | | 2,500.00 | 8,334.84 |
| Expressway Business Park Owners' Association, LLC[50] | 217.47 | 5,141.95 | | | 1,000.00 | 6,359.42 |
| Farrell Business Park Association | 15.68 | | 797.50 | | | 813.18 |
| Montana One, LLC | | 495.00 | | | | 495.00 |
| National Note[51] | 26,974.27 | | | 2,591.48 | 10,000.00 | 39,565.75 |
| ND 1, LLC | | 1,890.00 | | | | 1,890.00 |
| Presidential Utah Properties, LC | 122.55 | 6,450.00 | | 54.50 | | 6,627.05 |
| Quail Hollow | 69.97 | 8,465.00 | | | | 8,534.97 |
| Riverbend Estates LC | 261.08 | 3,936.50 | | | | 4,197.58 |
| The Property Company, LLC | 381.58 | | | 5,207.70 | | 5,589.28 |
| Twin Pines Property, LC | 5.05 | 5,094.05 | | 171.00 | 100.00 | 5,370.10 |
| **Totals** | **31,119.47** | **53,792.50** | **3,625.50** | **8,024.68** | **13,600.00** | **110,162.15** |

## B.   Operating Expenses of Receivership Entities

At the time of his appointment, many of the Receivership Entities had high operating expenses and significant unpaid debt, including back property taxes on virtually all real property. Under the Receivership Order, the Receiver is required to pay expenses incurred by the

---

[47]   This amount includes cash found at the NNU offices, utility refunds, laundry revenue, royalties, and an equipment sale.

[48]   This account is related to the receivership account for Land, Utah, LC, and the Receiver anticipates combining the two accounts.

[49]   This is the account that was used for the EBPOA, the management of which will be turned over as of October 1, 2012. *See supra*, Section IV.D.20 (discussing the EBPOA).

[50]   This account is used for income and expenses of the Expressway Business Park Units still owned by the receivership estate. *See supra*, Section IV.D.20 (discussing these Units).

[51]   This total does not include the $547.82 sent to the Receiver from the American Gold Reserve bank account. *See supra*, n. 33.

receivership estate after June 25, 2012, but not those incurred before that date.  Accordingly, other than a handful of tenants who rented receivership property whose security deposits have been returned to them by the Receiver from receivership funds, persons owed monies for goods or services provided to the Receivership Entities before June 25, 2012, will be required to submit a claim for payment as part of the claims process that will be established.

The Receiver has worked diligently to reduce or eliminate the formerly high operating expenses incurred each month by Palmer and the Receivership Entities.  Given his obligation to pay post-Receivership Order expenses, the following expenses, excluding those for Old Glory Mint,[52] have been paid by the Receiver during the Reporting Period from the receivership estate's bank accounts (or in cases where payment by credit card was required, by the Receiver as an expense of the receivership estate):

---

[52]    *See infra,* Section V.D.

| Expense Category | Amount |
|---|---:|
| Utilities | 19,571.36 |
| Waste collection | 2,010.23 |
| Fire alarm monitoring | 150.00 |
| Office cleaning | 660.01 |
| Elevator servicing | 329.79 |
| Repairs | 5,015.50 |
| Maintenance | 2,113.82 |
| Insurance | 12,869.32 |
| Rent paid | 3,220.00 |
| Owners Association dues | 519.06 |
| Title reports on properties | 2,250.00 |
| Construction materials | 3,704.14 |
| Property managers | 10,941.82 |
| Advertising rentals | 190.80 |
| Bank fees | 514.82 |
| Storage units, moving fees | 2,635.45 |
| Computer imaging | 482.00 |
| Security deposits returned | 2,720.00 |
| **Total** | **69,898.12** |

**C.    Current Bank Balances**

The balances in the bank accounts opened by the Receiver, excluding Old Glory Mint, as of September 30, 2012, are shown in the table below:[53]  Attached hereto as **Exhibit 4** is an Accounting Report related to this matter.

