Peggy Hunt (Utah State Bar No. 6060)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual, <br><br> Defendants. | **SECOND STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** <br> *For the Quarter Ending December 31, 2012* <br><br> 2:12-cv-00591 BSJ <br><br> The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities") hereby submits this Second Status Report for the period October 1, 2012 through December 31, 2012 (the "Reporting Period").

## TABLE OF CONTENTS

I. PROCEDURAL HISTORY ......................................................................................... 1

II. CONTINUED OPERATIONS ................................................................................... 2

    A.    Old Glory Minting Company, LLC ............................................................ 2

    B.    Rental Properties ........................................................................................ 4

        1.    Middleton, Idaho: Two Leased Homes .......................................... 5
        2.    Manhattan, Montana: Manhattan Grille Condominium .................. 5
        3.    Brigham City, Utah: Twin Pines Apartments ................................ 6
        4.    Ogden, Utah: Office Building ......................................................... 6
        5.    Vernal, Utah: East Meadows Trailer Park ..................................... 7
        6.    Fairfield, Utah: Cedar Fort Land .................................................... 8
        7.    Spanish Fork, Utah: Expressway Business Park ............................. 8
        8.    Temple, Georgia: Single Family Residence ................................... 9

III. REAL ESTATE HOLDINGS .................................................................................. 9

    A.    Nature of Interests Against Properties and Clearing Title .................... 10

    B.    Analysis of Value and Liquidation Method ........................................... 11

    C.    Court Approval Required ........................................................................ 11

    D.    Properties Listed For Sale ...................................................................... 12

    E.    Property Sales During the Reporting Period .......................................... 12

        1.    Summit Park Lot ........................................................................... 13
        2.    Elkhorn Ridge Lot #1 ................................................................... 13
        3.    Elkhorn Ridge Lot #4 ................................................................... 13
        4.    Elkhorn Ridge Lot #5 ................................................................... 14
        5.    Elkhorn Ridge Lot #48 ................................................................. 14

    F.    Properties With No Value ....................................................................... 14

        1.    Lack of Equity .............................................................................. 14
        2.    Inner City Homes and Building Lot .............................................. 15

    G.    Ongoing Investigation of Additional Properties ................................... 15

    H.    Assistance by Investor Group ................................................................ 16

IV. NON REAL ESTATE ASSETS .............................................................................. 17

A.      Personal Property ................................................................. 17

     1.      Mint Equipment ....................................................... 17
     2.      Office Furniture at Expressway Business Park.......... 17
     3.      Property at the National Note Office ........................ 17
     4.      Vehicles.................................................................... 18
     5.      Other Personal Property ........................................... 18

B.      Alleged Mineral Assets......................................................... 18

C.      Pre-Receiver Asset Transfers ............................................... 19

V. LITIGATION                                                                    19

A.      Actions Against The Receiver ............................................... 19

     1.      Complaint in Intervention Filed by First National Bank of Layton ("FNB").................................................... 20
     2.      Complaint in Intervention Filed by Rhonda Pilcher, Barry Pilcher and Commercial Design & Construction, Inc........................................... 20
     3.      Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust (the "Kirk Trust").......................... 20
     4.      Complaint in Intervention Filed by American Pension Services ("APS").................................................... 20

B.      Actions Commenced By The Receiver.................................... 21

     1.      Order to Show Cause—Mint Employee ................... 21

VI. RECORDS OF THE RECEIVERSHIP ENTITIES                                        21

A.      Business Records .................................................................. 22

B.      Investor Payment Records ..................................................... 22

C.      Accounting Software ............................................................. 22

D.      Bank Records ........................................................................ 22

VII. INITIAL FINANCIAL ANALYSIS                                                 23

A.      Potential Sources of Recovery ............................................... 23

     1.      Winning Investors.................................................... 23
     2.      Accounts Receivable................................................ 23
     3.      Contract Breaches .................................................... 24
     4.      Employee Bonuses ................................................... 24
     5.      Commissions ............................................................ 25

B.      Questionable Transactions ..................................................................... 25

      1.      Dubious Investment Ventures ................................................. 25
      2.      Investor Promissory Notes ...................................................... 26

C.      Financial Condition ................................................................................ 26

D.      Receivership Financial Information ....................................................... 27

      1.      Bank Accounts ......................................................................... 27
      2.      Deposits .................................................................................... 27
      3.      Expenditure Breakdown ........................................................... 28
      4.      Administrative Expense of Receiver and Counsel .................... 28

VIII. NEXT STEPS                             29

      1.      Property Sales .......................................................................... 29
      2.      Challenging Liens .................................................................... 30
      3.      Preserving and Maximizing Asset Values ............................... 30
      4.      Financial Analysis and Recovery Efforts ............................... 30

IX. CONCLUSION                           31

# I.

## <u>PROCEDURAL HISTORY</u>

On June 25, 2012, this action (the "<u>Civil Case</u>") was commenced by the United States Securities and Exchange Commission (the "<u>SEC</u>") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "<u>Court</u>").[1]   The SEC alleges, among other things, that Defendants Palmer and National Note engaged in securities fraud and operated a Ponzi scheme that took over $100 million from more than 600 investors.

The SEC filed several *ex parte* motions with its Complaint on June 25, 2012, all of which were granted by the Court.  In particular, the Court entered a Temporary Restraining Order and Order to Show Cause (the "<u>TRO</u>")[2], an Order Freezing Assets and Prohibiting Destruction of Documents (the "<u>Asset Freeze Order</u>"),[3] and an Order Appointing Receiver and Staying Litigation (the "<u>Receivership Order</u>").[4]   Palmer has since stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5]

As a result of the Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **<u>Exhibit A</u>**.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

On November 12, 2012, in accordance with the Receivership Order,[6] the Receiver filed his First Report and Liquidation Plan for the period of June 25, 2012 through September 30, 2012 (the "First Report").[7]  This is the Receiver's Second Status Report for the period of October 1, 2012 through December 31, 2012, defined above as the "Reporting Period."

## II.

### CONTINUED OPERATIONS

The Receiver is managing the receivership estate with the goal of maximizing the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those National Note investors who have not received a return of their principal investment in whole or part.  As discussed in the First Report, to facilitate this goal, the Receiver has discontinued the operations of National Note and most of its affiliated entities, except in those limited instances discussed below,[8] and he has attempted to minimize the enterprise's historically high operating expenses going forward.

