Peggy Hunt (Utah State Bar No. 6060)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
       armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>   v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>                Defendants. | **THIRD STATUS REPORT OF R. WAYNE KLEIN, RECEIVER**<br>*For the Quarter Ending March 31, 2013*<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of

Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National

Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the

"Receivership Entities" hereby submits this Third Status Report for the period January 1, 2013

through March 31, 2013 (the "Reporting Period").

# TABLE OF CONTENTS

Page

I. PROCEDURAL HISTORY .................................................................................. 1

II. CONTINUED OPERATIONS ............................................................................. 2

    A.    Middleton, Idaho: Two Leased Homes.......................................................... 3
    B.    Brigham City, Utah: Twin Pines Apartments. ............................................... 3
    C.    Ogden, Utah: Office Building. ....................................................................... 4
    D.    Vernal, Utah: East Meadows Trailer Park. .................................................... 4
    E.    Fairfield, Utah: Cedar Fort Land. ................................................................. 5
    F.    Spanish Fork, Utah: Expressway Business Park. ........................................... 5
    G.    Temple, Georgia: Single Family Residence. ................................................. 6

III. REAL ESTATE HOLDINGS ............................................................................. 6

    A.    Efforts to Release Liens and Other Interests Against Real Properties................... 8

        1.    Assignments of Beneficial Interests ("ABIs") ............................... 8
        2.    Deeds of Trust Held by Overpaid Investors.................................. 8
        3.    Deeds of Trust Granted Improperly .............................................. 9
        4.    Deeds of Trust Held by Lenders .................................................... 9
        5.    Construction Liens ......................................................................... 9

    B.    Real Property Sales Approved During the Reporting Period/Closed. ................... 9

        1.    Summit, Utah: Summit Park Lot.................................................... 9
        2.    Salt Lake City, Utah: NNU Office ................................................ 10

    C.    Real Property Sales Approved During the Reporting Period/Not Closed. ........... 10

        1.    Malad, Idaho: Elkhorn Ridge Lots ## 4, 5 & 48........................... 11
        2.    Mesa, Arizona: Clearview Business Park ..................................... 11
        3.    Gilbert, Arizona: Farrell Business Park ........................................ 11

    D.    Sale of Real Properties/Court Approval Requested. ............................................ 12

        1.    Malad, Idaho: Elkhorn Ridge Lot #1 ............................................ 12
        2.    Eagle Mountain City, Utah: Autumn Ridge, Phase I ................... 13
        3.    Salt Lake City, Utah: Residential Building Lots........................... 13
        4.    Vernal, Utah: East Meadows Trailer Park .................................... 13

    E.    Abandoned Real Properties—Lack of Equity....................................................... 14

i

      1.    Sanpete County, Utah: Gooseberry Cabin .................................................. 14
      2.    Salt Lake City, Utah: Cottonwood Road Compound ................................ 14
      3.    Spanish Fork, Utah: Expressway Unit # 109 ........................................... 15

  F.    Properties Believed to Have No Value—Option. ................................................. 15

IV. NON REAL ESTATE ASSETS ........................................................................................ 16

  A.    Personal Property. ............................................................................................... 16

      1.    Advertising Truck ...................................................................................... 16
      2.    Property at the National Note Office ......................................................... 16

  B.    Alleged Mineral Assets. ...................................................................................... 17
  C.    Pre-Receiver Asset Transfers. ............................................................................. 17

V. LITIGATION ................................................................................................................... 17

  A.    Actions Against The Receivership Estate. ........................................................... 17

      1.    Complaint in Intervention Filed by First National Bank of Layton
          ("FNB") ...................................................................................................... 17
      2.    Complaint in Intervention Filed by Rhonda Pilcher, Barry Pilcher
          and Commercial Design & Construction, Inc. .......................................... 18
      3.    Complaint in Intervention Filed by the True & Marjorie Kirk
          Family Trust (the "Kirk Trust") ................................................................ 18
      4.    Complaint in Intervention Filed by American Pension Services
          ("APS") ...................................................................................................... 18

  B.    Actions Commenced By The Receiver. ............................................................... 19

VI. RECORDS OF THE RECEIVERSHIP ENTITIES ............................................................ 19

  A.    Business Records. ............................................................................................... 19
  B.    Investor Payment Records. .................................................................................. 19
  C.    Accounting Software. .......................................................................................... 20
  D.    Bank Records. .................................................................................................... 20

VII. INITIAL FINANCIAL ANALYSIS ................................................................................ 21

  A.    Potential Sources of Recovery. ........................................................................... 21

      1.    Winning Investors ..................................................................................... 21
      2.    Accounts Receivable ................................................................................. 23
      3.    Contract Breaches ..................................................................................... 23
      4.    Commissions ............................................................................................. 24

B.   Questionable Transactions. ........................................................ 24

    1.   Dubious Business Ventures ............................................... 24
    2.   Property Valuations.......................................................... 25
    3.   East Meadows Trailer Park ............................................... 25

C.   Financial Condition.............................................................. 25
D.   Receivership Financial Information....................................... 26

    1.   Bank Accounts ................................................................ 26
    2.   Deposits........................................................................... 27
    3.   Expenditure Breakdown................................................... 28
    4.   Administrative Expense of Receiver and Counsel.............. 28

VIII. NEXT STEPS............................................................................. 29

    1.   Property Sales ................................................................. 29
    2.   Challenging Liens ............................................................ 29
    3.   Litigation......................................................................... 30
    4.   Financial Analysis ........................................................... 30

IX. CONCLUSION............................................................................. 31

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States
Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note
by the filing of a Complaint in the United States District Court for the District of Utah (the
"Court").[1]  The SEC alleges, among other things, that Defendants Palmer and National Note
engaged in securities fraud and operated a Ponzi scheme that took over $100 million from more
than 600 investors.

