Peggy Hunt (Utah State Bar No. 6060)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **FOURTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** *For the Quarter Ending June 30, 2013* |
| Plaintiff, | |
| v. | 2:12-cv-00591 BSJ |
| NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual, | The Honorable Bruce S. Jenkins |
| Defendants. | |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of

Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National

Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the

"Receivership Entities" hereby submits this Fourth Status Report for the period April 1, 2013

through June 30, 2013 (the "Reporting Period").

# TABLE OF CONTENTS

Page

I. PROCEDURAL HISTORY ................................................................................ 1

II. CONTINUED OPERATIONS ......................................................................... 2

    A.    Middleton, Idaho: Two Leased Homes .................................................... 3
    B.    Brigham City, Utah: Twin Pines Apartments ......................................... 3
    C.    Ogden, Utah: Office Building .................................................................. 4
    D.    Vernal, Utah: East Meadows Trailer Park. .............................................. 5
    E.    Fairfield, Utah: Cedar Fort Land .............................................................. 5
    F.    Spanish Fork, Utah: Expressway Business Park ...................................... 6
    G.    Temple, Georgia: Single Family Residence ............................................ 7

III. REAL ESTATE HOLDINGS ........................................................................ 7

    A.    Efforts to Release Liens and Other Interests Against Real Properties ................... 8

        1.    Assignments of Beneficial Interests ("ABIs") ............................. 9
        2.    Deeds of Trust ............................................................................. 10
        3.    Construction Liens ....................................................................... 11

    B.    Real Property Sales Approved During the Reporting Period/Closed .................. 11

        1.    Elkhorn Lot #5, Malad, Idaho ...................................................... 12
        2.    Elkhorn Lot #48, Malad, Idaho .................................................... 12
        3.    Elkhorn Lot #4, Malad, Idaho ...................................................... 12
        4.    Residential Building Lots at 900 West, Salt Lake City, Utah ................... 13
        5.    Clearview Business Park, Mesa, Arizona ..................................... 13
        6.    Farrell Business Park, Units 103-104, Gilbert, Arizona ........................... 14
        7.    Farrell Business Park, Unit 105, Gilbert, Arizona ........................ 14
        8.    Farrell Business Park, Unit 106, Gilbert, Arizona ....................... 15
        9.    Farrell Business Park, Unit 107, Gilbert, Arizona ....................... 15
        10.    Farrell Business Park, Units 109-111, Gilbert, Arizona .............. 16
        11.    Farrell Business Park, Units 113-114, Gilbert, Arizona .............. 16
        12.    Farrell Business Park, Unit 115-116, Gilbert, Arizona ............... 17
        13.    Autumn Ridge Phase I, Lots #8 and #54, Eagle Mountain, Utah .............. 17
        14.    Autumn Ridge Phase I, Lot #4, Eagle Mountain, Utah ............... 18
        15.    Manhattan Grille Condominium, Manhattan, Montana ................ 18
        16.    Expressway Business Park, Unit 305, Spanish Fork, Utah ................ 19

    C.    Real Property Sales Approved During the Reporting Period/Not Closed ............ 19

        1.    Indian Canyon Land, Duchesne County, Utah ............................. 20
        2.    Elkhorn Lot #1, Malad, Idaho ...................................................... 20

         3.      East Meadows Trailer Park, Vernal, Utah ................................................ 21

         4.      Bandana Cabin, Duchesne County, Utah ................................................ 21

         5.      Autumn Ridge Phase I ........................................................................... 21

  D.     Sale of Real Properties/Court Approval Requested ....................................... 21

         1.      Autumn Ridge Phase II, Eagle Mountain City, Utah ............................. 22

  E.     Property Division—Obtaining Clear Title ..................................................... 22

  F.     Relinquished Real Properties—Lack of Equity ............................................ 23

         1.      Riverbend Estates, Middleton, Idaho ..................................................... 23

  G.     Properties Believed to Have No Value—Option ........................................... 24

IV. NON-REAL ESTATE ASSETS ..................................................................................... 24

  A.     Personal Property ............................................................................................ 24

  B.     Alleged Mineral Assets ................................................................................... 25

  C.     Pre-Receiver Asset Transfers ......................................................................... 25

V. LITIGATION ................................................................................................................ 25

