are the first two of nine lots being purchased by Hallmark Homes.  The lots sold for $37,000.00

each, pursuant to a Court-approved process.[46]  The sale closed on May 31, 2013, and after

property taxes, sales commissions, and closing costs, the Receivership Estate received net sale

proceeds in the amount of $63,108.31.  Thirty seven ABIs had been recorded against these lots.

Fourteen have been voluntarily released, but twenty three remain.  Thus, sale proceeds are being

held in a reserve account until the Court has ruled on the validity and effect of the ABIs.

      14.     <u>Autumn Ridge Phase I, Lot #4, Eagle Mountain, Utah</u>:[47]  This lot is the

first of eight lots being purchased by Merit Homes.  The lot sold for $37,000.00 pursuant to a

Court-approved process.[48]  The sale closed on June 3, 2013, and after property taxes, sales

commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount

of $30,821.91.  Thirty seven ABIs had been recorded against these lots.  Fourteen have been

voluntarily released, but twenty three remain.  Thus, sale proceeds are being held in a reserve

account until the Court has ruled on the validity and effect of the ABIs.

      15.     <u>Manhattan Grille Condominium, Manhattan, Montana</u>:[49]  This property is

a small condominium located in Manhattan, Montana.  The property was sold for $51,000.00

pursuant to a Court-approved sale.[50]  The sale closed on June 5, 2013, and after payment of

property taxes, sales commissions, and closing costs, the Receivership Estate received net sale

---

[46] Docket No. 293.

[47] *See* First Report, p. 40.

[48] Docket No. 293.

[49] *See* First Report, p. 28.

[50] Docket No. 300.

proceeds in the amount of $45,933.32. There were interests recorded against this property, and

thus, the net sale proceeds were deposited into the Receivership operating account.

      16.    <u>Expressway Business Park, Unit 305, Spanish Fork, Utah</u>:[51] This property

consists of an unfinished unit in a business park. The Court approved a public sale of the

property and auction procedures based on a stalking horse bid in the amount of $64,000.00.[52] At

the auction, bidding raised the price to $69,000.00, an increase of $5,000.00. The sale closed on

June 27, 2013, and after payment of four years of back property taxes, sales commissions, and

closing costs, the Receivership Estate received net sale proceeds in the amount of $55,840.79.

There are many ABIs recorded against all of the Expressway Business Park units and related

undeveloped land, including against this unit. Some of the ABIs have been voluntarily released,

but many remain and, therefore, sale proceeds are being held in a reserve account until the Court

has ruled on the validity and effect of the ABIs

      C.    <u>**Real Property Sales Approved During the Reporting Period/Not Closed**</u>. The

Court entered Orders approving private sales or procedures for the public sales of the following

properties free and clear of interests, none of which had closed at the end of the Reporting

Period. With the exception of one, these sales should close prior to the end of the next reporting

period. The exception involves Elkhorn Lot #1 for which the Receiver obtained a buyer, but the

sale was not approved based on representations by Palmer that a higher offer could be obtained.

As discussed in further detail below, the sale to Palmer's buyer has failed to close.

      These properties are subject to certain recorded interests, and thus upon closing, all net

---

[51] *See* First Report, p. 45.

[52] Docket No. 270.

sale proceeds obtained from the encumbered properties are expected to be held in reserve by the Receiver on behalf of the Receivership Estate pending resolution of all disputes related to such interests.

      1.    <u>Indian Canyon Land, Duchesne County, Utah</u>:[53]  The Court has approved the sale of this property at auction.[54]  The purchaser, Duchesne County, bid $148,222.56.  No other bidders qualified to participate in the auction, so the sale to Duchene County is final.  The Receiver is in the process of closing this sale.

