Colbert owed $84,000.00 to National Note relating to the Riverbend project, which debt was forgiven and "capitalized" to the Riverbend development. This had the effect of artificially increasing the value of the Riverbend project on the books of National Note and allowed the company to avoid showing this write-off as a loss. On December 31, 2008, National Note forgave a loan to Drew Brinar in the amount of $234,192.60. Rather than write off the loan—which would be a charge against income—National Note capitalized it, adding the amount of the forgiven loan to the value of the Clearview Business Park. These book entries are contrary to generally accepted accounting principles. As discussed above, in all of these cases, the Receiver has sued these former employees to recover the amounts that were forgiven.

    4.  <u>Borrowers</u>: The records of National Note list many accounts where the borrowers appear to still owe money to National Note. The Receiver has analyzed these records to if these accounts are collectable. The Receiver's investigation has revealed that many of the "loans" carried on the books of National Note do not reflect monies actually owed to National Note. Thus, although National Note showed these "loans" as assets, in many instances, they were not, and the assets listed in the financial records of National Note have been substantially overvalued for many years. Obviously, because debts do not really exist, there will be no recovery for the Receivership Estate. Examples of these supposed "borrowers" include:

- In 1998, a family was considering purchasing a mobile home. The family signed an agreement to "hold" a particular mobile home for purchase. The family later decided not to proceed with the sale. This purchase contract was transferred to National Note, which carried the receivable on its books—for 14 years—at a value of $9,600.00 even though the

purchase was never consummated, no payments were made, and there were no efforts to collect on the note.

- Prior to 2002, National Note had made two loans to a borrower for $178,480.13 which were secured by real property. When the borrower defaulted, National Note foreclosed on the property in 2002. After it foreclosed, National Note continued to carry the $178,480.13 loan as a note receivable assets and it also included the property on its books as an asset. In addition to double counting assets, the values stated on the books were grossly overstated—the real property was never worth $1,550,000.00.

- Many loans were carried on the books of National Note where the loan had been paid off, but where some additional interest was shown to have accrued on the loan. This additional interest was never collected, but it continued to be carried on the books of National Note. In numerous instances, this interest continued to be shown for more than ten years after the underlying loan had been paid off.

**B.     Receivership Financial Information.** The following financial information is provided for the Reporting Period:

1.     <u>Bank Accounts</u>. The Receiver initially opened fifteen bank accounts for the operation of the Receivership. These have now been consolidated into one general operating account (the "<u>Operating Account</u>"). Additionally, one additional bank account has been opened to hold deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "<u>Real Estate Account</u>"). The balances in these accounts as of the close of the Reporting Period are as follows:

| Entity/Operation | 6/30/13 Account Balance |
|---|---|
| Operating Account | $759,313.55 |
| Real Estate Account | $1,893,105.13 |
| **TOTAL** | **$2,652,418.68** |

2. <u>Operating Account Deposits</u>. The sources of funds deposited into the Operating Account during the Reporting Period are shown in the following table:

| Source | Amount |
|---|---|
| Real estate sales[86] | $117,736.46 |
| Rents | $48,390.29 |
| Asset sales (non-real estate) | $2,225.94 |
| Settlement funds | $403,707.65 |
| Insurance, utility refunds | $795.64 |
| Bank credits | $134.70 |
| **TOTAL** | **$572,990.68** |

3. <u>Operating Account Expenditures</u>. The expenses, by category, that have been paid from the Operating Account during the Reporting Period are:

| Type of Expense | Amount |
|---|---|
| Utilities | $3,722.64 |
| Publish legal notices | $6,919.98 |
| Dues to owners' associations | $3,855.00 |
| Appraisals | $3,050.00 |
| Insurance | $2,378.15 |
| Maintenance | $1,471.46 |
| Title company expense | $250.00 |
| Real property closing expenses[87] | $7,297.42 |
| Property taxes | $14,875.03 |
| Miscellaneous expenses[88] | $931.49 |
| **TOTAL** | **$44,751.17** |

---

[86] These are the proceeds from the sales of properties that are not subject to liens. The proceeds from the sales of properties that had liens were deposited into the Real Estate Account.

[87] This category includes monies paid to lender holding a lien on property, surveys, and creation of legal descriptions of properties.

