Peggy Hunt (Utah State Bar No. 6060)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>Defendants. | **FIFTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER**<br>*For the Quarter Ending September 30, 2013*<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this Fifth Status Report for the period July 1, 2013 through September 30, 2013 (the "Reporting Period").

# TABLE OF CONTENTS

**Page**

I. PROCEDURAL HISTORY ...................................................................................................1

II. CONTINUED OPERATIONS.............................................................................................2

    A.    Middleton, Idaho: Two Leased Homes.................................................................3
    B.    Brigham City, Utah: Twin Pines Apartments. ....................................................4
    C.    Ogden, Utah: Office Building..............................................................................4
    D.    Vernal, Utah: East Meadows Trailer Park. .........................................................5
    E.    Fairfield, Utah: Cedar Fort Land. .......................................................................6
    F.    Spanish Fork, Utah: Expressway Business Park..................................................6
    G.    Temple, Georgia: Single Family Residence. .......................................................7

    H.    Elkhorn Ridge Estates. . . . . . . .

III. REAL ESTATE HOLDINGS...............................................................................................8

    A.    Efforts to Release Liens and Other Interests Against Real Properties.................. 9
    B.    Real Property Sales Approved During the Reporting Period/Closed. ................. 12
    C.    Real Property Sales Approved During the Reporting Period/Not Closed. ........... 15
    D.    Sale of Real Properties/Court Approval Requested.............................................. 17
    E.    Abandoned Real Properties—Lack of Equity...................................................... 18
    F.    Properties Believed to Have No Value—Option. ................................................ 19

IV. NON REAL ESTATE ASSETS ..........................................................................................20

    A.    Personal Property. ............................................................................................... 20
    B.    Alleged Mineral Assets....................................................................................... 20
    C.    Pre-Receiver Asset Transfers.............................................................................. 21

V. LITIGATION.......................................................................................................................21

    A.    Actions Commenced By The Receivership Estate. ............................................. 21
    B.    Settlements With Overpaid Investors. .........................................................
    C.    Actions Against The Receivership Estate..................................................

VI. RECORDS OF THE RECEIVERSHIP ENTITIES ...........................................................30

VII. FINANCIAL ANALYSIS....................................................................................................30

    A.    Questionable Transactions. ..........................................................................
    B.    Receivership Financial Information...................................................................... 30

VIII. NEXT STEPS ...........................................................................................................34

IX. CONCLUSION............................................................................................................36

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[1]   The SEC alleges, among other things, that Defendants Palmer and National Note engaged in securities fraud and operated a Ponzi scheme that took over $100 million from more than 600 investors.

The SEC filed several *ex parte* motions with its Complaint on June 25, 2012, all of which were granted by the Court.  In particular, the Court entered a Temporary Restraining Order and Order to Show Cause (the "TRO"),[2] an Order Freezing Assets and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[4]  Palmer later stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5]

As a result of the Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **Exhibit A**.

---

[1]   Docket No. 1.

[2]   Docket No. 7.

[3]   Docket No. 8.

[4]   Docket No. 9.

[5]   Docket Nos. 41 and 42.

In accordance with the Receivership Order,[6] the Receiver has filed the following status reports:

- The First Report and Liquidation Plan, for the period of June 25, 2012 through September 30, 2012, was filed November 12, 2012 (the "First Report").[7]

- The Receiver's Second Status Report, for the period of October 1, 2012 through December 31, 2012, was filed on February 26, 2013 (the "Second Report").[8]

- The Third Status Report, for the period of January 1, 2013 through March 31, 2013, was filed on May 2, 2013 (the "Third Report").[9]

- The Fourth Status Report, for the period of April 1, 2013 through June 30, 2013, was filed on August 13, 2013 (the "Fourth Report").[10]

- This is the Fifth Status Report, for the period of July 1, 2013 through September 30, 2013, defined above as the "Reporting Period."

## II.

## CONTINUED OPERATIONS

The Receiver is managing the Receivership Estate with the goal of maximizing the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those National Note investors who have not received a return of their principal investment in whole or part.  To facilitate this goal, the Receiver has discontinued the

---

[6]    Docket No. 9 (Receivership Order) at pp.18-20.

[7]    Docket No. 73 (First Report).

[8]    Docket No. 170 (Second Report).

[9]    Docket No. 288 (Third Report).

[10]    Docket No. 408 (Fourth Report).

operations of National Note and most of its affiliated entities, except in those limited instances that have previously been described in earlier Status Reports and as discussed immediately below, and he has attempted to minimize the enterprise's historically high operating expenses going forward.

At this time, the only operations going forward are those related to several real estate holdings of the Receivership Estate.[11]   The following is a description of the Receiver's limited operation of several real estate properties which are being operated either because they are generating net income for the Receivership Estate or because their continued operation will minimize losses:

A. **Middleton, Idaho: Two Leased Homes.**  The Receivership Estate includes two residential properties that are located in Middleton, Idaho, adjacent to a 175-acre proposed subdivision that National Note had planned under the name "Riverbend Estates," discussed in further detail at pages 25 - 26 of the First Report.[12]   The two homes are currently being rented through the services of a professional property manager, generating approximately $1,345.00 in monthly net income.  The Receiver's ultimate disposition of these homes will likely depend on the development of Riverbend Estates.[13]

---

[11]  *See* First Report, pp. 9-10, 57-58 & Second Report, Part II.A (discussing operation of Old Glory Minting Company, LLC; operations of this entity were discontinued by the Receiver in December 2012).  Certain of the real property being operated described in the First and Second Reports is now being liquidated.  *See* First Report, pp. 24-53; Second Report, Part II.B.  This Report discusses only those real properties being operated during the Reporting Period.

[12]  The name of the National Note affiliate that intended to develop the property is Riverbend Estates, LLC. The Receiver refers to this property as the "River Run Subdivision" in the First Report.  First Report at pp. 25-26. Both "River Run" and "Riverbend" were used to describe this property.

[13]  *See* discussion *infra* at Part III.E.

**B.**     **Brigham City, Utah: Twin Pines Apartments.** The Twin Pines Apartments are three buildings with twenty apartments located in Brigham City, Utah, which are leased to lower income tenants. Further information about this property is set forth at pages 29 - 30 of the First Report. During the Reporting Period, the Receiver continued to operate this property through his property manager. As a result of property repairs and the work of the property manager, occupancy is now averaging 95%, compared to slightly over 50% when the Receiver was appointed. The Apartments are now generating approximately $3,500.00 monthly net income for the Receivership Estate. Expenses in the approximate amount of $16,000.00 were incurred in July, 2013 to make necessary sewer repairs on the property.

