Peggy Hunt (Utah State Bar No. 6060)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual, <br><br> Defendants. | **SIXTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** <br> *For the Quarter Ending December 31, 2013* <br><br> 2:12-cv-00591 BSJ <br><br> The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of

Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National

Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the

"Receivership Entities" hereby submits this Sixth Status Report for the period October 1, 2013

through December 31, 2013 (the "Reporting Period").

**TABLE OF CONTENTS**

**Page**

I. PROCEDURAL HISTORY ........................................................................................... 1

II. CONTINUED OPERATIONS ................................................................................... 3

    A.    Middleton, Idaho: Two Leased Homes. ............................................... 3
    B.    Brigham City, Utah: Twin Pines Apartments. ....................................... 4
    C.    Ogden, Utah: Office Building. ............................................................... 5
    D.    Spanish Fork, Utah: Expressway Business Park. ................................ 6
    E.    Temple, Georgia: Single Family Residence. ........................................ 7

III. REAL ESTATE HOLDINGS .................................................................................. 7

    A.    Efforts to Release Liens and Other Interests Against Real Properties. ................... 8
    B.    Real Property Sales Approved During the Reporting Period/Closed. ................. 10
    C.    Real Property Sales Approved During the Reporting Period/Not Closed. ........... 15
    D.    Abandoned Real Properties—Lack of Equity. ................................... 15

IV. NON REAL ESTATE ASSETS .............................................................................. 16

    A.    Personal Property. ............................................................................... 16
    B.    Alleged Mineral Assets. ...................................................................... 16
    C.    Pre-Receiver Asset Transfers. ............................................................. 17

V. LITIGATION .......................................................................................................... 17

    A.    Actions Commenced By The Receivership Estate. ............................. 17
    B.    Settlements With Overpaid Investors. ................................................ 19
    C.    Actions Against The Receivership Estate. .......................................... 20

VI. RECORDS OF THE RECEIVERSHIP ENTITIES ............................................. 22

VII. FINANCIAL ANALYSIS ..................................................................................... 23

    A.    Receivership Financial Information ..................................................... 23

VIII. NEXT STEPS ..................................................................................................... 25

IX. CONCLUSION ...................................................................................................... 27

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[1] The SEC alleges, among other things, that Defendants Palmer and National Note violated the securities laws and operated an investment fraud that took over $100 million from more than 600 investors.

The SEC filed several *ex parte* motions with its Complaint on June 25, 2012, all of which were granted by the Court. In particular, the Court entered a Temporary Restraining Order and Order to Show Cause (the "TRO"),[2] an Order Freezing Assets and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[4] Palmer later stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5] The SEC filed a motion for summary judgment against Palmer on July 19, 2013,[6] which Palmer opposed on October 14, 2013.[7] Trial had been set for February 24, 2014 but has been postponed due to Palmer obtaining new counsel.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

[6] Docket No. 377.

[7] Docket No. 473.

As a result of the Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **Exhibit A**.

In accordance with the Receivership Order,[8] the Receiver has filed the following status reports:

- The Receiver's First Status Report and Liquidation Plan, for the period June 25, 2012 through September 30, 2012, was filed November 12, 2012 (the "First Report").[9]

- The Second Status Report, for the period October 1, 2012 through December 31, 2012, was filed on February 26, 2013 (the "Second Report").[10]

- The Third Status Report, for the period January 1, 2013 through March 31, 2013, was filed on May 2, 2013 (the "Third Report").[11]

- The Fourth Status Report, for the period April 1, 2013 through June 30, 2013, was filed on August 13, 2013 (the "Fourth Report").[12]

- The Fifth Status Report, for the period July 1, 2013 through September 30, 2013, was filed on November 4, 2013 (the "Fifth Report").[13]

- This is the Sixth Status Report, for the period October 1, 2013 through December 31,

---

[8] Docket No. 9 (Receivership Order) at pp.18-20.

[9] Docket No. 73 (First Report).

[10] Docket No. 170 (Second Report).

[11] Docket No. 288 (Third Report).

[12] Docket No. 408 (Fourth Report).

[13] Docket No. 510 (Fifth Report).

2013, defined above as the "<u>Reporting Period</u>."

## II.

## <u>CONTINUED OPERATIONS</u>

The Receiver is managing the Receivership Estate with the goal of maximizing the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those National Note investors who have not received a return of their principal investment in whole or part. To facilitate this goal, the Receiver has discontinued the operations of National Note and most of its affiliated entities, except in those limited instances that have previously been described in earlier Status Reports and as discussed immediately below, and he has attempted to minimize the enterprise's historically high operating expenses going forward. However, some of the expenses of the Receivership, such as litigation expenses, are beyond the Receiver's control. The Receiver must respond to requests for relief that are not in the best interest of the Receivership Estate, such as when others seek to intervene to further their personal interests or oppose property sales.

