Peggy Hunt (Utah State Bar No. 6060)
Chris Martinez (Utah State Bar No. 11152)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email:  hunt.peggy@dorsey.com
         martinez.chris@dorsey.com
         armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br>     v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>                    Defendants. | **SECOND INTERIM FEE APPLICATION FOR RECEIVER AND RECEIVER'S PROFESSIONALS FOR SERVICES RENDERED FROM JANUARY 1, 2013 THROUGH JUNE 30, 2013**<br><br>  2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

In accordance with the Order Appointing Receiver and Staying Litigation (the "Receivership Order"),[1] R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note" or "NNU"), as well as certain subsidiaries and entities affiliated with National Note, and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this second interim "Fee Application,"

---
[1]    Docket No. 9.

seeking approval by the Court of fees and expenses incurred by the Receiver, the Receiver's forensic accountants, Klein and Associates, PLLC ("Klein and Associates"), and the Receiver's legal counsel, Dorsey & Whitney LLP ("Dorsey"), for the period of January 1, 2013 through June 30, 2013 (the "Application Period"), and authorization to pay all authorized fees and expenses from unencumbered funds of the Receivership Estate.  This Fee Application was provided to the United States Securities and Exchange Commission ("SEC") for review, comment and objection prior to filing.  The SEC provided comments to the Receiver and the Receiver understands that there is no objection by the Commission to relief sought herein.

In support hereof, the Receiver states as follows.

## I.      BACKGROUND

1.      On June 25, 2012, this case was commenced by the SEC against Defendants Palmer and National Note in this Court.  The SEC alleges, among other things, that Defendants Palmer and National Note engaged in securities fraud and operated a scheme that took over $100 million from more than 600 investors.

2.      The SEC filed several *ex parte* motions on June 25, 2012, all of which were granted by the Court.  In particular, the Court entered the Receivership Order, appointing the Receiver and authorizing the Receiver to employ professionals to assist him with his duties.[2]

3.      Upon his appointment, and in accordance with the Receivership Order, the Receiver employed the Dorsey as his legal counsel and Klein and Associates as his forensic

---

[2]      Receivership Order ¶ 58.

accountants, and such retention was approved by the Court.[3]  Neither the Receiver nor any of his professionals have entered into an any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

4.       On December 9, 2013, the Court entered an Order approving the Receiver's first *Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered from June 25, 2012 Through December 31, 2012*,[4] which authorized payment of $320,914.50 to Klein & Associates, and $103,730.75 to Dorsey for fees and services rendered during the application period, and payment of $38,841.94 to Klein & Associates, and $1,599.82 to Dorsey for reimbursement of out of pocket expenses for the same period.  No applications have been filed since that time.

5.       During the present Application Period, the Receiver and his professionals have provided actual and necessary services for the benefit of the Receivership Estate which are set forth in greater detail below.  The Receiver respectfully submits that the fees and expenses requested in the Fee Application are reasonable and should be approved.

6.       As noted above, the Receiver submitted the Fee Application to the SEC for review, comment and objection prior to filing.  The SEC provided comments to the Receiver, and the SEC has informed the Receiver that it has no objection to the fees and expenses as requested herein.

---

[3]       Docket No. 14 (Order Authorizing Receiver to Employ Professionals).

[4]       Docket No. 555.

## II.   <u>SERVICES PERFORMED</u>

7.      To date, the Receiver has filed the following reports with the Court:   *Initial Report and Liquidation Plan*, which includes a status report for the period of June 25, 2012 through September 30, 2012 (the "<u>First Status Report</u>");[5] *Second Status Report* for the period of October 1, 2012 through December 31, 2012 (the "<u>Second Status Report</u>");[6] *Third Status Report* for the period of January 1, 2013 through March 31, 2013;[7] *Fourth Status Report* for the period of April 1, 2013 through June 30, 2013 (the "<u>Fourth Status Report</u>");[8] *Fifth Status Report* for the period of July 1, 2013 through September 30, 2013 (the "<u>Fifth Status Report</u>");[9] and *Sixth Status Report* for the period of October 1, 2013 through December 31, 2013 (the "<u>Sixth Status Report</u>");[10] These Status Reports provide a comprehensive description of the services performed by the Receiver and his professionals during the Application Period and are incorporated herein by reference.

