Peggy Hunt (Utah State Bar No. 6060)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
          armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>     v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>                    Defendants. | **SEVENTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER**<br>*For the Quarter Ending March 31, 2014*<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this Seventh Status Report for the period January 1, 2014 through March 31, 2014 (the "Reporting Period").

# TABLE OF CONTENTS

**Page**

I. PROCEDURAL HISTORY ...................................................................................1

II. CONTINUED OPERATIONS ..............................................................................3

    A.    Middleton, Idaho: Two Leased Homes................................................. 4
    B.    Brigham City, Utah: Twin Pines Apartments. ....................................... 5
    C.    Ogden, Utah: Office Building............................................................ 6
    D.    Temple, Georgia: Single Family Residence. ........................................ 7

III. REAL ESTATE HOLDINGS ...............................................................................7

    A.    Efforts to Release Liens and Other Interests Against Real Properties.................... 9
    B.    Real Property Sales Closed During the Reporting Period. .................................. 11
    C.    Real Property Sales Approved During the Reporting Period/Not Closed. ........... 12
    D.    Real Property Sales for which Court Approval Was Requested.......................... 12
    E.    Real Properties to Relinquish—Lack of Equity................................................ 12
    F.    Investigation of Environmental Issues on Expressway Land…………………….. 13

IV. NON REAL ESTATE ASSETS .........................................................................13

    A.    Personal Property. ......................................................................... 13
    B.    Alleged Mineral Assets.................................................................... 14
    C.    Pre-Receiver Asset Transfers........................................................... 14

V. LITIGATION.................................................................................................15

    A.    Actions Commenced By The Receivership Estate. .............................. 15
    B.    Settlements of Litigation................................................................. 15
    C.    Default Judgments . ....................................................................... 17
    D.    Actions Against The Receivership Estate............................................ 17

VI. RECORDS OF THE RECEIVERSHIP ENTITIES ................................................19

VII. FINANCIAL ANALYSIS..................................................................................20

    A.    Receivership Financial Information................................................... 20

VIII. NEXT STEPS .............................................................................................22

IX. CONCLUSION...............................................................................................24

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[1]  The SEC alleges, among other things, that Defendants Palmer and National Note violated the securities laws and operated an investment fraud that took over $100 million from more than 600 investors.

The SEC filed several *ex parte* motions with its Complaint on June 25, 2012, all of which were granted by the Court.  In particular, the Court entered a Temporary Restraining Order and Order to Show Cause (the "TRO"),[2] an Order Freezing Assets and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[4]  Palmer later stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5]  The SEC filed a motion for summary judgment against Palmer on July 19, 2013,[6] which Palmer opposed on October 14, 2013.[7]  The trial date

---

[1]    Docket No. 1.

[2]    Docket No. 7.

[3]    Docket No. 8.

[4]    Docket No. 9.

[5]    Docket Nos. 41 and 42.

[6]    Docket No. 377.

[7]    Docket No. 473.

that was set for February 24, 2014 has been postponed.

As a result of the Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **Exhibit A**.

In accordance with the Receivership Order,[8] the Receiver has filed the following status reports:

- The Receiver's First Status Report and Liquidation Plan, for the period June 25, 2012 through September 30, 2012, was filed November 12, 2012 (the "First Report").[9]

- The Second Status Report, for the period October 1, 2012 through December 31, 2012, was filed on February 26, 2013 (the "Second Report").[10]

- The Third Status Report, for the period January 1, 2013 through March 31, 2013, was filed on May 2, 2013 (the "Third Report").[11]

- The Fourth Status Report, for the period April 1, 2013 through June 30, 2013, was filed on August 13, 2013 (the "Fourth Report").[12]

- The Fifth Status Report, for the period July 1, 2013 through September 30,

---

[8]   Docket No. 9 (Receivership Order) at pp.18-20.

[9]   Docket No. 73 (First Report).

[10]   Docket No. 170 (Second Report).

[11]   Docket No. 288 (Third Report).

[12]   Docket No. 408 (Fourth Report).

2013, was filed on November 4, 2013 (the "Fifth Report").[13]

- The Sixth Status Report, for the period October 1, 2013 through December 31, 2013, was filed February 4, 2014 (the "Sixth Report").[14]

- This is the Seventh Status Report, for the period January 1, 2014 through March 31, 2014, defined above as the "Reporting Period."