---

[53]    These balances are from the Receiver's records since many of the monthly account statements from the bank do not correspond with the calendar month.

| Receivership Entity | 9/30/12 Account Balance |
|---|---:|
| Land, Utah, LC - East Meadows | 5,573.09 |
| Land, Utah, LC | 2,273.36 |
| Expressway Business Park Owners Organization, LLC | 700.02 |
| Expressway Business Park Owners Organization, LLC | 1,477.46 |
| Farrell Business Park Association | 432.77 |
| Montana One, LLC | 441.38 |
| National Note | 10,324.91 |
| ND 1, LLC | 1,848.38 |
| Presidential Utah Properties, LC | 1,921.47 |
| Quail Hollow | 6,048.69 |
| Riverbend Estates LC | 4,155.96 |
| The Property Company, LLC | 5,559.66 |
| Twin Pines Property, LC | 54.70 |
| **Totals** | **40,811.85** |

D.      **Old Glory Minting Company**

The Receiver determined that continuing operation of Old Glory Mint was prudent to determine the value of the operation for purposes of potentially marketing it for sale.   A summary of operations during the Reporting Period, is as follows:

| INCOME | | | Amount |
|---|---|---|---|
| | | Frozen Bank Balance | 7,438.93 |
| | | Advance from Receiver | 2,500.00 |
| | | Initial Capital[54] | 33,567.90 |
| | | Customer Orders | 1,291,694.72 |
| | **Total Income** | | **1,335,201.55** |
| | | | |
| **EXPENDITURES** | | | |
| | | Purchase of Precious Metals | 1,187,919.56 |
| | | Payroll | 33,809.71 |
| | | Banking Fees | 479.02 |
| | | Shipping, Postage | 1,297.72 |
| | | Insurance | 4,504.68 |
| | | Telephone, Utilities | 3,853.47 |
| | | Specialty Gases | 4,351.52 |
| | | Warehouse Rent | 5,775.00 |
| | | Lease of Coin Presses, Equipment | 8,500.00 |
| | | Office Supplies | 361.79 |
| | | Shop Supplies, Tools, Parts | 8,079.91 |
| | | Security Systems | 856.06 |
| | | Personal Property Taxes | 665.83 |
| | **Total Expenditures** | | **1,260,454.27** |
| | | | |
| **NET** | | | **74,747.28** |

Please note that this information is designed for the sole purpose of giving the Court and investors a general idea of the volume of business generated and the type of expenditures incurred by Old Glory Mint. It is not a balance sheet for Old Glory Mint and is not intended to present an accurate picture of Old Glory Mint's profitability. Numerous factors, such as the results of orders in process of being filled, the value of raw materials at the mint and expenses advanced by the Receiver for the Mint's operation, are not included in this summary.

E.      **Fees and Expenses of the Receiver and Counsel**

The Receiver and his staff have spent many hours taking control of the Receivership

---

[54]   Initial Capital consists of inventory held at National Note at the time the Asset Freeze Order was entered and checks made payable to Old Glory Mint that were delivered to the offices of National Note.

Entities and their assets, as well as Palmer's assets, when applicable.  The Receiver's counsel has been active in providing legal services for the receivership estate.  Given the funds available on hand, it is premature to submit a fee application at this time.  But, for the Reporting Period, the Receiver and his staff have spent 1,090.3 billable hours valued at $121,464.00.  The Receiver's legal counsel has spent approximately 168.8 billable hours valued at $46,491.50.  In addition, both the Receiver and his counsel have necessarily advanced costs or operating funds to the receivership estate and they will seek reimbursement of these costs and expenses in conjunction with a request for fees incurred.

## VI.

## NEXT STEPS

**A.**     **Actions to be Taken**

Going forward, the Receiver intends to continue to administer and manage the receivership estate so as to preserve and, where possible, maximize the value of its assets prior to liquidation.  As discussed, this process will not include development of real properties, but rather the preparation, marketing and sale of properties so as to obtain sales at fair market value.  At this time, the Receiver anticipates that he will take at least the material following actions:

1. Continuing to assess the value of the real properties held by the receivership estate, and where no equity exists, requesting Court approval to abandon the property.  In cases involving properties with potential equity, the Receiver intends, if he has not already, to list the properties for sale at fair market value (not liquidation value) through real estate agents.  This process will involve ordering appraisals and title reports, when appropriate, so as to determine whether offers for properties are fair and reasonable, and interests against properties proposed for sale.