Limited business operations have continued during the Reporting Period so as to maximize or preserve the value of the Receivership Estate's property, including continued operation of the business conducted by Old Glory Minting Company, LLC discussed in Part A; and limited operation of several real estate properties discussed in Part B.

A.    **Old Glory Minting Company, LLC**.  The Receivership Entities include an entity named "Old Glory Minting Company, LLC" that at times relevant hereto was in the

---

[6] Docket No. 9 (Receivership Order) at pp.18-20.

[7] Docket No. 73 (First Report).

[8] *See infra,* Parts II.A.-B.

business of minting precious metal coins (the "Mint").  As set forth in the First Report, the Receiver decided to keep operating the Mint so as to determine the best way to maximize the value of this asset for the Receivership Estate.[9]  These operations continued during part of the Reporting Period, but as described below, have now ceased.

Prior to the Receiver's appointment, the Mint had failed to fulfill its customer's orders, even in cases where the customer paid for the product.[10]  In operating the Mint, the Receiver's intent was to attempt to re-build customer confidence by establishing a track record of delivering product purchased, thus also increasing revenues so as to facilitate the sale of the business as a going concern.  The business, however, could not be restored.  While the Mint's revenues initially increased after the Receiver's appointment,[11] in September, 2012, the volume of new orders began dropping, and by late October, the decline worsened, making it clear that the decline in orders was not going to be temporary.

While attempting to restore the business during the Reporting Period, the Receiver identified and had discussions with four entities who expressed interest in purchasing the Mint's business.  The Receiver provided certain due diligence materials to these potential purchasers, including (1) lists of equipment used by the Mint, but that was not owned by the Mint, (2) the Mint's financial information,  (3) the purchase patterns of its customers, and (4) the history and volume of customers who had placed orders that had not been delivered.  After reviewing this information, however, each of these potential purchasers declined to make an offer to purchase the business.

---

[9] First Report at pp. 9-10.

[10] *See* First Report at p. 9.

[11] *See* First Report at p. 10.

With the above-described decline in business and no potential purchaser, the Receiver decided to cease the Mint's operations. Thus, on or about November 7, 2012, the Receiver began winding down the Mint's business — new orders were refused, and when existing orders were filled in mid-November, the Mint ceased operations. The Receiver notified the landlord for the warehouse where the Mint did business that it would terminate its lease, and informed equipment owners that they needed to remove their equipment from the business premises.

On December 7, 2012, the Receiver finalized the Mint's closure by (a) auctioning office supplies and those pieces of equipment owned by the Mint; (b) retrieving the Mint's business records and computers; (c) taking possession of all coin and bar dies used in the manufacture of the Mint's products; and (d) retrieving coins and petty cash still at the Mint. The auction of equipment and supplies has yielded approximately $34,430.00 for the Receivership Estate as of the Reporting Date.

The Receiver understands that Brett Romney, the Mint's former manager, intends to conduct minting and other businesses by renting the warehouse space previously occupied by the Mint, purchasing some of the Mint's supplies and equipment at the Receiver's auction, and purchasing one of the lines of production equipment from a non-Mint owner. The Mint's customer lists, coin dies, and website rights, however, were sold by the Receiver in January 2013 to another entity for $4,000.

**B.** **Rental Properties**. Certain Receivership Entities own real properties that the Receiver continued to operate during the Reporting Period because they are generating net income for the Receivership Estate. While in many instances, the Receiver's operation of these properties is winding up, the Receiver will continue to operate some of the properties after the

Reporting Period.  Properties that have been operated during the Reporting Period are described

in Subparts B1 – B8 below.

         1.    <u>Middleton, Idaho: Two Leased Homes</u>.  The Receivership Estate includes

two residential properties that are located in Middleton, Idaho, adjacent to a 175-acre proposed

subdivision that National Note had planned under the name "Riverbend Estates," discussed in

further detail at pages 25 - 26 of the First Report.[12] The two homes are currently being rented

through the services of a professional property manager, generating $1,345.00 in monthly net

income. The Receiver's ultimate disposition of these properties will likely depend on what

happens to the adjacent land.[13]

         2.    <u>Manhattan, Montana: Manhattan Grille Condominium</u>.  The Manhattan

Grille Condominium is a small condominium, located in Manhattan, Montana, which is

discussed in further detail at pages 28 - 29 of the First Report.  At the time of the First Report,

the property was being managed by a property manager and leased to a third party, and the

receivership estate was generating monthly net income of close to $500.00.[14]  The tenant, who at

the time of the First Report had given notice of his intent to vacate, has now vacated the property

and it has not been re-let.[15]  Accordingly, although operated for a short period during the

Reporting Period, the Receiver is no longer operating this property, but rather has listed it for

sale with a realtor.  New businesses moving to the Manhattan, Montana area have sparked an

---

[12] The name of the National Note affiliate that intended to develop the property is Riverbend Estates, LLC. The Receiver refers to this property as the "River Run Subdivision" in the First Report.  First Report at pp. 25-26. Both "River Run" and "Riverbend" were used to describe this property.

[13] *See* discussion *infra* at Part III.G.

[14] *See* First Report at p. 28.

[15] *Id.*

increase in real estate activity, and the Receiver received two indications of interest during the Reporting Period.  The Receiver has contracted for an appraisal of the property and will use the results of that appraisal to determine whether to accept any potential purchase offers.

3.      <u>Brigham City, Utah: Twin Pines Apartments</u>.  The Twin Pines Apartments are three buildings with twenty apartments located in Brigham City, Utah, which are leased to lower income tenants.  Further information about this property is set forth at pages 29 - 30 of the First Report.

During the Reporting Period, the Receiver continued to operate this property through his property manager.  As a result of property repairs and the work of the property manager, occupancy is now close to 90%, compared to slightly over 50% when the Receiver was appointed.  The Apartments are now generating approximately $3,500.00 monthly net income for the Receivership Estate, compared to the last Reporting Period when cash flow generated from the Apartments was insufficient to service all asserted debts.[16]

A National Note investor has been permitted to intervene in this case to assert an interest in this the Twin Pine Apartments, which interest the Receiver has challenged.  Litigation related to this matter is ongoing.