The SEC filed several *ex parte* motions with its Complaint on June 25, 2012, all of which
were granted by the Court.  In particular, the Court entered a Temporary Restraining Order and
Order to Show Cause (the "TRO"),[2] an Order Freezing Assets and Prohibiting Destruction of
Documents (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying
Litigation (the "Receivership Order").[4]  Palmer has since stipulated to the imposition of a
preliminary injunction and to continuation of these orders.[5]

As a result of the Receivership Order, the Receiver controls the assets of Palmer as well
as manages and controls National Note and the Related Entities identified in the Receivership
Order.  A list of the Receivership Entities is attached hereto as **Exhibit A**.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

On November 12, 2012, in accordance with the Receivership Order,[6] the Receiver filed his First Report and Liquidation Plan for the period of June 25, 2012 through September 30, 2012 (the "First Report").[7]  The Receiver's Second Status Report for the period of October 1, 2012 through December 31, 2012, was filed on February 26, 2013. (the "Second Report")[8]  This is the Third Status Report for the period of January 1, 2013 through March 31, 2013, defined above as the "Reporting Period."

## II.

## CONTINUED OPERATIONS

The Receiver is managing the Receivership Estate with the goal of maximizing the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those National Note investors who have not received a return of their principal investment in whole or part.  To facilitate this goal, the Receiver has discontinued the operations of National Note and most of its affiliated entities, except in those limited instances that have previously been described in earlier Status Reports and as discussed immediately below, and he has attempted to minimize the enterprise's historically high operating expenses going forward.

---

[6] Docket No. 9 (Receivership Order) at pp.18-20.

[7] Docket No. 73 (First Report).

[8] Docket No. 170 (Second Report).

At this time, the only operations going forward are those related to several real estate holdings of the Receivership Estate.[9]  The following is a description of the Receiver's limited operation of several real estate properties which are being operated either because they are generating net income for the Receivership Estate or because their continued operation will minimize losses:

A.    **Middleton, Idaho: Two Leased Homes**.  The Receivership Estate includes two residential properties that are located in Middleton, Idaho, adjacent to a 175-acre proposed subdivision that National Note had planned under the name "Riverbend Estates," discussed in further detail at pages 25 - 26 of the First Report.[10]  The two homes are currently being rented through the services of a professional property manager, generating $1,345.00 in monthly net income.  The Receiver's ultimate disposition of these homes will likely depend on the development of Riverbend Estates.[11]

B.    **Brigham City, Utah: Twin Pines Apartments**.  The Twin Pines Apartments are three buildings with twenty apartments located in Brigham City, Utah, which are leased to lower income tenants.  Further information about this property is set forth at pages 29 - 30 of the First Report.  During the Reporting Period, the Receiver continued to operate this property through his property manager.  As a result of property repairs and the work of the property manager,

---

[9] *See* First Report, pp. 9-10, 57-58 & Second Report, Part II.A (discussing operation of Old Glory Minting Company, LLC; operations of this entity were discontinued by the Receiver in December 2012).  Certain of the real property being operated described in the First and Second Reports is now being liquidated.  *See* First Report, pp. 24-53; Second Report, Part II.B.  This Report contains only those real properties being operated during the Reporting Period.

[10] The name of the National Note affiliate that intended to develop the property is Riverbend Estates, LLC. The Receiver refers to this property as the "River Run Subdivision" in the First Report.  First Report at pp. 25-26.  Both "River Run" and "Riverbend" were used to describe this property.

[11] *See* discussion *infra* at Part III.E.

occupancy is now averaging 95%, compared to slightly over 50% when the Receiver was appointed. The Apartments are now generating approximately $3,500.00 monthly net income for the Receivership Estate.

A National Note investor has been permitted to intervene in this case to assert an interest in this the Twin Pine Apartments, which interest the Receiver has challenged. Litigation related to this matter is ongoing.

      C.    **Ogden, Utah: Office Building.** The Office Building is an old, three-story commercial office building located in downtown Ogden, Utah that is co-owned with a third party (the "Co-Owner"). Further details related to the Office Building are set forth at pages 30 - 31 of the First Report.

At present, this building has two tenants sharing the main floor.[12] The rental income from these two tenants is not sufficient to pay operating expenses of the Office Building, and the Receiver is required to make ongoing repairs to the Office Building and its heating and plumbing systems to maintain its value. The Receiver has decided against seeking additional tenants for the Office Building and to market it for sale. Currently, the Co-Owner is attempting to find a buyer for the building or obtain financing to buy out the Receivership interest in the property. If this does not succeed in the near future, the Co-Owner has agreed to allow the property to be listed for sale.

      D.    **Vernal, Utah: East Meadows Trailer Park.** East Meadows is a mobile home park located in Vernal, Utah, with eighty-six lots and a large park area. As discussed on pages 34 – 35 of the First Report, the mobile homes owned by Land Utah, LC are parked on forty-five

---

[12] *See* First Report, p. 31.

of the lots (the "LU Homes"), an office and garage are located on one of the lots, certain lots are occupied by tenants who own their own mobile homes, and certain lots are empty. The Receiver, through a new property manager, has dramatically reduced expenses associated with running this property and increased the rents being collected, and the property is generating approximately $10,000.00 in net monthly income. The Receiver will continue to operate this property until it is sold to the highest and best bidder.[13]

       **E.**   **Fairfield, Utah: Cedar Fort Land.** The Cedar Fort Land is a large parcel of undeveloped real estate located in Fairfield, Utah discussed in greater detail at page 42 of the First Report. The Receiver obtained an appraisal which valued this property at $280,000.00. Given challenges related to the property's location, lack of access and environmental issues, this property may take some time to sell. In the meantime, the Receiver has agreed to lease the Cedar Fort Land for grazing, with the understanding that the lease may be terminated if the Land is sold. In addition to the annual income to be obtained from the lessee based on the number of cows using the land during the year, the lease qualifies the property as agricultural land which will result in substantially reduced property tax rates. The Receiver is evaluating several indications of interest that have been expressed relating to selling portions of this property.

       **F.**   **Spanish Fork, Utah: Expressway Business Park.** Expressway Business Park is located in Spanish Fork, Utah, containing 46 business condominium units that were built by National Note. At the time of the Receiver's appointment, forty-two of the units were sold, leaving four remaining units in the Receivership Estate, each of which is described in greater

---

[13] *See* Docket No. 248 and discussion *infra* at p. 13 (After evaluating several indications of interest from potential buyers, the Receiver accepted an opening offer in the amount of $1,025,000.00 to purchase the real property and LU Homes, which offer is subject to higher and better bids at auction. At this time, the Receiver is awaiting approval of his auction procedures and publication notice from the Court prior to conducting an auction).

detail at pages 42 – 46 of the First Report.[14]

The Receiver had leased two of the four units owned, #204 and #215, during the Reporting Period. Unit #204 continues to be rented, generating $1,000 in net monthly income for the Receivership Estate. The tenant in unit #215 vacated during this Reporting Period, and thus the Receiver will now market this unit for sale.