  A.     Claims Being Pursued by the Receivership Estate ......................................... 25

         1.      Improper Commissions Paid .................................................................. 26

         2.      Unpaid and Forgiven Loans, Unreimbursed Draws and Advances ......... 27

         3.      Credit Card Companies .......................................................................... 29

         4.      Employees and Family Members ........................................................... 29

         5.      Litigation Related to Interests in Real Property ...................................... 31

         6.      Overpaid Investors ................................................................................. 32

         7.      Tolling Agreements ................................................................................ 33

  B.     Settlements With Overpaid Investors ............................................................. 34

         1.      Full Repayments Without Settlement Agreements .................................. 34

         2.      First Motion for Approval of Settlement Agreements ............................. 34

         3.      Second Motion for Approval of Settlement Agreements ......................... 35

  C.     Actions Against the Receivership Estate ........................................................ 36

         1.      Complaint in Intervention Filed by First National Bank of Layton
              ("FNB") ................................................................................................. 36

         2.      Complaint in Intervention Filed by Rhonda Pilcher, Barry Pilcher
              and Commercial Design & Construction, Inc. ........................................ 36

         3.      Complaint in Intervention Filed by the True & Marjorie Kirk
              Family Trust (the "Kirk Trust") ............................................................. 36

4.   Complaint in Intervention Filed by American Pension Services ("APS") ................................................................................. 37

VI. RECORDS OF THE RECEIVERSHIP ENTITIES ................................................. 37

VII. FINANCIAL ANALYSIS ....................................................................................... 37

   A.   Questionable Transactions ................................................................... 37

      1.   "Black Sand" Ore ...................................................................... 38
      2.   Ghana Gold ................................................................................. 38
      3.   Loan Forgiveness ....................................................................... 38
      4.   Borrowers .................................................................................... 39

   B.   Receivership Financial Information ...................................................... 40

      1.   Bank Accounts ........................................................................... 40
      2.   Operating Account Deposits ..................................................... 41
      3.   Operating Account Expenditures .............................................. 41
      4.   Real Estate Account Deposits and Expenditures ..................... 42
      5.   Administrative Expense of Receiver and Counsel..................... 42

VIII. NEXT STEPS ........................................................................................................ 43

      1.   Property Sales ............................................................................. 43
      2.   Challenging Liens ....................................................................... 43
      3.   Litigation ...................................................................................... 43
      4.   Analysis of Insolvency and Ponzi ............................................. 44

IX. CONCLUSION ......................................................................................................... 44

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[1]  The SEC alleges, among other things, that Defendants Palmer and National Note engaged in securities fraud and operated a Ponzi scheme that took over $100 million from more than 600 investors.

The SEC filed several *ex parte* motions with its Complaint on June 25, 2012, all of which were granted by the Court.  In particular, the Court entered a Temporary Restraining Order and Order to Show Cause (the "TRO"),[2] an Order Freezing Assets and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[4]  Palmer has since stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5]

As a result of the Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **Exhibit A**.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

On November 12, 2012, in accordance with the Receivership Order,[6] the Receiver filed his First Report and Liquidation Plan for the period of June 25, 2012 through September 30, 2012 (the "First Report").[7]  The Receiver's Second Status Report for the period of October 1, 2012 through December 31, 2012, was filed on February 26, 2013 (the "Second Report").[8]  The Third Status Report, for the period of January 1, 2013 through March 31, 2013, was filed on May 2, 2013 (the "Third Report").[9]  This is the Fourth Status Report for the period of April 1, 2013 through June 30, 2013, defined above as the "Reporting Period."

## II.

### CONTINUED OPERATIONS

The Receiver is managing the Receivership Estate with the goal of maximizing the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those National Note investors who have not received a return of their principal investment in whole or part.  To facilitate this goal, the Receiver has discontinued the operations of National Note and most of its affiliated entities, except in those limited instances that have previously been described in earlier Status Reports and as discussed immediately below, and he has attempted to minimize the enterprise's historically high operating expenses going forward.

At this time, the only operations going forward are those related to several real estate

---

[6] Docket No. 9 (Receivership Order), pp.18-20.

[7] Docket No. 73 (First Report).

[8] Docket No. 170 (Second Report).