      2.    <u>Elkhorn Lot #1, Malad, Idaho</u>:[55]  At a hearing held on April 12, 2013 at which the Receiver was seeking to sell this partially-built cabin to a third party buyer for $130,000.00, Palmer represented to the Court that he had a buyer willing to pay $143,000.00 in cash.  As a result, the Court approved the sale to Palmer's buyer.[56]  The title company issued a title commitment on May 8, 2013, but the buyer delayed closing.  The Receiver granted the buyer additional time to come up with the funds to close, and the buyer finally agreed that if he did not close by June 14th, he would forfeit his $7,150.00 deposit.  At the end of that period, the buyer did not close, the original purchaser obtained by the Receiver stated it no longer had an interest in the property, thus causing the Receiver to have to remarket the property for sale.  These efforts are ongoing.

---

[53] *See* First Report, p. 23.

[54] Docket No. 269.

[55] *See* First Report, p. 26.

[56] Docket No. 264.  The order was signed on April 15, 2013.

3.      <u>East Meadows Trailer Park, Vernal, Utah</u>:[57]  On May 2, 2013, the Court approved a public sale of the property and auction procedures based on a stalking horse bid in the amount of $1,025,000.00.[58]  The auction was held on June 10, 2013, and a high bid in the amount of $1,030,000.00 was obtained.  This sale is expected to close in early July.

4.      <u>Bandana Cabin, Duchesne County, Utah</u>:[59]  On June 14, 2013, The Court approved a public sale of the property and auction procedures based on a stalking horse bid in the amount of $260,000.00.[60]  The auction is scheduled for August 9, 2013.

5.      <u>Autumn Ridge Phase I</u>:[61]  Merit Homes and Hallmark Homes have agreed to purchase seventeen building lots pursuant to certain Court-approved procedures. [62]  As discussed above, [63]  the builders have closed on the purchases of three of these lots and are expected to purchase another fourteen lots in the coming months pursuant to the pre-approved sale procedures.

**D.      <u>Sale of Real Properties/Court Approval Requested</u>.**  At the close of the Reporting Period, the Receiver had negotiated the sale of certain real property and had filed a Motion with the Court seeking approval of the private sales free and clear of any interests as set forth below.  The property is subject to certain recorded interests, and thus all net sale proceeds

---

[57] *See* First Report, p. 34.

[58] Docket No. 292.

[59] *See* First Report, p. 32.

[60] Docket No. 341.

[61] *See* First Report, p. 40.

[62] Docket No. 293.

[63] *See* Part III.B., above.

obtained will be held in reserve by the Receiver on behalf of the Receivership Estate at closing, pending resolution of all disputes related to such interests.

1.    Autumn Ridge Phase II, Eagle Mountain City, Utah:[64]  The Receiver filed a Motion on May 15, 2013, seeking approval to sell sixty two lots in a partially developed subdivision located in Eagle Mountain City for $538,000.00 with the sale to be free and clear of interests.[65]  At a hearing, the Court expressed concerns about a term of the agreement requiring the Receiver to have a role in purchasing water for the development.  The Receiver has negotiated revisions to the purchase agreement without any terms relating to water.  The revised purchase agreement will be submitted to the Court in the near future.

E.    **Property Division—Obtaining Clear Title**.  In 2008, National Note agreed to purchase 278.06 acres of land adjacent to Elkhorn Ridge Estates, located near Malad, Idaho.[66] The land purchased was divided into five parcels, which National Note was to purchase in stages.  National Note agreed to pay $834,180.00 for this land, equal to $3,000.00 per acre.  By late 2011, National Note had completed payments for the first three parcels, had paid for a portion of the fourth parcel, and had made no payments on fifth parcel.  At the time of the entry of the Receivership Order, National Note was in default, and foreclosure proceedings on the fourth and fifth parcels had been commenced by the seller financers

During the Reporting Period, the Receiver negotiated a settlement agreement with the

---

[64] *See* First Report, p. 40.

[65] Docket No. 303.