[88] This category includes bank fees, storage unit rental, and other miscellaneous expenses.

4. <u>Real Estate Account Deposits and Expenditures</u>. The transactions in the Real Estate Account during the quarter were as follows:

| Source | Amount |
|---|---|
| Deposits: properties not closed | $177,150.00 |
| Deposit refunds | ($42,000.00) |
| Real estate sales closed | $1,756,114.13 |
| Bank fees | ($147.00) |
| **TOTAL** | **$1,891,117.13** |

5. <u>Administrative Expense of Receiver and Counsel</u>. The Receiver and his staff have spent many hours in taking control of the Receivership Entities and their assets. Furthermore, the Receiver has necessarily required the assistance of legal counsel, and counsel has been active in providing such services to the Receivership Estate.

For the Reporting Period, the Receiver and his staff have spent a total of 1,947.9 hours valued at $217,586.00.[89] Additionally, the Receiver has advanced funds to the Receivership Estate for expenses incurred or operating costs for which he will seek reimbursement. The Receiver's legal counsel has spent approximately 557.6 billable hours and incurred expenses on behalf of the Receivership Estate with total receivables for the Reporting Period in the amount of $138,144.00.[90]

---

[89] During the first reporting period, the Receiver reported total fees of $121,464.00. *See* First Report, p. 59. During the second reporting period, the Receiver reported total fees of $199,458.00. *See* Second Report, p. 29. During the third reporting period, the Receiver reported total fees of $227,155.00. *See* Third Report, p. 28. Thus, as of the close of the current Reporting Period, total fees of the Receiver are in the amount of $765,663.00.

[90] During the first reporting period, counsel reported total fees and costs of $46,491.50. *See* First Report, p. 59. During the second reporting period, counsel reported total fees and costs of $58,705.32. *See* Second Report, p. 29. During the third reporting period, counsel reported total fees and costs of $134,778.81. *See* Third Report, p. 29. Thus, as of the close of the current Reporting Period, total fees and costs for counsel are in the amount of $378,119.63.

## VIII.

### NEXT STEPS

This Reporting Period has seen a significant change in emphasis. The vast majority of the work of the Receiver and his counsel during the quarter has focused on property sales and initiating litigation against persons who owe money to the Receivership Estate. At this time, the Receiver anticipates addressing the following priorities in the coming months:

1. <u>Property Sales</u>. As discussed in Part III above, the Receiver has spent substantial time during the Reporting Period marketing and selling real property holdings of the Receivership Estate. The Receiver will continue to aggressively pursue sales of properties that he has identified as having value for the Receivership Estate, including by conducting due diligence on the value of the properties, liens asserted against the properties, the best means of selling properties, and ways of overcoming defects relating to various properties. In all cases, the Receiver will sell real estate only after obtaining Court approval.

2. <u>Challenging Liens</u>. As discussed in Part III above, the Receiver and his legal counsel have been investigating and evaluating interests asserted against real property holdings, including the ABIs issued by Palmer. During the Reporting Period, the Receiver has filed suit against holders of ABIs and deeds of trust, negotiated the releases of deeds of trust, and entered into negotiations with other lien holders. These efforts will continue. In particular, the Receiver expects to file additional lawsuits against those holding ABIs in real estate that has already been sold. The Receiver expects to get the ABI claims invalidated so the proceeds from the sales of the real estate can be made available for distribution to all victims.

3. <u>Litigation</u>. In light of the large number of lawsuits filed during June, the

Receiver expects that significant time will be spent in the coming months serving these lawsuits on the defendants, providing discovery, responding to motions to dismiss, and negotiating settlements with defendants.

    4.    <u>Analysis of Insolvency and Ponzi</u>.  The Receiver has begun work preparing a report demonstrating the time periods when National Note was insolvent and showing that National Note was operating as a Ponzi scheme for many years.

## IX.

## CONCLUSION

Significant progress has been made during the Reporting Period.  The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Receivership Estate so as to maximize any distribution available to investors.

DATED this 13th day of August, 2013.

*Wayne Klein*
WAYNE KLEIN, Receiver

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **FOURTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this ___ day of August, 2013, and served via ECF on all parties who have requested notice in this case, including the Securities and Exchange Commission.

/s/ Peggy Hunt