A National Note investor has been permitted to intervene in this case to assert an interest in the Twin Pine Apartments, which interest the Receiver has challenged. Litigation related to this matter is ongoing. During the pendency of the litigation, all net rental proceeds are being segregated and maintained by the property manager.

**C.**     **Ogden, Utah: Office Building.** The Office Building is an old, three-story commercial office building located in downtown Ogden, Utah that is co-owned with a third party (the "Co-Owner"). Further details related to the Office Building are set forth at pages 30 - 31 of the First Report.

At present, this building has two tenants sharing the main floor.[14] The rental income from these two tenants is not sufficient to pay operating expenses of the Office Building, and the Receiver has been required to make necessary ongoing repairs to the Office Building and its heating and plumbing systems to maintain its value. The Receiver has decided against seeking

---

[14]   *See* First Report, p. 31.

4

additional tenants for the Office Building and to attempt to seek the consent of the Co-Owner to market it for sale.

During the Reporting Period, the Receiver began substantive discussions with the Co-Owner, to discuss marketing the Office Building for sale. The Co-Owner, however, has decided to pursue development of the Building. The Receiver and Co-Owner are in discussions on ways to cooperate during the Co-Owner's efforts to remodel the Building for other uses. In those discussions, the Receiver's primary focuses are on: i) eliminating the need for the Receivership Estate to continue funding operating costs, ii) ensuring that no Receivership funds will need to be expended as part of the development work, and iii) protecting the interests of the Receivership Estate in the Office Building during the redevelopment project. The Co-Owner has agreed to provide the Receiver with periodic progress reports. In the event that funding of the Co-Owner's development affects the Receivership Estate's interest therein, the Receiver will seek Court approval of the terms of such a course of action.

**D.** **Vernal, Utah: East Meadows Trailer Park.** East Meadows is a mobile home park located in Vernal, Utah, which was being operated by the Receiver for a period of time, including for a short period during the Reporting Period.[15] The Court approved holding an auction of this property, at which time the property was sold for $1,030,000.00. The sale closed during the Reporting Period, on July 29, 2013 and all payments from the sale,[16] as well as final payments of rents from the property manager, have been paid to the Receiver. This is no longer property of the Receivership Estate.

---

[15] *See* First Report, pp. 34-35 (description of this property).

[16] *See* Docket Nos. 292 and 405 (Net proceeds from the sale were $979,620.29, after payment of property taxes and closing costs).

    **E.**    **Fairfield, Utah: Cedar Fort Land.**   The Cedar Fort Land is a large tract of approximately 93 total acres of undeveloped real estate located in Fairfield, Utah discussed in greater detail at page 42 of the First Report.   The Receiver's efforts to sell this property are discussed in greater detail at page 17 below.   Pending sale of the property, the Receiver is leasing the Cedar Fort Land for grazing, with the understanding that the lease may be terminated if the Land is sold.[17]

    **F.**    **Spanish Fork, Utah: Expressway Business Park.**   Expressway Business Park, located in Spanish Fork, Utah, contains 46 business condominium units that were built by National Note.   At the time of the Receiver's appointment, forty-two of the units had been sold, leaving four remaining units in the Receivership Estate, each of which is described in greater detail at pages 42 – 46 of the First Report.[18]   Two of these remaining units were disposed during a prior reporting period.   The last two units, which the Receiver has been operating, were sold or released during this Reporting Period.   Prior to such action, the Receiver had been collecting rents and paying expenses related to the remaining Units.   When the sale of Unit 215 closes, the Receivership Estate will no longer own any finished units at Expressway Business Park, but it still owns significant undeveloped and partially-developed land next to the developed project.

    1.    Unit 109.   After obtaining approval from the Court, unit #109 was relinquished to a first lienholder on March 29, 2013.[19]

---

[17]   In addition to the annual income to be obtained from the lessee, based on the number of cows using the land during the year, the lease qualifies the property as agricultural land which will result in substantially reduced property tax rates.

[18]   The First Report erroneously indicated that the project had 48 units and that 44 had sold. *See* First Report, pp. 42-43.

[19]   Docket No. 241.

2.      Unit 204.  This property was subject to a deed of trust held by a lender which had initiated foreclosure proceedings.  The lender obtained an appraisal of this unit indicating that the property was worth less than the amount owed to the secured lender.  On July 10, 2013, the Court entered an order approving a settlement agreement between the Receiver and the lender that returned this property to the lender based on the lender's agreement not to seek any deficiency claim or make any claims against the Receivership Estate.[20]  Pursuant to this agreement, this Unit has now been returned to the lender and the Receiver is no longer collecting any rents or paying any expenses related to the property.

3.      Unit 215.  The Receiver received an offer to purchase this Unit for $112,500.00, and the Court approved an auction of the Unit, using this offer as an opening bid.[21]  The auction was conducted on September 11, 2013, and the property sold for $127,500.00.  The sale is expected to close in early October at which time the Receiver will file a notice with the Court of the results of the auction. As a result of this sale, the Receiver will no longer collect rents or pay expenses related to this Unit.

4.      Unit 305.  This property was sold at auction in June, 2013.[22]

**G.      Temple, Georgia: Single Family Residence.**  This home is located in Temple, Georgia, and was being managed by a professional property manager.  Further details related to this property are set forth at page 51 of the First Report.  During the Reporting Period, the property has been repaired and prepared for sale, and the Receiver has now received an offer to

---

[20]   Docket No. 363.

[21]   Docket No. 393.

[22]   *See* Fourth Report p. 19.  The sale of this property closed on June 27, 2013.

purchase this property for $125,000.00. The Receiver plans to submit the necessary motions with the Court to secure approval of the sale. Once the home is sold, the Receiver will no longer operate this property.

     **H.**    **Elkhorn Ridge Estates**. A description of this property located near Malad, Idaho is set forth at pages 26-27 of the First Report. The Receiver has had a fence constructed around and upgrades performed on the entrance road to this subdivision. With the completion of these projects, the County has given final approval to the subdivision and the Receiver is now free to sell all the lots in the subdivision without seeking zoning variances. The Receiver is marketing these lots for sale.

**III.**

**REAL ESTATE HOLDINGS**

A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report and some of which also are discussed in Part II above. The Receiver has determined that some of the real properties appear to have value for the Receivership Estate and need to be operated and/or marketed for sale, some properties have no equity, and some require further investigation and analysis, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver has sold numerous properties and actively marketed other properties. Attached hereto as **Exhibit B** is a chart setting forth the status of all real properties in the Receivership Estate as of September 30, 2013.