At this time, the only operations are those related to several real estate holdings of the Receivership Estate.[14] The following is a description of the Receiver's limited operation of several real estate properties which are being operated either because they are generating net income for the Receivership Estate or because their continued operation will minimize losses:

A.   <u>Middleton, Idaho: Two Leased Homes</u>. The Receivership Estate includes two

---

[14] *See* First Report, pp. 9-10, 57-58 & Second Report, Part II.A (discussing operation of Old Glory Minting Company, LLC; operations of this entity were discontinued by the Receiver in December 2012). Certain of the real property being operated described in the First and Second Reports is now being liquidated. *See* First Report, pp. 24-53; Second Report, Part II.B. This Report discusses only those real properties being operated during the Reporting Period.

residential properties that are located in Middleton, Idaho, adjacent to a 175-acre proposed subdivision that National Note had planned under the name "Riverbend Estates," discussed in further detail at pages 25 - 26 of the First Report.[15]  The two homes are currently being rented through the services of a professional property manager, generating approximately $1,300.00 in monthly net income.  The Receiver's ultimate disposition of these homes will likely depend on the development of Riverbend Estates.[16]

**B.**   **Brigham City, Utah: Twin Pines Apartments.**  The Twin Pines Apartments are three buildings located in Brigham City, Utah, containing twenty apartments which are leased to lower income tenants.  Further information about this property is set forth at pages 29 - 30 of the First Report.  During the Reporting Period, the Receiver continued to operate this property through his property manager.  As a result of property repairs and the work of the property manager, occupancy has been averaging 95%, compared to slightly over 50% when the Receiver was appointed.  Until early December, the Apartments were generating approximately $3,500.00 monthly net income for the Receivership Estate.

A National Note investor has been permitted to intervene in this case to assert an interest in the Twin Pine Apartments, which interest the Receiver has challenged.  Litigation related to this matter is ongoing.  During the pendency of the litigation, all net rental proceeds are being segregated and are being held by the property manager.

On December 2, 2013, there was a significant fire at the complex.  There were no

---

[15] The name of the National Note affiliate that intended to develop the property is Riverbend Estates, LLC. The Receiver refers to this property as the "River Run Subdivision" in the First Report.  First Report at pp. 25-26. Both "River Run" and "Riverbend" were used to describe this property.

[16] *See* discussion *infra* at Part III.E.

injuries.  But, one of the three buildings was gutted by the fire.  The fire started in one of that building's units and spread to the seven other units in that building.  The eight families living in those units had all of their possessions destroyed in the fire.  The residents of the other two buildings were displaced overnight, but were allowed back in their homes the following day. The American Red Cross arranged a temporary shelter for the residents.  Within a few days, the property manager hired by the Receiver had arranged for new housing for all residents of the units destroyed by the fire.  There was an enormous outpouring of assistance from the Brigham City community.  This included a clothing drive which resulted in three large rooms filled with clothing, toys and toiletries, and substantial cash donations to the affected families.  Some of the donated cash was used to subsidize rent for new apartments for tenants where the property manager was unable to arrange new housing at comparable rates.

The Property is covered by an insurance policy.  A disaster recovery company took emergency steps to secure the site.  Insurance adjusters, fire investigators, and structural engineers have all visited the site.  The insurance company is evaluating whether the building can be rebuilt or needs to be demolished and reconstructed completely.

C.     **Ogden, Utah: Office Building**.  The Office Building is an old, three-story commercial office building located in downtown Ogden, Utah that is co-owned with a third party (the "Co-Owner").  Further details related to the Office Building are set forth at pages 30 - 31 of the First Report.

At present, this building has two tenants sharing the main floor.[17]  The rental income

---

[17] *See* First Report, p. 31.

from these two tenants is not sufficient to pay operating expenses of the Office Building, and the Receiver has been required to make necessary ongoing repairs to the Office Building and its heating and plumbing systems to maintain its value. The Receiver has decided against seeking additional tenants for the Office Building.

During the Reporting Period, the Receiver continued substantive discussions with the Co-Owner regarding the Co-Owner's desire to pursue development of the Building. The Receiver is awaiting the results of a feasibility study being performed by the Co-Owner. The Receiver and Co-Owner are in discussions on ways to cooperate if the Co-Owner's desire to remodel the Building for other uses proves feasible. In those discussions, the Receiver's primary focuses are on: i) eliminating the need for the Receivership Estate to continue funding operating costs, ii) ensuring that no Receivership funds will need to be expended as part of the development work, and iii) protecting the interests of the Receivership Estate in the Office Building during the redevelopment project. The Co-Owner has agreed to provide the Receiver with periodic progress reports. In the event that funding of the Co-Owner's development affects the Receivership Estate's interest therein, the Receiver will seek Court approval of the terms of such a course of action.