8.      The efforts of the Receiver and his professionals giving rise to the fees and costs incurred during and requested for this Application Period are detailed in the Third Status Report and the Fourth Status Report, both of which are incorporated herein.

---

[5]     Docket No. 73.

[6]     Docket No. 170.

[7]     Docket No. 288.

[8]     Docket No. 408.

[9]     Docket No. 510.

[10]    Docket No. 510.

9.     In general, however, during the Application Period, the Receiver and his professionals primarily focused on the following:

A.     <u>Limited Business Operations</u>:  Attending to operational and legal issues related to the continued operation of the following properties: (1) two leased homes in Middleton, Idaho; (2) the Twin Pines Apartments, Brigham City, Utah; (3) an office building located in Ogden, Utah; (4) the East Meadows mobile home park located in Vernal, Utah; (5) the Cedar Fort Land, Fairfield, Utah; (6) two units in the Expressway Business Park, Spanish Fork, Utah; and (7) a residence located in Temple, Georgia.

B.     <u>Disposition of Assets</u>:  The Receiver and his professionals attended to all aspects of disposing of personal and real property assets during the Application Period. All efforts in this regard are focused on minimizing expense while maximizing the value of property for the Receivership Estate.  Thus, the Receiver generally first considers whether the property in question has value for the Receivership Estate by considering the fair market value of the property (typically obtained from the advice of relevant professionals), the existence of interests asserted against the property, the validity and/or avoidability of those interests, the costs of invalidating or avoiding any interests, and costs associated with marketing and sale, including in obtaining Court approval of a proposed sale.  If it is determined that there is no equity in a property, the Receiver typically seeks authority to relinquish the property to avoid continued administrative costs.  If there is equity in the property, the Receiver evaluates the timing of and the best method for marketing and selling the property so as to maximize its value for the benefit of the Receivership Estate.

In so doing, the Receiver and his professionals engaged in at least the following tasks related to asset disposition during the Application Period:

- Filing a motion seeking Court approval of sale procedures for sixty two lots in a partially developed subdivision located in Eagle Mountain City, Utah;

- Attending to the investigation, analysis and, where necessary litigation of the validity of deeds of trust against real property of the Receivership Estate, including negotiating settlement agreements with two holders of deeds of trust, and continuing litigation with other deed of trust holders;

- Evaluating the equity in numerous real properties, and seeking Court approval to relinquish properties with no equity for the Receivership Estate;

- Negotiating with a creditor with liens against the Riverbend Estates property located in Middleton, Idaho; and

- Evaluating properties for sale, marketing properties, negotiating sales, obtaining Court approval of purchase offers, attending to issues of conducting public sales (where applicable), and closing sales.  As of end of the Application Period, the following is a list of real property sales that have been closed, and which were ready to close as a result of the entry of Orders approving the sales:

  - *Closed Sales*:  (1) Summit Park Lot near Park City, Utah; (2) NNU Office, Salt Lake City, Utah; (3) Elkhorn Lot #5, Malad, Idaho; (4) Elkhorn Lot #48, Malad, Idaho; (5) Elkhorn Lot #4, Malad, Idaho; (6) two residential building lots on 900 W, Salt Lake City, Utah; (7) Clearview Business Park, Mesa, Arizona; (8) seven separate sales totaling twelve units in the Farrell Business Park, Gilbert, Arizona; (9) Autumn Ridge Phase I, Lots #8 and #54. Eagle Mountain, Utah; (10) Autumn Ridge Phase I, Lot #4, Eagle Mountain, Utah; (11) Manhattan Grille Condominium, Manhattan, Montana; and (l2) Expressway Business Park, Unit 305, Spanish Fork, Utah; and

  - *Court-Approved Sales:*[11]  (1) Outpost Canyon, Duchesne County, Utah; (2) Elkhorn Lot #1, Malad, Idaho; (3) East Meadows Trailer Park, Vernal, Utah; (4) Bandana Cabin, Duchesne County, Utah; and (5) Autumn Ridge Phase 1, Eagle Mountain, Utah.