## II.

## CONTINUED OPERATIONS

The Receiver is managing the Receivership Estate with the goal of maximizing the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those National Note investors who have not received a return of their principal investment in whole or part.  To facilitate this goal, the Receiver has discontinued the operations of National Note and most of its affiliated entities, except in those limited instances that have previously been described in earlier Status Reports and as discussed immediately below, and he has attempted to minimize the enterprise's historically high operating expenses going forward.  However, some of the expenses of the Receivership Estate, particularly litigation expenses, are beyond the Receiver's control.  When others seek to intervene or oppose property sales, the Receiver needs to respond.

At this time, the only operations going forward are those related to several real estate

---

[13]   Docket No. 510 (Fifth Report).

[14]   Docket No. 598 (Sixth Report).

holdings of the Receivership Estate.[15]   The following is a description of the Receiver's limited operation of several real estate properties which are being operated either because they are generating net income for the Receivership Estate or because their continued operation will minimize losses:

    A.    **<u>Middleton, Idaho: Two Leased Homes</u>**.  The Receivership Estate includes two residential properties that are located in Middleton, Idaho, adjacent to a 175-acre proposed subdivision that National Note had planned under the name "<u>Riverbend Estates</u>," discussed in further detail at pages 25 - 26 of the First Report.[16]   The two homes are currently being rented through the services of a professional property manager, generating approximately $1,300.00 in monthly net income.   The Receiver has been operating these properties because they are generating income, and he wanted to postpone liquidating them pending a determination as to the Receivership Estate's interest in Riverbend Estates.   Riverbend Estates had no equity for the Receivership Estates and, thus, during the Reporting Period, the Court entered an Order approving a settlement agreement with a third party lender, requiring the Receiver to relinquish

---

[15]   *See* First Report, pp. 9-10, 57-58 & Second Report, Part II.A (discussing operation of Old Glory Minting Company, LLC; operations of this entity were discontinued by the Receiver in December 2012).   Certain of the real property being operated described in earlier Status Reports have now been liquidated.   *See* First Report, pp. 24-53; Second Report, Part II.B; Third Report, Part II; Fourth Report, Part II; Fifth Report, Part II; Sixth Report, Part II.  This Report discusses only those real properties being operated during the Reporting Period.

[16]   The name of the National Note affiliate that intended to develop the property is Riverbend Estates, LLC. The Receiver refers to this property as the "River Run Subdivision" in the First Report.  First Report at pp. 25-26. Both "<u>River Run</u>" and "<u>Riverbend</u>" were used to describe this property.

Riverbend Estates to the lender.[17]   Now that the property has been relinquished, and given the more favorable marketing season, the Receiver anticipates marketing these homes for sale.

      **B.**     **Brigham City, Utah: Twin Pines Apartments.**     The Twin Pines Apartments consist of buildings located in Brigham City, Utah, containing twenty apartments which are leased to lower income tenants.   Further information about this property is set forth at pages 29 - 30 of the First Report.   As a result of the fire that was described in the Sixth Report, only 12 of the 20 units are being rented.   The Receiver continues to operate this property through his property manager.

      Based on reports by fire investigators and structural engineers, the Receiver has determined that it would not benefit the Receivership Estate to rebuild the building that was destroyed by fire in December 2013.   First, the insurance proceeds would not cover the costs of reconstructing the building consistent with current building codes.   Second, the reconstructed building is not likely to result in an increase in the value of the property that exceeds the cost of the reconstruction.   Third, this property is the subject of litigation in which an investor asserts that title to the property should be transferred to the investor.   If the investor prevails, the receivership funds expended to rebuild the burned structure would benefit only that particular investor, not the Receivership Estate.   For the foregoing reasons, the insurance proceeds in the amount of $265,412.45 are being held in trust pending the conclusion of the litigation.[18]   In addition, during the pendency of the litigation, all net rental proceeds are being segregated and

---

[17]   *See* discussion *infra* at Part III.E.

[18]   Some of these funds may be used to demolish and haul debris from the burned structure.

held by the property manager.

  **C.**  <u>**Ogden, Utah: Office Building**</u>**.**  The Office Building is an old, three-story commercial office building located in downtown Ogden, Utah, that is co-owned with a third party (the "<u>Co-Owner</u>").  Further details related to the Office Building are set forth at pages 30 - 31 of the First Report.