2.  Selling property listed for sale and obtaining Court approval of such sales.

3.  Obtaining voluntary releases of ABIs, and where this is not possible, bringing appropriate actions to have the ABIs declared invalid.   Additionally, and related, reviewing the validity and amount of liens asserted against the properties, and where appropriate, contesting liens that appear to be unenforceable.

4.  Reconstructing and analyzing the Receivership Entities' bank records so as to determine, among other things, whether monies paid to insiders, creditors, investors and others, are recoverable by the Receiver for the benefit of the receivership estate.

5.  Continuing review and analysis of the Receivership Entities' many years of business records, including but not limited to their computer records, promissory notes issued by National Note, and records involving investor transactions, which are located in numerous locations, including the NNU Offices, a portable storage unit on the National Note property, and several off-site storage units.

6.  Continuing analysis and review of debts owed to the receivership estate, notes and accounts payable and non-real estate investments, and collection of the same.

7.  Commencing litigation, when necessary, to recovery monies owed to the receivership estate from among others, insiders, those who borrowed money from or were given money by Palmer or the Receivership Entities, and net winning investors (*i.e.*, those investors who received more money than the amount of their principal investment).

8.  Providing any assistance requested of him by governmental agencies related to their investigations of this matter.

9.  Establishing and implementing, with Court approval, a process for submitting claims. This process will not be commenced unless and until there are sufficient funds to

distribute to investors.

10. Evaluating the allowance of claims filed, and where appropriate contesting claims that are not allowable.

11. Formulating and recommending to the Court a plan of distribution of net liquidation proceeds obtained by the Receiver for the benefit of the receivership estate.

**B.**     **Timetable**

The Receiver intends to administer the receivership estate efficiently and in a manner that will allow him to make a distribution to investors as soon as reasonably possible.  At this time, the Receiver anticipates that his administration of the estate will take between three to five years in light of at least the following factors: (1) the size and complexity of the National Note enterprise, including the significant number of affiliated entities and numerous bank accounts; (2) the condition and unreliability of the Receivership Entities' records; (3) the extent of property included within the receivership estate; (4) the condition and marketability of the real properties and, in certain instances, environmental issues and title issues related to the same; (5) the time that will be necessary to market properties for sale given existing national economic conditions; and (6) the time that will be necessary to finalize litigation related to recovering assets of the receivership estate.

**C.**     **Expected Recovery**

The Receiver cannot estimate at this time the amount of money, if any, that will be distributed to investors.  He has and will continue to administer the receivership estate in such a way so as to maximize any distribution available, but the amount distribution amount will depend on numerous factors, including but not limited to the following: (1) the value of the receivership estates' assets; (2) the validity of interests, including liens and ABIs, asserted

against such assets; (3) the ability to recover assets of the receivership estate through demand, and where necessary litigation; and (4) the number of claimants and amount of claims.

## VII.

## CONCLUSION

Considerable progress has been made in the three months since the Receiver's appointment, but as discussed above, there is significant additional work to be done. The Receiver has and will continue to administer the receivership estate in such a way so as to maximize any distribution available to investors.

DATED this /2 th day of November, 2012.

R. WAYNE KLEIN, *Receiver*

<u>**CERTIFICATE OF SERVICE**</u>

IT IS HEREBY CERTIFIED that on this 34th day of November, 2012, the above **INITIAL REPORT AND LIQUIDATION PLAN OF R. WAYNE KLEIN, RECEIVER** was filed with the Court and served via ECF on all persons receiving electronic notice in this case.  In addition, on this 34th day of November, 2012, said **REPORT**, was served via e-mail on the following:

> Thomas M. Melton
> Daniel J. Wadley
> Paul N. Feindt
> Alison J. Okinaka
> SECURITIES AND EXCHANGE COMMISSION
> 15 W. South Temple, Suite 1800
> Salt Lake City, UT  84101
> meltont@sec.gov
> wadleyd@sec.gov
> feindtp@sec.gov
> okinakaa@sec.gov
>
> *Attorneys for Plaintiff Securities and Exchange Commission*
>
> Brennan H. Moss
> Pia Anderson Dorius Reynard & Moss
> 222 South Main, Suite 1830
> Salt Lake City, UT 84101
>
> *Attorneys for Defendant Wayne Palmer*

　　　　　　　　　　　　　　　　/s/ Peggy Hunt
　　　　　　　　　　　　　　Peggy Hunt, *Counsel to the Receiver*