4.      <u>Ogden, Utah: Office Building</u>. The Office Building is an old, three-story commercial office building located in downtown Ogden, Utah that is co-owned with a third party (the "<u>Co-Owner</u>").  Further details related to the Office Building are set forth at pages 30 - 31 of the First Report.

At the time of the Receiver's appointment, there were three tenants, using approximately

---

[16] *See* First Report at p. 30.

one-half of the office space, but paying below market rent, and a church was using the premises without paying rent.  As set forth in the First Report, the church was unable to pay rent and vacated the property at the Receiver's request.  Since that time, the tenant that was using the top floor moved, leaving just two tenants sharing the main floor. [17]  The rental income from these two tenants is not sufficient to pay operating expenses of the Office Building, and the Receiver has been required to make repairs to the Office Building's heating and plumbing systems to maintain its value.  As a result of this operating expense, the Receiver wants to discontinue operation of the Office Building and market it for sale.  Thus, he does not want to seek new tenants for fear that long-term leases might dissuade buyers from being interested in purchasing the property.  The Receiver's ability to market the Office Building for sale during the Reporting Period, however, has been impaired because the Co-Owner of the Office Building has refused to talk with the Receiver.

    5. <u>Vernal, Utah: East Meadows Trailer Park</u>.  East Meadows is a mobile home park located in Vernal, Utah, with eighty-six lots and a large park area.  As discussed on pages 34 – 35 of the First Report, mobile homes owned by Land Utah, LC are parked on forty-five of the lots (the "<u>LU Homes</u>"), an office and garage are located on one of the lots, certain lots are occupied by tenants who own their own mobile homes, and certain lots are empty.

    The Receiver employed a new property manager during the first reporting period.  Through the efforts of this property manager, occupancy rates and average rents have risen during the current Reporting Period, and operating expenses related to the Trailer Park have dropped significantly.  Thus, the Trailer Park is now generating approximately $10,000.00 in net

---

[17] *See* First Report at p. 31.

monthly income.

During the Reporting Period, the Receiver has received interest from third parties to purchase this property.  While he ultimately may sell the property to one of these parties, the Receiver is still evaluating the market value of the property and the best way to maximize the value of this asset for the Receivership Estate.  Appraisals of the property have been ordered and are being evaluated in light of the new profitability of the property.

      6.    <u>Fairfield, Utah: Cedar Fort Land</u>.  The Cedar Fort Land is a large parcel of undeveloped real estate located in Fairfield, Utah discussed in greater detail at page 42 of the First Report.  The Receiver intends to list the Cedar Fort Land for sale and is awaiting the results of an appraisal to determine an appropriate asking price for the property.  Given challenges related to the property's location, lack of access and environmental issues, this property may take some time to sell.  In the meantime, the Receiver has agreed to lease the Cedar Fort Land for grazing, with the understanding that the lease may be terminated if the Land is sold.  In addition to the annual income to be obtained from the lessee based on the number of cows using the land during the year, the lease qualifies the property as agricultural land which will result in substantially reduced property tax rates.

      7.    <u>Spanish Fork, Utah: Expressway Business Park</u>.  Expressway Business Park is located in Spanish Fork, Utah, containing 48 business condominium units that were built by National Note.  At the time of the Receiver's appointment, forty-four of the units were sold, leaving four remaining units in the Receivership Estate, each of which is described in greater detail at pages 42 – 46 of the First Report.

The Receiver continued to rent two of the four units owned, #204 and #215, during the

Reporting Period, generating a total of $1,580.00 in net monthly income.  Unit #109 remains

vacant, but the Receiver intends to surrender it to the first lienholder based on his assessment that

there is no equity in the property.  Finally, Unit #305 is unfinished and cannot be leased in its

current condition.  The Receiver listed this property for sale with a broker "as is" at a listing

price of $65,000.

        8.    <u>Temple, Georgia: Single Family Residence</u>.  This home is located near

Atlanta, in Temple, Georgia, and is being managed by a professional property manager.  Further

details related to this property are set forth at page 51 of the First Report.

At the time of the First Report and during the current Reporting Period, the property was

being leased and generating monthly revenue for the Receivership Estate of approximately

$945.00, not including taxes.[18]  But, the tenants paid rent untimely, and now that the lease term

has concluded, the property manager has given the tenants the required 60-day notice to quit

required under Georgia law.  A real estate broker has been located for the Receiver by certain

investors knowledgeable of the market, and the property will be fixed up and marketed for sale.

### III.

### <u>REAL ESTATE HOLDINGS</u>

A significant portion of the Receivership Estate's potential assets are in real estate

holdings, some of which are discussed in Part II above.  During the Reporting Period, the

Receiver has continued to investigate these holdings and, while this investigation is continuing,

he has determined that there are some properties that appear to have value for the Receivership

Estate, some do not, and some need further analysis, including an analysis of the validity and

---

[18] *See* First Report at p. 51.

enforceability of certain interests that have been asserted against the properties.

- Part A below discusses the nature of the interests asserted against these properties and actions being taken to clear title;

- Part B discusses the Receiver's analysis of real property holdings and evaluation of the method of liquidation;

- Part C outlines the necessity for Court approval and other related sale procedures;

- Part D identifies real properties that have been listed for sale;

- Part E set forth the sales obtained during the Reporting Period;

- Part F discusses properties that the Receiver has identified as having limited value; and

- Part G describes assistance the Receiver has received from a group of organized investors in relation to real property holdings.

      A.     **<u>Nature of Interests Against Properties and Clearing Title.</u>**  The Receiver is currently investigating numerous types of interests that have been asserted against certain real properties that are part of the Receivership Estate, including at least the following types of interests: (1) liens that were granted after investment funds had already been paid to National Note; (2) liens purporting to secure loans that have been repaid entirely or in part; (3) Palmer's provision of "Assignments of Beneficial Interest" ("ABIs") to investors purportedly securing investments; and (4) construction and mechanic's liens on the properties.  Many of these interests may not be valid or enforceable, some are avoidable under applicable law, and the amount of some of the liens may be subject to reduction or settlement.  During the Reporting Period, the Receiver has begun to make demand on persons holding these types of interests requesting voluntarily releases or reductions so as to avoid the expense of litigation.  These

demands have been partially fruitful.  In cases where no release is provided or reduction should be made but is not, the Receiver anticipates commencing litigation to clear title to the properties in question so as to increase the total value of the properties for the benefit of the Receivership Estate.