The other two units owned by the Receivership Estate are not being operated by the Receiver. After obtaining approval from the Court, unit #109 was abandoned to a first lienholder,[15] and the Receiver is in the process of selling unit #305.

G. **Temple, Georgia: Single Family Residence.** This home is located near Atlanta, in Temple, Georgia, and is being managed by a professional property manager. Further details related to this property are set forth at page 51 of the First Report. During earlier reporting periods, the property was being leased and generating monthly revenue for the Receivership Estate, but the tenants have been evicted for non-payment of rent and the Receiver is in the process of repairing the property prior to marketing it for sale.

## III.

## REAL ESTATE HOLDINGS

A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report and some of which also are discussed in Part II above. The Receiver has determined that some of the real properties appear to have value for the Receivership Estate and need to be operated and/or marketed for sale, some

---

[14] The Fist Report erroneously indicated that the project had 48 units and that 44 had sold. *See* First Report, pp. 42-43.

[15] *See* discussion *infra* at p.15.

properties have no equity, and some require further investigation and analysis, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver has taken actions deemed appropriate given his analysis of each of the properties as of March 31, 2013. His investigation and analysis continues, and he has taken numerous actions since the close of the Reporting Period that will be included in his next Status Report. Attached hereto as **Exhibit B** is a chart setting forth the status of real properties in question as of April 30, 2013, including all properties that are being marketed for sale.

For purposes of this Status Report, the Receiver discusses the following in Parts A through F:

- Part A below discusses the efforts undertaken during the Reporting Period to release liens and other claims recorded against these properties;

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales or methods of sale that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale or the method of sale has been requested;

- Part E describes real properties in which it does not appear that the Receivership Estate has equity at this time; and

- Part F identifies real properties that are believed to have no value.

**A.      Efforts to Release Liens and Other Interests Against Real Properties.**  During

the Reporting Period, the Receiver's investigation of real property holdings of the Receivership

Estate has continued.  While his investigation is ongoing, the Receiver has determined that there

are numerous types of interests that have been asserted against many of the Receivership Estate's

real properties, including at least the following types of interests for which he has taken the

following actions:

1.      Assignments of Beneficial Interests ("ABIs").  The First and Second

Reports described the ABIs that were recorded against a wide variety of the Receivership

Estate's real properties purportedly in favor of certain National Note investors.  The Receiver

does not believe that ABIs have any validity and, therefore, absent a voluntary release of the

ABIs,[16] the Receiver has challenged or intends to challenge the ABIs as necessary and

appropriate.  In certain cases, the Court has approved the sale of real property free and clear of

the ABIs, with interests afforded thereby, if any, attaching to the net sale proceeds.  In these

instances, absent voluntary release of the ABIs in question, the Receiver will commence

litigation to clear title to the net sale proceeds so as to increase the funds available for

distribution to all National Note investors who have incurred a loss of their principal investment.

2.      Deeds of Trust Held by Overpaid Investors.  Deeds of Trust have been

recorded against some of the Receivership Estate's real properties by National Note investors

who were overpaid (meaning they have received distributions in excess of the principal amount

of their investments).  Absent voluntary release of such Deeds of Trust, the Receiver intends to

---

[16] In most instances, the Receiver has sent letters to holders of ABIs requesting that they execute a voluntarily release, and approximately one third to one half of the ABIs on various properties have been released as a result.

file lawsuits as necessary and appropriate.

      3.    <u>Deeds of Trust Granted Improperly</u>. Deeds of Trust were recorded against some of the Receivership Estate's properties by National Note investors long after such investors had made their investment. The Receiver asserts that these Deeds of Trust are avoidable fraudulent transfers.

      4.    <u>Deeds of Trust Held by Lenders</u>. Deeds of Trust were recorded against some of the Receivership Estate's properties by what appear to be third party lenders who lent money for the purchase of such properties. The Receiver continues to investigate the validity and extent of such Deeds of Trust, and to take all appropriate actions in regard thereto, including negotiating appropriate settlement agreements and claim reductions.

      5.    <u>Construction Liens</u>. In preparing to close on the sale of one property in the Receivership Estate, the Receiver discovered that three construction liens had been placed on the property and two were still in effect. The Receiver negotiated a release of one lien and a reduction in the amount of the other, which will be paid at closing.

    **B.**    **<u>Real Property Sales Approved During the Reporting Period/Closed</u>.** Two Court-approved real property sales were closed by the Receiver during the Reporting Period:

      1.    <u>Summit, Utah: Summit Park Lot</u>.[17] The Summit Part Lot, a building lot near Park City, Utah, sold for $37,500.00 pursuant to a Court approved private sale.[18] This sale closed on or about January 28, 2013, and after taxes, sales commissions and closing costs, the Receivership Estate received net sale proceeds in the amount $32,477.61. No liens or other

---

[17] *See* First Report, p. 32.

[18] Docket No. 135.

interests were recorded against this property other than those paid out of the gross sale proceeds.

    2. <u>Salt Lake City, Utah: NNU Office</u>.[19]  The NNU Office located in Salt Lake City, Utah, sold for $285,000.00 pursuant to a Court-approved private sale.[20]  This is the building where National Note and most of the other affiliated Receivership Entities and other companies tied to Palmer (but which are not in the Receivership Estate) operated their business. This sale closed on or about March 19, 2013, and the Receivership Estate received net sale proceeds totaling $55,903.09 after payment of $191,000.00 to the holder of a valid and perfected lien as well as taxes, sales and closing costs in the total amount of $38,096.91.  No liens or other interests were recorded against this property other than the undisputed ones paid from the gross sale proceeds.