[9] Docket No. 288 (Third Report).

holdings of the Receivership Estate.[10]  The following is a description of the Receiver's limited operation of several real estate properties which are being operated either because they are generating net income for the Receivership Estate or because their continued operation will minimize losses:

      A.      __Middleton, Idaho: Two Leased Homes__.  The Receivership Estate includes two residential properties that are located in Middleton, Idaho, adjacent to a 175-acre proposed subdivision that National Note had planned under the name "Riverbend Estates," discussed in further detail at pages 25 - 26 of the First Report.[11]  The two homes are currently being rented through the services of a professional property manager, generating approximately $1,345.00 in monthly net income.  The Receiver's ultimate disposition of these homes will likely depend on the development of Riverbend Estates.[12]

      B.      __Brigham City, Utah: Twin Pines Apartments__.  The Twin Pines Apartments are three buildings with twenty apartments located in Brigham City, Utah, which are leased to lower income tenants.  Further information about this property is set forth at pages 29 - 30 of the First Report.  During the Reporting Period, the Receiver continued to operate this property through his property manager.  As a result of property repairs and the work of the property manager,

---

[10] *See* First Report, pp. 9-10, 57-58 & Second Report, Part II.A (discussing operation of Old Glory Minting Company, LLC; operations of this entity were discontinued by the Receiver in December 2012).  Certain of the real property being operated described in the earlier Reports is now being liquidated.  *See* First Report, pp. 24-53; Second Report, Part II.B; Third Report, Part II.  This Report contains only those real properties being operated during the Reporting Period.

[11] The name of the National Note affiliate that intended to develop the property is Riverbend Estates, LLC. The Receiver refers to this property as the "River Run Subdivision" in the First Report.  First Report, pp. 25-26. Both "River Run" and "Riverbend" were used to describe this property.

[12] *See* discussion *infra* at Part III.F.

occupancy is now averaging 95%, compared to slightly over 50% when the Receiver was appointed. The Apartments are now generating approximately $3,500.00 monthly net income for the Receivership Estate.

A National Note investor has been permitted to intervene in this case to assert an interest in the Twin Pine Apartments, which interest the Receiver has challenged. Litigation related to this matter is ongoing. During the pendency of the litigation, all net rental proceeds are being segregated and maintained by the property manager.

C. **Ogden, Utah: Office Building**. The Office Building is an old, three-story commercial office building located in downtown Ogden, Utah that is co-owned with a third party (the "Co-Owner"). Further details related to the Office Building are set forth at pages 30 - 31 of the First Report.

At present, this building has two tenants sharing the main floor.[13] The rental income from these two tenants is not sufficient to pay operating expenses of the Office Building, and the Receiver is required to make ongoing repairs to the Office Building and its heating and plumbing systems to maintain its value. The Receiver has decided against seeking additional tenants for the Office Building and to market it for sale. Previously, the Co-Owner indicated an intent to find a buyer for the building or obtain financing to buy out the Receivership interest in the property. The Co-Owner has not reported any progress in either of these efforts and communicates with the Receiver rarely. The Receiver has sent a letter to the Co-Owner listing the expenses and net losses incurred in the operation of the Office Building, demanding that she

---

[13] *See* First Report, p. 31.

contribute to her share of the expenses and net losses.  If the Co-Owner does not make these payments, the Receiver intends to file suit against her.

**D.      Vernal, Utah: East Meadows Trailer Park.**  East Meadows is a mobile home park located in Vernal, Utah, with eighty-six lots and a playground area.  As discussed on pages 34 – 35 of the First Report, mobile homes owned by Land Utah, LC are parked on forty-five of the lots (the "LU Homes"), an office and garage are located on one of the lots, certain lots are occupied by tenants who own their own mobile homes, and certain lots are empty.  The Receiver, through a new property manager, has dramatically reduced expenses associated with running this property and increased the rents being collected, and the property is generating approximately $10,000.00 in net monthly income.  On May 2, 2013, the Court entered an Order approving a public sale of this property.[14]  The auction was held on June 10, 2013 and the property was sold to the highest bidder for $1,030,000.00.  The Receiver will continue to operate this property until the sale closes.

**E.      Fairfield, Utah: Cedar Fort Land.**  The Cedar Fort Land is a large tract of undeveloped real estate located in Fairfield, Utah discussed in greater detail at page 42 of the First Report.  The Receiver obtained an appraisal which valued this property at $280,000.00.  Despite challenges related to the property's location, lack of access and environmental issues, the Receiver has received offers to purchase two sections of this property and expects to receive an offer for a third section.  When purchase agreements are finalized the Receiver expects to file motions seeking Court approval of public sales of these properties.  In the meantime, the

---

[14] Docket No. 292. A Court-approved notice of auction was published, informing interested parties of a stalking horse bid and inviting other bids for the property.