[66] *See* Initial Report at p. 26.

sellers which was approved by the Court by Order entered on May 2, 2013.[67]  The agreement has

several components: i) the sellers have agreed to waive any claims to the first three parcels, ii)

the Receiver agreed on behalf of the Receivership Estate to waive any claim to the fifth parcel

and to return that parcel to the sellers, and iii) as of June 19, 2013, the fourth parcel was divided

into two sections, with the Receivership Estate retaining 43.68 acres and 8.31 acres returned to

the sellers.  As a result of this agreement, the Receivership Estate will have clear title to 217.68

acres of land which the Receiver will market for sale.

     **F.**    **Relinquished Real Properties—Lack of Equity**.  During the Reporting Period,

the Receiver filed one motion seeking authority to relinquish real property which the Receiver

believes has no equity for the Receivership Estate as follows:[68]

     1.    <u>Riverbend Estates, Middleton, Idaho</u>.[69]  This property is a 172-acre parcel

of land in Middleton, Idaho, which was purchased by National Note for approximately $10.4

million.  The Receiver has determined that there is no equity in this property because in 2012,

the property was appraised as having a value of $1 million, and there is a secured debt against

the property that exceeds $5 million.  During the Reporting Period, the Receiver has negotiated a

settlement agreement with the secured creditor pursuant to which the Receiver will relinquish the

property on behalf of the Receivership Estate to the lender.  In return, the creditor has agreed,

*inter alia*, to release the Receivership Estate from all potential claims that it might hold against

the Receivership Estate, to pay all property taxes owed on the property and the costs of effecting

---

[67] Docket No. 289.

[68] The Receiver is evaluating other properties where there may be no equity.

[69] *See* First Report, p. 25.

the transfer, and to reimburse the Receiver for certain of his costs in seeking approval of the agreement by the Court.[70]

      **G.**    **Properties Believed to Have No Value—Option**.  As discussed in Part IV.D.29 – Part IV.D.32 of the First Report, National Note owns three old, inner city homes, located in Cleveland and Toledo, Ohio and Chicago, Illinois as well as a building lot in Cleveland.  Efforts to market these properties have been unsuccessful because brokers have refused to visit the properties.  The Receiver granted an option to a real estate investor to purchase the three properties with homes, subject to Court approval.  The option was to have been exercised by May 4, 2013.  The buyer did not exercise the option and the Receiver has no other prospects for realizing value from the properties.  The Receiver intends to ask the Court for permission to abandon these properties.

**IV.**

**NON-REAL ESTATE ASSETS**

      In addition to real estate, the Receivership Estate is comprised of other categories of assets, including certain personal property described in Part A below, unrefined ore discussed in Part B below, and recovery of improper transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

      **A.**    **Personal Property**.  National Note owned a limited amount of personal property. Most of the personal property was sold and reported in prior reporting periods.  Small amounts of revenue, outlined in the financial discussion below, were received during the current

---

[70] Docket No. 178.

Reporting Period from the online sale of items by the auctioneer.

      **B.**    **Alleged Mineral Assets**.  As described in the Second Report,[71] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("HMI"), to assist the Receiver in investigating whether ore held by National Note had any commercial value.  The Receiver receives regular reports from HMI on its progress in efforts to recover precious metals from this ore.  If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in accordance with Management Agreement described in the Second Report.

      **C.**    **Pre-Receiver Asset Transfers**.  Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate, including but not limited to National Notes' payment of false profits and commissions on investments.  A discussion of the types of claims discovered by the Receiver and his intended course of action for recovery of these claims is set forth in the next section, below.

**V.**

**LITIGATION**

      **A.**    **Claims Being Pursued by the Receivership Estate**.

      On May 20, 2013, the Court entered an Order reappointing the Receiver,[72] and based on that Order, the Receiver filed Notices of Appointment in twenty six judicial districts, in addition to the five in which he had previously filed such Notices.  On May 21, 2013, the Court entered

---

[71] Second Report, pp. 18-19.

[72] Docket No. 311.