For purposes of this Status Report, the Receiver discusses the following in Parts A

8

through F below:

- Part A discusses the efforts undertaken during the Reporting Period to release alleged interests recorded against the Receivership Estate's real properties;

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale has been requested;

- Part E describes actions taken by the Receiver regarding real properties in which it does not appear that the Receivership Estate has equity; and;

- Part F identifies real properties that are believed to have no value.

   **A.      Efforts to Release Liens and Other Interests Against Real Properties.**  As part of the Receiver's investigation of real property holdings of the Receivership Estate, the Receiver has determined that there are numerous types of interests that have been asserted against many of the Receivership Estate's real properties, including at least the following types of interests for which he has taken the following actions:

   1.      Assignments of Beneficial Interests ("ABIs").  The First and Second Reports described the ABIs that have been recorded against a wide variety of the Receivership Estate's real properties purportedly in favor of certain National Note investors.  If the ABIs are deemed valid liens on the real estate, almost all the value of real estate held by the Receivership Estate would be paid to the ABI holders, with little money left for investors who were not granted ABIs.  The Receiver believes the ABIs are not valid interests on the property.

Accordingly, the Receiver has taken the following actions:

a.   <u>Request Voluntary Releases</u>:  As real estate properties have been sold, the Receiver has sent letters to holders of ABIs on those properties, explaining that he believes the ABIs are not valid liens and requesting that the holders voluntarily release the ABIs. In general, approximately one third to one half of ABIs against a given property have been voluntary released by holders of those alleged interests.  In the case of one property, where only one ABI had been recorded, the Receiver obtained a voluntary release from the holder, thus freeing all of the net sale proceeds from any interests at closing.

b.   <u>Sale of Property Free and Clear of Liens and Interests</u>:  For properties that have ABIs recorded against them, the Receiver has asked the Court for permission to sell the properties free and clear of these alleged interests, with any interests to attach to the net proceeds of the sale.  The Receiver is holding the net sales proceeds of these sales in a reserve account pending a determination as to the validity of the disputed ABIs.

c.   <u>ABIs Held by Defendants Sued by the Receiver</u>:  As described below in Part V, the Receiver has begun filing lawsuits against overpaid investors and others who received improper payments from National Note or its affiliates.  To the extent that the Receiver's investigation revealed that these defendants also held ABIs, the lawsuits seek to have the Court invalidate the ABIs.  As discussed immediately below, the Receiver has begun filing additional lawsuits against those ABI holders who are not overpaid, seeking invalidation of the ABIs.

2.   <u>Lawsuits Filed Seeking Declaration of Invalidity of ABIs</u>:  The Receiver has commenced litigation against holders of ABIs on real properties that have been sold by the

Receiver.  Three additional lawsuits were filed during the Reporting Period.  These are described in Part V, below.  Additional similar lawsuits are planned. Deeds of Trust.  Deeds of trust have been recorded against some of the Receivership Estate's real properties.  Several of these deeds of trust are held by National Note investors who were overpaid (meaning they have received distributions in excess of the principal amount of their investments).  The Receiver is taking the following actions regarding deeds of trust:

        a.    <u>Settlement Agreements</u>:  In two cases, the Receiver has been able to negotiate the releases of deeds of trust against receivership property through settlement.  In one instance, an investor agreed to return overpaid amounts to the Receiver and released his deed of trust recorded against the Deer Meadows property.  In the second instance, a deed of trust was held by a lender on real property known as the "Outpost" property.[23]  The Receiver negotiated a 25% reduction in the amount owed to the holder of the deed of trust and the deed of trust was released.  Both of these settlement agreements have been approved by the Court.[24]

        b.    <u>Litigation</u>:  The Receiver is litigating the validity of deeds of trust on two other properties.  An investor, the True and Marjorie Kirk Trust, holds a deed of trust on real property known as the "Twin Pines" property located in Brigham City, Utah.[25]  The Receiver believes that this deed of trust is avoidable because it was transferred to the Trust without National Note receiving contemporaneous, reasonably equivalent value.  Kirk is suing the Receiver, seeking an order that the Receiver honor the deed of trust. This litigation is

---

[23]   *See* First Report, pp. 33-34 (describing this property).

[24]   Docket Nos. 308 and 348.

[25]   *See* First Report, pp. 29-30 (describing this property).

ongoing.  In the other matter, on June 25, 2013, the Receiver filed suit against John Spinola, asserting that a deed of trust he recorded against a cabin located in Kanab, Utah, is not valid because the promissory note related to the deed of trust has been paid off.  The Receiver has since settled with Mr. Spinola, and the deed of trust will be released.  The Receiver is marketing the Kanab property for sale.

        c.      <u>Continuing Investigation</u>:  A deed of trust has been recorded against certain property known as the "Bandanna Cabin" and several have been filed against the "Overland Trails" property.[26]  The Receiver asserts that this deed of trust against the Bandanna Cabin is avoidable because it was given without reasonably equivalent consideration to National Note, and he continues to engage in settlement negotiations with the holder of that deed of trust. The Receiver also is evaluating whether the multiple deeds of trust recorded against the Overland Trails property are valid, and he will take appropriate action when he has completed that evaluation.

        3.      <u>Construction Liens</u>.  At the time the Receiver was appointed, two construction liens had been recorded against real property known as the "Clearview" property located in Arizona.[27]  The Receiver negotiated a release of one lien and a reduction of the amount of the debt associate with the other.  The reduced debt was paid at the closing of the sale of this property.

      **B.**      **<u>Real Property Sales Approved During the Reporting Period/Closed</u>.**  Five Court-approved real property sales were closed by the Receiver during the Reporting Period.  It

---

[26]   *See* First Report, pp. 32, 41-42 (describing these properties).

[27]   *See* First Report, pp. 49-50 (describing this property).

should be noted that the net sales proceeds for most of these properties were reduced substantially by the need to pay significant unpaid property taxes assessed against the properties prior to the Receiver's appointment; generally three to four years of property taxes were owed. Two of these properties were sold using an auction approach (one of which resulted in a $5,000.00 increase in the sales price), and the other three were sold through private sales with the offering and accepted sales price based on values of three independent appraisals issued by Court-approved appraisers.

      1.    <u>Elkhorn Lot #1, Malad, Idaho</u>:[28]   Four prior attempts to sell this partially-built cabin located near Malad City, Idaho, had failed due to a variety of reasons. On August 27, 2013, the Court approved a private sale of this property for $155,000.00.[29] This sale closed on August 29, 2013, and after property taxes, sales commissions and closing costs, the Receivership Estate received net sale proceeds in the amount of $142,834.78. The property had six ABIs recorded against it, but three of the ABIs were voluntarily released by the holders before the sale closed. Because three ABIs still exist, the net proceeds from the sale are being held in a real estate holding account while the Receiver files suit against the ABI holders to get a judicial ruling on the validity of the ABIs.