    **D.**    <u>**Spanish Fork, Utah: Expressway Business Park**</u>. Expressway Business Park, located in Spanish Fork, Utah, contains 46 business condominium units that were built by National Note. At the time of the Receiver's appointment, forty-two of the units had been sold, leaving four remaining units in the Receivership Estate, each of which is described in greater

detail at pages 42 – 46 of the First Report.[18]   Three of these remaining units were disposed of during prior reporting periods.  The sale of the last unit closed during this Reporting Period. With this sale, the Receivership Estate no longer owns or operates any finished units at Expressway Business Park.  The Receivership Estate continues to own significant undeveloped and partially-developed land next to this developed project, which the Receiver is attempting to liquidate.

      **E.**    **Temple, Georgia: Single Family Residence.**  This home is located in Temple, Georgia, and was being rented out, under the oversight of a professional property manager. Further details related to this property are set forth at page 51 of the First Report.  During the Reporting Period, the Receiver accepted an offer to purchase this property for $125,000.00.  The Court has approved this sale,[19] which is expected to close in early January, 2014.  Thus, the Receiver will no longer operate this Property going forward.

**III.**

**REAL ESTATE HOLDINGS**

     A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report and some of which also are discussed in Part II above.  The Receiver has determined that some of the real properties appear to have value for the Receivership Estate and need to be operated and/or marketed for sale, some properties have no equity, and some require further investigation and analysis, including an

---

[18] The Fist Report erroneously indicated that the project had 48 units and that 44 had sold.  *See* First Report, pp. 42-43.

[19] Docket No. 553.

analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver has sold numerous properties and actively marketed other properties.  Attached hereto as **Exhibit B** is a chart setting forth the status of all real properties in the Receivership Estate as of December 31, 2013.

For purposes of this Status Report, the Receiver discusses the following in Parts A through D below:

- Part A discusses the efforts undertaken during the Reporting Period to release alleged interests recorded against the Receivership Estate's real properties;

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales that have been approved by the Court, but which have not yet closed;

- Part D describes actions taken by the Receiver regarding real properties in which it does not appear that the Receivership Estate has equity.

    A.    **Efforts to Release Liens and Other Interests Against Real Properties.**  As part of the Receiver's investigation of real property holdings of the Receivership Estate, the Receiver has determined that there are numerous types of interests that have been asserted against many of the Receivership Estate's real properties, including at least the following types of interests for which he has taken the following actions:

    1.    Assignments of Beneficial Interests ("ABIs").  The First and Second

Reports described the ABIs that have been recorded against a wide variety of the Receivership

Estate's real properties purportedly in favor of certain National Note investors. If the ABIs are

deemed valid liens on the real estate, almost all the value of real estate held by the Receivership

Estate would be paid to the ABI holders, with little money left for investors who were not

granted ABIs. The Receiver believes the ABIs are not valid interests on the property.

Accordingly, the Receiver has taken the following actions:

      a.     <u>Request Voluntary Releases</u>: As real estate properties have been

sold, the Receiver has sent letters to holders of ABIs on those properties, explaining that he

believes the ABIs are not valid liens and requesting that the holders voluntarily release the ABIs.

In general, approximately one third to one half of ABIs against a given property have been

voluntarily released by holders of those alleged interests. In the case of one property, where only

one ABI had been recorded, the Receiver obtained a voluntary release from the holder, thus

freeing all of the net sale proceeds from any interests at closing.

      b.     <u>Sale of Property Free and Clear of Liens and Interests</u>: For

properties that have ABIs recorded against them, the Court has ordered that the properties be

sold free and clear of these alleged interests, with any interests to attach to the net proceeds of

the sale. The Receiver is holding the net sales proceeds of these sales in a reserve account

pending a determination as to the validity of the disputed ABIs.

      c.     <u>ABIs Held by Defendants Sued by the Receiver</u>: As described

below in Part V, the Receiver filed lawsuits against overpaid investors and others who received

false profits or other improper payments from National Note or its affiliates. To the extent that

the Receiver's investigation revealed that these defendants also held ABIs, the lawsuits seek to

have the Court invalidate the ABIs.  As discussed immediately below, the Receiver has begun filing additional lawsuits against those ABI holders who are not overpaid, seeking invalidation of the ABIs.

      2.    <u>Lawsuits Filed Seeking Declaration of Invalidity of ABIs</u>:  During the third quarter of 2013, the Receiver commenced litigation against holders of ABIs on several properties that have been sold by the Receiver.  Additional similar lawsuits are planned.