---

[11]  Although none of these sales had closed as of the end of the Application Period, all have now closed.

> As a result of these sales, the Receivership Estate has obtained $1,962,231.29 in net sale proceeds during the Application Period. When the sales were of unencumbered property, the net sale proceeds have been deposited into the Receiver's Operating Account, and when the sale is subject to contested interests, the net sale proceeds are deposited into the Receiver's Real Estate Account.[12]

Since the end of the Application Period, the Receiver and his professionals continued to use the above methodology in liquidating property of the Receivership Estate.

        C.     <u>Asset Analysis and Recovery/Litigation Claims</u>. A large part of the focus of the Receiver and his professionals during the Application Period was the investigation, and research and evaluation of claims of the Receivership Estate involving avoidable transfers, unpaid loans, and the invalidity of transfers made to select investors, referred to in this case as "Assignments of Beneficial Interests" ("<u>ABIs</u>"). All efforts in this regard have been focused on minimizing expense while maximizing the value of property for the Receivership Estate. Thus, after identifying potential claims and before commencing any litigation to liquidate the same, the Receiver and his professionals engaged in the following process:

        1.     Demand letters were sent to each target defendant giving that person an opportunity to resolve the claim alleged prior to the commencement of any litigation, including by providing the Receiver with a hardship affidavit evidencing an inability to pay any judgment that might be obtained;

        2.     In response, a significant number of the target defendants

---

[12] *See infra* at Part III (discussing bank accounts).

contacted the Receiver, and in all such instances the Receiver and his professionals (a) received from the target defendants any disputed facts and investigated those facts, (b) when appropriate, determined that there was no claim against the target defendant based on the additional facts received, (c) when possible and appropriate negotiated the settlement of viable claims, including investigating claims of financial hardship based on the target defendant's hardship affidavit so as to prevent the filing of lawsuits against persons against whom judgment would not be collectable, and (d) in some instances, collected funds turned over based on demand;

3.    In another significant number of cases, either a settlement could not be reached based on demand or the target defendant did not respond to the Receiver's demand and thus the Receiver was required to commence litigation in the last weeks of the Application Period – mid- June 2013 -- to liquidate the Receivership Estate's claims; and

4.    Since the end of the Application Period, and in response to the filing of suit, many defendants have reached out to the Receiver to attempt to resolve claims alleged outside of litigation, and in all such instances, the Receiver and his professionals then engaged in the process described in (2) above, and also filing motions to approve settlement agreements negotiated and drafted.

Accordingly, as part of this process, at least the following was accomplished by the Receiver and his professionals during the Application Period:

- Investigation and analysis of monies transferred to investors and others by National Note.

- Analysis of claims for recovery of funds transferred and the drafting of demand

letters and litigation papers related to the same.

- Over 225 demand letters were drafted and sent to litigation targets requesting turnover of avoidable transfers, ABIs, or monies otherwise received.

- Over 140 avoidance lawsuits were compiled and filed by mid-June 2013, after demand having been made, including the following:

  ➢ At least 111 lawsuits were filed against investors who received funds in excess of their principal investment;
  ➢ At least 11 lawsuits were filed against those who received commissions for investors solicited;
  ➢ At least 4 lawsuits were against credit card companies who were transferred funds from NNU on account of the personal debts of others; and
  ➢ Twelve lawsuits were against relatives of Palmer and certain management of National Note seeking to recovery improper payments.