  In February 2014, one of the two tenants vacated the Office Building.  The rent being paid by the remaining tenant is not sufficient to cover variable operating expenses, and the Receiver has directed that tenant to vacate the Office Building by no later than May 31, 2014.  At that time, the Receiver will turn off all unnecessary utilities and terminate services that do not have to be maintained.

  As reported in earlier Status Reports, the Co-Owner of the Office Building desires to pursue a redevelopment of the Building.  Receiver has engaged in ongoing discussions with the Co-Owner about balancing her redevelopment goals with the Receiver's duty to minimize the expenses related to and maximize the value of the Office Building for the Receivership Estate.[19] During the Reporting Period, the Co-Owner has reported to the Receiver that marked progress has been made in her redevelopment efforts.  Specifically, the results of a feasibility study were delivered to a potential lender and the Co-Owner is awaiting approval of a loan.  If the loan is approved, the Receiver and Co-Owner will negotiate an agreement on how to cooperate during the development project.  The Receiver's primary focuses will be: i) eliminating the need for the Receivership Estate to continue funding operating costs, ii) ensuring that no Receivership funds

---

[19] *See* Sixth Status Report, p. 6.

will need to be expended as part of the development work, and iii) protecting the interests of the Receivership Estate in the Office Building during the redevelopment project. If such an agreement is reached, the Receiver will seek Court approval of the terms of such a course of action.

During the Reporting Period, the Receiver identified 18 Assignments of Beneficial Interest in Trust Deeds, referred to herein as "ABIs," recorded against the Office Building. As with ABIs against other properties of the Receivership Estate, the Receiver contests the validity of these ABIs, which if determined to be valid, would likely deplete any equity that may exist in the property for the Receivership Estate.[20] Accordingly, the Receiver has sent letters to these 18 ABI holders, asking that they voluntarily release their assignments. As of March 31, 2014, almost half of these holders have voluntarily released their ABIs.

**D.    Temple, Georgia: Single Family Residence.**  This home is located in Temple, Georgia, and was being rented to a third party under the oversight of a professional property manager. Further details related to this property are set forth at page 51 of the First Report. During the Reporting Period, the sale of this property closed and thus it is no longer part of the Receivership Estate.[21]

### III.

### REAL ESTATE HOLDINGS

A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report and some of which also are

---

[20]    *See* discussion *infra* at Part III.A (discussing ABIs).

[21]    Docket No. 553.

discussed in Part II above.  The Receiver has determined that some of the real properties appear to have value for the Receivership Estate and need to be operated and/or marketed for sale, some properties have no equity, and some require further investigation and analysis, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver closed the sale of one property and actively marketed other properties for sale.  Attached hereto as **Exhibit B** is a chart setting forth the status of all real properties in the Receivership Estate as of March 31, 2014.

For purposes of this Status Report, the Receiver discusses the following in Parts A through F below:

- Part A discusses the efforts undertaken during the Reporting Period to release alleged interests recorded against the Receivership Estate's real properties;

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale has been requested;

- Part E describes actions taken by the Receiver regarding real properties in which it does not appear that the Receivership Estate has equity; and

- Part F describes information learned by the Receiver impacting the value of certain property of the Receivership Estate.

      **A.**    <u>**Efforts to Release Liens and Other Interests Against Real Properties**</u>.  As part of the Receiver's investigation of real property holdings of the Receivership Estate, the Receiver has determined that there are numerous types of interests that have been asserted against many of the Receivership Estate's real properties, including at least the following types of interests for which he has taken the following actions:

      1.      <u>Assignments of Beneficial Interests ("ABIs")</u>.  The First and Second Reports described the ABIs that have been recorded against a wide variety of the Receivership Estate's real properties purportedly in favor of certain National Note investors.  If the ABIs are deemed valid interests, a significant portion of the net sale proceeds from the sale of such real estate would be paid to ABI holders, with little money left for those investors who were not provided ABIs.  The Receiver believes the ABIs are not valid interests on the property. Accordingly, the Receiver has taken the following actions:

      a.      <u>Sale of Property Free and Clear of Liens and Interests</u>:  For properties that have ABIs recorded against them, the Court has ordered, based on the Receiver's request, that the properties be sold free and clear of these alleged interests, with any interests to attach to the net proceeds of the sale.  The Receiver is holding the net sales proceeds of these sales in what he calls the "Real Estate Account," a segregated reserve account, pending a determination as to the validity of the disputed ABIs.