      **B.**     <u>**Analysis of Value and Liquidation Method**</u>.  To determine if a property has value, the Receiver typically obtains a broker's opinion or an appraisal, as well as a preliminary title report to determine what, if any, interests exist against the property.  Once he obtains this information, the Receiver determines whether there is potential value for the Receivership Estate by, among other things, evaluating the interests asserted against the property and the cost of liquidating the property.  If he determines that the property has equity for the Receivership Estate, he typically lists it for sale and markets it through an independent person knowledgeable of the market; but, in some instances he has approached or been approached by potential purchasers based on information provided by those familiar with the properties, such as Palmer, so as to reduce the costs of sale.  Also, in some instances, where he determines it is appropriate, the Receiver may sell properties through public auction.  Methods of sale are discussed in greater detail immediately below.

      **C.**     <u>**Court Approval Required**</u>.  The Receiver is required to obtain Court approval of sales of real property.  Sections 2001 and 2002 of title 28 of the United States Code govern these issues, allowing for "public" (auction) and "private" sales of real property, with both types of sales requiring Court-approved notice, including publication notice.  Additionally, in the case of private sales, the Receiver is required to obtain appointment of three independent appraisers prior to the Court's approval of the sale, and to follow certain procedures that are defined in the statute

to ensure that the maximum value is obtained for the property being sold.  In some instances, the Receiver will market the property and obtain an offer for its purchase, but then subject that purchase offer to higher and better offers through public auction.  In each sale, the method and result of marketing and the Receiver's proposed method of liquidation are described in the papers filed with the Court seeking approval of the sale.  Notices of these sales are also posted on the Receiver's website.

        **D.**     **<u>Properties Listed For Sale</u>**.  The Receiver had begun obtaining appraisals and listing properties for sale at the end of the reporting period for the First Report.  During the current Reporting Period, additional appraisals have been obtained on some properties, more properties have been listed for sale, and agreements have been reached to sell certain properties.  The document attached as **<u>Exhibit B</u>** hereto contains a listing of all real properties identified as being part of the Receivership Estate and the status of those properties as of February 18, 2013.

        **E.**     **<u>Property Sales During the Reporting Period</u>**.  During the Reporting Period, the Receiver has been actively engaged in evaluating real properties owned by the Receivership Estate, and in cases where such properties have value, determining the best method of maximizing the value of those properties through liquidation pursuant to the requirements discussed in Parts B and C above, or in limited instances, through managing the properties as described in Part II.B above.  As of the close of this Reporting Period, December 31, 2012, the Receiver had obtained sale agreements and, in some instances, filed motions with the Court related to the following five properties:[19]

---

[19] Other sales have been negotiated since the end of this Reporting Period, all of which are disclosed to the Court pursuant to relevant motions seeking approval of the sales.  Details of these sales will be included in the Receiver's next Status Report.  *See* Exh. B (Property Sale Listing Chart).

1.      Summit Park Lot:  By Order entered on January 22, 2013,[20] the Court approved the private sale of this property, located near Park City, Utah,[21] the sale has closed, and net sale proceeds in the total amount of $32,477.61, after the costs of sale and payment of taxes, have been received by the Receivership Estate.  No liens or other interests were recorded against this property.

2.      Elkhorn Ridge Lot #1:  Subject to Court approval, the Receiver has entered into an agreement to sell this property, one of forty-seven lots with a partially-built cabin in the "Elkhorn Ridge" subdivision near Malad, Idaho,[22] by private sale for a total purchase price of $130,000.[23]  ABIs have been recorded against this property, and the Receiver will request that the sale of this property be free and clear of those ABIs and any other interests, with such interests, to the extent that they exist, attaching to the net sale proceeds.

3.      Elkhorn Ridge Lot #4:  Subject to Court approval and higher and better offers, the Receiver has entered into an agreement to sell this property, a vacant lot in the "Elkhorn Ridge" subdivision near Malad, Idaho[24] by private sale for a total purchase price of $35,000.00.[25]  ABIs have been recorded against this property, and the Receiver will request that the sale of this property be free and clear of those ABIs and any other interests, with such

---

[20] Docket No. 135.

[21] *See* First Report at p. 32 (describing property).

[22] *See* First Report at pp. 26-28 (describing property).

[23] On February 7, 2013, after the close of the current Reporting Period, the Receiver filed a motion seeking approval of this sale.  *See* Docket No. 150.

[24] *See* First Report at pp. 26-28 (describing property).

[25] We have filed a motion seeking approval of the sale of this property which will be heard after the Court approves the method of publication notice.  *See* Docket Nos. 102 (sale motion), 105 (publication notice motion).

interests, to the extent that they exist, attaching to the net sale proceeds.

        4.    <u>Elkhorn Ridge Lot #5</u>:  Subject to Court approval and higher and better offers, the Receiver has entered into an agreement to sell this property, a lot with a partially-built cabin in the "Elkhorn Ridge" subdivision near Malad, Idaho,[26] by private sale for a total purchase price of $80,000.00. [27]  ABIs have been recorded against this property, and the Receiver will request that the sale of this property be free and clear of those ABIs and any other interests, with such interests, to the extent that they exist, attaching to the net sale proceeds.

        5.    <u>Elkhorn Ridge Lot #48</u>:  Subject to Court approval and higher and better offers, the Receiver has entered into an agreement to sell this property, a lot with a partially-built cabin in the "Elkhorn Ridge" subdivision near Malad, Idaho,[28] by private sale for a total purchase price of $80,000.00.[29]  ABIs have been recorded against this property, and the Receiver will request that the sale of this property be free and clear of those ABIs and any other interests, with such interests, to the extent that they exist, attaching to the net sale proceeds.

        **F.**    **<u>Properties With No Value</u>**.  Some real properties, although titled in National Note's name, have no value based on valid interests that exist against them, or the nature of the property.  Each is discussed below.