    C. **<u>Real Property Sales Approved During the Reporting Period/Not Closed</u>**.  The Court entered Orders approving private sales or procedures for the public sales of the following properties free and clear of interests, none of which had closed at the end of the Reporting Period.  In all instances, the Receiver expects that the sales will close prior to the close of the next reporting period.  All but one of the properties in question are subject to certain recorded interests, and thus upon closing, all net sale proceeds obtained will be held in reserve by the Receiver on behalf of the Receivership Estate pending resolution of all disputes related to such interests.  The exception, Elkhorn Ridge Lot #5, had all ABI interests released before closing and all net sales proceeds from the property were deposited into the Receivership Estate's Operating Account.

-----------------------------------

[19] *See* First Report, pp. 7, 38.

[20] Docket No. 161.

1.   <u>Malad, Idaho: Elkhorn Ridge Lots ## 4, 5 & 48</u>:[21]   Private sales of three

parcels of real property, all lots located in the Elkhorn Ridge Estates near Malad, Idaho,[22] had

been approved by the Court[23] but had not closed as of March 31, 2013:[24]  Lot # 4 sold for

$35,000.00; Lot # 5 (with a partially-built cabin) sold for $80,000.00; and Lot # 48 (also with a

partially-built cabin) sold for $80,000.00.

2.   <u>Mesa, Arizona: Clearview Business Park</u>:[25]  A public sale of this

condominium warehouse building located in Mesa, Arizona, with an opening bid in the amount

of $737,000.00 was approved by the Court by Order entered on February 26, 2013.[26]  During the

Reporting Period, a Court-approved notice of public sale was published by the Receiver, and

competing bids were to be submitted to the Receiver by no later than April 15, 2013.[27]

3.   <u>Gilbert, Arizona: Farrell Business Park</u>:[28]  Public sales of the 12

warehouse condominium units owned by the Receivership Estate at Farrell Business Park,

located in Gilbert, Arizona based on seven opening bids totaling $966,261.36 in amount were

---

[21] *See* First Report, pp. 26-27.

[22] *See* First Report, pp. 26-27.

[23] Docket No. 231.

[24] At the time of the filing of this Third Report, the sales of these Lots had closed.  *See* **Exh. B**.  A report of the closing will be provided in the Receiver's next report.

[25] *See* First Report, pp. 49-50.

[26] Docket No. 177.

[27] At the time of the filing of this Third Report, the Receiver has received no higher and better bids, and he will proceed to close the sale to the person submitting the opening bid as provided for in the Court-approved Auction Bid Procedures.

[28] *See* First Report, pp. 48-49.

approved by the Court by Order entered on March 8, 2013.[29]  During the Reporting Period, Court-approved notices of public sale were published by the Receiver, and competing bids were to be submitted to the Receiver by no later than April 22, 2013.[30]

      **D.**     <u>**Sale of Real Properties/Court Approval Requested.**</u>  At the close of the Reporting Period, the Receiver had negotiated the sale of certain real property and had filed Motions with the Court seeking approval of the private sales or the form of public sales free and clear of any interests.[31]  Each of the properties in question is subject to certain recorded interests, and thus all net sale proceeds obtained will be held in reserve by the Receiver on behalf of the Receivership Estate at closing pending resolution of all disputes related to such interests.

      1.     <u>Malad, Idaho: Elkhorn Ridge Lot #1</u>:[32]  The Receiver filed a Motion during the Reporting Period seeking approval to sell Lot # 1 in the Elkhorn Ridge Estates near Malad, Idaho with its partially-built cabin, for $130,000.00 free and clear of interests.[33]  Since the end of the Reporting Period, a higher offer for Lot #1 was made in the amount of $143,000.00 and was subject to approval.[34]

---

[29] Docket Nos. 201-208.

[30] At the time of the filing of this Third Report, the Receiver had received higher and better offers for some of the Units and, thus, the Receiver will conduct an auction in accordance with the Court-approved Auction Procedures and report on that auction in the next report.

[31] At the time of the filing of this Third Report, the Receiver had filed additional Motions seeking approval of private sales or of public sale procedures for additional real properties. *See* **Exh. B.** These properties will be discussed in the Receiver's next report.

[32] *See* First Report, pp. 26-27; Second Report, p. 13.

[33] Docket No. 150.

[34] At the time of the filing of this Third Report, the Court had entered an Order approving the sale to the person making the higher offer. Docket No. 264. A closing of this sale is still pending. *See* **Exh. B**.

2.    Eagle Mountain City, Utah: Autumn Ridge, Phase I:  Autumn Ridge is a residential subdivision project located in Eagle Mountain City, Utah, which has two groups of lots, one being known as "Phase I." [35]  During the Reporting Period, the Receiver filed a Motion requesting that the Court approve the sale of 17 of the 19 Phase I lots free and clear of interests for a total purchase price of $629,000.00. [36]

3.    Salt Lake City, Utah: Residential Building Lots: [37]  During the Reporting Period, the Receiver filed a Motion requesting that the Court approve the sale of two building lots located in Salt Lake City, Utah to The Salvation Army for a total purchase price of $70,000.00. [38]

4.    Vernal, Utah: East Meadows Trailer Park: [39]  During the Reporting Period, the Receiver filed a Motion requesting that the Court approve procedures for the public sale of mobile home park located in Vernal, Utah, together with the LU Homes. [40]  The proposed opening bid for this sale is in the amount of $1,025,000.00.  At the time of the filing of this Status Report, the Receiver is awaiting approval of his proposed auction procedures and publication notice from the Court.

---

[35] *See* First Report, pp. 40-41.

[36] Docket No. 228.

[37] *See* First Report, p. 36.

[38] Docket No. 200. After the close of the Reporting Period, the Court entered an Order approving this private sale. *Id.* at 263.

[39] *See* First Report, pp. 34-35.

[40] Docket No. 248.

E.      **Abandoned Real Properties—Lack of Equity.**  During the Reporting Period, the Receiver obtained Orders from the Court approving agreements with certain parties holding valid, non-avoidable interests in the real properties described below.[41]  As a result of these agreements, the Receiver abandoned any interest of the Receivership Estate in the real properties in question based on a determination that the properties lacked equity for the Estate.  In all instances, the Receiver obtained, *inter alia*, a release from the opposing parties of all potential claims that they might hold against the Receivership Estate, and the opposing parties incurred certain applicable costs of transfer.