Receiver is leasing the Cedar Fort Land for grazing, with the understanding that the lease may be terminated if the Land is sold.[15]

    **F.**    <u>**Spanish Fork, Utah: Expressway Business Park**</u>. Expressway Business Park, located in Spanish Fork, Utah, contains 46 business condominium units that were built by National Note. At the time of the Receiver's appointment, forty-two of the units had been sold, leaving four remaining units in the Receivership Estate, each of which is described in greater detail at pages 42 – 46 of the First Report.[16]

    After obtaining approval from the Court, unit #109 was relinquished to a first lienholder on March 29, 2013.[17] The Receiver marketed unit #305 for sale and, with permission of the Court, conducted an auction.[18] At the auction, the property was sold for $69,000.[19] Unit #215 had been rented for a time, but is now vacant. The Receiver is in discussions with several parties interested in purchasing this unit and hopes to receive an offer soon on this property. The fourth property, unit #204, continues to be rented, generating $1,000 in net monthly income for the Receivership Estate. However, this unit is subject to a lender's deed of trust and foreclosure proceedings were commenced by the lender prior to the entry of the Receivership Order. The lender obtained an appraisal of this unit which indicates that the property is worth less than the

---

[15] In addition to the annual income to be obtained from the lessee, based on the number of cows using the land during the year, the lease qualifies the property as agricultural land which will result in substantially reduced property tax rates.

[16] The Fist Report erroneously indicated that the project had 48 units and that 44 had sold. *See* First Report, pp. 42-43.

[17] Docket No. 241.

[18] Docket No. 270.

[19] *See* discussion below at Part III.B. The sale of this property closed on June 27, 2013.

amount owed to the secured lender. The Receiver has negotiated a settlement agreement with the lender and intends to file a motion with the Court seeking permission to return this property to the lender based on the lender's agreement not to seek any deficiency or make any claims against the Receivership Estate. Until the property is returned to the lender, rents will continue to be paid to the Receiver.

       **G.**    **Temple, Georgia: Single Family Residence**. This home is located near Atlanta, in Temple, Georgia, and was being managed by a professional property manager. Further details related to this property are set forth at page 51 of the First Report. During earlier reporting periods, the property was being leased and generating monthly revenue for the Receivership Estate. During this Reporting Period, the tenants ceased paying rents and were evicted. The Receiver has engaged a real estate agent to market the property. In preparation for the sale, the Receiver has approved work by landscapers to improve the appearance of the property and by contractors to make repairs to the home.

**III.**

**REAL ESTATE HOLDINGS**

A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report and some of which also are discussed in Part II above. The Receiver has determined that some of the real properties appear to have value for the Receivership Estate and need to be operated and/or marketed for sale, some properties have no equity, and some require further investigation and analysis, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver has sold numerous properties and actively marketed other properties. Attached hereto as **Exhibit B** is a chart setting forth the status of all real properties in the Receivership Estate as of June 30, 2013.

For purposes of this Status Report, the Receiver discusses the following in Parts A through G:

- Part A below discusses the efforts undertaken during the Reporting Period to release liens and other claims recorded against these properties;

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales or methods of sale that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale or the method of sale has been requested;

- Part E describes properties that were divided by the Receiver to gain clear title to certain properties;

- Part F describes actions taken by the Receiver regarding real properties in which it does not appear that the Receivership Estate has equity; and

- Part G identifies real properties that are believed to have no value.

A. **Efforts to Release Liens and Other Interests Against Real Properties**. As part of the Receiver's investigation of real property holdings of the Receivership Estate, the Receiver has determined that there are numerous types of interests that have been asserted against many of the Receivership Estate's real properties, including at least the following types of interests for which he has taken the following actions:

1.      Assignments of Beneficial Interests ("ABIs").  The First and Second

Reports described the ABIs that were recorded against a wide variety of the Receivership

Estate's real properties purportedly in favor of certain National Note investors.  If the ABIs are

determined to be valid interests, a significant portion of the real estate sales proceeds held by the

Receivership Estate would be paid to the ABI holders, with little money left for investors who

were not granted ABIs.  The Receiver believes that the ABIs are not legally valid interests.