25

an amended Order allowing the Receiver to commence litigation.[73]

Since that time, the Receiver has filed 136 lawsuits against the recipients of funds transferred to them by National Note prior to the entry of the Receivership Order.[74]  These transfers fall into several categories described below.  The Receiver's investigation is ongoing and additional lawsuits are expected to be filed in the future.

Monies obtained through this litigation are expected to be a significant asset of the Receivership Estate.  Such funds, however, will be net of the expense of obtaining settlements, judgments and the ordinary costs of litigation, such as filing fees, which alone totaled $54,000.00.

The lawsuits filed by the Receiver to date include:

1.      Improper Commissions Paid:  Based on National Note's books and records, commissions were paid to certain parties for soliciting investors for National Note.  The Receiver has filed seven lawsuits seeking recovery of commissions paid, and where applicable, recovery of false profits received by these individuals:

a.      Joel Blakeslee:  On June 6, 2013, the Receiver sued Mr. Blakeslee to recover $503.67 in commissions, plus monies he received as an investor;

b.      Mark Licciardo and Linda Mueller:  A lawsuit was filed on June 17, 2013, alleging that these individuals received $52,684.23 in commissions and to recover monies Mr. Licciardo received as an investor;

---

[73] Docket No. 315.

[74] Copies of the complaints in each of these lawsuits can be viewed on the Receiver's website: http://www.kleinutah.com/index.php/receiverships/national-note-of-utah-lc .

        c.     <u>Ralph Ball</u>:  On June 7, 2013, the Receiver sued Mr. Ball to recover $5,200.00 in commissions;

        d.     <u>Amin Haq</u>:  Mr. Haq was sued on June 7, 2013, for $10,000.00 in commissions;

        e.     <u>Dennis Heaton</u>:  Mr. Heaton was sued on June 13, 2013.  The Receiver is seeking to recover $137,939.10 in commissions, plus monies he received as an investor;

        f.     <u>Peggy Baird</u>:  Ms. Baird was sued on June 21, 2013 as part of the Receiver's effort to recover $7,924.38 in commissions plus monies she received as an investor; and

        g.     <u>Keller Realty</u>:  The Receiver sued Keller Realty on June 7, 2013 to recover $10,000.00 in commissions.

        2.     <u>Unpaid and Forgiven Loans, Unreimbursed Draws and Advances</u>. National Note's books and records show that borrowers or former employees owed money to National Note and the amount owed does not appear to have been paid or appears to have been forgiven for no consideration.  The lawsuits filed in this category are:

        a.     <u>Wilton Battles</u>:  On June 21, 2013, suit was commenced alleging that Mr. Battles owes the Receivership Estate $25,376.83 for monies loaned to him;

        b.     <u>Innovative Services</u>:  On June 21, 2013, the Receiver sued Innovative Services seeking the recovery of $20,000.00 loaned to it which has not been repaid;

        c.     <u>Richard Madsen</u>:  The Receiver filed suit on June 21, 2013 against Mr. Madsen to recover $15,850.00 in unpaid loans;

d.      106th Southtowne Hotel, LLC:  The Receiver sued 106th Southtowne Hotel, LLC on June 24, 2013, to recover $130,174.40 in unpaid loans;

e.      Estate of Leo Pavich:  On June 25, 2013, the Receiver sued the estate of Leo Pavich to recover $38,308.52 in unpaid loans;

f.      Thomas Schultz:  The Receiver sued Mr. Schultz on June 21, 2013, to recover $437,894.59 in unpaid loans that were forgiven for no benefit to National Note;

g.      Drew Brinar:  Mr. Brinar was sued on June 21, 2013, to recover $234,192.60 in unpaid loans that were forgiven for no benefit to National Note;

h.      Chad Colbert:  The Receiver filed suit against Mr. Colbert on June 21, 2013, seeking the recovery of $84,000.00 in unpaid loans that were forgiven for no benefit to National Note;

i.      Michelle Anderson:  On June 21, 2013, the Receiver sued Ms. Anderson to recover $68,589.28 in unpaid advances;

j.      Brian Brady:  Mr. Brady was sued on June 21, 2013, to recover unpaid advances in the amount of $25,348.38.