      2.    <u>Autumn Ridge Phase I, Lots #41, Eagle Mountain, Utah</u>:[30]   This is the second of eight lots being purchased in this subdivision by Merit Homes. The lot sold for

---

[28]   *See* First Report, p. 26 (describing this property).

[29]   Docket No. 419.

[30]   *See* First Report, p. 40 (describing this property).

$37,000.00, pursuant to a Court-approved process.[31]   The sale closed on August 14, 2013, and after property taxes, sales commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $30,867.73.   As discussed above,[32] 38 ABIs had been recorded against the Autumn Ridge property prior to the Receiver's appointment.   While approximately half of those ABIs have been voluntarily released, the net sale proceeds of this lot are being held by the Receiver in a real estate reserve account pending resolution of the disputes related to the validity of the remaining ABIs.

      3.      <u>Autumn Ridge Phase I, Lot #40, Eagle Mountain, Utah</u>:[33]   This is the third of nine lots in this subdivision being purchased by Hallmark Homes.   The lot sold for $37,000.00, pursuant to a Court-approved process.[34]   The sale closed on September 25, 2013, and after property taxes, sales commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $30,911.96.   As discussed above,[35] 38 ABIs had been recorded against the Autumn Ridge property prior to the Receiver's appointment.   While approximately half of those ABIs have been voluntarily released, the net sale proceeds of this lot are being held by the Receiver in a real estate reserve account pending resolution of the disputes related to the validity of the remaining ABIs.

---

[31]    Docket No. 293.

[32]    *See supra*, pp. 9-12.

[33]    *See* First Report, p. 40 (describing this property).

[34]    Docket No. 293.

[35]    *See supra*, pp. 9-12.

    4.    <u>East Meadows Mobile Home Park, Vernal, Utah</u>:[36] This property consists of a mobile home park located in Vernal, Utah. The Receiver received an offer to purchase this property for $1,025,000.00 opening bid, and obtained Court approval of an auction process that used the offer as an opening bid.[37] At the auction, bidding raised the price to $1,030,000.00, an increase of $5,000.00. The sale closed on July 29, 2013, and after property taxes and closing costs, the Receivership Estate received net sale proceeds in the amount of $979,620.29.[38] There were several ABIs and trust deeds recorded against the property. While some have been released, the net sale proceeds are being held by the Receiver in a reserve account pending a resolution of disputes related to the remaining interests.

    5.    <u>Indian Canyon/Outpost on the Strawberry</u>:[39] On April 22, 2013, the Court entered an Order approved a public sale of this property.[40] A sale of the property to Duchesne County closed on July 26, 2013. After payment of property taxes and closing costs, the Receivership Estate received net sales proceeds in the amount of $134,068.12. The only lien recorded against this property was released prior to closing and thus the net proceeds have been deposited into the Receivership Estate's operating account.

    **C.**    **<u>Real Property Sales Approved During the Reporting Period/Not Closed</u>.** The Court entered Orders approving three private sales or procedures for the public sales of the following properties free and clear of interests, none of which had closed at the end of the

---

[36]   *See* First Report, p. 34 (describing this property).

[37]   Docket No. 292.

[38]   Some of this amount had been paid to the Receivership Estate previously as a bid deposit.

[39]   *See* First Report, p. 23.

[40]   Docket No. 269.

Reporting Period.

These properties are subject to certain recorded interests, and thus upon closing, all net sale proceeds obtained from the properties are expected to be held in reserve by the Receiver on behalf of the Receivership Estate pending resolution of all disputes related to such interests.

      1.     Bandanna Cabin, Duchesne County, Utah:[41]  On June 14, 2013, the Court entered an order authorizing an auction of this completed cabin, using an offer of $260,000.00 as the opening bid.[42]  No persons other than the person who had submitted the offer pre-qualified to bid, and thus the August 7, 2013 auction was canceled and the Receiver requested that the offeror complete the sale.  The buyer has now closed and the Receiver has received the net sale proceeds.  Autumn Ridge Phase II, Eagle Mountain City, Utah:[43]  On August 20, 2013, the Court entered an order providing for a second publication of notice of the sale of 62 lots of a partially developed subdivision located in Eagle Mountain City based on an opening bid of $538,000.[44]  No other bids were received and following a hearing on September 24, 2013, the Court issued an order approving the sale of this property.[45]  The property sale closed October 1, 2013 and the results will be described in the next status report.

      3.     Expressway Business Park, Unit #215, Spanish Fork, Utah:[46]  On July 31, 2013, the Court entered an order approving an auction of this property, an unfinished business

---

[41]   *See* First Report, p. 32.

[42]   Docket No. 341.

[43]   *See* First Report, p. 40.

[44]   Docket No. 412.

[45]   Docket No. 460.

[46]   *See* First Report, p. 45 (describing this property).

condominium unit located in Spanish Fork, based on a stalking horse bid of $112,500.00.[47]   At

the auction, bidding raised the sales price to $127,500.00, an increase of $15,000.00.  The sale is

expected to close in early October 2013 and will be described in the next status report.

     **D.**     **Sale of Real Properties/Court Approval Requested.**   At the close of the

Reporting Period, the Receiver had negotiated the sale of certain real property and had filed

motions with the Court seeking approval of the public sales of these properties, free and clear of

any interests.   The properties are subject to certain recorded interests, and thus all net sale

proceeds obtained will be held in reserve by the Receiver on behalf of the Receivership Estate at

closing, pending resolution of all disputes related to such interests.

     1.     <u>Fairfield/Cedar Fort Land, Fairfield, Utah</u>:[48]   The Receivership Estate

owns approximately 93 acres of vacant land in Fairfield, Utah.   The Receiver obtained an

appraisal that valued the land at approximately $3,000.00 per acre, and entered into a preliminary

agreement to sell eight acres of the land to a buyer for $25,000.00.   On September 25, 2013, the

Court entered an Order authorizing an auction of the eight-acre of the property to determine

whether any other buyers are willing to pay a higher price.[49]   The Receiver also received an offer

for the remaining 85 acres and filed a motion seeking Court approval to conduct an auction for

the large parcel in conjunction with the auction of the eight-acre parcel.   However, the potential

purchaser of the 85-acre parcel later withdrew its offer, and at present, there are no pending

offers for the larger parcel.