      3.    <u>Deeds of Trust</u>:  Deeds of trust have been recorded against some of the Receivership Estate's real properties.  Several of these deeds of trust are held by National Note investors who were overpaid (meaning they have received distributions in excess of the principal amount of their investments).  In two instances, the Receiver has been able to negotiate the releases of deeds of trust against receivership property through settlement.  In two other instances, the Receiver is in litigation against holders of deeds of trust.  One of these lawsuits was settled with the holder agreeing to release the deed of trust.  The second lawsuit, involving the True and Marjorie Kirk Family Trust's claim against the Twin Pines Apartments, is still in litigation.  The Receiver is continuing his investigation into deeds of trust that have been recorded against properties known as "Bandanna Cabin"[20] and "Overland Trails."[21]

    **B.**    **<u>Real Property Sales Approved During the Reporting Period/Closed</u>.**  Sixteen Court-approved real property sales were closed by the Receiver during the Reporting Period.  It should be noted that the net sales proceeds for most of these properties were reduced

---

[20] The Bandanna Cabin was sold during the Reporting Period.  The net proceeds from the sale are being held in a reserve account pending resolution of the deed of trust on this property.

[21] *See* First Report, pp. 32, 41–42 (describing these properties).

substantially by the need to pay significant unpaid property taxes assessed against the properties prior to the Receiver's appointment; generally three to four years of property taxes were owed. Five of these properties were sold using an auction approach. One of the auctions resulted in an $80,000.00 increase in the gross sales price and a second resulted in an increase of $15,000.00 in the gross sales price. For the other three auctions, there were no competing bids and the properties were sold to the stalking horse bidders. The remaining 11 properties were sold through private sales with the accepted sales price based on values of three independent appraisals issued by Court-approved appraisers. A description of these closed sales are as follows:

     1.    <u>Autumn Ridge Phase II</u>:[22] This property consists of 62 building lots in a subdivision in Eagle Mountain City, Utah. The Receiver received an offer to purchase this property for $538,000.00. The Court held a hearing on September 24, 2013 on the proposed sale and issued an order on September 30, 2013 approving the sale.[23] The sale closed October 1, 2013, and after property taxes, real estate commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $446,610.24. There are multiple ABIs recorded against this property. The net proceeds from the sale are being held in a reserve account pending court determination of the validity of the ABIs.

     2.    <u>Expressway Business Park, Unit #215, Spanish Fork, Utah</u>:[24] On July 31, 2013, the Court entered an order approving an auction of this property, an unfinished business

---

[22] *See* First Report, pp. 40-41 (describing this property).

[23] Docket No. 460.

[24] *See* First Report, p. 45 (describing this property).

condominium unit located in Spanish Fork, based on a stalking horse bid of $112,500.00.[25]  At

the September 11, 2013 auction, bidding raised the sales price to $127,500.00, an increase of

$15,000.00.  The sale closed on October 30, 2013 and after payment of closing costs and

property taxes, a net $112,965.27 was received from the sale.  There are over 60 ABIs recorded

on the Expressway units and adjacent land.  As a result, the net proceeds from the sale were

deposited into the Receivership Estate's reserve account pending Court determination of the

validity of the ABIs.

       3.    <u>Bandanna Cabin, Duchesne County, Utah</u>:[26]  On June 14, 2013, the Court

authorized an auction of this completed cabin, using an offer of $260,000.00 as the opening

bid.[27]  No persons other than the person who had submitted the offer pre-qualified to bid, and

thus the August 7, 2013 auction was canceled and the Receiver completed the sale to the buyer.

This sale closed on October 24, 2013, and after property taxes, real estate commissions, and

closing costs, the Receivership Estate received $226,374.07 in net sales proceeds.[28]  A deed of

trust on this property was given to an investor.  The Receiver disputes the validity of this deed of

trust and has been negotiating for the release of the deed of trust.  In the interim, the net proceeds

from the sale are being held in a reserve account.[29]

       4.    <u>Autumn Ridge Lots 6, 7, 11, 21, 30, 33, 51, 52, 55, 60, Eagle Mountain</u>

---

[25] Docket No. 393.

[26] *See* First Report, p. 32.

[27] Docket No. 341.

[28] The Receiver also sold personal property located at the cabin, including furniture and two ATVs.  The sale of this personal property netted an additional $26,000.00 for the Receivership Estate.

[29] See the discussion of this deed of trust at Part III.A.3.c, above.

City, Utah:[30]  On May 3, 2013, the Court approved a private sale of these building lots for

$37,000.00 each, for a total of $370,000.00.[31]  The sales of these ten lots closed on October 31,

2013, and after property taxes, sales commissions and closing costs, the Receivership Estate

received net sale proceeds in the amount of $312,978.61.  Two other lot sales were authorized by

the Court, but the builder failed to complete the purchase in a timely manner and forfeited its

$4,000.00 deposit.  The ten lots that were sold have multiple ABIs recorded against them.  Until

the validity of these ABIs has been determined by the Court, the net proceeds from the sale will

be retained in the Receivership Estate's reserve account.[32]

     5.     <u>Cottonwood Road Property, Salt Lake City, Utah</u>:[33]  This property consists

of five parcels of land totaling approximately one acre.  There is a boarded-up home on the

property.  The Receiver preliminarily accepted a purchase offer from a buyer for $211,000.00 for

the property and filed a motion seeking Court approval to conduct an auction. On September 10,

2013, the Court authorized the Receiver to conduct an auction, but required the Receiver to

present the auction results to the Court for final approval before the sale could close.[34]  The

auction was held on October 17, 2013 with three qualified bidders participating in the auction.