- Claims against borrowers or former employees whose loans appeared to have been forgiven for no consideration were investigated, demands were made, and by the end of June 2013, 14 collection lawsuits were filed.

- The existence of ABIs recorded against real properties of the Receivership Estate was investigated, and requests for releases were issued to the holders of ABIs. While numerous ABI holders released their ABIs pursuant to informal request, many did not. Lawsuits were filed against those who did not respond to the Receiver's request for a release.

- When appropriate, the Receiver entered into Tolling Agreements with numerous parties to extend applicable statutes of limitations.

- In instances where settlement agreements were possible, the Receiver has negotiated settlement, drafted appropriate papers related to the same, and during the Application Period filed two motions seeking approval of the settlement agreements that have been executed. To date, settlement recoveries from the settlements approved in these motions have totaled $422,793.69.

  D.   Litigation.   Services rendered during the Application Period related to

litigation are primarily in two categories:

- Intervention Actions: The Receiver has been required to engage in litigation with several entities as a result of intervention complaints filed in this case, including by the True & Marjorie Kirk Family Trust, the Pilchers, American Pension Services, and

First National Bank of Layton; and

- Notices of Receivership:  Based on his investigation, the Receiver determined that he was required to be reappointed and file Notices of Receivership in multiple additional jurisdictions.

E.   <u>Continuing Investigation</u>:   The Receiver's investigation of the Receivership Estate continued during the Application Period.  As part of these duties, the Receiver and his professionals have engaged in at least the following tasks:

- Located and preserved books and records of the Receivership Estate;

- Reconstructed bank transactions;

- Investigated questionable transactions involving "black sand" ore, Ghanian gold, certain business ventures, and property valuations; and

- Investigated and began preparing a report summarizing facts related to the Receiver's investigation, including facts related to National Note's mismanagement and fraud, as well as facts showing that the enterprise was insolvent since at least 1995.

F.   <u>Administration of Receivership Estate</u>:   The Receiver and his professionals have incurred fees and expenses in administering the Receivership Estate, including at least the following: maintaining bank accounts and books and records of the Receivership Estate; receiving funds; making payments necessary to preserve assets; communicating with investors and others; monitoring a Management Agreement with HMI Management LLC; and, when requested, providing information to relevant governmental authorities.

10.   Through the actual and necessary work of the Receiver and his professionals, the Receiver has provided considerable benefit to the Receivership Estate.

### III.     BANK ACCOUNTS OF THE RECEIVERSHIP ESTATE

11.     The Receivership Estate currently has two bank accounts, designated as an "Operating Account" and a "Real Estate Account".[13]  The Operating Account holds funds that are free and clear of any interests, and as of March 24, 2014, this Account had a balance in the total amount of $1,101,197.88.  The Real Estate Account holds the net sale proceeds that have been obtained from the liquidation of real property against which ABIs have been recorded, and as of March 24, 2014, this Account had a balance in the total amount of $4,354,631.36.  Until ABIs are released or disputes related to the ABIs are resolved, funds in the Real Estate Account will be held by the Receiver in this separate account.

12.     If the Court approves this Fee Application, the Receiver would pay the approved fees and expenses from the Operating Account.  Given the amount requested, the Operating Account has sufficient funds to pay these fees and expenses.

### IV.     REQUEST FOR COURT APPROVAL OF FEES AND EXPENSES

13.     The Receivership Order provides, in relevant part, that:

> 59.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

> 60.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the

---

[13]     *See* Fourth Status Report at pp. 40-42.

Court for compensation and expense reimbursement from the Receivership Estate (the "Quarterly Fee Applications"). At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the Commission a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by Commission staff.

61. All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. . . .

62. Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. . . .[14]

14. The Receiver now respectfully requests that the Court enter an Order approving on an interim basis and authorizing payment from the Receivership Estate of the reasonable compensation and expenses outlined herein for the Application Period of January 1, 2013 through June 30, 2013. The total fees and out-of-pocket expenses requested for the Receiver and his professionals is in the total amount of $624,943.01, which is summarized as follows:[15]

---

[14] Receivership Order ¶¶ 59-62.