      b.      <u>Request Voluntary Releases</u>:  As properties have been sold, the Receiver has sent letters to the relevant ABI holders requesting that they voluntarily release the ABIs.  In general, approximately one third to one half of ABIs against a given property have been voluntarily released by ABI holders in response to the Receiver's letter.  In the case of one

property, where only one ABI had been recorded, the Receiver obtained a voluntary release from the holder, thus freeing all of the net sale proceeds from any interests at closing.

   c. <u>ABIs Held by Defendants Sued by the Receiver</u>:  As described below in Part V, the Receiver has filed lawsuits against overpaid investors and others who received improper payments from National Note or its affiliates.  To the extent that the Receiver's investigation has revealed that these defendants also hold ABIs, the lawsuits ask the Court to invalidate the ABIs.  As discussed immediately below, the Receiver has begun filing additional lawsuits against those ABI holders who are not overpaid, seeking invalidation of their ABIs as well.

   2. <u>Lawsuits Filed Seeking Declaration of Invalidity of ABIs</u>:  During the third quarter of 2013, the Receiver commenced lawsuits against holders of ABIs on several liquidated properties who refused to voluntarily release their ABIs pursuant to the Receiver's request outlined above.  Since that time, some of the ABI holders have released their ABIs, and litigation against them has been dismissed.  Litigation against those defendants who have not yet released their ABIs is ongoing.  As additional properties subject to ABIs are sold by the Receiver, he will file similar lawsuits against those ABI holders who do not voluntarily release the ABIs.

   3. <u>Deeds of Trust</u>:  Deeds of trust have been recorded against some of the Receivership Estate's real properties.  Several of these deeds of trust are held by National Note investors who were overpaid (meaning they have received distributions in excess of the principal amount of their investments).  In two instances, the Receiver has been able to negotiate the releases of deeds of trust against receivership property through settlement prior to filing a

lawsuit.  Another deed of trust was released as part of a settlement after the filing of a lawsuit.  In two other instances, the Receiver has been in litigation against holders of deeds of trust.  One of these lawsuits was settled with the holder agreeing to release the deed of trust.  The second lawsuit, involving the True and Marjorie Kirk Family Trust's claim to the Twin Pines Apartments, is still in litigation.  Finally, the Receiver has been engaged in pre-litigation settlement negotiations with the holder of a deed of trust against the "Bandanna Cabin,"[22] and he continues his investigation of deeds of trust that have been recorded against the "Overland Trails" property.[23]

   **B.    Real Property Sales That Closed During the Reporting Period.**  One Court-approved real property sale was closed by the Receiver during the Reporting Period.

   1.      Single Family Home, Temple, GA:[24]  This property consists of a 2,132 square foot home in Temple, Georgia.  The Receiver received an offer to purchase this property for $125,000.00.  The Court held a hearing on December 5, 2013 on the proposed sale and issued an order on December 5, 2013 approving the sale.[25]  The sale closed January 10, 2014, and after property taxes, real estate commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $106,843.83.  There were no ABIs recorded against this property

---

[22]   The Bandanna Cabin was sold during the last quarter of 2013.  The net proceeds from the sale are being held in the Receiver's Real Estate Account pending resolution of the deed of trust on this property.

[23]   *See* First Report, pp. 32, 41-42 (describing these properties).

[24]   *See* First Report, p. 51 (describing this property).

[25]   Docket No. 553.

and the net proceeds from the sale were deposited into the Receivership operating account.

       **C.**     **Real Property Sales Approved During the Reporting Period/Not Closed.**

There were no new property sales approved by the Court during the Reporting Period.

       **D.**     **Real Property Sales for Which Court Approval Was Requested**.  During the Reporting Period, the Receiver filed a motion seeking Court approval of the sale of one property.