        1.    <u>Lack of Equity</u>.  To date, the Receiver has identified the following four properties which appear to have no equity for the Receivership Estate because the amount of

---

[26] *See* First Report at pp. 26-28 (describing property).

[27] We have filed a motion seeking approval of the sale of this property which will be heard after the Court approves the method of publication notice.  *See* Docket Nos. 102 (sale motion), 105 (publication notice motion).

[28] *See* First Report at pp. 26-28 (describing property).

[29] We have filed a motion seeking approval of the sale of this property which will be heard after the Court approves the method of publication notice.  *See* Docket Nos. 102 (sale motion), 105 (publication notice motion).

secured debt against the property exceeds its value: (a) certain parcels of real property located in Salt Lake County, Utah, identified in the First Report as the "Cottonwood Road Compound;"[30] (b) the "Gooseberry Cabin," located in Sanpete County, Utah;[31] (c) the "River Run Property", located in Middleton, Idaho;[32] and (d) the "Expressway Business Park", Unit # 305, located in Spanish Fork, Utah.[33] In these instances, the Receiver has negotiated or is in the process of negotiating with the secured creditors to abandon the property to the creditors while minimizing the Receivership Estate's exposure to claims, including by waiving claims against the Estate.

2. Inner City Homes and Building Lot. As discussed in Part IV.D.29 – Part IV.D.32 of the First Report, National Note owns three old, inner city homes, located in Cleveland and Toledo, Ohio and Chicago, Illinois as well as a building lot in Cleveland. Efforts to market these properties have been unsuccessful because brokers have refused to visit the properties. The Receiver has granted, subject to Court approval, an option to a real estate investor to purchase the three properties with homes, which must be exercised by May 4, 2013. If exercised, the three homes will be sold for approximately $75,000.00; but if not exercised, the Receiver will need to conduct further analysis of these properties.

G. **Ongoing Investigation of Additional Properties**. During the Reporting Period, the Receiver continued to investigate (1) certain properties that are not yet ready to be marketed

---

[30] First Report at p. 36. This discussion only applies to 3.94 of the total approximately 5 acres of land that comprises the Cottonwood Road Compound. The Receiver has agreed to abandon the 3.94 acres with no equity to First National Bank of Layton pursuant to an agreement. *See* Docket No. 141. The remaining acreage remains property of the Receivership Estate.

[31] *See* First Report at p. 46. On January 16, 2013, the Court entered an Order approving an agreement related to the abandonment of this property to the secured creditor. *See* Docket No. 125

[32] *See* First Report at p. 25.

[33] *See* First Report at p. 45.

for sale given issues that require further examination; and (2) the possibility of other real estate that is part of the Receivership Estate based on documents discovered as part of National Note's books and records.  While his investigation continues, at this time, the Receiver has not identified additional properties.

As part of his investigation, however, the Receiver has discovered that National Note purchased and made payments on certain real property located adjacent to the Elkhorn Ridge development near Malad, Idaho.[34]  National Note may have defaulted under the purchase agreement, and thus, the Receiver currently is engaged in negotiations with the sellers to obtain some value related this land for the Receivership Estate and anticipates filing a motion seeking the Court's approval of this settlement shortly.

H.    **Assistance by Investor Group**.  One group of National Note investors, members of which have knowledge of some of the real estate markets in question, has organized itself and has been providing the Receiver assistance in preserving and liquidating properties.  The Receiver is informed that this group also is exploring possible joint ventures with developers to create value for properties that otherwise would not have any equity.  The Receiver has made it clear to this investor group that, in an exercise of his discretion and business judgment, he welcomes productive assistance, but he has discretion to decline suggestions made and that in accepting such assistance, this group is not and will not be afforded any special status and that it should expect no remuneration for its efforts.

---

[34] *See* First Report at pp. 26-28.

## IV.

## NON REAL ESTATE ASSETS

In addition to real estate, the Receivership Estate is comprised of several other categories of assets, including certain personal property described in Part A below; unrefined ore discussed in Part B, and collection and litigation assets related to transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

A.    **Personal Property**.  National Note owns a limited amount of personal property. These assets, which the Receiver has sold or is preparing for sale, include:

1.    Mint Equipment.  As noted above in Part II.A, during the Reporting Period, the Receiver has sold equipment and supplies of the Mint for total net proceeds to the Receivership Estate in the amount of $34,430.

2.    Office Furniture at Expressway Business Park.  The Receiver has sold office furniture located in the Office for the Expressway Business Park to one of the owners of a unit in that development, resulting in total net proceeds to the Receivership Estate in the amount of $1,700.00.

3.    Property at the National Note Office.  The Receiver employed an auctioneer to auction certain personal property existing in the former office building for National Note, located in West Jordan, Utah, including books, pictures, decorations, supplies, and tools, and this auction took place on December 14, 2012.  Palmer attended the auction and purchased some of the property being auctioned.  The on-site auction resulted in total net sale proceeds to the Receivership Estate in the amount of $1,309.00.

In addition, at the advice of his auctioneer, the Receiver has authorized the sale of certain

of this personal property, including silver coins and novelty currencies, to be sold on an online auction.  As these are sold, the net sale proceeds will be paid to the Receivership Estate.

       4.   <u>Vehicles</u>.  The Receiver is in the process of selling vehicles owned by National Note.

       5.   <u>Other Personal Property</u>.  Other personal property that is being stored by the Receiver likely will be sold at a future auction.

    **B.**    **Alleged Mineral Assets**.  National Note owns ore that certain investors believe contains high levels of precious metals which can be extracted using an innovative, proprietary technology.[35]  While the Receiver does not believe that the ore has significant value and storage of the ore was burdensome, in exercising his authority to manage the Receivership Estate's assets under the Receivership Order, he has entered into a Management Agreement with HMI Management LLC, a Delaware limited liability company controlled by a group of investors ("HMI"), to assist the Receiver in managing Homeland Minerals, LLC and Freedom Minerals I, LLC, Receivership Entities involved in the ownership of the ore and the proprietary technology (collectively, the "<u>Ore Entities</u>").  Pursuant to the Management Agreement, which the Receiver may terminate at any time without cause, HMI will manage the day to day operations of the Ore Entities, including funding of the same, in hopes of ultimately processing the ore for the mutual benefit of HMI and the Receivership Estate.  Any net proceeds from the processing of this ore will be shared in the same proportion as had been agreed when National Note was still in business, with the Receivership Estate receiving 37.5% of the total net proceeds, and under the Management Agreement, HMI has agreed to be accountable to the Receiver and to include the

---

[35] *See* First Report at Part IV.C (discussing mineral assets in greater detail).