    1.      Sanpete County, Utah: Gooseberry Cabin.[42]  This cabin, located in Sanpete County, Utah, was valued at $115,000.00, but a Deed of Trust securing a debt in the amount of $218,718.12 had been recorded against it.  The Court entered an Order on or about January 16, 2013,[43] approving a Settlement Agreement under which, among other things, the Receiver executed a Quit Claim Deed, transferring the property to the holders of the Deed of Trust.

    2.      Salt Lake City, Utah: Cottonwood Road Compound:[44]  An approximately four-acre portion of approximately 4.9 total acres of real property located in Salt Lake City, Utah, known as the "Cottonwood Road Complex" was subject to a Deed of Trust held by First

---

[41] After the close of the Reporting Period, but prior to the filing of this Third Report, the Receiver has filed a Motion to approve a Settlement Agreement related to, among other things, the abandonment of certain real property located in Middleton, Idaho, known as "River Run" or "Riverbend Estates."  Docket No. 278; *see* Second Report, p. 15 (discussing lack of equity).  This Settlement Agreement will be discussed in the Receiver's next report.

[42] *See* First Report, pp. 46-47; Second Report, p. 15 & Exh. B (indicating lack of equity).

[43] Docket No. 125.

[44] *See* First Report, pp. 36-37; Second Report, p. 15 & Exh. B (indicating lack of equity).

National Bank of Layton, securing a debt in the amount of approximately $1.7 million. Because this four acres parcel had an appraised value of $1.1 million, the Receiver entered into a Settlement Agreement with the Bank which provided, in part, for the Receivership Estate's transfer of the four-acre portion of the Cottonwood Road Complex to the Bank. The parties filed a Joint Motion seeking approval of this Agreement, and on February 27, 2013, the Court entered an Order approving the Settlement Agreement.[45]

        3.      <u>Spanish Fork, Utah: Expressway Unit # 109</u>:[46] This business condominium located in Spanish Fork, Utah was appraised at $140,000.00, but had a Deed of Trust recorded against it securing a debt in the amount of $143,792.28. Accordingly, the Receiver negotiated a Settlement Agreement with the lienholder abandoning any interest of the Receivership Estate in the property, and on March 29, 2013, the Court entered an Order approving this Settlement Agreement.[47]

       **F.**      **Properties Believed to Have No Value—Option.** As discussed in Part IV.D.29 -- Part IV.D.32 of the First Report, National Note owns three old, inner city homes, located in Cleveland and Toledo, Ohio and Chicago, Illinois as well as a building lot in Cleveland. Efforts to market these properties have been unsuccessful because brokers have refused to visit the properties. The Receiver has granted an option to a real estate investor to purchase the three properties with homes, subject to Court approval, which must be exercised by May 4, 2013. If exercised, the three homes will be sold for approximately $75,000.00; if not exercised, the

---

[45] Docket No. 179.

[46] The Receiver erroneously identified this property as Expressway Business Park Unit #305 in his Second Report. Second Report, p. 15. Unit #305 is being marketed for sale by the Receiver, and Unit #109 had at the time of the Second Report been identified as a property in which there was no equity.

[47] Docket No. 241.

Receiver will need to conduct further analysis of these properties.

## IV.

## NON-REAL ESTATE ASSETS

In addition to real estate, the Receivership Estate is comprised of several other categories of assets, including certain personal property described in Part A below; unrefined ore discussed in Part B, and collection and litigation assets related to transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

**A.** **Personal Property.** National Note owns a limited amount of personal property. These assets, which the Receiver has sold or is preparing for sale during the Reporting Period, include some additional assets of Old Glory Mint. In the Second Report, the Receiver discussed his wind-down of Old Glory Mining Company, LLC and his sale of certain of the company's equipment and supplies.[48] During the current Reporting Period, the Receiver sold the company's customer records, dies, and the Internet domain name for $4,000.00.

1.   Advertising Truck. The Receivership Estate obtained approximately $5,500.00 in net sale proceeds from the sale of an advertising truck, which included the Receiver's payment of a standard sales commission and $7,565.42 owed to Key Bank on a valid and enforceable secured debt.

2.   Property at the National Note Office. Certain items located at the former National Note office were sold through an online auction, resulting in approximately $2,066.06 in net sale proceeds for the Receivership Estate.

---

[48] Second Report, pp. 2-4, 17.

**B.** **Alleged Mineral Assets.** As described in the Second Report,[49] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("HMI"), to assist the Receiver in investigating whether ore held by National Note had any commercial value. The Receiver receives regular reports from HMI on its progress in efforts to recover precious metals from this ore. If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in accordance with Management Agreement described in the Second Report.

**C.** **Pre-Receiver Asset Transfers.** Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate, including but not limited to National Notes' payment of false profits and commissions on investments. A discussion of the types of claims discovered by the Receiver and his intended course of action for recovery of these claims is set forth in the Financial Analysis discussed in Part VII below.

## V.

## LITIGATION

**A.** **Actions Against The Receivership Estate.** The following has occurred during the Reporting Period with regard to actions that have been commenced in the Civil Case:

1. **Complaint in Intervention Filed by First National Bank of Layton ("FNB")**
50: During the Reporting Period, the Court entered an Order approving a Settlement Agreement

---

[49] Second Report, pp. 18-19.

[50] Docket No. 23.

between the Receiver and FNB 51.  As a result of this Settlement Agreement, litigation related to the Complaint in Intervention has been suspended.[52]

      2.    Complaint in Intervention Filed by Rhonda Pilcher, Barry Pilcher and Commercial Design & Construction, Inc.:[53]  As a result of a Settlement Agreement that was approved by the Court during the Reporting Period, this Complaint has been dismissed.[54]

      3.    Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust (the "Kirk Trust"):[55]  The Court has permitted the Kirk Trust to intervene in the Civil Case to assert rights related to certain property identified in the First Report as the "Twin Pines Apartments."[56]  The Receiver has filed an answer disputing that the Kirk Trust has a secured interest in the property, and affirmatively asserting claims against Kirk Trust.  Litigation of this matter is ongoing.

      4.    Complaint in Intervention Filed by American Pension Services ("APS"):[57]  The Court has permitted APS to intervene in the Civil Case to assert certain claims related to APS's role as a custodian of certain National Note investor accounts.  During the Reporting Period, the parties filed joint motions to extend the time for APS to file its Complaint in Intervention pending settlement negotiations.  This matter is ongoing.