Accordingly, the Receiver has taken the following actions:

a.      Request Voluntary Releases:  As real estate properties have been

sold, the Receiver has sent letters to holders of ABIs recorded against those properties,

requesting that the holders voluntarily release the ABIs.  Such requests have been met with

moderate success.  In general, approximately one third to one half of the ABI holders in any

given property have executed voluntary releases.  In the case of one property, there was only one

ABI and it was released by the holder.

b.      Sale of Property Free and Clear of Liens:  For properties where

ABIs have been recorded, the Receiver has asked the Court for permission to sell the properties

free and clear of interests, with interests, if any, attaching to the proceeds of the sale.  Where

such sales have been approved and consummated, the Receiver holds the sales proceeds in a

reserve account pending release of the ABIs or the Court's determination of the validity of the

ABIs.

c.      Lawsuits Filed:  As described below in Part V, the Receiver has

begun filing lawsuits against overpaid investors and others who received improper payments

from National Note or its affiliates.  To the extent that the Receiver's investigation revealed that

these defendants also hold ABIs, the lawsuits seek to have the Court invalidate the ABIs.  The

Receiver plans to file additional lawsuits against those ABI holders who are not overpaid

investors, seeking invalidation of the ABIs.

        2.    <u>Deeds of Trust</u>.  Deeds of trust were recorded against some of the

Receivership Estate's real properties prior to the entry of the Receivership Order.  Several of

these deeds of trust are held by National Note investors who were overpaid (meaning they have

received distributions in excess of the principal amount of their investments).  The Receiver is

taking the following actions regarding deeds of trust:

        a.    <u>Settlement Agreements</u>:  In two cases, the Receiver negotiated

settlements with the holders, obtaining releases of deeds of trust as follows.  An overpaid

investor agreed to return overpaid amounts to the Receiver and released his deed of trust on the

Deer Meadows property.  In the second instance, a deed of trust was held by a lender on the

Indian Canyon property.  The Receiver negotiated a 25% reduction in the amount owed on the

deed of trust and the lender released the deed of trust.  Both these settlements have been

approved by the Court.[20]

        b.    <u>Litigation</u>:  The Receiver is litigating the validity of deeds of trust

on two other properties.  First, an investor, the True and Marjorie Kirk Trust, holds a deed of

trust on the Twin Pines property located in Brigham City, Utah.  The Receiver believes this deed

of trust is avoidable under Utah fraudulent transfer law.  The Trust has been authorized by the

Court to intervene in this case, and has commenced a lawsuit against the Receiver to enforce the

---

[20] Docket Nos. 308 & 348.

deed of trust.  In the other matter, the Receiver filed suit against John Spinola on June 25, 2013,

asserting that his deed of trust recorded against the cabin in Kanab, Utah, is not valid because the

promissory note to which the deed of trust is tied has been paid off.

      c.      <u>Continuing Investigation</u>:  A deed of trust has been recorded

against the Bandana Cabin property.  The Receiver asserts that this deed of trust is avoidable

because it was given without equivalent consideration to National Note, and he is currently

engaged in negotiations with the holder of this deed of trust related to his claims.  The Receiver

also is evaluating whether the multiple deeds of trust on the Overland Trails property are valid.

      3.      <u>Construction Liens</u>.  At the time the Receiver was appointed, two

construction liens existed against the Clearview Business Park, located in Arizona.  The Receiver

negotiated a release of one lien and a reduction in the amount of the debt associated with the

other.  This property has been sold, and the second lien was paid at the closing.

      **B.**      **<u>Real Property Sales Approved During the Reporting Period/Closed</u>**.  Sixteen

Court-approved real property sales were closed by the Receiver during the Reporting Period,

each of which is described below.  Some of the properties were sold at auction.  In most

instances where auctions were conducted, the properties sold for higher prices than the initial bid

received by the Receiver.  While in several cases, the public sale increased the prices by

$5,000.00, in other instances, the auction raised the price by as much as $50,000.00.

It should be noted that the net sales proceeds for most of these properties were reduced

substantially because significant property taxes assessed against the property had not been paid

prior to the Receiver's appointment and were required to be satisfied from the sale proceeds;

generally, three to four years of property taxes were owed.  An unpaid construction lien on the

Clearview Business Park, discussed above, also reduced the net sales proceeds.  These unpaid obligations are indications that National Note had been facing financial difficulties for multiple years before the SEC asked the Court to close its operations and appoint a receiver.