k.      Jackie Clayton:  The Receiver sued Ms. Clayton on June 24, 2013, to recover $62,500.00 in unpaid loans;

l.      Donald Maloney:  On June 21, 2013, the Receiver sued Mr. Maloney to recover $25,000.00 in unpaid loans;

m.      Kleen Water Power:  This company was sued on June 21, 2013, seeking recovery of $35,000.00 in unpaid loans; and

n.      Real Property Solutions:  On June 21, 2013, suit was filed against

this company to recover $17,500.00 in unpaid loans;

        3.     <u>Credit Card Companies</u>:  Lawsuits were filed against the following credit card companies where the Receiver's investigation revealed that: i) the credit cards were issued to individuals, not National Note, and payments for credit card charges were paid by National Note, and ii) credit cards issued in the name of National Note were used for personal expenses of Palmer or other employees, but the payments were made by National Note.

        a.     <u>American Express</u>:  The Receiver filed suit against American Express on June 24, 2013, to recover $1,393,225.05 in payments made to it by National Note;

        b.     <u>AT&T Universal Card</u>:  The Receiver sued this company on June 24, 2013, seeking the recovery of $62,853.24 in charges paid by National Note;

        c.     <u>Key Bank Card Services</u>:  On June 24, 2013, the Receiver filed suit against Key Bank Card Services to recover $43,941.77 in payments made to it by National Note; and

        d.     <u>RC Willey</u>:  The Receiver sued RC Willey on June 24, 2013, seeking recovery of $41,273.77 paid to it by National Note.

        4.     <u>Employees and Family Members</u>:  The Receiver investigated payments made to employees of National Note and relatives of Palmer.  In general, the Receiver has determined that it would not be appropriate to seek the recovery of salary paid to employees who did not appear to have decision-making or management authority, did not control the financial records of the company, and did not have other financial transactions with National Note, such as borrowing money from the company or selling properties to the company.  In certain instances, however, suit against insiders is appropriate and, thus, the Receiver has begun to commence suits

in this category as follows:

        a.    <u>Reed Larsen</u>:  Suit was filed on June 24, 2013, against Mr. Larsen

and several other companies controlled by him for recovery of $2,405,785.70 paid to them by

National Note.

        b.    <u>Dan Ainsworth</u>:  The Receiver sued Mr. Ainsworth on June 25,

2013, seeking recovery of $279,090.83 paid to him by National Note.  For several years, Mr.

Ainsworth was the chief accountant for National Note and prepared its financial statements;

        c.    <u>Victor Wagner</u>:  Mr. Wagner was the Chief Financial Officer of

National Note for a time and also borrowed money from National Note which has not been

repaid.  The June 24, 2013 lawsuit against him seeks recovery of $503,742.40 paid to Wagner by

National Note.

        d.    <u>Christopher Affleck</u>:  Mr. Affleck, a former employee of National

Note, was sued on June 24, 2013 for $67,147.97 owed to National Note which had not been

repaid.

        e.    <u>Christy Palmer</u>:  The Receiver sued Christy Palmer, the wife of

Palmer, on June 24, 2013, seeking the recovery of $598,950.00 she owes to National Note.  The

bulk of this amount is for credit card purchases she made which were paid by National Note and

for amounts that she borrowed from National Note.

        f.    <u>Valerie Bills</u>:  Ms. Bills, a sibling of Palmer, was sued on June 24,

2013, seeking recovery of $91,032.00 in investment returns paid to her by National Note.

        g.    <u>Cory Palmer</u>:  Cory Palmer, a sibling of Palmer, was sued on June

24, 2013, seeking recovery of $90,632.00 in investment returns paid to him by National Note.