---

[47]    Docket No. 393.

[48]    *See* First Report, p. 42 (describing this property).

[49]    Docket No. 458.

2.     Cottonwood Road Property, Salt Lake City, UT:[50]  This property consists of five parcels of land totaling approximately one acre.   There is a boarded-up home on the property.  The Receiver preliminarily accepted a purchase offer from a buyer for $211,000.00 for the property and filed a motion seeking Court approval to conduct an auction. On September 10, 2013, the Court executed an order allowing the Receiver to conduct an auction, but requiring the Receiver to present the auction results to the Court for final approval before the sale closes.[51] The auction is scheduled for October 17, 2013.  The Receiver will report on the results of the auction in the next status report and will post updates on the Receivership website.

**E.     Real Properties to Relinquish—Lack of Equity.**  During the Reporting Period, the Receiver filed motions relating to two properties in the Receivership Estate where the Receiver believes the estate has no equity in the property:[52]

1.     Riverbend Estates, Middleton, Idaho.[53]  This property is an approximately 172-acre undeveloped parcel of land located in Middleton, Idaho.  A creditor has recorded a trust deed against the property related to a debt in excess of $5 million.  The Receiver sought Court approval to relinquish the property to the creditor because there does not appear to be equity for the Receivership Estate inasmuch as the property's appraised value in 2012 was only $1.0 million.[54]  At a hearing on July 3, 2013, the Court declined to rule on the Receiver's request to relinquish the property, instructing the Receiver to obtain a current appraisal.  The Receiver

---

[50]   *See* First Report, p. 42 (describing this property).

[51]   Docket No. 433.

[52]   The Receiver is evaluating other properties where there may be no equity.

[53]   *See* First Report, p. 25.

[54]   Docket No. 278.

thereafter ordered a second appraisal of the property, and on September 11, 2013, the Receiver filed a notice with the Court showing that the property was currently worth $1.2 million.[55]  Since that time, the Court determined that it will not grant the Receiver's motion to relinquish the property.

        2.    <u>Expressway Business Park, Unit #204, Spanish Fork, Utah</u>:  This business condominium unit was appraised as having a value of $105,000.00, but National Note (through an affiliate) owes more than $110,000.00 to a lender who has a lien on this unit.  The Receiver negotiated a settlement agreement with the lender under which the Receiver would seek Court approval to relinquish the property to the lender in exchange for the lender agreeing not to assert any deficiency claim against the Receivership Estate or make any claims for recovery.  The Court entered an order approving this settlement agreement on July 10, 2013,[56] and the property has been transferred to the lender as agreed.

        **F.**    **<u>Properties Believed to Have No Value</u>.**  As discussed in Part IV.D.29 – Part IV.D.32 of the First Report, National Note owns three old, inner city homes, located in Cleveland and Toledo, Ohio and Chicago, Illinois as well as a building lot in Cleveland.  Efforts to market these properties have been unsuccessful because brokers have refused to visit the properties.  The Receiver granted an option to a real estate investor to purchase the three properties with homes, subject to Court approval.  The option was to have been exercised by May 4, 2013.  The buyer did not exercise the option and the Receiver has no other prospects for realizing value from the properties.

---

[55]    Docket No. 435.

[56]    Docket No. 363.

The Receiver filed a motion on August 22, 2013 seeking the Court's permission to relinquish these properties.[57]   The Court held a hearing on September 9, 2013 and authorized relinquishment of the properties.[58]   The Receiver has given notice to the known affected government agencies that the Receivership Estate has relinquished any interest in the properties.

## IV.

## NON-REAL ESTATE ASSETS

In addition to real estate, the Receivership Estate is comprised of other categories of assets, including certain personal property described in Part A below, unrefined ore discussed in Part B below, and proceeds of lawsuits to recover  transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

**A.   Personal Property.**   National Note owned a limited amount of personal property. Most of the personal property was sold in prior reporting periods.   Small amounts of revenue were received from the sale of items from the National Note office, which are identified in the financial discussion later in this Report.

**B.   Alleged Mineral Assets.**   As described in the Second Report,[59] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("HMI"), to assist the Receiver in investigating whether ore held by National Note had any commercial value.   The Receiver receives regular reports from HMI on its progress in efforts to recover precious metals from this ore.   Reports received during the Reporting Period indicate

---

[57]   Docket No. 414.

[58]   Docket No. 434.

[59]   Second Report, pp. 18-19.

that the precious metals contained in the ore are not of sufficiently high concentration to make their extraction commercially viable.  However, HMI is currently exploring the possibility that the ore can be processed and used for production of a compound that includes precious metals in the ore.  Such a compound, if commercially feasible, would have value.  Further tests are being conducted.  If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in accordance with Management Agreement described in the Second Report.

      **C.**    **Pre-Receiver Asset Transfers.**  Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate, including but not limited to National Notes' payment of false profits and commissions on investments.  A discussion of the types of claims discovered by the Receiver and his intended course of action for recovery of these claims is set forth in the next section below.

**V.**

**LITIGATION**

      **A.**    **Claims Being Pursued by the Receivership Estate.**  As described in the Fourth Report, the Receiver has begun filing suit to recover payments or transfers made by National Note and its affiliated entities that should be returned to the Receivership Estate.  A total of 136 lawsuits were filed in June 2013.  Copies of the complaints in these lawsuits can be found on the Receiver's website.  Investigations are ongoing and additional lawsuits are expected.  The lawsuits filed by the Receiver to date include:

1.     Improper Commissions Paid:  The Receiver found that commissions were paid to individuals for their roles in soliciting others to invest in National Note.  The Receiver has filed six lawsuits seeking recovery of commissions paid.  The defendant in one of those lawsuits repaid the full amount of commissions he received.  In addition, Linda Mueller, a defendant in one of the lawsuits has demonstrated that she did not receive any of the commission payments sent to the company that she worked for and, as a result, she has been dismissed from the lawsuit against the company.  Thus, the remaining five lawsuits are in litigation.  In some of these cases, the defendants are also alleged to have been overpaid as investors.

2.     Unpaid and Forgiven Loans, Unreimbursed Draws and Advances.  The Receiver found numerous instances where borrowers or former employees owed money to National Note where the amount owed does not appear to have been paid or was forgiven.  It is possible that some of these defendants will be able to demonstrate that they provided equivalent value to National Note and that the lawsuits will need to be dismissed.