The property was sold for $291,000.00—an $80,000.00 increase from the stalking horse bid

---

[30] *See* First Report, p. 26 (describing this property).

[31] Docket No. 293.

[32] The Receiver filed suit on September 12, 2013 against the holders of 13 ABIs on the Autumn Ridge land.  (Case No. 2:13CV845).

[33] *See* First Report, p. 42 (describing this property).

[34] Docket No. 433.

amount.  On October 28, 2013, the Court approved the sale of this property to the high bidder.[35]

After paying property taxes and closing costs, the net proceeds from the sale were $279,189.07.

Because there are ABIs recorded against the property, the net proceeds from the sale are being

held in the Receivership Estate's reserve account pending Court determination of the validity of

the ABIs.

      6.    Fairfield/Cedar Fort Land, Fairfield, Utah:[36]  The Receivership Estate

owns approximately 93 acres of vacant land in Fairfield, Utah.  The Receiver obtained an

appraisal that valued the land at approximately $3,000.00 per acre, and entered into a preliminary

agreement to sell eight acres of the land to a buyer for $25,000.00.  On September 25, 2013, the

Court entered an Order authorizing an auction of the eight-acre of the property to determine

whether any other buyers are willing to pay a higher price.[37]  An auction was held at the property

on November 12, 2013.  One other bidder prequalified to participate in the auction, but failed to

appear at the auction.  The property was sold to the stalking horse bidder and the other bidder

forfeited its bid deposit.  The net proceeds from the sale, after paying property taxes, real estate

commissions, and closing costs was $22,274.21.  Because there are ABIs recorded on the

property, the net proceeds from the sale are being held in the Receivership Estate's  reserve

account pending Court determination of the validity of the ABIs.

      7.    Elkhorn Ridge Lot #2, Malad, Idaho:[38]  This property is a 2.5 acre vacant

---

[35] Docket No. 532.

[36] *See* First Report, p. 42 (describing this property).

[37] Docket No. 458.

[38] *See* First Report, pp. 26-28 (describing this property).

building lot in the Elkhorn Ridge subdivision near Malad, Idaho.  On October 21, 2013, the Court authorized an auction of this building lot, using a $31,500.00 offer as the opening bid.[39] No persons pre-qualified to bid and thus the November 26, 2013 auction was canceled and the property was sold to the buyer who made the original bid.  The property sale closed on December 6, 2013 and after paying property taxes, sales commissions, and closing costs, a net $27,725.00 was received.  Because this property is subject to one ABI, the net proceeds from the sale were deposited in the Receivership Estate's reserve account until the validity of the ABI is determined by the Court.

    **C.**   **Real Property Sales Approved During the Reporting Period/Not Closed.**  The Court entered an Order approving the private sale of one property, which had not yet closed at the end of the Reporting Period.

        1.   Georgia Single Family Home:[40]  This property consists of a 2,132 square foot single family home on .67 acres in Temple, Georgia.  The Receiver received an offer to purchase this home for $125,000.00.  This price was slightly above the average of three appraisals obtained on the property.  On December 5, 2013, the Court approved the sale to the buyer.[41]  The sale is expected to close in early January 2014.  There are no deeds of trust or ABIs on this property so the net sales proceeds after closing will be deposited into the Receivership Estates' operating account.

    **D.**   **Real Properties to Relinquish—Lack of Equity.**  During the Reporting Period,

---

[39] Docket No. 485.

[40] *See* First Report, p. 51 (describing this property).

[41] Docket No. 553.

no motions relating to properties in the Receivership Estate where the Receiver believes the estate has no equity in the property were filed:[42]  However, the lender for property known as "Riverbend Estates" located in Middleton, Idaho, filed a motion to intervene and has sued the Receiver seeking title to this property.  This litigation is described in Part V, below.

## IV.

## NON-REAL ESTATE ASSETS

In addition to real estate, the Receivership Estate is comprised of other categories of assets, including certain personal property described in Part A below, unrefined ore discussed in Part B below, and proceeds of lawsuits to recover  transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

A.     **Personal Property.**  National Note owned a limited amount of personal property. Most of the personal property was sold in prior reporting periods but, as described in Part III.B.3 above, personal property related to the property known as "Bandanna Cabin" was sold during the Reporting Period.  The proceeds from this sale are summarized in the financial discussion later in this Report.