[15] *See* Exhibit A-1 (Receiver and Klein and Associates Summary of Fees and Expenses); Exhibit A-2 (Dorsey Summary of Fees and Expenses); Exhibit B-1 (Invoices for Services of Receiver and Klein and Associates); Exhibit B-2 (Invoices for Services of Dorsey); Exhibit C-1 (Invoice of Out-of-Pocket Expenses for Receiver and Klein and Associates); Exhibit C-2 (Invoice of Out-of-Pocket Expenses for Dorsey).

| | RECEIVER AND KLEIN AND ASSOCIATES | DORSEY |
|---|---|---|
| Fees | $443,421.00 <br> ($88,684.20)-20% reduction <br> $354,736.80 | $264,593.50 <br> ($10,136.25)-voluntary reduction <br> $254,457.25 |
| Expenses | $3,659.48 | $12,089.48 |
| **TOTAL** | $358,396.28[16] | $266,546.73[17] |

15.     The amounts requested include voluntary reductions made by the respective professionals in an exercise of their billing judgment.  Reductions are summarized as follows:

A.     The Receiver and the staff of Klein & Associates actually billed 4,116.00 hours during the Application Period, which does not include an additional 147.90 hours of time which are not being billed, amounting to $17,619.00 in fees in unbilled time.  *See* **Exhibit A-1**.  Thus, the above-noted total fees in the amount of $443,421.00 does not account for this 147.90 hours of unbilled time and amounts to a voluntary reduction of $17,619.00, including unbilled time of the Receiver valued at $10,035.00.  In addition, the Receiver discounted his billed hours by an additional 20 percent, resulting in a further

---

[16]   This amount is less than, but differs slightly from the amounts listed in the Third and Fourth Status Reports.  The total amount reported in those reports is in the amount of $444,741.00.  *See* Third Status Report, p. 28; Fourth Status Report, p. 42.  The difference of $1,320 reflects some time that was reclassified as being not billed and some corrections in the billing rate that were made during a further view of the time records in preparing this Fee Application.

[17]   This amount differs slightly from the combined amounts listed in the Third and Fourth Status Reports, which totaled $272,922.81.  *See* Third Status Report, p. 28; Fourth Status Report, p. 42.  The difference reflects the fact that Dorsey's invoices as of the filing of the Third and Fourth Status Reports had not been finalized, all expenses for the Application Period had not yet been billed, and Dorsey had not finished voluntarily reducing its fees.

reduction of billed fees in the amount of $88,684.20.   The Receiver and Klein & Associates, thus have made total voluntary reductions in the amount of $106,303.20.

B.      In an exercise of its billing judgment, Dorsey has voluntarily reduced its actual billed fees in the total amount of $10,136.25.   *See* **Exhibit A-2**.   This reduction does not include the unbilled time of Ms. Hunt, which in many instances, has not been billed to oversee aspects of this case.   Dorsey's fees for the Application Period are categorized into four separate matter numbers: (a) Matter 1 – National Note of Utah Case Administration; (b) Matter 2 - Litigation; (c) Matter 3 - Asset Disposition; and (d) Matter 5 – Asset Analysis and Recovery.   In this regard the following should be noted:

A.      Matter 1 – Case Administration, includes legal services rendered in assisting the Receiver with his administration of the Receivership Estate.

B.      Matter 2 – Litigation, includes legal services rendered to assist the Receiver with litigation that has been filed by or against the Receivership Estate.   Note that while the Receiver has commenced significant litigation during the Application Period as discussed in ¶8(C) above, time incurred on such services was billed to Matter 5 as discussed below.