       1.         Autumn Ridge Lot 3, Eagle Mountain, UT:[26]  On March 6, 2014, the Receiver accepted an offer to purchase this building lot at a price of $39,900.00.  The Receiver had previously obtained three appraisals of this property.  The average of the appraisals valued this land at $34,233.33; the offer is higher than the average of the three appraisals and higher than all of the individual appraisals.  On March 26, 2014, the Receiver filed a motion with the Court seeking approval to publish notice of this offer and to consummate the sale with the buyer if no qualifying higher offers are received.[27]

       **E.**     **Real Properties to Relinquish—Lack of Equity.**  On January 24, 2014, the Court entered an Order granting approving a settlement agreement under which the Receiver relinquished "Riverbend Estates," located in Middleton, Idaho, to Barclay Associates, LLC ("Barclay")—a creditor of National Note holding deeds of trust against the property in a total amount of $5 million—far in excess of the value of the property.[28]  As part of a settlement agreement between the Receiver and Barclay, Barclay paid $2,500.00 towards litigation costs and it has agreed to release claims, including its deficiency claim, against the Receivership

---

[26]  *See* First Report, p. 26 (describing this property).

[27]  Docket No. 619.

[28]  Docket No. 590.

Estate.

**F.      Investigation of Environmental Issues on Expressway Business Park Land.**

As part of his investigation, the Receiver has learned that approximately 30 acres of real property associated with the "Expressway Business Park," located in Spanish Fork, Utah, is on the site of a former landfill.  The Receiver ordered an appraisal of the property, requesting that this fact be evaluated in the valuation.  The appraisal report delivered to the Receiver reveals that, while the property is in an excellent location for development and sale, its status as a former landfill will negatively affect the value of the property.  Furthermore, Spanish Fork City is requiring that any future construction on this property include certain remediation work which is anticipated to be expensive thus also negatively affecting the value of the property.   Roads and utility improvements constructed by National Note on the land prior to the Receiver's appointment will have to be removed and thus have no value.  Currently, taking into account the remediation issues, the property is valued by the appraiser at $1.25 million.  This value is significantly below the price National Note paid for the land, and much lower than the Receiver had hoped to earn from the sale of the property.

**IV.**

**NON-REAL ESTATE ASSETS**

In addition to real estate, the Receivership Estate is comprised of other categories of assets, including certain personal property described in Part A below, unrefined ore discussed in Part B below, and proceeds of lawsuits to recover transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

**A.      Personal Property.**  National Note owned a limited amount of personal property.

Most of the personal property was sold in prior reporting periods, but the Receiver was paid $196.85 from the proceeds of an online auction of assets recovered from the National Note office building. The proceeds from this sale are included in the financial discussion later in this Report.

      **B.**     **<u>Alleged Mineral Assets</u>.** As described in the Second Report,[29] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("<u>HMI</u>"), to assist the Receiver in investigating whether ore held by National Note has any commercial value. The Receiver receives regular reports from HMI on its efforts to recover precious metals from this ore. Reports received during the Reporting Period indicate that HMI has taken concrete steps in its efforts to determine whether recoverable metals are present in the ore. If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in accordance with Management Agreement described in the Second Report.

      **C.**     **<u>Pre-Receiver Asset Transfers</u>.** Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate, including but not limited to National Note's payment of false profits and commissions on investments. A discussion of the types of claims discovered by the Receiver and his intended course of action for recovery of these claims is set forth in the next section below.

---

[29]   Second Report, pp. 18-19.

**V.**

**LITIGATION**

**A.    Claims Being Pursued by the Receivership Estate.**  As described in the Fourth Report, the Receiver has filed suit to recover payments or transfers made by National Note and its affiliated entities that should be returned to the Receivership Estate.  A total of 136 lawsuits were filed in June 2013.  Copies of the complaints in these lawsuits can be found on the Receiver's website.  Investigations are ongoing and additional lawsuits are expected.  The lawsuits filed by the Receiver seek recovery for a variety of payments that the Receiver believes were improper, including the receipt of commissions for soliciting investors, unpaid and forgiven loans made by National Note, payments to credit card companies on credit cards in the name of individuals associated with National Note, payments to employees and relatives of Palmer, and payments of false profits to investors who received more than the amount of their principal investment.  In addition, as described earlier, the Receiver has commenced litigation against holders of various types of liens against property of the Receivership Estate.  In a few instances, the Receiver has entered into tolling agreements with a number of persons, extending the statutes of limitations to allow further investigation.

**B**.    **Settlements of Litigation**.  The Receiver has been successful in obtaining numerous settlement agreements during the Reporting Period.  Settlement agreements generally include an obligation to return funds to the Receivership Estate in exchange for dismissal of the Receiver's lawsuit and/or a mutual release of claims.