Receiver in certain material decisions.  In short, if the ore is found to contain recoverable precious metals, these net proceeds will be paid to the Receiver for the benefit of the Receivership Estate, but the Estate will not bear the risk of processing the ore, which the Receiver believes is highly speculative.

C.   **Pre-Receiver Asset Transfers**.  Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate.  A discussion of the types of claims discovered by the Receiver and his intended course of action for recovery of these claims is set forth in the Financial Analysis discussed in Part VII below.

**V.**

**LITIGATION**

A.   **Actions Against The Receiver**.  To date, four actions have been commenced within the Civil Case as follows:

      1.      <u>Complaint in Intervention Filed by First National Bank of Layton</u> ("FNB").[36]  The Court permitted FNB to intervene to assert rights related to portions of the Cottonwood Road Complex and property identified in the First Report at the "<u>Kanab Cabin</u>."[37] As of this date, this matter has primarily been resolved by the parties.[38]

      2.      <u>Complaint in Intervention Filed by Rhonda Pilcher, Barry Pilcher and Commercial Design & Construction, Inc.</u>[39]  These parties claimed an interest in the Gooseberry Cabin, and initially sought to intervene in the Civil Case related to that right.  This matter has since been resolved by the Receiver pursuant to a settlement agreement that has been approved by the Court.[40]

      3.       <u>Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust</u> (the "<u>Kirk Trust</u>").[41]  The Court has permitted the Kirk Trust to intervene in the Civil Case to assert rights related to certain property identified in the First Report as the "Twin Pines Apartments."[42]  The Receiver disputes the Kirk Trust's allegations set forth in its Complaint, and will file an answer so stating.  This litigation is ongoing.

      4.       <u>Complaint in Intervention Filed by American Pension Services ("APS")</u>.[43]

---

[36] Docket No. 23.

[37] *See* First Report at p. 48 & Docket No. 51 (Order).

[38] *See* Docket No. 141.

[39] *See* Docket No. 28.

[40] *See* Docket No. 125.

[41] *See* Docket No. 89.

[42] *See* First Report at pp. 29-30.

[43] *See* Docket No. 101.

APS has filed a motion to intervene in the Civil Case related to certain issues it asserts related to its standing as a custodian of certain investor accounts.  A hearing on APS's motion to intervene is scheduled for February 26, 2013.  The parties are currently engaged in settlement negotiations.

**B.**      **Actions Commenced By The Receiver**.  During the Reporting Period, the Receiver has been evaluating claims and causes of action that are property of the Receivership Estate, which are generally discussed above.  This analysis is ongoing, and the Receiver anticipates bringing lawsuits when warranted in the near future.  As of this time, the following is the only litigation commenced by the Receiver to date:

1.      <u>Order to Show Cause—Mint Employee</u>.  On September 18, 2012, the Receiver filed a Motion for an Order to Show Cause in regard to one of the Mint's former employees who had taken certain precious metal coins as "payment" of sums allegedly owed to him by the Mint.[44]  The Court granted the Receiver's Motion and issued an Order to Show Cause.[45]  A hearing was held on November 7, 2012, at which time a settlement was presented to the Court under which the employee agreed to pay $9,000.00 to the Receivership Estate.  Five thousand dollars of this amount has been received to date, and litigation related to his matter is concluded.

**VI.**

**RECORDS OF THE RECEIVERSHIP ENTITIES**

During the Reporting Period, the Receiver has made substantial progress in identifying and analyzing books and records of the Receivership Entities, including but not limited to the

---

[44] Docket Nos. 59 - 60.

[45] Docket No. 65.

following:

    **A.**    **<u>Business Records</u>**.  The Receiver has been indexing the twenty years of business records that he has located to date, and at this time, most of the more-current business records have been indexed, so as to assist him in efficiently investigating the assets and liabilities of the Receivership Estate.

    **B.**    **<u>Investor Payment Records</u>**.  Prior to the Receiver's appointment, it appears that significant amounts of transactions with investors were recorded by National Note through the use of a software program called "<u>NoteSmith</u>."  The Receiver is using this program and its data to identify potential assets and liabilities of the Receivership Estate.

    **C.**    **<u>Accounting Software</u>**.  Prior to the Receiver's appointment, it appears that National Note used two primary accounting programs: QuickBooks and Peachtree.  Analysis of the information in these programs has enabled the Receiver to, among other things, identify cash flow patterns, intercompany transfers, and transfers to third parties, as well as to provide the Court and investors with the financial analysis set forth below in Part VII.

    **D.**    **<u>Bank Records</u>**.  During the Reporting Period, the Receiver has collected and evaluated the Receivership Entities' bank records, both those found in the Entities' books and records and those obtained through subpoenas issued by the SEC, so as to, among other things, assist in: (1) verifying the accuracy of transactions recorded in the companies' accounting software; (2) obtaining evidence necessary to support recovery of funds that were transferred prior to the entry of the Receivership Order; and (3) identifying intercompany transfers.

## VII.

## INITIAL FINANCIAL ANALYSIS

Although the Receiver's investigation and analysis is ongoing, from examination of the books and records discussed in Part VI above, the Receiver has determined and/or discloses as follows:

A.     **Potential Sources of Recovery.**   National Note made numerous types of transfers prior to the Receiver's appointment which may be recoverable for the benefit of the Receivership Estate.   Analysis of these potential assets is on-going, but as of this time, the Receiver has discovered the following:

1.     Winning Investors.  Governing law requires that National Note investors who received a return greater than the principal sum they invested return their "false profits" for the benefit of the Receivership Estate.   National Note's records indicate that approximately 232 investors are recipients of false profits, and although further analysis may be necessary, the false profits transferred appear to be as high as $6.3 million.   This amount does not include amounts that may have been paid to certain persons who acted or are deemed to have acted in bad faith. During the Reporting Period, the Receiver has been analyzing these types of transfers, and anticipates making demand for repayment of the false profits.   Those who do not respond to the informal demand for repayment will be subject to formal legal action.