---

[51] Docket Nos. 179.

[52] *See* Docket No. 181.

[53] *See* Docket No. 28.

[54] Docket No. 125.

[55] *See* Docket No. 89.

[56] *See* First Report at pp. 29-30.

[57] *See* Docket No. 101.

**B.**   **Actions Commenced By The Receiver.**   During the Reporting Period, the Receiver has continued his investigation of claims held by the Receivership Estate, including but not limited to National Note's payment of false profits to investors (*i.e.*, amounts paid to an investor in excess of the amount of the investor's principal investment) and commissions.   In many instances, the Receiver began making demand for repayment of these types of claims, and in response, some of these recipients have turned over the funds; but, most have not.

On March 29, 2013, the Court entered an Order authorizing the Receiver to file lawsuits on behalf of the Receivership Estate.[58]   The Receiver anticipates that he will commence litigation shortly, including but not limited to filing complaints against those persons who have received false profits and commissions, as well as to seek invalidation of ABIs and other unenforceable interests against real properties.

## VI.

## RECORDS OF THE RECEIVERSHIP ENTITIES

During the Reporting Period, the Receiver continued to make substantial progress in identifying and analyzing books and records of the Receivership Entities, including but not limited to the following:

**A.**   **Business Records.**   The Receiver completed the indexing of twenty years of business records that he has located to date.

**B.**   **Investor Payment Records.**   The Receiver has accessed the transactions recorded by National Note on the software program called "NoteSmith" and conducted an analysis of the same.   This program records investor payments to National Note, reinvestment of

---

[58] Docket No. 240.

interest, and distributions to investors. Analysis of the data in NoteSmith has allowed the Receiver to identify, among other things, investors who received payments from National Note in excess of the amounts of their principal investments. This information has been the basis for the demands made on overpaid investors.

      **C.**      **Accounting Software.** National Note used two primary accounting programs: QuickBooks and Peachtree. Analysis of the information in these programs has enabled the Receiver to, among other things, identify cash flow patterns, intercompany transfers, and transfers to third parties, as well as to provide the Court and investors with the financial analysis set forth below in Part VII.

      **D.**      **Bank Records.** During the Receivership Period, the Receiver has continued to collect and evaluate the Receivership Entities' bank records, some of which were opened as far back as 1995. To date, the Receiver has identified twenty-six Receivership Entities that held bank accounts, some of which had more than one account, and analysis of the activities in these accounts is ongoing. The following is a summary of activity in the pre-Receivership bank accounts for the approximately five and one half years prior to the commencement of the Civil Case to illustrate the volume of transactions the bank accounts:

| Deposits | Transaction Numbers | Amount |
|---|---|---|
| Transfers between NNU bank accounts | 18,355 | $62,427,888.69 |
| Overnight investment sweeps | 1,311 | $301,944,866.62 |
| Transfers from other Receivership Entities' accounts | 447 | $11,225,694.41 |
| Business transactions | 2,846 | $93,700,372.89 |
| Presently unknown source | 120 | $2,596,346.53 |
| **Total** | **23,079** | **$471,994,169.14** |
| | | |
| **Withdrawals** | | |

| Transfers between NNU bank accounts | 18,355 | $62,427,884.38 |
|---|---|---|
| Overnight investment sweeps | 1,309 | $300,945,697.27 |
| Transfers to other Receivership Entities' accounts | 1,245 | $30,725,440.03 |
| Business transactions | 22,530 | $78,790,201.22 |
| Presently unknown recipients | 32 | $764,600.69 |
| **TOTAL** | **43,471** | **$473,653,823.59** |

## VII.

## INITIAL FINANCIAL ANALYSIS

Although the Receiver's investigation and analysis is ongoing, from examination of the books and records discussed in Part VI above, the Receiver has determined and/or discloses as follows:

A. **Potential Sources of Recovery.** National Note made numerous types of transfers prior to the Receiver's appointment which may be recoverable for the benefit of the Receivership Estate. Analysis of these potential assets is ongoing, but as of this time, the Receiver has discovered the following:

1. Winning Investors. Governing law requires that National Note investors who received a return greater than the principal sum they invested return their "false profits" for the benefit of the Receivership Estate. National Note's records indicate that approximately 232 investors are recipients of false profits, and although further analysis may be necessary, the false profits transferred appear to be as high as $6.3 million. This amount does not include amounts that may have been paid to certain persons who acted or are deemed to have acted in bad faith. During the Reporting Period, the Receiver has continued analyzing these types of transfers, and anticipates making demand for repayment of the false profits.

21

a.      *Demand Letters*.  As of March 31, 2013, the Receiver sent demand letters to close to 200 investors who received more in distributions from National Note than the principal amount of their respective investments.  These letters demand a return of all false profits that the investors received.  Approximately half of these investors have responded to the demand letters, with a small amount agreeing to repay their false profits.  However, most have denied that their false profits are recoverable.  While the Receiver has responded that he is entitled to recovery under applicable law, he anticipates that he will be required to commence lawsuits against many of these investors to recover their false profits during the next reporting period.

b.      *Recoveries of False Profits*.  Based on governing law, the Receiver believes that he has a basis on which to recover 100% of false profits that were paid to investors by National Note.  Numerous investors have recognized this point, and have voluntarily returned the false profits that they received based on the demand made on them by the Receiver.[59]  Some have also entered into settlement agreements with the Receiver, promising to repay the false profits either over time or in a reduced amount based on proven financial hardship.[60]  In the majority of cases, however, the Receiver anticipates that he will be required to commence lawsuits against investors who received false profits to obtain

---

[59] As of March 31, 2013, six investors had returned false profits in full, resulting in total recoveries for the Receivership Estate in the amount of $20,347.99.  Since the end of this Reporting Period, the Receiver has obtained additional recoveries which will be reported in his next Status Report.

[60] *See* Docket No. 271 (Motion to Approve Settlement Agreements).

recovery.  The filing of these lawsuits will commence in the next reporting period. To avoid being sued, recipients of false profits should contact the Receiver and attempt to work out a settlement agreement for the repayment of such false profits.