        1.         <u>Elkhorn Lot #5, Malad, Idaho</u>:[21]  This partially-built cabin near Malad City, Idaho, sold for $80,000.00 pursuant to a Court-approved private sale.[22]  This sale closed on April 8, 2013, and after payment of three years of back property taxes, sales commissions and closing costs, the Receivership Estate received net sale proceeds in the amount of $71,803.14.  One ABI was recorded against this property, but the ABI was released before the sale closed.

        2.         <u>Elkhorn Lot #48, Malad, Idaho</u>:[23]  This lot in the Elkhorn Ridge subdivision also included a partially-built cabin.  It sold for $80,000.00 pursuant to a Court-approved private sale.[24]  The sale closed on April 9, 2013, and after payment of three years of back property taxes, sale commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $73,620.84.  The property has one ABI recorded against it, and thus the sale proceeds are being held in a reserve account until the Court rules on the validity and effect of the ABI.

        3.         <u>Elkhorn Lot #4, Malad, Idaho</u>:[25]  This is a vacant building lot in the Elkhorn Ridge subdivision.  It sold for $35,000.00 pursuant to a Court-approved private sale.[26]

---

[21] *See* First Report, p. 26.

[22] Docket No. 231.

[23] *See* First Report, p. 26.

[24] Docket No. 231.

[25] *See* First Report, p. 26.

[26] Docket No. 231.

The sale closed on April 26, 2013, and after payment of three years of back property taxes, sale commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $30,893.21. The property has two ABIs recorded against it. One of the ABIs was voluntarily released, but the other ABI has not. As a result, the proceeds from the sale are being held in a reserve account until the Court has ruled on the validity and effect of the ABI.

        4.      Residential Building Lots at 900 West, Salt Lake City, Utah:[27] These two building lots near downtown Salt Lake City were sold to the Salvation Army for $70,000.00 pursuant to a Court-approved private sale.[28] The sale closed on May 8, 2013, and after property taxes and closing costs, the Receivership Estate received net sale proceeds in the amount of $65,295.00. The sale was negotiated directly with the Salvation Army, and thus there were no commissions paid from the sales proceeds. This property had eight ABIs recorded against it. Five of the ABIs have been released voluntarily but three remain, so the proceeds from the sale are being held in a reserve account until the Court has ruled on the validity and effect of the ABIs.

        5.      Clearview Business Park, Mesa, Arizona:[29] This property is a partially-constructed business park having eight units. The Court approved a public sale of the property and auction procedures based on a stalking horse bid in the amount of $737,000.00.[30] No bids were submitted higher than the stalking horse bid, and the property sold for $737,000.00. The

---

[27] *See* First Report, p. 39.

[28] Docket No. 263.

[29] *See* First Report, p. 49.

[30] Docket No. 177.

sale closed on May 10, 2013, and after payment of four years of back property taxes, totaling $91,634.94, sale commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $591,295.43.  The property has twenty seven ABIs recorded against it. Fourteen have been voluntarily released, but thirteen remain.  Accordingly, sale proceeds are being held in a reserve account until the Court has ruled on the validity and effect of the ABIs.

6.   Farrell Business Park, Units 103-104, Gilbert, Arizona:[31]  This property consists of two unfinished units in a business park.  The Court approved a public sale of the property and auction procedures based on a stalking horse bid in the amount of $153,261.35.[32] At the auction, bidding raised the price to $203,261.36, an increase of $50,000.00.  The sale closed on May 31, 2013, and after payment of four years of back property taxes and closing costs, the Receivership Estate received net sale proceeds in the amount of $167,994.10.  There were no commissions paid on these sales as the Receiver negotiated directly with the buyer. Fifteen ABIs were recorded against all of the unsold units, including these units.  Eleven were voluntarily released, but four remain so the proceeds from the sale are being held in a reserve account until the Court has ruled on the validity and effect of the ABIs.

7.   Farrell Business Park, Unit 105, Gilbert, Arizona:[33]  This property consists of an unfinished unit in a business park.  The Court approved a public sale of the property and auction procedures based on a stalking horse bid in the amount of $82,000.00.[34]  At the auction,

---

[31] *See* First Report, p. 48.