h.    <u>Debra Palmer</u>:  Debra Palmer, a sibling of Palmer, was sued on June 24, 2013, seeking recovery of $90,632.00 in investment returns paid to her by National Note.

i.    <u>Ken Palmer</u>:  Ken Palmer, a sibling of Palmer, was sued on June 24, 2013. seeking recovery of $18,527.00 in investment returns paid to him by National Note.

j.    <u>Mont Palmer</u>:  Mont Palmer, a sibling of Palmer, was sued on June 21, 2013, seeking recovery of $1,137,847.66 paid to him by National Note.

k.    <u>Dan Palmer</u>:  Dan Palmer, a sibling of Palmer, was sued on June 24, 2013, seeking recovery of $90,632.00 in investment returns paid to him by National Note.

l.    <u>Karen Thomas</u>:  Thomas, a sibling of Palmer, was sued on June 24, 2013, seeking ,recovery of $249,292.31 in investment returns paid to her and affiliated entities by National Note.

5.    <u>Litigation Related to Interests in Real Property</u>:  This litigation involves voiding or avoiding interests that are asserted against real property held by the Receivership Estate, including the following:

a.    <u>Kanab Property Lien</u>:  John Spinola holds a lien against certain property of the Receivership Estate located in Kanab, Utah, yet the Receiver's investigation shows that the debt related to this lien has been paid in full or in part, and that the lien may be void or avoidable.  The Receiver filed suit on June 25, 2013 against Mr. Spinola related these claims.

b.    <u>Bandana Cabin Lien</u>:  A lien has been asserted against this property, which the Receiver has determined is void or voidable.  During the Reporting Period,

the Receiver has engaged in negotiations with the holder of this lien. If those negotiations are not successful, the Receiver expects to file suit against the lienholder to seek to have it voided or avoided.

          c.    <u>ABIs</u>:  As discussed above, numerous investors hold ABIs against real property of the Receivership Estate. The Receiver has filed and will continue to file lawsuits against the holders of these ABIs in instances where he cannot obtain their voluntary release. Some of these claims are made in complaints filed against overpaid investors, insiders, and others described herein.

          6.    <u>Overpaid Investors</u>:  Persons who received payments from National Note in excess of their principal investment are required to return those funds to the Receivership Estate. As discussed in earlier Reports, to avoid litigation, the Receiver has sent demand letters to overpaid investors, requesting turn over these funds, and some investors have returned these funds. Further, as noted below in Part V.B, the Receiver has reached settlements with a number of overpaid investors. Most overpaid investors, however, have not responded to the Receiver's requests for turnover or have refused to return the excess amounts of their investments. Thus, in June 2013, the Receiver filed 111 lawsuits against overpaid investors, which suits made demand for overpaid funds and, where relevant, invalidation of ABIs. Three of these lawsuits were filed against recipients of commissions, seven included family members, and included insider lawsuits (Mr. Larsen and Mr. Wagner) discussed above. A list of the 99 remaining investors, exclusive of those who received commissions and insiders, that were sued for recovery of overpayments is attached as Exhibit C.

      The lawsuits against overpaid investors seek the return of all payments made to them by

National Note.  The complaints note that only a portion of these amounts are overpayments—called "false profits."  However, governing law provides that if the overpaid investors did not act in good faith, the Receiver can recover all of the payments to them, not just the false profits.  Whether an investor acted in good faith in receiving payments from National Note will depend on a number of factors, such as whether the investor was involved in managing the business of National Note, received commissions for soliciting others to invest, was on notice that the investment returns were unrealistic (including investors who were being paid as much as 18% interest), and withdrew funds based on suspicions that the investment program was not legitimate.  The burden is on the defendants to prove that they acted in good faith and without knowledge of the fraud.  If the defendants meet this burden, the Receiver will be able to recover only the false profits, not the entire amount of payments made to them.