There were 14 lawsuits filed in this category.  Based on information received from some of the defendants, the Receiver has agreed to dismiss lawsuits against one defendant who demonstrated hardship and against a second defendant who demonstrated that the monies paid to him by National Note were for another person and that he did not keep any of those funds.  The Receiver has signed preliminary settlement agreements with two other defendants.  Litigation of the remaining ten lawsuits continues.

On September 9, 2013, the Receiver filed a lawsuit against Aaron Olsen and Utah Land Banks, LLC, seeking the recovery of a total of $178,945.73 paid to these defendants by National Note.  This litigation is ongoing.

3.      Credit Cards:   Lawsuits were filed against four companies where the Receiver's investigation revealed that: i) the credit cards were issued by those companies to individuals, not National Note, and payments for credit card charges were paid by National Note; and ii) credit cards issued in the name of National Note were used for personal expenses of Palmer or other employees, but the payments were made by National Note.  Litigation of these four lawsuits continues.

4.      Insiders, Family Members:   The Receiver investigated payments made to employees of National Note and relatives of Palmer, and has begun filing lawsuits against some of these persons.  In general, the Receiver has decided not to seek the recovery of payments to employees who did not appear to have decision-making or management authority, did not control the financial records of the company, and did not have other financial transactions with National Note, such as borrowing money from the company or selling properties to the company.   To date, the Receiver has filed 12 lawsuits in this category.

All of these defendants are defending the lawsuits against them or appear to be avoiding service of process.  Reed Larsen filed a motion to dismiss the lawsuit against him, asserting that the Receiver failed to provide sufficient specificity about the allegations against him.   This motion was withdrawn after the Receiver replied to his motion and filed an amended complaint.

The defendants in six of these lawsuits have all retained one law firm to represent them. After the close of the Reporting Period, the attorney for these defendants filed a motion to intervene in the SEC's case.[60]   The motion by these defendants indicates that they seek to intervene to assist in the defense of Palmer and to argue that National Note was not being

---

[60]     Docket No. 468.

operated as a Ponzi scheme.  The Receiver has responded to this motion,[61] and that status of this request will be discussed in the next status report.

     5.    <u>Lien Releases</u>:  The Receiver has commenced litigation against holders of various types of liens against property of the Receivership Estate:

     a.    <u>Deeds of Trust</u>.  The Receiver filed suit on June 25, 2013 against John Spinola, seeking to avoid his lien on the property known as the "Kanab Cabin."  On or about September 24, 2013, the Receiver and Spinola signed a settlement agreement which has now been approved by the Court.[62]  Pursuant to the Agreement, Spinola will release his deed of trust and the Receiver will dismiss the lawsuit against Spinola.

     The Receiver is in negotiations with the holder of a deed of trust on another property in the Receivership Estate to have the deed of trust voluntarily released.  If those negotiations are not successful, the Receiver expects to file suit to avoid the lien.

     b.    <u>Assignments of Beneficial Interest ("ABIs")</u>.  In connection with lawsuits the Receiver has filed against overpaid investors, insiders, and others, if the defendant holds an ABI that has not been voluntarily released,[63] the Receiver's lawsuit includes a request that the ABI be declared invalid.  In addition, the Receiver is filing lawsuits against other holders of ABIs.

     On August 6, 2013, the Receiver filed a lawsuit against Harvest Time Ministries, Inc., which holds an ABI against lot 48 of Elkhorn Ridge.  Harvest Time holds the only ABI recorded

---

[61]    Docket No. 498.

[62]    Docket No. 506.

[63]    *See supra* discussion at p. 10.

against this property.  Proceeds from the sale of this property are being held in a reserve account pending determination of the validity of this ABI.

On September 3, 2013, the Receiver filed a lawsuit against two holders of ABIs on the Farrell Court property located in Arizona, which has been sold by the Receiver. At the time the Receiver was appointed, there were 15 ABI recorded on this property, but 13 voluntarily released their ABIs.  Thus, litigation was commenced only against the remaining two ABI holders. Proceeds from the sale of this property are being held in a reserve account pending determination of the validity of these ABIs.

On September 12, 2013, the Receiver filed a lawsuit against 14 persons who hold ABIs against properties known as "Autumn Ridge."  There originally were over 30 ABIs recorded against this property, but all but 14 holders have voluntarily released their ABIs.  Since the filing of the lawsuit, some of these 14 defendants have agreed to release their ABIs.  Thus, the litigation continues as to the remaining defendants.

6.   Overpaid Investors:  As described in the Fourth Status Report, the Receiver filed 111 lawsuits against investors who received more in payments from National Note than the amount of their principal investments.  Some of those sued have reached settlements with the Receiver during the Reporting Period.  These are described below in Part V.B.  The lawsuits against the remaining defendants are at various stages: i) many defendants have voluntarily accepted service of the lawsuits and the deadlines to file answers have not arrived, ii) a number of defendants are in negotiations with the Receiver regarding possible settlements, iii) some defendants have filed answers with the Court, and iv) a significant number of defendants appear to be avoiding service of process or cannot be found.  This will require expending

additional Receivership funds to pay process servers to search out those defendants and serve them. In some cases, it may be necessary to ask the Court for permission to serve the defendants via publication of the summons in the newspaper.

Investigation of overpayments made by National Note to additional investors continues. Some investors have signed tolling agreements allowing for additional time to conduct further investigation and negotiations. The Receiver expects that additional lawsuits will be filed against overpaid investors in the future.

7.    <u>Tolling Agreements</u>: In connection with his investigations of payments by National Note, a number of recipients have requested additional time to conduct analysis of their own records or to negotiate possible settlements with the Receiver. In these cases, the parties have entered into tolling agreements to permit the statute of limitations to be extended to allow further investigation. Additional lawsuits may be filed against these parties in the future.

**B.**    **<u>Settlements With Overpaid Investors</u>**. The Receiver has been successful in obtaining numerous settlement agreements during the Reporting Period. In a few instances, overpaid investors have returned excess funds without executing a settlement agreement. In most cases, a settlement agreement was negotiated which included an obligation to return funds to the Receivership Estate in exchange for dismissal of the Receiver's lawsuit.

The Receiver notes that in some instances, the defendants sued by the Receiver have demonstrated financial hardship which would make pursuit of a judgment questionable when the cost of litigation is weighed against the likelihood of collection. The Receiver scrutinizes allegations of hardship carefully to ensure that the defendants truly merit hardship treatment, and not all requests for hardship treatment are recognized. Where hardship is demonstrated, the

Receiver typically agrees to dismiss the lawsuit for a greatly reduced payment. The Receiver believes that the frequency of hardship settlements will decrease because those who may qualify for hardship treatment typically identify themselves early in the litigation process.