B.     **Alleged Mineral Assets.**  As described in the Second Report,[43] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("HMI"), to assist the Receiver in investigating whether ore held by National Note had any commercial value.  The Receiver receives regular reports from HMI on its progress in efforts to recover precious metals from this ore.  Reports received during the Reporting Period indicate

---

[42] The Receiver is evaluating properties held by the Receivership Estate where there may be no equity.

[43] Second Report, pp. 18-19.

that the precious metals contained in the ore are not of sufficiently high concentration to make their extraction commercially viable.  However, HMI is currently exploring the possibility that the ore can be processed and used for production of a compound that includes precious metals in the ore.  Such a compound, if commercially feasible, would have value.  Further tests are being conducted.  If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in accordance with Management Agreement described in the Second Report.

      **C.**    **Pre-Receiver Asset Transfers.**  Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate, including but not limited to National Notes' payment of false profits and commissions on investments.  A discussion of the types of claims discovered by the Receiver and his intended course of action for recovery of these claims is set forth in Part V below.

V.

**LITIGATION**

      **A.**    **Actions Commenced by the Receivership Estate.**  As described in the Fourth Report, the Receiver has begun filing suit to recover payments or transfers made by National Note and its affiliated entities that should be returned to the Receivership Estate.  A total of 136 lawsuits were filed in June 2013.  Copies of the complaints in these lawsuits can be found on the Receiver's website.  Investigations are ongoing and additional lawsuits are expected.  The lawsuits filed by the Receiver seek recovery for a variety of payments that the Receiver believes were improper, including:

1. <u>Improper Commissions Paid</u>:  The Receiver found that commissions were paid to a number of individuals for their roles in soliciting others to invest in National Note.

2. <u>Unpaid and Forgiven Loans, Unreimbursed Draws and Advances</u>.  The Receiver found numerous instances where borrowers or former employees owed money to National Note where the amount owed does not appear to have been paid or was forgiven.

3. <u>Credit Cards</u> :  Lawsuits were filed against four companies that received payments from National Note for personal charges on the credit cards.

4. <u>Insiders, Family Members</u>:  The Receiver investigated payments made to employees of National Note and relatives of Palmer, and has begun filing lawsuits against some of these persons.

5. <u>Lien Releases</u>:  As described earlier, the Receiver has commenced litigation against holders of various types of liens against property of the Receivership Estate:

6. <u>Overpaid Investors</u>:  As described in the Fourth Status Report, the Receiver filed 111 lawsuits against investors who received more in payments from National Note than the amount of their principal investments.  Some of those sued have reached settlements with the Receiver during the Reporting Period.  These are described below in Part V.B.  Since that time additional settlements have reached made as described in a motion for approval filed in early January 2014.  These settlements will be described in the next status report.

7. <u>Tolling Agreements</u>:  In connection with his investigations of payments by National Note, the Receiver has entered into tolling agreements with a number of persons.  These tolling agreements extend the statutes of limitations to allow further investigation.

**B.**     <u>Settlements With Overpaid Investors</u>.  The Receiver has been successful in obtaining numerous settlement agreements during the Reporting Period.  Settlement agreements subject to Court approval generally include an obligation to return funds to the Receivership Estate in exchange for dismissal of the Receiver's lawsuit, and a release of claims against the Receivership Estate.

The Receiver notes that in multiple instances, the defendants sued by the Receiver have demonstrated financial hardship which would make collection of a judgment difficult.  In such instances, pursuing judgment is not beneficial when the cost of litigation is weighed against the likelihood of collection.  The Receiver scrutinizes allegations of hardship carefully to ensure that the defendants truly merit hardship treatment, and has rejected many requests for hardship treatment.  Where hardship is demonstrated, the Receiver typically agrees to dismiss the lawsuit for a greatly reduced payment.  The Receiver believes that the frequency of hardship settlements will decrease because those who may qualify for hardship treatment typically identify themselves early in the litigation process.

A summary of settlements made during the Reporting Period is set forth as follows:

1.     <u>Fifth Motion for Approval of Settlement Agreements</u>.  On October 30, 2013, the Receiver filed a motion seeking approval of eleven settlement agreements.[44]  The Court granted this motion and approved the agreements on October 31, 2013.[45]  Six of these settlement agreements required the investors to pay a total of $74,009.51 to the Receivership Estate.  As of December 31, 2013, $36,250.00 of this amount has been paid.  The motion

---

[44] Docket No. 502.

[45] Docket No. 506.

describing these settlement agreements is posted on the Receivership website.

        2.      <u>Sixth Motion for Approval of Settlement Agreements</u>.  Additional settlement agreements were negotiated during the Reporting Period and a motion was filed with the Court in early January 2014 seeking approval of eighteen additional settlement agreements.[46] These will be described in the next status report.