C.      Matter 3 – Asset Disposition, includes all legal services rendered in relation to the disposition of property of the Receivership Estate, including advising the Receiver on issues related to the Receivership Estate's interests in real property and marketing, preparing all necessary pleadings and notices necessary for private and public sales, preparing for and attending hearings on motions seeking approval of sale procedures and sales, and assisting the Receiver with issues related to the closing of sales

and transfer of properties sold.

D.     Matter 5 – Asset Analysis and Recovery,[18] includes legal services rendered to assist the Receiver with the evaluation and, when appropriate, recovery of property of the Receivership Estate, including analysis of and commencement of the litigation claims discussed in ¶ 8(C) above.   It should be noted that:

1.     Dorsey spent considerable time during the Application Period researching potential litigation claims of the Receivership Estate, evaluating the strength of such claims, and when appropriate, making demand on those claims prior to incurring costs of litigation.   In general, demands have resulted in a significant number of ABI releases, and in the recovery of some false profits paid to investors.   It has also resulted in the Receiver avoiding suit by (a) settling certain disputed claims or claims that, based on financial information provided, would not have been collectable in whole or in part if reduced to judgment, and (b) avoiding suits of non-viable claims based on facts provided to the Receiver in response to demand.   All of this time, which was prior to the filing of any lawsuit, has been billed to Matter 5—Asset Analysis and Recovery.

2.     Also as noted in ¶ 8(C) above, Dorsey filed over 150 complaints during the Application Period.   Again to reduce costs, Dorsey drafted complaints that could be replicated for the different categories of claims being asserted, and then spent relatively minimal time tailoring these form complaints for each case.

---

[18]   No time was billed to Matter 4, which involves claims analysis.   These issues have not yet arisen in this case.

All time spent on these tasks also was billed to Matter 5 inasmuch as prior to the commencement of litigation, the time was difficult to apportion to any one matter and was deemed to be asset analysis and recovery.  After complaints were filed, the matters became litigation matters, and Dorsey opened separate billing matters for each lawsuit.  Because all of the complaints were filed in mid-June 2013, nearly at the end of the present Application Period, the separate billing statements for each of the lawsuits will first appear in the Receiver's next interim Fee Application.

16.     This Fee Application is supported by the following documents.   **Exhibit A** contains a summary of the fees incurred for each of the billing matters, with Exhibit A-1 containing a summary for the Receiver and Klein & Associates, and Exhibit A-2 containing a summary for Dorsey.  Detailed invoices which describe the work performed by the Receiver and Dorsey on a daily basis are attached hereto as **Exhibit B**, with Exhibit B-1 containing the Receiver and his firm's invoices, and Exhibit B-2 containing Dorsey's invoices.  The invoices of the Receiver have been redacted to remove communications with counsel that are privileged.  Summaries of the expenses incurred are attached as **Exhibit C**, with Exhibit C-1 containing the invoices itemizing the expenses of the Receiver and Klein & Associates, and Exhibit C-2 containing invoices itemizing Dorsey's expenses.

17.     In compliance with ¶ 60 of the Receivership Order, the Fee Application, including the invoices in **Exhibit B** and **Exhibit C**, were provided to the SEC and after review and comment, the SEC has no objection to the fees and expenses requested.

18.     As discussed in the Receiver's first *Interim Fee Application for Receiver and*

*Receiver's Professionals for Services Rendered from June 25, 2012 Through December 31, 2012*,[19] the Receiver has not filed Quarterly Fee Applications as authorized under ¶ 60 of the Receivership Order quoted above because he felt it was necessary to first increase the amount on deposit in the Operating Account from which such fees and expenses will be paid.  Rather, accruing fees and expenses have been disclosed on an ongoing basis to the Court, the SEC and parties in interest in each of the six Status Reports discussed above, with the most recent being set forth in the Sixth Status Report.[20]  In October 2013, the Receiver filed his first interim Fee Application, seeking approval of and authorization to pay fees and expenses for the period of June 25, 2012 through December 31, 2012.  That Fee Application was allowed,[21] and fees and expenses for that period of time were paid by the Receiver.  As of this date, however, while fees and expenses have been disclosed, they have not been requested or paid for 2013, or the first quarter of 2014.  Going forward, the Receiver intends to file interim Quarterly Fee Applications. This second interim Fee Application is, as noted, for the period of January 1, 2013 through June 30, 2013.  After the Court rules on this Fee Application, the Receiver will file a third fee application for the period of July 1, 2013 through December 31, 2013.  Once the 2013 fees and expenses have been reviewed by the Court, the Receiver will thereafter file fee requests for quarterly periods.  The Receiver has discussed this plan with the SEC and it consents thereto.