In some instances, the defendants sued by the Receiver have demonstrated financial hardship which would make recovery of a judgment questionable when the cost of litigation is

weighed against the likelihood of collection.  The Receiver scrutinizes allegations of hardship carefully to ensure that the defendants truly merit hardship treatment, and has denied a significant portion of the requests for hardship treatment.  But, where hardship is demonstrated, the Receiver typically agrees to dismiss the lawsuit for a greatly reduced payment.  The Receiver believes that the frequency of hardship settlements will decrease because those who may qualify for hardship treatment typically identify themselves early in the litigation process.  In addition, the Receiver has begun notifying defendants that if they intend to seek settlement concessions based on financial hardship, those hardship claims need to be asserted in lieu of continuing substantive defensive litigation.

A summary of repayments and settlements is set forth as follows:

1.        Sixth Motion for Approval of Settlement Agreements.   On January 3, 2014, the Receiver filed a motion seeking approval of 18 settlement agreements.[30]  The Court granted this motion and entered an Order approving the agreements on January 6, 2014.[31] Thirteen of these settlement agreements required the investors to pay a total of $206,023.94 to the Receivership Estate.  As of March 31, 2014, $101,600.00 of this amount has been paid.  The motion describing these settlement agreements is posted on the Receiver's website.

2.        Settlement with American West Bank:  On February 28, 2014, the Court entered an Order approving a settlement agreement between the Receiver and American West Bank, thus resolving the Receivership Estate's claim related to real property collateralizing a lien

---

[30]   Docket No. 568.

[31]   Docket No. 571.

held by American West Bank.[32]   Pursuant to the Agreement, American West Bank has paid $70,000.00 to the Receivership Estate.

        3.                 <u>Seventh Motion for Approval of Settlement Agreements</u>.  The Receiver filed a motion on March 10, 2014, seeking approval of seven additional settlement agreements.[33] The Court granted this motion, approving the agreements by Order entered on March 14, 2014.[34] Two of these settlement agreements required the investors to pay a total of $24,592.85 to the Receivership Estate.  As of March 31, 2014, all $24,592.85 of this amount has been paid.  The motion describing these settlement agreements is posted on the Receivership website.

        **C.**    **Default Judgments**.  In some instances, defendants sued by the Receiver have failed to respond to the litigation commenced against them by the Receiver.  In such cases, the Receiver has begun to seek default judgments against the defendants.  During the Reporting Period, the Receiver obtained one default judgment in the amount of $99,358.79.  The Receiver is in the process of researching the viability of collection of this judgment.

        **D.**    **Actions Against the Receivership Estate**.  As described in earlier Status Reports, a number of other parties have filed motions to intervene in the Civil Case in order to assert claims to property or wanting to foreclose on properties where the lender believes its interests are not adequately protected by the Receivership Estate.  The following has occurred during the Reporting Period with regard to actions that have been commenced in the Civil Case relating to intervention by other parties:

---

[32]   Docket No. 608.

[33]   Docket No. 614.

[34]   Docket No. 617.

1.        <u>Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust</u> (the "Kirk Trust"):[35]  The Court permitted the Kirk Trust to intervene in the Civil Case to assert rights related to certain property identified in the First Report as the "<u>Twin Pines Apartments</u>."[36] The Receiver disputes that the Kirk Trust has a secured interest in the property, and has asserted affirmative claims against the Kirk Trust.  In August, 2013, cross motions seeking summary judgment were filed by the parties.[37]  A hearing on the cross-motions for summary judgment was held by the Court on January 7, 2014.  Both sides provided supplemental information to the Court following the hearing and the Court has taken the matter under advisement.

2.        <u>Complaint in Intervention Filed by Paul Hawkins ("Hawkins")</u>:  On October 9, 2013, the Court entered an Order authorizing Hawkins to intervene for the limited purpose of allowing him to proceed with his claims pursuant to a stipulation with the Receiver.[38] The Receiver was not required to take any action on this matter during the Reporting Period.