2.     Accounts Receivable.  National Note's records identify approximately 229 persons or entities who borrowed money from National Note, many of whom have not been repaying their respective loans.[46]   These accounts receivable will require significant additional

---

[46] *See* First Report at Part IV.B (discussing potential receivables in greater detail).

due diligence to determine their validity and collectability, but during the Reporting Period, the Receiver has been contacting these borrowers, requesting repayment. At this time no funds have been recovered as a result of these efforts, but the Receiver has obtained information that will assist him in either abandoning actions for recovery where evidence is produced that there is no basis for it, or collecting funds borrowed. To minimize cost, the Receiver will continue to attempt to collect on these assets, to the extent that they exist, informally. But, in cases where his requests for information and repayment go unanswered, he may eventually be required to take formal legal action.

        3.    <u>Contract Breaches</u>. During the Reporting Period, the Receiver's analysis of National Note's books and records has uncovered several instances where National Note transferred cash, apparently for goods or services, but no consideration was received. The Receiver has begun to make demand for recovery of damages under these breached agreements, and will pursue litigation in cases where it is warranted to obtain a recovery. For instance, most recently, the Receiver has demanded damages from a company that was paid over $100,000 which does not appear to have performed.

        4.    <u>Employee Bonuses</u>. National Note's records show that between 2007 and 2011, National Note paid its employees bonuses from a bank account held by Receivership Entity Homeland Funding, LLC. This includes bonuses paid between 2009 and 2011 when the SEC alleges that National Note was operating as a Ponzi scheme and when investors went unpaid in 2011. The payments were as follows:

| Year | Total Bonuses Paid |
|------|-------------------|
| 2007 | $95,140.65 |
| 2008 | $81,400.00 |
| 2009 | $101,350.00 |

| | |
|---|---|
| 2010 | $75,750.00 |
| 2011 | $10,751.32 |

5.      Commissions.  During the Reporting Period, the Receiver has been investigating the nature and scope of over $750,000.00 recorded in National Note's books and records as "commissions."  The Receiver has determined that some of these commissions were real estate related; others appear to have been paid to persons who were not licensed securities agents for bringing investors to National Note (several commission recipients have informed the Receiver that they were paid 2% of the amount invested by those they brought to the scheme). According to the records, close to $300,000.00 of this sum was paid to one of Palmer's relatives. Under applicable law, many of these commissions may be recoverable for the benefit of the Receivership Estate, and the Receiver's investigation of these matters continues.

**B.      Questionable Transactions**.  The Receiver has discovered at least the following related to apparent third party transactions as of this time:

1.      Dubious Investment Ventures.  National Note's records suggest that it invested funds in other investment schemes, some of which may be fraudulent.  For example:  (a) close to $5 million appears to have been invested by National Note in Catalyst Liquidity Fund, an entity that appears to have ceased doing business; (b) National Note may have purchased 70,000 shares of stock of an entity called "Mobile Wireless Security, Inc.," which appears to have ceased doing business in 2005; (c) National Note has possession of a $300 million "Private Registered Bonded Promissory Note," which is supposedly payable through the United States Treasury; and (d) documentation indicates that that Deutsche Bank would send National Note $3.7 million as part of a "secret" investment program.  The Receiver does not believe that recovery of these potential assets will be possible, but he will continue to investigate whether

there is any possibility of doing so to the extent that the circumstances warrant.

2.     Investor Promissory Notes.  From examination of the records to date, the Receiver has determined that as a whole, Promissory Notes that National Note issued to its investors appear to have promised interest rates of between 12% and 18%.  Thus, at times, National Note was borrowing money from investors at 12% interest and then paying 18% interest to other investors.  The Receiver also has determined that in addition to National Note, Receivership Entities Homeland Holdings, LLC and Homeland Funding, LLC were also issuing Promissory Notes to investors.  Additionally, other companies believed to be controlled by National Note managers also appear to have been issuing Promissory Notes to investors.

C.     **Financial Condition.**  Preliminary analysis of the books and records makes clear that National Note was in financial distress for at least several years prior to the entry of the Receivership Order as evidenced by at least the following: (a) its default on numerous development projects, resulting, in some instances, in judgments and liens against real properties; (b) its failure to pay taxes related to numerous properties; (c) its failure to accurately and completely report its financial condition in private placement memoranda issued to investors, including by failing to report often significant losses of affiliated companies; (d) the existence of multiple intercompany transfers that involved the use of investor funds raised by National Note to pay the expenses of affiliated Receivership Entities and journal entries showing that the funds these Entities had "borrowed" from National Note were used primarily to pay "interest" rather than for property acquisition or development; and (e) the undercapitalization of Receivership Entities that National Note caused to be formed.  The Receiver's investigation of these issues continues.

**D.**   **Receivership Financial Information**.  The following financial information is provided for the period following the entry of the Receivership Order:

1.   Bank Accounts.  Upon his appointment, the Receiver initially opened fifteen bank accounts which included a general operating account (the "Operating Account"), as well as separate accounts generally reflecting the Receivership Estate's limited continued business operations.  As operations are wound down and these other bank accounts are no longer needed, they will be closed and their funds will be transferred to the Operating Account.  The Receiver anticipates opening one additional bank account in which to reserve net proceeds of real estate sales in cases where disputed lien interests have attached to those sales proceeds pending resolution of the lien disputes.  At the close of the Reporting Period, balances are shown below:

| Entity/Operation | 12/31/12 Account Balance |
|---|---|
| East Meadows Trailer Park | 24,669.24 |
| Land Utah, LC | 0.00 |
| Expressway Owners | 1,107.26 |
| Expressway Operating | 5,671.52 |
| Farrell Owners | 973.07 |
| Montana One | 0.00 |
| Receiver's Operating Account | 11,937.23 |
| ND 1 | 5,568.30 |
| Old Glory: Main | 35,655.63 |
| Old Glory: Metals | 378.39 |
| Presidential Properties | 1,319.81 |
| Quail Hollow | 0.00 |
| Riverbend Estates | 8,179.96 |
| Property Company | 0.00 |
| Twin Pines | 0.00 |
| **TOTAL** | **$95,460.41** |