        2.    <u>Accounts Receivable</u>.  National Note's records identify approximately 229 persons or entities who borrowed money from National Note, many of whom have not been repaying their respective loans.[61]  The Receiver's investigation of these accounts receivable and their collectability has continued during the Reporting Period, including though the Receiver contacting borrowers and requesting repayment.  At this time no funds have been recovered as a result of these efforts, but the Receiver has obtained information that will assist him in either abandoning actions for recovery where evidence is produced that there is no basis for it, or collecting funds borrowed.  To minimize cost, the Receiver will continue to attempt to collect on these assets, to the extent that they exist, informally.  But, in cases where his requests for information and repayment go unanswered, he may eventually be required to take formal legal action.

        3.    <u>Contract Breaches</u>.  During the Reporting Period, the Receiver has continued his analysis of National Note's books and records related to National Note's transfers of cash for which no consideration was received.  The Receiver has continued to make demand for recovery of damages under these breached agreements, and will pursue litigation in cases where it is warranted to obtain a recovery.

---

[61] *See* First Report, Part IV.B (discussing potential receivables in greater detail).

4.    Commissions.  During the Reporting Period, the Receiver has continued to investigate the nature and scope of over $750,000.00 recorded in National Note's books and records as "commissions."  The Receiver has determined that some of these commissions were real estate related; others appear to have been paid to persons who were not licensed securities agents for bringing investors to National Note (several commission recipients have informed the Receiver that they were paid 2% of the amount invested by those they brought to the scheme). According to the records, close to $300,000.00 of this sum was paid to one of Palmer's relatives. Under applicable law, many of these commissions may be recoverable for the benefit of the Receivership Estate, and the Receiver's investigation of these matters continues. Lawsuits to recover these commissions will be filed by the Receiver in most instances in the coming months. For some recipients of commissions, the Receiver may wait until a claims process is created and use the receipt of commissions in deciding whether to allow investor claims to be accepted.

B.    **Questionable Transactions.**  In his earlier reports, the Receiver has reported on National Note's questionable transactions that he has discovered.  As his investigation has continued, the Receiver has discovered additional transactions as follows:

1.    Dubious Business Ventures.  National Note's records suggest that it invested funds in other investment schemes, some of which may be fraudulent.  For example: (a) monies transferred by National Note to LD&B Management, Inc. (who was sued by the SEC in 1999 for raising $8.6 million from investors in a promissory note Ponzi scheme); (b) monies transferred by National Note to Horizon Mortgage (which filed bankruptcy in 2010 and had a forensic accountant appointed as bankruptcy trustee in 2011); and (c) monies transferred by National Note to Jeffrey Mowen, who pleaded guilty to federal criminal charges in 2011 in

connection with a Ponzi scheme he was operating. The Receiver does not believe that recovery of these potential assets will be possible, but he will continue to investigate whether there is any possibility of doing so to the extent that the circumstances warrant.

2.    Property Valuations.  National Note engaged in very questionable valuation methods and self-dealing which appear, at least in part, to have been for the purpose of inflating the value of its asset holdings. For example, National Note paid approximately $133,500.00 for certain property referred to as the "Outpost Property" located in Duchesne, Utah in 2004 – which property has recently appraised as having a value of $140,000.00.[62]   However, in 2006, National Note caused its affiliate Indian Canyon, LLC to issue a promissory note in its favor in the principal amount of $1,550,000.00 supposedly based on the value of the Outpost Property, but which was in fact more than ten times its purchase price or current valuation.

3.    East Meadows Trailer Park.  Among National Note's business records, the Receiver has discovered an internal memorandum analyzing the financial operations of the East Meadows Trailer Park located in Vernal, Utah,[63] disclosing that East Meadows had net operating losses every year.  Annual operating losses ranged from $115,000.00 to $265,000.00, and over a five year period totaled $876,000.00.  Yet, since the Receiver's appointment, he has employed a new property manager.  During the six months of the manager's employment, East Meadows has net operating income of $63,337.83.

C.    **Financial Condition**.  Preliminary analysis of the books and records makes clear that National Note was in financial distress for at least several years prior to the entry of the

---

[62] See Docket Nos. 252-253 (Motion to Sell Outpost Property and Receiver's Supporting Declaration).

[63] See First Report, pp. 34-35.

Receivership Order as evidenced by at least the following: (a) its default on numerous development projects, resulting, in some instances, in judgments and liens against real properties; (b) its failure to pay taxes related to numerous properties; (c) its failure to accurately and completely report its financial condition in private placement memoranda issued to investors, including by failing to report often significant losses of affiliated companies; (d) the existence of multiple intercompany transfers that involved using the investor funds raised by National Note to pay the expenses of affiliated Receivership Entities and journal entries showing that the funds these Entities had "borrowed" from National Note were used primarily to pay "interest" rather than for property acquisition or development;[64] and (e) the undercapitalization of Receivership Entities that National Note caused to be formed.  The Receiver's investigation of these issues continues.

        **D.**    **Receivership Financial Information**.  The following financial information is provided for the period following the entry of the Receivership Order:

        1.    Bank Accounts.  Upon his appointment, the Receiver initially opened fifteen bank accounts which included a general operating account (the "Operating Account"), as well as separate accounts generally reflecting the Receivership Estate's limited continued business operations.  Additionally, one additional bank account has been opened in which to hold deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "Real Estate Account").