[32] Docket No. 202.

[33] *See* First Report, p. 48.

[34] Docket No. 203.

bidding raised the price to $92,000.00, an increase of $10,000.00.  The sale closed on May 21, 2013, and after payment of four years of property taxes, sales commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $70,392.98.  Fifteen ABIs were recorded against all of the unsold units, including this unit.  Eleven were voluntarily released, but four remain so the proceeds from the sale are being held in a reserve account until the Court has ruled on the validity and effect of the ABIs.

  8.  Farrell Business Park, Unit 106, Gilbert, Arizona:[35]  This property consists of an unfinished unit in a completed business park.  The Court approved a public sale of the property and auction procedures based on a stalking horse bid in the amount of $82,000.00.[36]  At the auction, bidding raised the price to $97,000.00, an increase of $15,000.00.  The sale closed on June 7, 2013, and after payment of four years of back property taxes, sales commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $74,832.11.  Fifteen ABIs were recorded against all of the unsold units, including this unit.  Eleven were voluntarily released, but four remain so the proceeds from the sale are being held in a reserve account until the Court has ruled on the validity and effect of the ABIs.

  9.  Farrell Business Park, Unit 107, Gilbert, Arizona:[37]  This property consists of an unfinished unit in a business park.  The Court approved a public sale of the property and auction procedures based on a stalking horse bid in the amount of $85,000.00.[38]  At the auction,

---

[35] See First Report, p. 48.

[36] Docket No. 204.

[37] See First Report, p. 48.

[38] Docket No. 205.

bidding raised the price to $90,000.00, an increase of $5,000.00. The sale closed on June 7, 2013, and after payment of four years of back property taxes, sales commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $67,699.81. Fifteen ABIs were recorded against all of the unsold units, including this unit. Eleven were voluntarily released, but four remain so the proceeds from the sale are being held in a reserve account until the Court has ruled on the validity and effect of the ABIs.

> 10. Farrell Business Park, Units 109-111, Gilbert, Arizona:[39] This property consists of three unfinished units in a completed business park. The Court approved a public sale of the property and auction procedures based on a stalking horse bid in the amount of $240,000.00.[40] No higher bids were submitted, and the property sold for $240,000.00. The sale closed on May 16, 2013, and after payment of four years of back property taxes in the amount of $50,415.26, sales commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $177,584.74. Fifteen ABIs were recorded against all of the unsold units, including these units. Eleven were voluntarily released, but four remain so the proceeds from the sale are being held in a reserve account until the Court has ruled on the validity and effect of the ABIs.

> 11. Farrell Business Park, Units 113-114, Gilbert, Arizona:[41] This property consists of two unfinished units in a business park. The Court approved a public sale of the

---

[39] *See* First Report, p. 48.

[40] Docket No. 206.

[41] *See* First Report, p. 48.

property and auction procedures based on a stalking horse bid in the amount of $164,000.00.[42]

At the auction, bidding raised the price to $214,000.00, an increase of $50,000.00. The sale

closed on June 3, 2013, and after payment of four years of back property taxes, sales

commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount

of $170,188.90. Fifteen ABIs were recorded against all of the unsold units, including these units.

Eleven were voluntarily released, but four remain so the proceeds from the sale are being held in

a reserve account until the Court has ruled on the validity and effect of the ABIs.

          12.    Farrell Business Park, Unit 115-116, Gilbert, Arizona:[43] This property

consists of two unfinished units in a completed business park. The Court approved a public sale

of the property and auction procedures based on a stalking horse bid in the amount of

$160,000.00.[44] No higher or betters offers were received, and these units sold to the stalking

horse bidder for $160,000.00. The sale closed on June 11, 2013, and after payment of four years

of back property taxes, sales commissions, and closing costs, the Receivership Estate received

net sale proceeds in the amount of $118,576.00. Fifteen ABIs were recorded against all of the

unsold units, including these units. Eleven were voluntarily released, but four remain so the

proceeds from the sale are being held in a reserve account until the Court has ruled on the

validity and effect of the ABIs.

          13.    Autumn Ridge Phase I, Lots #8 and #54, Eagle Mountain, Utah:[45] These

---

[42] Docket No. 207.

[43] *See* First Report, p. 48.

[44] Docket No. 208.

[45] *See* First Report, p. 40.