The process of resolving these lawsuits has already begun.  In one case, an investor signed a settlement agreement just a few days after the lawsuit was filed against her.  In a few other cases, the Receiver has been provided with information showing that the defendants have had their debts discharged in recent bankruptcies or have provided hardship affidavits verifying their financial inability to repay the amounts owed.  In these instances, the lawsuits have been or will be dismissed

Investigation of overpayments to investors continues.  The Receiver expects that additional lawsuits will be filed against overpaid investors.

7.    Tolling Agreements: In connection with his investigation of payments made by National Note, a number of recipients have requested additional time to conduct analysis of their own records or to negotiate a settlement with the Receiver.  In these cases, the

Receiver has entered into a tolling agreement with the party to extend any applicable statute of limitations. Absent resolution of these potential claim by settlement or otherwise, the Receiver expects to file lawsuits against these parties in the coming months.

**B.** **Settlements With Overpaid Investors**. As discussed in previous Reports, in advance of filing lawsuits against overpaid investors, the Receiver sent demand letters to the investors, requesting a voluntary return of the overpaid amounts. As described in more detail below, some investors voluntarily returned the amount of their overpayments, some agreed to return the overpaid amounts after signing a settlement agreement with the Receiver, and some have agreed to return lesser amounts based on demonstrated financial hardship. In several other instances, the Receiver has agreed to waive claims he might assert in return for the investor waiving claims the investor might assert against future monies collected by the Receivership Estate. As noted above, in connection with certain of these settlement agreements, the Receiver has also obtained releases of deeds of trust and ABIs.

1. <u>Full Repayments Without Settlement Agreements</u>. Between February 19, 2013 (in the prior Reporting Period) and June 30, 2013, ten investors repaid $82,754.47 to the Receivership Estate that had been paid to them in excess of the principal amount of their investments. During this Reporting Period, $62,406.73 of this total amount was recovered.

2. <u>First Motion for Approval of Settlement Agreements</u>. On April 22, 2013, the Receiver filed a motion seeking Court approval of eight settlement agreements with overpaid investors.[75] Six of these settlement agreements required the investors to return a total of

---

[75] Docket No. 271.

$213,037.36 to the Receivership Estate.  Over $198,000.00 of this amount has been recovered to date, with the balance due by December 31, 2013.  Two of these agreements allowed the investors to repay less than the full amount of their overpayments.  In one case, the investor waived significant claims that it might have otherwise asserted against the Receivership Estate and in the other, the investor demonstrated significant financial hardship that justified a reduction.  In the seventh agreement, the Receiver agreed to waive $3,141.92 in overpayments by an investor in return for the son of this investor agreeing to waive $17,200.00 of the amount of claim he might assert in the future.  In the eighth agreement, the Receiver agreed to pay $2,500.00 for the release of a deed of trust recorded against the Indian Canyon property held by the seller of the property.  This represented a 25% reduction in the amount owing to the seller. The Court held a hearing on these settlement agreements on May 15, 2013, and entered an Order approving the agreements on May 20, 2013.[76]

       3.     <u>Second Motion for Approval of Settlement Agreements</u>.  A motion was filed with the Court on May 28, 2013, seeking approval of a second group of six settlement agreements with overpaid investors.[77]  Five of these settlement agreements will result in the investors repaying a total of $210,234.28 to the Receivership Estate.  Four of these are full repayments while the fifth is a reduced amount based on the investor releasing a deed of trust and waiving over $400,000.00 in claims that otherwise could be asserted against the Receivership Estate.  In the sixth settlement, the Receiver agreed to waive a claim of the Receivership Estate to a $49,671.39 overpayment in return for related investors waiving

---

[76] Docket No. 308.

[77] Docket No. 324.