A summary of repayments and settlements is set forth as follows:

1.   <u>Full Repayments Without Settlement Agreements</u>. During the Reporting Period, Ralph Ball repaid $5,200.00 to the Receivership Estate. This was a return of the full amount of commissions paid to him by National Note.

2.   <u>Third Motion for Approval of Settlement Agreements</u>. On July 8, 2013, the Receiver filed a motion seeking approval of ten settlement agreements,[64] and the Court has entered an order granting this motion thus approving the agreements.[65] Seven of these settlement agreements required the investors to pay a total of $146,280.55 to the Receivership Estate. As of September 30, 2013, $135,241.451 of this amount has been paid. The balance is due by December 31, 2013. The motion describing these settlement agreements is posted on the Receivership website.

3.   <u>Fourth Motion for Approval of Settlement Agreements</u>. A motion was filed with the Court on August 28, 2013 seeking approval of a seven additional settlement agreements,[66] and the Court has entered an order granting this motion, thus approving the agreements.[67] Six of these settlement agreements will result in the investors repaying a total of $106,596.11 into the Receivership Estate. As of the end of the Reporting Period, $99,576.79 of

---

[64]   Docket No. 359.

[65]   Docket No. 364.

[66]   Docket No. 422.

[67]   Docket No. 425.

this amount has been paid.  The remainder is due by December 31, 2013.

      **C.**      <u>**Actions Against the Receivership Estate**</u>.  As described in earlier status reports, a number of other parties have filed motions to intervene in the Civil Case in order to assert claims to property or wanting to foreclose on properties where the lender believes its interests are not adequately protected by the Receivership.  The following has occurred during the Reporting Period with regard to actions that have been commenced in the Civil Case relating to intervention by other parties:

            1.      <u>Complaint in Intervention Filed by First National Bank of Layton</u> (<u>"FNB"</u>):  No activity occurred during the Reporting Period in this matter and none is expected in the future.[69]

            2.      <u>Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust</u> (<u>the "Kirk Trust"</u>):[70]  The Court permitted the Kirk Trust to intervene in the Civil Case to assert rights related to certain property identified in the First Report as the "<u>Twin Pines Apartments</u>."[71] The Receiver has filed an answer disputing that the Kirk Trust has a secured interest in the property, and affirmatively asserting claims against Kirk Trust.  On August 5, 2013, the Receiver filed a motion seeking summary judgment against the Kirk Trust.[72]  The Kirk Trust also filed a motion for summary judgment.  Litigation of this matter is ongoing.

---

[68]    Docket No. 23.

[69]    *See* Docket No. 181.

[70]    *See* Docket No. 89.

[71]    *See* First Report at pp. 29-30.

[72]    Docket No. 399.

3.    Complaint in Intervention Filed by American Pension Services ("APS"):[73]
The Court permitted APS to intervene in the Civil Case to assert certain claims related to APS's role as a custodian of certain National Note investor accounts.  To date, APS has not filed the lawsuit against the Receiver that it had sought to file.  No further litigation in this matter is expected.

4.    Complaint in Intervention Filed by Investor Group:[74]  On July 2, 2013, a motion for intervention was filed by a group of investors.  On July 19, 2013, the Receiver filed his opposition to this intervention motion,[75] and on August 1, 2013, the investor group withdrew its motion to intervene.[76]

5.    Complaint in Intervention Filed by Paul Hawkins ("Hawkins"):    On September 4, 2013, Hawkins filed a motion seeking to intervene in the Civil Case so as to lift the litigation stay and allow him to file suit against former employees of National Note and Old Glory Mint, LLC.[77]  The Receiver opposed the motion, and an agreement with Hawkins was ultimately reached under which the Receiver withdrew his opposition.  Under this agreement, which was approved by the Court on October 9, 2013 (after the end of the Reporting Period),[78] Hawkins agreed not to assert any claims against the Receivership Estate and to delay collection of any judgment he may obtain from the targets of his litigation pending collection of claims the

---

[73]   *See* Docket No. 101.

[74]   Docket No. 352.

[75]   Docket No. 379.

[76]   Docket No. 396.

[77]   Docket No. 427.

[78]   Docket No. 466.

Receivership Estate may have against the same parties.

## VI.

## <u>RECORDS OF THE RECEIVERSHIP ENTITIES</u>

Substantial progress has been made in the financial analysis and investigation.   The Receiver has located all of the internal financial records created by National Note for the different affiliated entities for the period from 1995 forward.    The Receiver also has reconstructed all banking transactions for National Note and its affiliated entities for the period since January 1, 2007.

The Receiver has begun drafting a report summarizing the results of his investigation, including his forensic review of National Note's and its affiliate's financial and intercompany records, so as to provide the Court and parties in interest with information about the financial condition of National Note and its affiliated entities for each year commencing in 1995 through the filing of the Civil Case in 2012.  It is anticipated that this report will be used in the SEC's Civil Case, and in lawsuits filed by the Receiver that are based on allegations of insolvency and the existence of a Ponzi enterprise.  At this time, the Receiver has determined that National Note was insolvent since 1995 and that it was operated as a Ponzi enterprise.

## VII.

## <u>FINANCIAL ANALYSIS</u>

A.     <u>Questionable Transactions</u>.  As the Receiver's investigation continues, he has learned of additional questionable transactions as follows:

1.     <u>Loans to Insiders</u>.  National Note told investors that it was able to pay a 12% (or higher) interest rate because National Note loaned money out to others at higher interest

rates.  Yet, the Receiver has found instances where National Note loaned money to insiders at interest rates lower than the rate that was promised to investors.  For example, on January 1, 2008, National Note loaned $55,000.00 to Palmer's son, Lincoln Palmer.  This loan had an interest rate of 6%, and has not been paid.  Also on January 1, 2008, National Note loaned $100,000.00 to Palmer's wife, Christy Palmer.  This loan had an interest rate of 6%, and has not been paid.  In essence, National Note was subsidizing loans to family members—borrowing money from investors at a rate of 12% interest and then re-loaning the funds at 6% interest to insiders.

    2. <u>Money Flows Between Affiliated Entities</u>.  The financial statements contained in the private placement memoranda given to many investors included financial information only for National Note and not any affiliated entities.  In fact, the private placement memoranda stated that National Note did not have any subsidiaries or affiliates.  As part of the forensic accounting being performed by the Receiver, he has tracked the funds that were transferred between National Note and the affiliated entities as well as money flows between the affiliated entities.  These money flows show the high frequency and extensive amount of funds transferred between the various entities.  An example of these money flows for 2007 is attached as **Exhibit C**.