        C.      **Actions Against the Receivership Estate**.  As described in earlier Status Reports, a number of other parties have filed motions to intervene in the Civil Case in order to assert claims to property or wanting to foreclose on properties where the lender believes its interests are not adequately protected by the Receivership.  The following has occurred during the Reporting Period with regard to actions that have been commenced in the Civil Case relating to intervention by other parties:

        1.      <u>Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust (the "Kirk Trust")</u>:[47]  The Court permitted the Kirk Trust to intervene in the Civil Case to assert rights related to certain property identified in the First Report as the "Twin Pines Apartments."[48] The Receiver disputes that the Kirk Trust has a secured interest in the property, and has asserted affirmative claims against the Kirk Trust.  In August, both parties filed motions seeking summary judgment.[49]  A hearing on the cross-motions for summary judgment was held in early January, 2014, and the Court took the matter under advisement.

---

[46] Docket No. 568.

[47] *See* Docket No. 89.

[48] *See* First Report at pp. 29-30.

[49] The Receiver's motion for summary judgment was filed August 5, 2013.  *See* Docket No. 399.

   2.   Complaint in Intervention Filed by Paul Hawkins ("Hawkins"):  On

October 9, 2013, the Court granted a motion to intervene filed by Hawkins.  Hawkins alleges that

Old Glory Mint was storing silver coins that he purchased and that Old Glory sold his coins to

others.  The Court conditioned the intervention on Hawkins's agreement that he will not assert

any claims against the Receivership Estate and that he will delay collection of any judgment he

may obtain from the targets of his litigation pending collection of claims the Receivership Estate

may have against the same parties.[50]

   3.   Complaint in Intervention Filed by 30 Overpaid Investors ("Overpaid

Investors"):  On October 9, 2013, a motion to intervene was filed by the Overpaid Investers sued

by the Receiver.[51]  At a hearing on the motion, the Overpaid Investors indicated they wanted to

intervene to assist with Palmer's legal defense.  On November 21, 2013, the Court denied the

motion to intervene.[52]

   4.   Complaint in Intervention Filed by West Side Enterprises, Leon Harward

("Harward"):  On October 21, 2013, Leon Harward filed a motion to intervene on behalf of

himself and his company, West Side Enterprises.[53]  Following a hearing on November 12, 2013,

the Court denied Harward's motion.[54]  On December 26, 2013, Harward filed a motion

informing the Court that West Side Enterprises had conveyed to Harward its interest in the

---

[50] Docket No. 466.

[51] Docket No. 468.

[52] Docket No. 540.

[53] Docket No. 488.

[54] Docket No. 529.

properties in dispute and asked the Court to reconsider its denial of his motion to intervene.[55]

      5.     <u>Complaint in Intervention filed by Barclay Associates ("Barclay")</u>:  On November 15, 2013, Barclay filed a motion to intervene, asking the Court to allow Barclay to take title to most of the Riverbend Estates property located in Middleton, Idaho, consistent with the terms of a settlement agreement between Barclay and the Receiver.[56]  The Court has scheduled a hearing on Barclay's motion.

**VI.**

**RECORDS OF THE RECEIVERSHIP ENTITIES**

      Substantial progress has been made in the financial analysis and investigation.  The Receiver has located all of the internal financial records created by National Note for the different affiliated entities for the period from 1995 forward.  The Receiver also has reconstructed all banking transactions for National Note and its affiliated entities for the period since January 1, 2007.

      The Receiver is finalizing a report summarizing the results of his investigation, including his forensic review of National Note's and its affiliates' financial and intercompany records, to be able to provide the Court and parties in interest with information about the financial condition of National Note and its affiliated entities for each year commencing in 1995 through the filing of the Civil Case in 2012.  It is anticipated that this report will be used in the SEC's Civil Case, and in lawsuits filed by the Receiver that are based on allegations of insolvency and National Note's use of funds from investors to make distribution payments to other investors.  At this

---

[55] Docket No. 565.

[56] Docket No. 536.

22

time, the Receiver has determined that National Note has been insolvent since 1995 and that it was using money from investors to make distribution payments to other investors.

## VII.

## FINANCIAL ANALYSIS

A.    **Receivership Financial Information**.  The following financial information is provided for the Reporting Period:

1.    Bank Accounts.  The Receiver maintains two bank accounts for the operation of the Receivership: a general operating account (the "Operating Account") and an account holding earnest money deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "Real Estate Account").  The balances in these accounts as of the close of the Reporting Period are as follows:

| Entity/Operation | 12/31/13 Account Balance |
|---|---|
| Operating Account | $837,082.17 |
| Real Estate Account | $4,382,371.36 |
| **TOTAL** | **$5,219,453.53** |

2.    Operating Account Deposits.  The sources of funds deposited into the Operating Account during the Reporting Period are shown in the following table:

| Source | Amount |
|---|---|
| Real estate deposits, refunds | $6,063.82 |
| Rents | $9,532.50 |
| Asset sales (non-real estate) | $27,500.00 |
| Royalties | $20,942.04 |
| Settlement agreement payments | $178,549.29 |
| **TOTAL** | **$242,587.65** |