19.    The SEC has not requested a holdback of fees and expenses in this case.  The

---

[19]   Docket No. 467.

[20]   Sixth Status Report, at p. 42.  Fees and expenses for the current Application Period are set forth in the Third Status Report, at p. 28, and Fourth Status Reports, at p. 42.

[21]   *See supra* ¶ 4.

Receiver respectfully submits that a holdback of fees is not appropriate in this case because the Receiver and his professionals have voluntarily waived a significant amount of fees that were actually earned, a waiver has not been requested by the SEC, and the Receiver and his professionals already have deferred payment of significant amounts of their actual and necessary fees and expenses.

20.   The Receiver and his professionals understand that the authorization and payment of fees and expenses is interim in nature.  All fees and expenses allowed on an interim basis will be subject to final review at the close of the case and the discharge of the Receiver when the Receiver files a final accounting and final fee application.

## V.   CONCLUSION

21.   As noted in ¶19 above, the Receiver and his professionals have deferred seeking allowance and payment of fees and expenses pending the Receiver's increase of funds on hand in the Operating Account.  Thus, the Receiver's first interim fee application filed in October 2013, covered the period of June 25, 2012 through December 30, 2012.  That application was allowed, and all fees and expenses allowed by the Court on an interim basis as part of that application have been paid.  This present Fee Application is the Receiver's second interim fee application, covering the period of January 1, 2013 through June 30, 2013.  There are sufficient funds in the Operating Account to pay the fees and expenses requested herein.[22]  After the Court rules on this Fee Application, the Receiver will file a third fee application for the period of July 1, 2013 through December 31, 2013.  Once all of the fees and expenses incurred in 2013 have been

---

[22]   *See supra* Part III.

reviewed by the Court, the Receiver will file fee requests on a quarterly basis.

22.     The Receiver respectfully submits this Fee Application and requests that the Court enter an Order approving the actual and necessary fees and expenses incurred on behalf of and for the benefit of the Receivership Estate.  For all of the reasons stated, the Receiver submits that he and his professionals have provided a significant benefit to the Receivership Estate. During the Application Period alone, at least $1,962,231.29 in net real estate sale proceeds were obtained and settlements requiring the payment of $422,793.69 were entered into by the Receiver and approved by the Court.

23.     A proposed Order is attached hereto as **<u>Exhibit D</u>**.

The Receiver, Klein and Associates, and Dorsey verify under penalty of perjury that the foregoing is true and correct.

DATED this 16th day of April, 2013.

**RECEIVER**

WAYNE KLEIN, Receiver

**KLEIN AND ASSOCIATES PLLC**

WAYNE KLEIN, Principal

**DORSEY & WHITNEY LLP**

/s/ *Peggy Hunt*

Peggy Hunt
Chris Martinez
Jeffrey M. Armington
*Attorneys for R. Wayne Klein, Receiver*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above **SECOND INTERIM FEE APPLICATION FOR RECEIVER AND RECEIVER'S PROFESSIONALS FOR SERVICES RENDERED FROM JANUARY 1, 2013 THROUGH JUNE 30, 2013** was filed with the Court on this 16th day of April, 2014, and served via ECF on all parties who have requested notice in this case.

*/s/ Jeffrey M. Armington*