3.        <u>Complaint in Intervention Filed by 30 Overpaid Investors ("Overpaid Investors")</u>:  On October 9, 2013, a motion to intervene was filed by an attorney representing 30 overpaid investors sued by the Receiver.[39]  At a hearing on the motion, the Overpaid Investors indicated they wanted to intervene to assist with Palmer's legal defense.  On November 21, 2013,

---

[35]  *See* Docket No. 89.

[36]  *See* First Report at pp. 29-30.

[37]  The Receiver's motion for summary judgment was filed August 5, 2013.  *See* Docket No. 399.

[38]  Docket No. 466.

[39]  Docket No. 468.

the Court entered an Order denying the motion to intervene.[40]  The Receiver was not required to take any action on this matter during the Reporting Period.

      4.            <u>Complaint in Intervention Filed by West Side Enterprises, Leon Harward</u> ("Harward"):  On October 21, 2013, Leon Harward filed a motion to intervene on behalf of himself and his company, West Side Enterprises.[41]  The Court entered an Order denying Harward's motion.[42]  On December 26, 2013, Harward filed a motion requesting that the Court reconsider its Order denying his motion to intervene.[43]  After a hearing, the Court entered an Order denying the motion on February 19, 2014.[44]

      5.            <u>Complaint in Intervention filed by Barclay Associates ("Barclay")</u>:  As noted above in Part III.E, the Court entered an Order on January 23, 2014, approving a settlement agreement between the Receiver and Barclay relating to the Riverbend Estates property located in Middleton, Idaho.[45]  The Receiver expects no further litigation on this matter.

## VI.

## <u>RECORDS OF THE RECEIVERSHIP ENTITIES</u>

      Substantial progress has been made in the Receiver's financial analysis and investigation. The Receiver believes he has located all of the internal financial records created by National

---

[40]    Docket No. 540.

[41]    Docket No. 488.

[42]    Docket No. 529.

[43]    Docket No. 565.

[44]    Docket No. 603.

[45]    Docket No. 590.

Note for the different affiliated entities for the period from 1995 forward.  The Receiver also has reconstructed all banking transactions for National Note and its affiliated entities for the period since January 1, 2007.

The Receiver has completed a report summarizing the results of his investigation, including his forensic review of National Note's and its affiliates' financial and intercompany records, and has provided the report to the SEC and certain other governmental agencies that have requested the report.  The Receiver concludes in the report that National Note has been insolvent since 1995 through the filing of the Civil Case in 2012, and that it was using money from investors to make distribution payments to other investors.  This report, in conjunction with the report of an insolvency expert, will be used by the Receiver in litigation that has been and may be filed by the Receiver.

## VII.

## FINANCIAL ANALYSIS

A.     **Receivership Financial Information**.   The following financial information is provided for the Reporting Period:

1.            Bank Accounts.   The Receiver maintains two bank accounts for the operation of the Receivership: a general operating account (the "Operating Account") and an account holding earnest money deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "Real Estate Account").  The balances in these accounts as of the close of the Reporting Period are as follows:

| Account | 3/31/14 Account Balance |
|---|---|
| Operating Account | $1,099,591.28 |
| Real Estate Account | $4,354,631.36 |
| **TOTAL** | **$5,454,222.64** |

2.          Operating Account Deposits.  The sources of funds deposited into the

Operating Account during the Reporting Period are shown in the following table:

| Source | Amount In |
|---|---|
| Real estate sales, settlements | $204,568.83 |
| Rents | $6,586.00 |
| Royalties, refunds, auction sale | $3,531.45 |
| Settlement proceeds | $68,981.89 |
| **TOTAL** | **$283,668.17** |

3.          Operating Account Expenditures.   The following table shows the

categories of operating expenses that have been paid from the Operating Account during the

Reporting Period:

| Type of Expense | Amount Out |
|---|---|
| Utilities, waste hauling, snow removal | $7,490.12 |
| Property insurance, taxes, and miscellaneous operating expenses | $5,390.04 |
| Property appraisals/closing expenses | $5,120.20 |
| Litigation: Service of process | $3,159.20 |
| **TOTAL** | **$21,159.56** |

4.          Real Estate Account Deposits and Expenditures.  The transactions in the

Real Estate Account during the quarter were as follows:

| Source | Amount In | Amount Out |
|---|---|---|
| America West Bank Settlement Proceeds | $70,000.00 | $70,000.00 |
| Proceeds from property sales | $0.00 | $27,725.00 |
| Bank fees | $0.00 | $15.00 |
| **TOTAL** | **$70,000.00** | **$97,740.00** |

$70,000.00 received is from the settlement with American West Bank discussed at ¶ 5.B.2 *supra*.  These funds were transferred to the Operating Account and are accounted for as part of the deposits into the Operating Account disclosed above.  The $27,725.00 is the in net proceeds from the sale of Elkhorn Lot #2.  These proceeds were transferred to the Operating Account during the Reporting Period after ABIs against the property were voluntarily removed, thus leaving it without any encumbrances.