2.   Deposits.  The sources of funds deposited into the Receivership Estate's

bank accounts during the Reporting Period are shown in the following table:

| Source | Amount |
|---|---|
| Rents | 52,630.83 |
| Owners' association dues | 798.00 |
| Funds from frozen bank accounts | 27,147.34 |
| Other | 15,798.11 |
| Advances by Receiver | 12,000.00 |
| SUBTOTAL | 108,374.28 |
| | |
| Mint equipment sale proceeds | 34,430.00 |
| Mint gross sale revenue | 638,359.55 |
| **TOTAL** | **$781,163.83** |

3.      Expenditure Breakdown.  The following table shows the categories of

expenses that have been paid from the Receivership Estate's bank accounts during the Reporting

Period.[47]

| Type of Expense | Amount |
|---|---|
| Utilities | 16,033.24 |
| Waste hauling | 2,250.27 |
| Repairs | 27,282.41 |
| Insurance | 5,864.31 |
| Appraisals | 29,800.00 |
| Bank fees | 1,091.50 |
| Dues to owners' association | 4,713.32 |
| Elevator, fire service | 925.50 |
| Other | 9,824.49 |
| SUBTOTAL | 97,785.04 |
| | |
| Mint operating expenses | 701,186.03 |
| **TOTAL** | **$798,785.07** |

4.      Administrative Expense of Receiver and Counsel.  The Receiver and his

---

[47] Note that the time periods for the income and expenses, especially for the Mint, do not correlate precisely as income may be received in advance of the work being done.  Thus, particular operating entities may not show the expenditures occurring in the same quarter as the income.  Some additional expenses have been paid by the Receiver from his funds, generally because a credit card was needed to pay the expense.

staff have spent many hours in taking control of the Receivership Entities and their assets. Furthermore, the Receiver has necessarily required the assistance of legal counsel, and counsel has been active in providing such services to the Receivership Estate.  Given the funds on hand, it is premature to submit a fee application at this time.

But, for the Reporting Period, the Receiver and his staff have spent a total of 2,122.9 hours valued at $199,458.00.[48]  Additionally, the Receiver has advanced funds to the Receivership Estate for expenses incurred or operating costs for which he will seek reimbursement.  The Receiver's legal counsel has spent approximately 142 billable hours and incurred expenses on behalf of the Receivership Estate with total receivables for the Reporting Period in the amount of $58,705.32.[49]

## VIII.

## <u>NEXT STEPS</u>

Although ongoing, the Receiver has conducted a significant amount of investigation during the Reporting Period, and his administration of the estate will start to shift, focusing more on financial analysis, property sales, asset recovery, and litigation.  While administration of the Receivership Estate may change depending on circumstances that may arise, at this time, the Receiver anticipates addressing the following priorities:

1.      <u>Property Sales</u>.  As discussed in Part III above, the Receiver has spent significant time during the Reporting Period investigating and evaluating the value of real property holdings of the Receivership Estate, and where appropriate, he has begun to market

---

[48] During the first reporting period, the Receiver reported total fees of $121,464.00.  *See* First Report at p. 59.  Thus, as of the close of the current Reporting Period, total fees of the Receiver are in the amount of $320,922.00.

[49] During the first reporting period, counsel reported total fees and costs of $46,491.50.  Thus, as of the close of the current Reporting Period, total fees and costs for counsel are in the amount of $105,196.82.

such assets for sale.  The Receiver will continue to aggressively pursue marketing and liquidation of properties that he has identified as having value for the Receivership Estate, including by obtaining all above-described due diligence and Court approval.

2. <u>Challenging Liens</u>.  As discussed in Part III.A above, the Receiver and his legal counsel have spent significant time during the Reporting Period investigating and evaluating interests asserted against real property holdings, including the ABIs issued by Palmer, and in an effort to conserve resources, have made informal demands on certain persons whose interests appear to be invalid or unenforceable.  To clear title to properties listed for sale, or to release net sale proceeds against which contested interests have attached after sale, the Receiver will, if necessary, commence suit against persons who he believes hold invalid or unenforceable interests.

3. <u>Preserving and Maximizing Asset Values</u>.  The Receiver makes every attempt to preserve, and where possible, maximize the value of estate assets.  In this regard, the Receiver is investigating, and where appropriate, collaborating with others, including investors, to maximize the value of estate assets without exposing the Receivership Estate to risk.  An example is the Management Agreement with HMI discussed in Part IV.B above.

4. <u>Financial Analysis and Recovery Efforts</u>.  Significant progress has been made during the Reporting Period in the Receiver's financial analysis of the Receivership Entities, and this effort will continue to be a priority going forward so as to facilitate the Receiver's recovery efforts on behalf of the Receivership Estate, including recovering commissions, false profits, defaulted loans, fraudulent transfers, and other monies owed to National Note as discussed in Part VII above.

## IX.

### CONCLUSION

Significant progress has been made during the Reporting Period.  The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Receivership Estate so as to maximize any distribution available to investors.

DATED this 20th day of February, 2013.

_Wayne Klein_

WAYNE KLEIN, Receiver

<u>**CERTIFICATE OF SERVICE**</u>

IT IS HEREBY CERTIFIED that service of the above **RECEIVER'S SECOND REPORT** was served via email on this 26th day of February, 2013 on the following:

> Thomas M. Melton
> Daniel J. Wadley
> Paul N. Feindt
> Alison J. Okinaka
> SECURITIES AND EXCHANGE COMMISSION
> 15 W. South Temple, Suite 1800
> Salt Lake City, UT  84101
> meltont@sec.gov
> wadleyd@sec.gov
> feindtp@sec.gov
> okinakaa@sec.gov
>
> *Attorneys for Plaintiff Securities and Exchange Commission*
>
> Brennan H. Moss
> Pia Anderson Dorius Reynard & Moss
> 222 South Main, Suite 1830
> Salt Lake City, UT 84101
>
> *Attorneys for Defendant Wayne Palmer*

           /s/ Jeffrey M. Armington