        As National Note's business operations have been wound down, the Receiver has closed most of the "entity-related" accounts he had opened when first appointed, and caused any funds

---

[64] *See* chart *supra* at pp. 20-21.

on deposit in those accounts to be transferred to the Operating Account.  The balances in these

accounts as of the close of the Reporting Period are as follows:[65]

| Entity/Operation | Status | 3/31/13 Account Balance |
|---|---|---|
| East Meadows Trailer Park | Closed 3/29/13 | $0.00 |
| Land Utah, LC | Closed 10/17/12 | $0.00 |
| Expressway Owners | Closed 3/29/13 | $0.00 |
| Expressway Operating | Closed 3/1/13 | $0.00 |
| Farrell Owners | Closed 3/19/13 | $0.00 |
| Montana One | Closed 12/18/12 | $0.00 |
| Operating Account | Open | $230,957.95 |
| Real Estate Account | Open | $1,988.00 |
| ND 1 | Closed 3/19/13 | $0.00 |
| Old Glory: Main | Closed 3/19/13 | $0.00 |
| Old Glory: Metals | Closed 1/24/13 | $0.00 |
| Presidential Properties | Closed 3/1/13 | $0.00 |
| Quail Hollow | Closed 12/18/12 | $0.00 |
| Riverbend Estates | Closed 3/1/13 | $0.00 |
| Property Company | Closed 12/18/12 | $0.00 |
| Twin Pines | Closed 3/29/13 | $0.00 |
| TOTAL | | $232,945.95 |

    2.    Deposits.  The sources of funds deposited into the Operating Account and

Real Estate Account during the Reporting Period are shown in the following table:

| Source | Amount |
|---|---|
| Net from bank accounts closed | $109,744.43 |
| Real estate sales | $89,265.40 |
| Rents | $16,96033 |
| Asset sales (not real estate) | $17,281.86 |
| Settlement funds | $20,647.99 |
| Insurance, utility refunds | $541.62 |
| TOTAL | $254,441.63 |

---

[65] The Receiver's future Status Reports will only include a report of the Operating Account and the Real Estate Account.

    3.    <u>Expenditure Breakdown</u>.  The following table shows the categories of expenses that have been paid from the Receivership Estate's bank accounts during the Reporting Period:

| Type of Expense[66] | Amount |
|---|---|
| Utilities | $4,972.49 |
| Publication costs for legal notices | $2,928.48 |
| Dues to owners' association | $4,622.14 |
| Appraisals | $4,650.00 |
| Insurance | $3,294.75 |
| Maintenance | $4,368.15 |
| Title company expense | $114.00 |
| Real property closing expenses[67] | $10,015.43 |
| Miscellaneous expenses[68] | $455.46 |
| **TOTAL** | **$35,420.90** |

    4.    <u>Administrative Expense of Receiver and Counsel</u>.  The Receiver and his staff have spent many hours in taking control of the Receivership Entities and their assets. Furthermore, the Receiver has necessarily required the assistance of legal counsel, and counsel has been active in providing such services to the Receivership Estate.  Given the funds on hand, it is premature to submit a fee application at this time.

    For the Reporting Period, the Receiver and his staff have spent a total of 2,327.0 hours valued at $227,155.00.[69]  Additionally, the Receiver has advanced funds to the Receivership Estate for expenses incurred or operating costs for which he will seek reimbursement.  The

---

[66] These expenses do not include expenses in the separate bank accounts that were closed.

[67] This category includes monies paid to a bank holding a lien on the advertising truck that was sold as well as real estate taxes.

[68] This category includes bank fees, storage unit rental, and other miscellaneous expenses.

[69] During the first reporting period, the Receiver reported total fees of $121,464.00.  *See* First Report, p. 59.  During the second reporting period, the Receiver reported total fees of $199,458.00.  *See* Second Report, p. 29.  Thus, as of the close of the current Reporting Period, total fees of the Receiver are in the amount of $548,077.00.

Receiver's legal counsel has spent approximately 492.30 billable hours and incurred expenses on behalf of the Receivership Estate with total receivables for the Reporting Period in the amount of $134,778.81.[70]

## VIII.

### NEXT STEPS

The Receiver has conducted a significant amount of investigation during the Reporting Period and his administration of the estate has shifted, focusing more on financial analysis, property sales, asset recovery, and litigation. While administration of the Receivership Estate may change depending on circumstances that may arise, at this time, the Receiver anticipates addressing the following priorities in the coming months:

1.   Property Sales. As discussed in Part III above, the Receiver has spent significant time during the Reporting Period marketing and selling real property holdings of the Receivership Estate. The Receiver will continue to aggressively pursue sales of properties that he has identified as having value for the Receivership Estate, including by conducting due diligence on the value of the properties, liens asserted against the properties, the best means of selling properties, and ways of overcoming defects relating to various properties. In all cases, the Receiver will sell real estate only after obtaining Court approval.

2.   Challenging Liens. As discussed in Part III above, the Receiver and his legal counsel have spent significant time during the Reporting Period investigating and evaluating interests asserted against real property holdings, including the ABIs issued by Palmer,

---

[70] During the first reporting period, counsel reported total fees and costs of $46,491.50. *See* First Report, p. 59. During the second reporting period, counsel reported total fees and costs of $58,705.32. *See* Second Report, p. 29. Thus, as of the close of the current Reporting Period, total fees and costs for counsel are in the amount of $239,975.63.

and in an effort to conserve resources, have made informal demands on certain persons whose interests appear to be invalid or unenforceable. The Receiver expects to begin filing suit in the near future against ABI holders of properties that have been sold, so the net proceeds from the property sales may be released to the Receivership Estate and distributed.

       3.    <u>Litigation</u>. The Receiver expects to commence and begin prosecuting substantial litigation during the upcoming reporting period against, among others, overpaid investors, persons who received commissions, persons who received avoidable transfers or owe the Receivership Estate money, and holders of ABIs or other interests against real property or net sale proceeds.

       4.    <u>Financial Analysis</u>. Significant progress has been made during the Reporting Period in the Receiver's financial analysis of the Receivership Entities, and this effort will continue to be a priority going forward so as to facilitate the Receiver's recovery efforts on behalf of the Receivership Estate, including recovering commissions, false profits, defaulted loans, fraudulent transfers, and other monies owed to National Note as discussed above. In addition, this continuing analysis will include an insolvency analysis.

IX.

## CONCLUSION

Significant progress has been made during the Reporting Period. The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Receivership Estate so as to maximize any distribution available to investors.

DATED this 1st day of May, 2013.

_____
WAYNE KLEIN, Receiver

31

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **THIRD STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this 2nd day of May, 2013, and served via ECF on all parties who have requested notice in this case, including the Securities and Exchange Commission.

## CERTIFICATE OF SERVICE - MAIL, OTHER

I further certify that on the 2nd day of May, 2013, I caused to be served a true and correct copy of the **THIRD STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** by first class United State Mail, postage fully paid, addressed to:

> Wayne L. Palmer
> 8816 South 2240 West
> West Jordan, Utah 84088
> *Defendant*

/s/ Peggy Hunt