$199,000.00 in claims they otherwise could assert based on losses in other investment accounts. The Court held a hearing on this settlement motion on June 14, 2013, and on June 18, 2013 entered an Order approving these settlement agreements.[78]

      **C.**     **Actions Against the Receivership Estate**.  The following has occurred during the Reporting Period with regard to actions that have been commenced in the Civil Case:

          1.     <u>Complaint in Intervention Filed by First National Bank of Layton</u> ("FNB"):  No activity occurred during the Reporting Period in this matter and none is expected in the future.[80]

          2.     <u>Complaint in Intervention Filed by Rhonda Pilcher, Barry Pilcher and Commercial Design & Construction, Inc.</u>:[81]  This Complaint has been dismissed.[82]

          3.     <u>Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust</u> (the "Kirk Trust"):[83]  The Court has permitted the Kirk Trust to intervene in the Civil Case to assert rights related to certain property identified in the First Report as the "<u>Twin Pines Apartments</u>."[84]  The Receiver has filed an answer disputing that the Kirk Trust has a secured interest in the property, and affirmatively asserting claims against Kirk Trust.  Litigation of this matter is ongoing.

---

[78] Docket No. 348.

[79] Docket No. 23.

[80] *See* Docket No. 181.

[81] *See* Docket No. 28.

[82] Docket No. 125.

[83] *See* Docket No. 89.

[84] *See* First Report at pp. 29-30.

4.     Complaint in Intervention Filed by American Pension Services ("APS"):[85]

The Court permitted APS to intervene in the Civil Case to assert certain claims related to APS's role as a custodian of certain National Note investor accounts.  To date, APS has not filed the lawsuit against the Receiver that it had sought to file.  No further litigation in this matter is expected.

## VI.

## **RECORDS OF THE RECEIVERSHIP ENTITIES**

The Receiver has made substantial progress in his financial analysis and investigation of the Receivership Estate.  He believes that he has located most of the internal financial records created by National Note for itself and its affiliated entities.  The Receiver has reconstructed all banking transactions for National Note and its affiliated entities since January 1, 2007.  This has enabled and will enable the Receiver to verify the accuracy of National Note's internal records, identify recipients of funds, and know the amount of investments and withdrawals by investors.  Although his investigation is ongoing, from what he has reviewed to date, the Receiver has determined from National Note's internal records show that National Note was insolvent since 1994, and that the enterprise was operated as a Ponzi scheme.

## VII.

## **FINANCIAL ANALYSIS**

A.     **Questionable Transactions**.  In his earlier Reports, the Receiver discussed National Note's questionable transactions that he had discovered.  As his investigation has continued, the Receiver has learned of additional questionable transactions as follows:

---

[85] *See* Docket No. 101.

1.    "Black Sand" Ore.  In 2010, National Note began making payments to the owner of Utah Land Banks, LLC, an entity that asserts that it is the owner of 450 tons of "Black Sand" gold and platinum ore valued at $100 million.  The Receiver has learned to date of a total of $178,945.73 in payments that National Note made to this company. The recipient of these funds asserts this sum was for services and intellectual property related to developing a process for extracting gold and platinum from 20 tons of ore concentrates.  The Receiver is investigating whether these funds were properly paid and can be recovered.  The timing and amount of these payments is consistent with other indicators that when National Note began having difficulty raising sufficient funds from new investors to pay existing investors, it began making representations to investors that it had access to specialized ores that contained large amounts of gold and platinum and that profits from these ores would be used to repay investors.

2.    Ghana Gold.  National Note contacted a citizen of Ghana, who now lives in Utah, and paid this person to travel to Ghana in 2011 with a representative of National Note. The ostensible purpose of the trip was to negotiate with a Ghanian general to purchase gold.  The two representatives of National Note met with the general, but purchased no gold from him.  The representatives also met with a private gold seller.  While in Ghana, bank accounts were opened in Ghana by the citizen, and National Note later wired $174,280.00 to banks in Ghana.  The Receiver has not yet been able to determine what happened to the funds wired to Ghana.  This investigation is ongoing.

3.    Loan Forgiveness:  National Note made loans or gave advances to employees which were later forgiven.  National Note records indicate that in 2009, the company forgave a loan to its employee Thomas Schultz in the amount of $437,894.59.  In 2008, Chad