    B. **Receivership Financial Information**.  The following financial information is provided for the Reporting Period:

    1. <u>Bank Accounts</u>.  The Receiver maintains two bank accounts for the operation of the Receivership: a general operating account (the "<u>Operating Account</u>") and an account holding earnest money deposits on real estate purchases and the net proceeds of real

estate sales to which disputed interests have attached (the "Real Estate Account").  The balances

in these accounts as of the close of the Reporting Period are as follows:

| Entity/Operation | 9/30/13 Account Balance |
|---|---|
| Operating Account | $1,094,769.59 |
| Real Estate Account | $3,195,284.89 |
| TOTAL | $4,290,054.48 |

    2.     Operating Account Deposits.  The sources of funds deposited into the

Operating Account during the Reporting Period are shown in the following table:

| Source | Amount |
|---|---|
| Real estate sales[79] | $134,068.12 |
| Rents | $21,909.82 |
| Asset sales (non-real estate) | $1,700.00 |
| Settlement agreement payments | $263,931.10 |
| TOTAL | $421,609.04 |

    3.     Operating Account Expenditures.  The following table shows the

categories of expenses that have been paid from the Operating Account during the Reporting

Period:

| Type of Expense | Amount |
|---|---|
| Utilities | $5,694.19 |
| Expenses of property sales | $7,779.45 |
| Property maintenance expense | $12,046.56 |
| Litigation: Court filing fees | $53,600.00 |
| Litigation: Service of process | $4,577.85 |
| Receivership: Computer forensics | $1,570.00 |
| Receivership: Storage unit, copies | $595.95 |
| TOTAL | $86,155.00 |

---

[79]    These are the net proceeds from the closings of property sales that are not subject to liens.  The proceeds from the sales of properties that had liens were deposited into the Real Estate Account.

4.    <u>Real Estate Account Deposits and Expenditures</u>.  The transactions in the

Real Estate Account during the quarter were as follows:

| Source | Amount |
|---|---|
| Deposits: Property sales not closed | $246,000.00 |
| Real estate sale proceeds – closed sales | $1,056,224.76 |
| Bank fees | ($45.00) |
| **TOTAL** | **$1,302,179.76** |

5.    <u>Administrative Expense of Receiver and Counsel</u>.  The Receiver and his

staff have spent many hours in taking control of the Receivership Entities and their assets.

Furthermore, the Receiver has necessarily required the assistance of legal counsel, and counsel

has been active in providing such services to the Receivership Estate.  The Receiver and his

counsel filed on October 9, 2013 a First Interim Fee Application with the Court, seeking fees and

reimbursement of expense for the period of June 25, 2012 through December 31, 2012.[80]  A copy

of this Fee Application is posted on the Receiver's website and will be discussed in the next

status report.

For the Reporting Period, the Receiver and his staff have spent a total of 1,885.6 hours

working on this case for which fees in the total amount of $224,579.00 have been incurred.[81]

Additionally, the Receiver has advanced funds to the Receivership Estate for expenses incurred

or operating costs for which he will seek reimbursement.  For the Reporting Period, the

---

[80]   Docket No. 467.

[81]   A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver in prior Reporting Periods is set forth in each of the earlier Status Reports.  *See* First Report, p. 59; Second Report, p. 29; Third Report, p. 28; Fourth Report, p. 42; *see also* First Interim Fee Application, Docket No. 467. At this time, including fees requested by the Receiver in the First Interim Fee Application and during the periods covered by the Third Report, the Fourth Report, and this Reporting Period, the Receiver has incurred total fees of approximately $990,234.50.

Receiver's legal counsel has spent approximately 752.4 hours and incurred expenses on behalf of the Receivership Estate.   Total fees and expenses of counsel incurred during the Reporting Period are in the total amount of $204,893.94.[82]

## VIII.

### NEXT STEPS

This Reporting Period, like the last, has seen a significant change in emphasis on behalf of the Receiver.  The work of the Receiver and his counsel during this Reporting Period focused on: i) property sales, ii) pursuing litigation against persons who owe money to the Receivership Estate, and iii) analysis of financial records and preparation of a report analyzing insolvency and Ponzi indicators.  At this time, the Receiver anticipates addressing the following priorities in the coming months:

1.    Property Sales.  The Receiver will continue to aggressively pursue sales of properties that he has identified as having value for the Receivership Estate, including by conducting due diligence on the value of the properties, liens asserted against the properties, the best means of selling properties, and ways of overcoming defects relating to various properties. In all cases, the Receiver will sell real estate only after obtaining Court approval.

2.    Challenging Interests Against Properties.   The Receiver's efforts to challenge interests that have been recorded against real properties, such as liens and ABIs, will

---

[82]    A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver's legal counsel in prior Reporting Periods is set forth in each of the earlier Status Reports. *See* First Report, p. 59; Second Report, p. 29; Third Report, p. 29; Fourth Report, p. 42; *see also* First Interim Fee Application, Docket No. 467.  At this time, including fees and expenses requested by the Receiver's legal counsel in the First Interim Fee Application and during the periods covered by the Third Report, the Fourth Report, and this Reporting Period, the Receiver's legal counsel has incurred total fees and expenses in the approximate amount of $583,147.32.

continue.  This is expected to include existing and new litigation that will determine the legal status of ABIs and continued negotiations with holders of deeds of trust.

        3.    <u>Litigation</u>.  In light of the large number of lawsuits filed in June, 2013, a large share of legal counsel's time and the time of the Receiver will be spent in litigation-related activities, including but not limited to locating defendants and serving complains on the defendants, engaging in discovery, responding to motions to dismiss and summary judgment, and negotiating settlements with defendants when appropriate.

        4.    <u>Analysis of Insolvency and Ponzi</u>.  The Receiver has begun work preparing a report demonstrating the time periods when National Note was insolvent and showing that National Note was operating as a Ponzi scheme to, among other things, assist him with the Receivership Estate's claims against numerous parties.

        5.    <u>Claims Process</u>.  If the Court invalidates ABIs that have been asserted against certain real properties, the Receiver will be able to transfer funds from the Real Estate Account to the Operating Account.  When that happens, the Receiver will prepare recommendations to the Court on a claims process.

## IX.

## CONCLUSION

Significant progress has been made during the Reporting Period.  The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Receivership Estate so as to maximize any distribution available to investors.

DATED this 4TH day of November, 2013.

WAYNE KLEIN, Receiver

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **FIFTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this _4th_ day of November, 2013, and served via ECF on all parties who have requested notice in this case, including the Securities and Exchange Commission.

_/s/ Peggy Hunt_