3.    Operating Account Expenditures.  The following table shows the

23

categories of operating expenses that have been paid from the Operating Account during the

Reporting Period:

| Type of Expense | Amount |
|---|---|
| Utilities | $3,818.81 |
| Property insurance, taxes, dues, care | $16,771.88 |
| Property appraisals, public notice | $6,003.71 |
| Litigation: Service of process | $5,466.81 |
| Computer forensics, storage, filings | $3,126.85 |
| TOTAL | $35,188.06 |

    4.    <u>Real Estate Account Deposits and Expenditures</u>.  The transactions in the

Real Estate Account during the quarter were as follows:

| Source | Amount In | Amount Out |
|---|---|---|
| Deposits: Unsuccessful bidders | $638,000.00 | $648,000.00 |
| Proceeds from property sales | $1,197,116.47 | $0.00 |
| Bank fees | $0.00 | $30.00 |
| TOTAL | $1,835,116.47 | $648,030.00 |

    5.    <u>SFAR.</u>  Attached as **<u>Exhibit C</u>** is a copy of the Standardized Fund

Accounting Report for the Reporting Period.

    6.    <u>Administrative Expense of Receiver and Counsel</u>.  On December 9, 2013,

the Court approved an interim fee application to the Receiver and his counsel.[57]  The Court

allowed payment of $359,756.44 in fees and expense reimbursement for work by the Receiver

and $105,330.57 in fees and expenses by Dorsey and Whitney LLP, counsel for the Receiver.

For the Reporting Period, the Receiver and his staff have spent a total of 1,615.5 hours

working on this case for which fees in the total amount of $165,345.50 have been incurred.

Additionally, the Receiver has advanced funds to the Receivership Estate for expenses incurred

---

[57] Docket No. 555.

or operating costs for which he will seek reimbursement.  The Receiver's legal counsel has spent approximately 561.60 hours and incurred expenses on behalf of the Receivership Estate.  Total fees and expenses of counsel incurred during the Reporting Period are in the total amount of $153,367.00.[58]

## VIII.

## NEXT STEPS

This Reporting Period, like the last, has seen a significant change in emphasis on behalf of the Receiver.  The work of the Receiver and his counsel during this Reporting Period focused on: i) property sales, ii) pursuing litigation against persons who owe money to the Receivership Estate, and iii) analysis of financial records and preparation of a report analyzing insolvency and the use of money from new investors to make distribution payments to other investors.  At this time, the Receiver anticipates addressing the following priorities in the coming months:

1.      Analysis of Insolvency and Flow of Funds.  The Receiver is nearing completion on a report demonstrating the time periods when National Note was insolvent and showing the extent to which distribution payments to investors came from sources other than operating profits of National Note.  It is expected that this report will assist in the Receivership Estate's claims against overpaid investors, credit card companies, insiders, and holders of property interests.

---

[58] A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver and the Receiver's legal counsel in prior Reporting Periods is set forth in each of the status reports.  *See* First Report, p. 59; Second Report, p. 29; Third Report, pp. 28-29; Fourth Report, p. 42; Fifth Report, pp. 33-34; *see also* First Interim Fee Application, Docket No. 467.

2.      Litigation.  In light of the large number of lawsuits filed in June 2013, a large share of legal counsel's time and the time of the Receiver will be spent in litigation-related activities, including but not limited to locating defendants and serving complaints on the defendants, engaging in discovery, responding to motions to dismiss and summary judgment, and negotiating settlements with defendants when appropriate.

3.      Challenging Interests Against Properties.  The Receiver's efforts to challenge interests that have been recorded against real properties, such as liens and ABIs will continue.  This is expected to include existing and new litigation that will determine the legal status of ABIs and deeds of trust.

4.      Property Sales.  The Receiver will continue to pursue sales of properties that he has identified as having value for the Receivership Estate, including by conducting due diligence on the value of the properties, liens asserted against the properties, the best means of selling properties, and ways of overcoming defects relating to various properties. In all cases, the Receiver will sell real estate only after obtaining Court approval.  It is expected that property sales may slow as many of the properties with the most appeal have already been sold.

5.      Claims Process.  If the Court invalidates ABIs that have been asserted against certain real properties, the Receiver will be able to transfer funds from the Real Estate Account to the Operating Account.  When that happens, the Receiver will prepare recommendations to the Court on a claims process.

## IX.

## CONCLUSION

Significant progress has been made during the Reporting Period. The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Recceivership Estate so as to maximize any distribution available to investors.

DATED this 4th day of February, 2014.

WAYNE KLEIN, Receiver

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **SIXTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this 4th day of February, 2014, and served via ECF on all parties who have requested notice in this case, including the Securities and Exchange Commission.

/s/ Peggy Hunt

28