5.        SFAR.    Attached as **Exhibit C** is a copy of the Standardized Fund Accounting Report for the Reporting Period.

6.        Administrative Expense of Receiver and Counsel.    For the Reporting Period, the Receiver and his staff have spent a total of 882.7 hours working on this case for which fees in the total amount of $94,295.50 have been incurred.  Additionally, the Receiver has advanced funds to the Receivership Estate for expenses incurred or operating costs for which he will seek reimbursement.  The Receiver's legal counsel has spent approximately 490.2 hours and incurred expenses on behalf of the Receivership Estate.   Total fees and expenses of counsel incurred during the Reporting Period are in the total amount of $132,123.00.[46]

## VIII.

## NEXT STEPS

The focus of the Receivership continues to evolve.  The work of the Receiver and his

---

[46]   A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver and the Receiver's legal counsel in prior Reporting Periods is set forth in each of the status reports.  *See* First Report, p. 59; Second Report, p. 29; Third Report, pp. 28-29; Fourth Report, p. 42; Fifth Report, pp. 33-34; *see also* First Interim Fee Application, Docket No. 467.

counsel during this Reporting Period focused on: i) pursuing litigation against persons who owe money to the Receivership Estate, ii) defending litigation from persons seeking preferential treatment from assets of the Receivership Estate, and iii) completing an analysis of financial records and preparation of a report analyzing insolvency and the use of money from new investors to make distribution payments to other investors.  At this time, the Receiver anticipates addressing the following priorities in the coming months:

1.    <u>Litigation</u>.    In light of the large number of lawsuits filed in June 2013, a significant share of legal counsel's time and the time of the Receiver will be spent in litigation-related activities.  Significant progress has been made on the litigation front.  The number of active lawsuits has been reduced as a result of settlements, default judgments, and dismissals based on, among other things, the receipt of bankruptcy notices, leaving approximately fifty ancillary proceedings left to be litigated.  Since the Receiver has attempted at every juncture, both prior to and after filing his lawsuits, to avoid the costs of litigation by making demands and attempting to work out settlements, these remaining suits will necessarily require more time and effort typical of the litigation process, including engaging in discovery, responding to motions to dismiss and summary judgment, and proving the elements of the actions brought.  While the Receiver is hopeful that these remaining cases will be resolved prior to trial, he must prepare for trial in the event that this is not possible.

In addition to the filed lawsuits, the Receiver also continues to gather information and engage in discussions with approximately ten other potential defendants, to determine whether to file suit for recovery of payments to them.

2.      <u>Property Sales</u>.  The Receiver believes that the arrival of spring, combined with improving general economic conditions, will result in additional properties being sold during the coming summer and fall reporting periods.

3.      <u>Obtaining Judicial Rulings on Validity of Interests Against Properties</u>.   The Receiver expects to file motions in the near future to obtain judicial determinations of the validity of interests that have been recorded against real properties, such as liens and ABIs. When judicial rulings have been obtained, the Receiver expects to be able to get funds held in the real estate account released, so the claims process can begin.

4.      <u>Claims Process</u>.  If the Court determines that the ABIs and liens asserted against properties of the Receivership Estate are invalid, the Receiver will file a motion seeking authority to allow the claims process to begin.  This process will involve inviting investors and other potential claimants to submit information showing the amount that they claim they are owed by National Note or its affiliates.

IX.

<u>**CONCLUSION**</u>

Significant progress has been made during the Reporting Period.  The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Receivership Estate so as to maximize any distribution available to investors.

DATED this 24th day of April, 2014.

WAYNE KLEIN, Receiver

24

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **SEVENTH STATUS REPORT**

**OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this 24th day of April,

2014, and served via ECF on all parties who have requested notice in this case, including the

Securities and Exchange Commission.


*/s/ Peggy Hunt*