Peggy Hunt (Utah State Bar No. 6060)
Jeffrey M. Armington (Utah State Bar No. 14050)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
        armington.jeff@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>    v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>                    Defendants. | **EIGHTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER**<br>*For the Quarter Ending June 30, 2014*<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this *Eighth Status Report* for the period April 1, 2014 through June 30, 2014 (the "Reporting Period").

# TABLE OF CONTENTS

**Page**

I. PROCEDURAL HISTORY ........................................................................ 1

II. CONTINUED OPERATIONS..................................................................... 3

    A.    Middleton, Idaho: Two Leased Homes.............................................. 4
    B.    Brigham City, Utah: Twin Pines Apartments. ................................... 6
    C.    Ogden, Utah: Office Building............................................................. 7

III. REAL ESTATE HOLDINGS ...................................................................8

    A.    Efforts to Release Liens and Other Interests Against Real Properties.................... 9
    B.    Real Property Sales Closed During the Reporting Period. .................................. 12
    C.    Real Property Sales Approved During the Reporting Period/Not Closed. .......... 12
    D.    Real Property Sales for which Court Approval Was Requested.......................... 13
    E.    Real Properties to Relinquish—Lack of Equity.................................................. 14
    F.    Anticipated Sale of Expressway Land ................................................................ 14

IV. NON REAL ESTATE ASSETS ...............................................................15

    A.    Personal Property....................................................................................... 15
    B.    Alleged Mineral Assets............................................................................. 15
    C.    Pre-Receiver Asset Transfers................................................................... 16

V. LITIGATION ...........................................................................................16

    A.    Claims Being Pursued by the Receivership Estate. .......................................... 16
    B.    New  Lawsuits Filed During the Reporting Period............................................. 17
    C.    Significant Litigation Rulings.......................................................................... 18
    D.    Settlements of Litigation.................................................................................. 19
    E.    Default Judgments. .......................................................................................... 20
    F.    Actions Against the Receivership Estate. ......................................................... 20

VI. RECORDS OF THE RECEIVERSHIP ENTITIES ...............................22

    A.    Financial Report/Insolvency Expert. ............................................................... 23
    B.    Investigative Findings..................................................................................... 23

VII. FINANCIAL ANALYSIS.........................................................................26

    A.    Receivership Financial Information.................................................................. 26

i

VIII. NEXT STEPS ...................................................................................................................29

    A.    Litigation.................................................................................................. 29

    B.    Property Sales ......................................................................................... 30

    C.    Obtaining Judicial Rulings on Validity of Interests Against Properties ............... 30

    D.    Claims Process ....................................................................................... 30

IX. CONCLUSION...................................................................................................................31

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[1]  The same day, the Court granted several motions filed by the SEC, including a *Temporary Restraining Order and Order to Show Cause* (the "TRO"),[2] an *Order Freezing Assets and Prohibiting Destruction of Documents* (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[4]  Palmer later stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5]

The SEC filed a *Motion for Summary Judgment* in the Civil Case on July 19, 2013,[6] arguing that certain securities law violations had been established as a matter of law.  Palmer opposed the SEC's Motion,[7] and thereafter he filed a variety of motions[8] causing the Court to postpone a hearing on the SEC's Motion until July 9, 2014.  At that hearing, which occurred

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

[6] Docket No. 377.

[7] Docket No. 473.

[8] In May, the fourth law firm representing Palmer since the commencement of the Civil Case asked to withdraw as his counsel.

after the close of this Reporting Period, the Court determined that a trial will take place in the Civil Case on September 23, 2014.

As a result of the Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order. A list of the Receivership Entities is attached hereto as **Exhibit A**.

In accordance with the Receivership Order,[9] the Receiver has filed the following status reports:

- The Receiver's First Status Report and Liquidation Plan, for the period June 25, 2012 through September 30, 2012, was filed November 12, 2012 (the "First Report").[10]

- The Second Status Report, for the period October 1, 2012 through December 31, 2012, was filed on February 26, 2013 (the "Second Report").[11]

- The Third Status Report, for the period January 1, 2013 through March 31, 2013, was filed on May 2, 2013 (the "Third Report").[12]

- The Fourth Status Report, for the period April 1, 2013 through June 30, 2013, was filed on August 13, 2013 (the "Fourth Report").[13]

- The Fifth Status Report, for the period July 1, 2013 through September 30, 2013, was

---

[9] Docket No. 9 (Receivership Order) at pp.18-20.

[10] Docket No. 73 (First Report).

[11] Docket No. 170 (Second Report).

[12] Docket No. 288 (Third Report).

[13] Docket No. 408 (Fourth Report).

filed on November 4, 2013 (the "Fifth Report").[14]

- The Sixth Status Report, for the period October 1, 2013 through December 31, 2013, was filed February 4, 2014 (the "Sixth Report").[15]

- The Seventh Status Report, for the period January 1, 2014 through March 31, 2014, was filed April 24, 2014 (the "Seventh Report").[16]

- This is the Eighth Status Report, for the period April 1, 2014 through June 30, 2014, defined above as the "Reporting Period."

## II.

## CONTINUED OPERATIONS

The Receiver is working to maximize the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those National Note investors who have not received a return of their principal investment in whole or part. As part of that effort, the Receiver has discontinued the operations of National Note and almost all of its affiliated entities, except in those limited instances that have previously been described in earlier Status Reports and as discussed immediately below, and he has attempted to minimize the enterprise's historically high operating expenses going forward. However, some of the expenses of the Receivership Estate, particularly litigation expenses, are beyond the Receiver's control. When others seek to intervene or oppose property sales, the Receiver needs to respond.

---

[14] Docket No. 510 (Fifth Report).

[15] Docket No. 598 (Sixth Report).

[16] Docket No. 639 (Seventh Report).

At this time, the only operations going forward are those related to several real estate holdings of the Receivership Estate.[17]  The following is a description of the Receiver's limited operation of several real estate properties which are being operated either because they are generating net income for the Receivership Estate or because their continued operation will minimize losses:

A.    **Middleton, Idaho: Two Leased Homes**.  The Receivership Estate includes two residential properties that are located in Middleton, Idaho (the "Riverbend Homes"), adjacent to a 175-acre proposed subdivision that National Note had planned under the name "Riverbend Estates," discussed in further detail at pages 25 - 26 of the First Report.[18]  The Riverbend Homes are currently being rented through the services of a professional property manager, generating approximately $1,300.00 in monthly net income.

As reported in earlier Status Reports, the Receiver had determined that he should hold off marketing the Riverbend Homes for sale, pending a determination as to the status of the adjacent 175 acre subdivision.[19]  Subsequently, the Court entered an Order pursuant to which the Receiver relinquished the 175-acres to the secured lender that funded the purchase, and thus, the Receiver commenced marketing the Riverbend Homes for sale.  At this time, the Receiver has agreed to

---

[17] *See* First Report, pp. 9-10, 57-58 & Second Report, Part II.A (discussing operation of Old Glory Minting Company, LLC; operations of this entity were discontinued by the Receiver in December 2012).  Certain of the real property being operated described in earlier Status Reports have now been liquidated.  *See* First Report, pp. 24-53; Second Report, Part II.B; Third Report, Part II; Fourth Report, Part II; Fifth Report, Part II; Sixth Report, Part II; Seventh Report, Part II.  This Report discusses only those real properties being operated during the Reporting Period.

[18] The name of the National Note affiliate that intended to develop the property is Riverbend Estates, LLC. The Receiver refers to this property as the "River Run Subdivision" in the First Report.  First Report at pp. 25-26. Both "River Run" and "Riverbend" were used to describe this property.

[19] *See, e.g.*, Seventh Report, p. 4.

sell one of the Riverbend Homes, identified as "Riverbend Lot 6," to the current tenants of the property, and on June 26, 2014, he filed a *Motion Seeking Authorization to Sell Riverbend Lot 6 Free and Clear of Purported Interests Subject to Higher and Better Offers*.[20]  As set forth in that Motion, subject to Court approval and no higher or better offers, the buyers have agreed to pay $105,000.00, which is over 90% of the average appraised value of Riverbend Lot 6, and a limited $1,000.00 commission will be paid to the real estate agent.  Notice of this sale and solicitation of higher and better offers has been published, and a hearing on the Motion has been scheduled for August 4, 2014.  As of this time, no higher and better offers have been received by the Receiver for Riverbend Lot 6.

In addition, the Receiver anticipates the sale of the second Riverbend Home, identified as the "Hawthorne Avenue Home."  The Hawthorne Avenue Home suffers from a number of significant mold, plumbing, and electrical problems.  As a result, the Home has an average appraised value of approximately $80,000.00.  The property also had issues related to an inflated valuation for purposes of tax assessment, which the Receiver successfully challenged, resulting in the Canyon County Board of Equalization reducing taxable value of the Hawthorne Avenue Home from $136,000.00 to $80,000.00.  The current tenants of the Hawthorne Avenue Home have indicated a desire to purchase the property for a total of $75,000.00, and there would be no real estate commissions related to that sale.  This sale, however, is contingent on the tenants obtaining financing.  If the tenants obtain financing, the Receiver will seek approval of the sale from the Court, subject to higher and better offers.  If the tenants do not obtain financing, they

---

[20] Docket No. 680.

will move out and the Receiver will list the Hawthorne Avenue Home for sale with a real estate agent.

   **B.    Brigham City, Utah: Twin Pines Apartments.**  The Twin Pines Apartments consist of buildings located in Brigham City, Utah, containing twenty apartments which are leased to lower income tenants.  Further information about this property is set forth at pages 29 - 30 of the First Report.  The Receiver continues to operate this property through his property manager.  As a result of the fire that was described in the Sixth Report, only 12 of the 20 units are being rented; the building containing the other eight units was destroyed by the fire and will not be rebuilt.  The property was insured by the Receiver, and proceeds from the fire insurance policy are in the amount of $265,412.45.[21]  A recent appraisal obtained by the Receiver values the property—in its current, post-fire, condition—at $250,000.00.

   The Twin Pines Apartments are subject to a recorded deed of trust held by True and Marjorie Kirk Family Trust (defined below as the "Kirk Trust"),[22] who has intervened in the Civil Case to enforce its alleged claim against the property.  The Receiver has contested the validity and enforceability of this deed of trust.  Litigation is ongoing.  The Receiver has held the proceeds of the fire insurance policy as well as net rents collected on the property during the pendency of the litigation.  During the Reporting Period, the Receiver has engaged in settlement negotiations with Kirk Trust, and it is anticipated that a settlement agreement will be entered into in the next reporting period, which upon execution, the Receiver will submit to the Court for approval.

---

[21] Some of these funds may be used to demolish and haul debris from the burned structure.

[22] *See* discussion *infra* at Part V(F)(1).

**C.**    **Ogden, Utah: Office Building.**  The Office Building is a one-hundred-year-old, three-story commercial office building located in downtown Ogden, Utah, that is co-owned with a third party (the "Co-Owner").  Further details related to the Office Building are set forth at pages 30 - 31 of the First Report.  As of May 15, 2014, all of the Office Building tenants have vacated the Building.  The Receiver has turned off all unnecessary utilities and terminated services that do not have to be maintained.

As reported in earlier Status Reports, the Co-Owner of the Office Building has been working on a plan to redevelop the Building.[23]  However, those plans have not yet resulted in commitments to fund the development or permits for the construction and, thus, the Co-Owner has agreed to allow the Receiver to begin marketing the property for sale beginning on July 15, 2014.

During the Reporting Period, the Receiver identified 17 Assignments of Beneficial Interest in Trust Deeds, referred to herein as "ABIs," recorded against the Office Building.  As with ABIs against other properties of the Receivership Estate, the Receiver contests the validity of these ABIs, which if determined to be valid, would likely deplete any equity that may exist in the property for the Receivership Estate.[24]  Accordingly, the Receiver has sent letters to these 17 ABI holders, asking that they voluntarily release their assignments.  As of June 30, 2014, nine of these holders have voluntarily released their ABIs.

---

[23] *See* Sixth Status Report, p. 6; Seventh Status Report, pp.6-7.

[24] *See* discussion *infra* at Part III(A)(1) (discussing ABIs).

### III.

### REAL ESTATE HOLDINGS

A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report and some of which also are discussed in Part II above.  The Receiver has determined that a majority of the real properties appear to have value for the Receivership Estate and need to be operated and/or marketed for sale, some properties have no equity, and some require further investigation and analysis, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver closed the sale of one property and actively marketed other properties for sale.  Attached hereto as **Exhibit B** is a chart setting forth the status of all real properties in the Receivership Estate as of June 30, 2014.

For purposes of this Status Report, the Receiver discusses the following in Parts A through F below:

- Part A discusses the efforts undertaken during the Reporting Period to release alleged interests recorded against the Receivership Estate's real properties;

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale has been requested;

- Part E describes actions taken by the Receiver regarding real properties in which it does

8

not appear that the Receivership Estate has equity; and

- Part F describes information learned by the Receiver impacting the value of certain property of the Receivership Estate.

**A.    Efforts to Release Liens and Other Interests Against Real Properties.**  As part of the Receiver's investigation of real property holdings of the Receivership Estate, the Receiver has identified numerous types of interests that have been asserted against many of the Receivership Estate's real properties, including at least the following types of interests for which he has taken the following actions:

1.    Assignments of Beneficial Interests ("ABIs").  The First and Second Reports described the ABIs that have been recorded against a wide variety of the Receivership Estate's real properties purportedly in favor of certain National Note investors.  If the ABIs are deemed valid interests, a significant portion of the net sale proceeds from the sale of such real estate would be paid to ABI holders, with little money left for those investors who were not provided ABIs.  The Receiver believes the ABIs are not valid interests on the property. Accordingly, the Receiver has taken the following actions:

a.    Sale of Property Free and Clear of Liens and Interests:  For properties that have ABIs recorded against them, the Court has ordered, based on the Receiver's request, that the properties be sold free and clear of these alleged interests, with any interests to attach to the net proceeds of the sale.  The Receiver is holding the net sales proceeds of these sales in what he calls the "Real Estate Account," a segregated reserve account, pending a determination as to the validity of the disputed ABIs.

9

b.    Request Voluntary Releases:  As properties have been sold, the Receiver has sent letters to the relevant ABI holders requesting that they voluntarily release the ABIs.  In general, approximately one third to one half of ABIs against a given property have been voluntarily released by ABI holders in response to the Receiver's letter.  In the case of one property, where only one ABI had been recorded, the Receiver obtained a voluntary release from the holder, thus freeing all of the net sale proceeds from any interests at closing.

c.    ABIs Held by Defendants Sued by the Receiver:  As described below in Part V, the Receiver has filed lawsuits against overpaid investors and others who received improper payments from National Note or its affiliates.  To the extent that the Receiver's investigation has revealed that these defendants also hold ABIs, the lawsuits ask the Court to invalidate the ABIs.[25]  During the Reporting Period, some of the ABIs held by overpaid investor-defendants have been released as a result of settlement.  The Receiver anticipates that there may be additional releases made as overpaid investor actions are resolved.  Finally, several defendants in these actions have not responded to the Receiver's complaints, and he has commenced the process of obtaining default judgments against such defendants, which include a judgment that the ABIs in question are invalid.

2.    Lawsuits Filed Seeking Declaration of Invalidity of ABIs:  During the third quarter of 2013, the Receiver commenced lawsuits against holders of ABIs on several liquidated properties who refused to voluntarily release their ABIs pursuant to the Receiver's request outlined above.  Since that time, some of these ABI holders have released their ABIs,

---

[25] As discussed immediately below, the Receiver filed additional lawsuits against some ABI holders who are not overpaid seeking invalidation of their ABIs as well.

and litigation against them has been dismissed.  Litigation against those defendants who have not yet released their ABIs is ongoing.  As additional properties subject to ABIs are sold by the Receiver, he will file similar lawsuits against those ABI holders who do not voluntarily release the ABIs.  It is anticipated that the Receiver will request that such lawsuits be assigned to this Court, as the Court is controlling the funds from the sale of properties subject to ABIs in the "Real Estate Account" discussed above.

       3.    <u>Deeds of Trust</u>:  Deeds of trust have been recorded against some of the Receivership Estate's real properties.  Several of these deeds of trust are held by National Note investors who were overpaid (meaning they have received distributions in excess of the principal amount of their investments).  In two instances, the Receiver has been able to negotiate the releases of deeds of trust against receivership property through settlement prior to filing a lawsuit.  Another deed of trust was released as part of a settlement after the filing of a lawsuit.  In two other instances, the Receiver has been in litigation against holders of deeds of trust.  One of these lawsuits was settled with the holder agreeing to release the deed of trust.  The second lawsuit, involving the Kirk Trust's claim to the Twin Pines Apartments, is still in litigation, but it is anticipated that a settlement agreement will be presented to the Court for approval.[26]  Finally, the Receiver has been engaged in pre-litigation settlement negotiations with the holder of a deed of trust against the "<u>Bandanna Cabin</u>,"[27] and he continues his investigation of deeds of trust that

---

[26] *See* discussion *supra* at Part II(B) and *infra* at Part V(F)(1).

[27] The Bandanna Cabin was sold during the last quarter of 2013.  The net proceeds from the sale are being held in the Receiver's Real Estate Account pending resolution of the deed of trust on this property.

have been recorded against the "Overland Trails" property.[28]

**B.**     **Real Property Sales That Closed During the Reporting Period.**

One Court-approved real property sale was closed by the Receiver during the Reporting Period as follows.

1.     Autumn Ridge Lot 3, Eagle Mountain, Utah:[29]  This property consists of a developed residential building lot located in Eagle Mountain, Utah.  The Receiver received an offer to purchase this property for $39,900.00, and he filed a *Motion Seeking Authorization to Sell Autumn Ridge Lot 3 Free and Clear of Purported Interests and Subject to Higher and Better Offers*, seeking Court approval of the sale.[30]  Notice of the sale was published by the Receiver and no higher or better offers were received.  On April 25, 2014, the Court held a hearing on the Receiver's Motion, and it entered an order on April 28, 2014 approving the sale.[31]  The sale closed May 1, 2014, and after property taxes, real estate commissions, and closing costs, the Receivership Estate received net sale proceeds in the amount of $35,711.84.  Because there are multiple ABIs recorded against this property, the sale net proceeds were deposited in the Receivership Estate's Real Estate Account.

**C.**     **Real Property Sales Approved During the Reporting Period/Not Closed.**

All sales for which Court approval was obtained during the Reporting Period have closed.  Thus, there is nothing to report in this category.

---

[28] *See* First Report, pp. 32, 41-42 (describing these properties).

[29] *See* First Report, p. 26 (describing this property).

[30] Docket No. 619.

[31] Docket No. 644.

**D.** <u>**Real Property Sales for Which Court Approval Was Requested**</u>.  During the

Reporting Period, the Receiver sought approval to sell four properties as follows.

      1.     <u>Autumn Ridge Lot 2, Eagle Mountain, Utah</u>:[32]  On April 14, 2014, the

Receiver accepted an offer to purchase this building lot at a price of $39,900.00, an offering

price higher than the average appraised value of the property.  On May 2, 2014, the Receiver

filed a *Motion Seeking Authorization to Sell Autumn Ridge Lot 2 Free and Clear of Purported*

*Interests and Subject to Higher and Better Offers*, seeking Court approval of the sale.[33] Notice of

the sale was published by the Receiver and no higher or better offers were received.  On June 27,

2014, the Court held a hearing on the Receiver's Motion, and at that hearing, it approved the

sale.  An Order approving the sale was entered by the Court just after the close of the Reporting

Period, on July 1, 2014.[34]  The Receiver anticipates this sale will close during the next reporting

period.

      2.     <u>Autumn Ridge Lots 16 and 39, Eagle Mountain, Utah</u>:[35]  On June 2, 2014,

the Receiver accepted an offer to purchase these two building lots for a total sales price of

$79,800.00, an offering price higher than the average appraised values of these properties.  On

June, 11, 2014, the Receiver filed a *Motion Seeking Authorization to Sell Autumn Ridge Lots 16*

*and 30 Free and Clear of Purported Interests and Subject to Higher and Better Offers*, seeking

---

[32] *See* First Report, p. 26 (describing this property).

[33] Docket No. 647.

[34] Docket No. 692.

[35] *See* First Report, p. 26 (describing this property).

Court approval of the sale.[36] Notice of the sale was published by the Receiver and no higher or better offers were received. Just after the close of the Reporting Period, on July 8, 2014, the Court held a hearing on the Receiver's Motion, and on July 9, 2014, the Court entered an Order approving the sale these lots.[37] The Receiver anticipates this sale to close during the next reporting period.

        3.     <u>Riverbend Lot 6, Middleton, Idaho</u>:[38] On June 3, 2014, the Receiver accepted an offer to purchase this home -- referred to as "<u>Riverbend Lot 6</u>" -- for a sales price of $105,000.00, which is an offering price that is approximately 91% of the average appraised value of the property.[39] On June 26, 2014, the Receiver filed a *Motion Seeking Authorization to Sell Riverbend Lot 6 Free and Clear of Purported Interests and Subject to Higher and Better Offers*, seeking Court approval of the sale.[40] Notice of the sale was published by the Receiver and, to date, no higher or better offers have been received. The Court has scheduled a hearing on August 4, 2014 to consider the Receiver's Motion seeking authorization of this sale.

        **E.**     **<u>Real Properties to Relinquish—Lack of Equity.</u>** There is nothing to report during the Reporting Period in this category.

        **F.**     **<u>Anticipated Sales.</u>** In his Seventh Report, the Receiver discussed his investigation of approximately 30 acres of real property associated with the "<u>Expressway</u>

---

[36] Docket No. 668.

[37] Docket No. 696.

[38] *See* First Report, pp. 25-26 (describing this property).

[39] *See* discussion *supra* at Part II.

[40] Docket No. 680.

Business Park," located in Spanish Fork, Utah.[41]  He has discovered that this property is the site of a former landfill, and taking this fact and remediation required by Spanish Fork City into account, this property has a current appraised of $1.25 million.[42]  Using that appraisal, the Receiver has negotiated a tentative agreement to sell this property to a third party purchaser for its appraised value, subject to the buyer's due diligence efforts and Court approval.  When the due diligence period has ended, the Receiver intends to seek Court approval to sell this property at a public auction subject to higher and better offers, with the proposed buyer acting as a stalking horse bidder.

IV.

**NON-REAL ESTATE ASSETS**

In addition to real estate, the Receivership Estate is comprised of other categories of assets, including certain personal property described in Part A below, unrefined ore discussed in Part B below, and proceeds of lawsuits to recover transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

A.    **Personal Property.**  The personal property owned by National Note has all been sold at auction or, in a few cases, through sales directly to buyers.

B.    **Alleged Mineral Assets.**  As described in the Second Report,[43] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("HMI"), to assist the Receiver in investigating whether ore held by National Note has

---

[41] *See* Seventh Report, p. 13.

[42] *Id.*

[43] Second Report, pp. 18-19.

any commercial value. The Receiver receives regular reports from HMI on its efforts to recover precious metals from this ore. Reports received during the Reporting Period indicate that HMI continues to take concrete steps in its efforts to determine whether value can be recovered from the ore. If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in accordance with Management Agreement described in the Second Report.

C.      **Pre-Receiver Asset Transfers.**  Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate, including but not limited to National Note's payment of false profits and commissions on investments. A discussion of the types of claims discovered by the Receiver and his intended course of action for recovery of these claims is set forth in the next section below.

**V.**

**LITIGATION**

A.      **Claims Being Pursued by the Receivership Estate.**  As described in the Fourth Report, the Receiver has filed suit to recover payments or transfers made by National Note and its affiliated entities that should be returned to the Receivership Estate. A total of 136 lawsuits were filed in June 2013. Copies of the complaints in these lawsuits can be found on the Receiver's website. Investigations are ongoing and additional lawsuits have been field since June 2013, and others may be filed. The lawsuits filed by the Receiver seek recovery for a variety of payments that the Receiver believes were improper, including the receipt of commissions for soliciting investors, unpaid and forgiven loans made by National Note,

16

payments to credit card companies on credit cards in the name of individuals associated with National Note, payments to employees and relatives of Palmer, and payments of false profits to investors who received more than the amount of their principal investment. In addition, as described earlier, the Receiver has commenced litigation against holders of various types of liens against property of the Receivership Estate. In a few instances, the Receiver has entered into tolling agreements with a number of persons, extending the statutes of limitations to allow further investigation.

      **B.**      **New Lawsuits Filed During the Reporting Period.** The Receiver filed two additional lawsuits during the Reporting Period, as well as a motion seeking the turnover of funds as follows.

      1.      <u>Lawsuit Against Michelle Turpin, Michelle Turpin & Associates, P.C. and Michelle Turpin, P.C.</u>:[44] After numerous attempts to work with these parties, the Receiver was required to file suit against them. Specifically, on April 23, 2014, the Receiver filed a Complaint, seeking recovery of $88,135.37 in legal fees that were paid by National Note for tax preparation services that the Receiver believes were provided for the benefit of Palmer.

      2.      <u>Lawsuit Against Cedric and Cynthia Johnson (the "Johnsons")</u>: In June 2013, the Johnsons entered into an initial Tolling Agreement with the Receiver related to the Receiver's claims that the Johnsons are required to return $203,797.83 in false profits that they received from National Note and that ABIs that the Johnsons obtained are invalid and unenforceable. The tolling period in that initial Tolling Agreement was tolled further pursuant to

---

[44] *Klein v. Turpin*, Case No. 2:14-cv-00302-DBP (D. Utah) (Pead, J.).

two Amendments to the Tolling Agreement, extending the tolling period to June 30, 2014.  The

purpose for tolling the periods in question was to allow the parties time to attempt to resolve the

Receiver's claims, which are contested by the Johnsons, and also to allow the Johnsons time to

provide information to the Receiver about their alleged hardship financial standing.  Despite

these courtesies, the Johnsons failed to provide the Receiver with information, and thus, the

Receiver commenced a lawsuit against them on June 30, 2014.[45]

        3.    <u>Motion for Turnover</u>:  On May 30, 2014, after numerous good faith

attempts to obtain turnover absent Court order, the Receiver filed a *Motion Seeking Turnover*,[46]

requesting an order requiring the law firms of Mackey Price and Mecham and Pia Anderson

Dorius Reynard and Moss, to return a total of $10,000.00 in funds that are property of the

Receivership Estate.  At the close of the Reporting Period, neither firm had responded to the

Motion.  It is anticipated, however, that responses will be filed, and that the Court will hold a

hearing on the Motion.

        **C.**    **<u>Significant Litigation Rulings</u>**.  During the Reporting Period, the following

rulings of note have been issued in the Receiver's clawback cases ancillary to this Civil Case.

        1.    *<u>Klein v. Eaton et al.</u>*:[47]  On May 14, 2014, a *Memorandum Decision* was

issued in this proceeding,[48] denying the defendants' motion to dismiss the Receiver's lawsuit

---

[45] *Klein v. Johnson*, Case No. 2:14-cv-00470-PMW (D. Utah) (Warner, J.).

[46] Docket No. 658.

[47] Case No. 2:13-cv-00440-DB (D. Utah) (Benson, J.).

[48] *Id.*, Docket No. 11.

against them.  The Court rejected the defendants' jurisdictional arguments, and held that the defendants were subject to litigation in Utah.

      **D.**    **Settlements of Litigation.**  The Receiver succeeded in obtaining eight additional settlement agreements during the Reporting Period.  Settlement agreements generally include an obligation to return funds to the Receivership Estate in exchange for dismissal of the Receiver's lawsuit and/or a mutual release of claims.

      In some instances, the defendants sued by the Receiver have demonstrated financial hardship which would make recovery of a judgment questionable when the cost of litigation is weighed against the likelihood of collection.  The Receiver scrutinizes allegations of hardship carefully to ensure that the defendants truly merit hardship treatment, and has denied a significant percentage of the requests for hardship treatment.  But, where hardship is demonstrated, the Receiver typically agrees to settlement agreement that provides the Receivership Estate relief commensurate with the demonstrated hardship and, typically, provides for the lawsuit to be dismissed.  The Receiver has made it clear to defendants that claims of financial hardship will be considered at the beginning of litigation, not after litigation costs have been incurred.

      During the Reporting Period, the Receiver has obtained approval of the eight settlement agreements noted above.  Specifically, on June 9, 2014, the Receiver filed his *Eighth Motion Seeking Approval of Settlement Agreements,*[49] which Motion was granted by the Court by Order

---

[49] Docket No. 664.

entered on June 16, 2014.[50]  Six of these settlement agreements required the investors to pay a

total of $68,100.00 to the Receivership Estate.  As of June 30, 2014, $33,500.00 of this amount

has been paid.

  **E.** **Default Judgments**.  In some instances, defendants sued by the Receiver have

failed to respond to the litigation commenced against them by the Receiver.  In such cases, the

Receiver has begun to seek default judgments against the defendants.  During the Reporting

Period, the Receiver obtained five default judgments, in the total amount of $528,133.69.  The

Receiver is in the process of researching the viability of collection of these judgments.

  **F.** **Actions Against the Receivership Estate**.  As described in earlier Status

Reports, a number of other parties have filed motions to intervene in the Civil Case in order to

assert claims to property or wanting to foreclose on properties where the lender believes its

interests are not adequately protected by the Receivership Estate.  The following has occurred

during the Reporting Period with regard to actions that have been commenced in the Civil Case

relating to intervention by other parties:

   1. Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust

(the "Kirk Trust"):[51]  The Court permitted the Kirk Trust to intervene in the Civil Case to assert

rights related to certain property identified in the First Report as the "Twin Pines Apartments."[52]

The Receiver disputes that the Kirk Trust has a secured interest in the property, and has asserted

affirmative claims against the Kirk Trust.  In August, 2013, cross motions seeking summary

---

[50] Docket No. 673.

[51] *See* Docket No. 89.

[52] *See* First Report at pp. 29-30; *see also* discussion *supra* at Part II(B).

judgment were filed by the parties.[53]  A hearing on the cross-motions for summary judgment was held by the Court on January 7, 2014.  Both sides provided supplemental information to the Court following the hearing and the Court has taken the matter under advisement but no decision has been rendered.  The Receiver and the Kirk Trust have been discussing a possible settlement, and as discussed above, it is anticipated that a proposed settlement agreement will be presented to the Court for approval during the next reporting period.

      2.      <u>Complaint in Intervention Filed by Paul Hawkins ("Hawkins")</u>:  On October 9, 2013, the Court entered an Order authorizing Hawkins to intervene for the limited purpose of allowing him to proceed with his claims pursuant to a stipulation with the Receiver.[54]  The Receiver was not required to take any action on this matter during the Reporting Period.

      3.      <u>Complaint in Intervention Filed by 30 Overpaid Investors ("Overpaid Investors") And Motion to Transfer</u>:  On October 9, 2013, a *Motion to Intervene* was filed by 30 Overpaid Investors sued by the Receiver, seeking to intervene in the Civil Case to assist Palmer in his claims that National Note was not operated as a Ponzi scheme.[55]  The Receiver objected to this Motion,[56] and after a hearing on November 21, 2013, the Court entered an Order denying the Motion.[57]  The Receiver was not required to take any action on this matter during the Reporting Period.

---

[53] The Receiver's *Motion for Summary Judgment* was filed August 5, 2013.  *See* Docket No. 399.

[54] Docket No. 466.

[55] Docket No. 468.

[56] Docket No. 498.

[57] Docket No. 540.

Separately, after the Motion to Intervene was denied, these Overpaid Investors filed a *Motion to Transfer Related Cases and Supporting Memorandum*,[58] seeking to transfer the Receiver's 23 ancillary proceedings naming the Overpaid Investors as defendants from the judge to which they were assigned to this Court.  The Receiver responded to this Motion,[59] and a hearing was held by the Court on June 27, 2014.  The Court took the Overpaid Investors' Motion under advisement.

      4.    <u>Complaint in Intervention filed by Barclay Associates ("Barclay")</u>:  As noted in Part III.E of the Sixth Report, the Court entered an Order on January 23, 2014, approving a settlement agreement between the Receiver and Barclay relating to the Riverbend Estates property located in Middleton, Idaho.[60]  The Receiver has now relinquished that property to Barclay pursuant to a Court-authorized agreement, and the Receiver expects no further litigation on this matter.

## VI.

## <u>RECORDS OF THE RECEIVERSHIP ENTITIES</u>

Substantial progress has been made in the Receiver's financial analysis and investigation.  The Receiver believes he has located all of the internal financial records created by National

---

[58] Docket No. 654.  The Overpaid Investors had previously filed motions in each of the ancillary proceedings seeking to transfer the cases to this Court.  Those motions were later withdrawn, and a single motion was filed with this Court.

[59] Docket No. 663.

[60] Docket No. 590.

Note for the different affiliated entities for the period from 1995 forward.  The Receiver also has reconstructed all banking transactions for National Note and its affiliated entities for the period since January 1, 2007 through the filing of the Civil Case using original bank records.

A.  **Financial Report/Insolvency Expert**.  The Receiver completed a report summarizing the results of his investigation, including his review of National Note's and its affiliates' financial and intercompany records, and has provided the report to the SEC and certain other governmental agencies that have requested the report.  The Receiver concludes in the report that National Note has been insolvent since 1995 through the time of the filing of the Civil Case in 2012, and that National Note was using money from investors to make distribution payments to other investors.  This report, in conjunction with the impending report of the Receivership Estate's insolvency expert, Lone Peak Valuation Group,[61] will be used by the Receiver in litigation that has been and may be filed by the Receiver.

B.  **Investigative Findings**.  During the Reporting Period, the Receiver has taken on several more targeted investigations of National Note's operations prior to the commencement of the Civil Case, as follows.

1.  Net Profit Interests:  In late 2010 and early 2011, National Note raised $4 million from investors through the sale of what are called "Net Profit Interests," which were represented as interests in net profits expected from processing ores into gold or platinum.  A prospectus dated January 11, 2011 was prepared and regulatory filings were made with the SEC and six state securities agencies.  Based on his investigation to date, the Receiver has discovered

---

[61] *See* Docket No. 660 (*Order Granting Receiver's Motion For Employment of Lone Peak Valuation Group as Insolvency Expert*).

that National Note raised approximately $2 million from investors before January 11, 2011, which is expressly contrary to the statements it made in its regulatory filings that no money had been raised before January 11, 2011. Additionally, and importantly, the Receiver's investigation has revealed that only a small amount of the money raised through the sale of these Net Profit Interests was used as represented for development of the mineral ores. Specifically, although the Receiver's investigation is ongoing, at this time, it appears that at least $1.3 million of the approximately $2 million raised from investors in Net Profit Interests before January 11, 2011 was actually used by National Note to make distributions to other investors who held promissory notes.

      2.   <u>National Note 1990-1994 Activity</u>: The Receiver has located limited early financial records for National Note, consisting primarily of its internally-generated financial statements and journal entries, and he has used those records to reconstruct National Note's stated financial activity in its early years. Based thereon, the Receiver has determined that National Note was organized by Palmer on December 30, 1992. Yet, National Note's records include a "discounted note" that apparently Palmer purchased in 1990 and listed as one of National Note's assets. Starting with this 1990 note and ending in 1994, National Note recorded that it had made 48 loans and that it had established 51 promissory note accounts for investors.

      National Note's ledgers show that it opened a bank account on December 30, 1992, the date of its organization, and that on December 31, 1992, there was $10,100.00 on deposit in that account, primarily attributed to a "franchise fee." In 1993 and 1994, the ledgers show that additional bank accounts were opened, and at the close of 1993, $2,444.13 was on deposit, and at the close of 1994, $40,369.39 was on deposit.

By December 31, 1993, one year after it was formally organized, National Note's balance sheet showed that it had net income in the amount of $3,793.33 and net equity in the amount of $57,399.49. Income was based primarily on approximately $34,000.00 in commissions and only $0.33 in interest, less marketing and overhead costs. The reported positive equity was based primarily based on book entries for notes receivable in the total amount of approximately $120,000.00 plus "note equities" in the amount of $34,855.36, as against liabilities for notes payable in the amount of $82,600.07. National Note referred to "note equities" as the amount between the notes receivable it held as against notes payable it owed to investors. It is unclear whether these items were booked at face value, present value or some other value. At that time, this "note equities" differential was recorded on the books as a profit—later, in 1998, this practice changed, and the difference was recorded as unearned income and recorded as a liability. Partner draws during this time were $18,409.59.

At the close of 1994, National Note recorded $13,158.86 in net income and $112,410.54 in net equity. Income was based primarily on approximately $83,000.00 in commissions, with only approximately $30,000.00 being generated from interest and fees earned, and the remaining difference being marketing and overhead costs. This reported positive equity was based primarily on notes receivable in the total amount of $608,005.48 plus $46,476.59 in "note equities, as against liabilities for notes payable in the amount of $561,528.89. Partner draws in 1994 increased to $56,721.21.

In 1993, National Note began using investor funds to purchase, among other things, discounted notes, in addition to the note discussed above that Palmer purchased in 1990 that was

25

carried on National Note's books.  From the books and records, it appears that with these transactions, as well as others, select funds were recorded in the books and records, while others were not.

   3.   Free Car Program:  National Note marketed a "Free Car Program" to investors.  Under this Program, National Note represented that if the investors deposited the purchase price of a car, National Noted would invest the funds in its note program and use interest earned to make the investor's car payments.  National Note further represented that after the car loan was paid off, the investor would both have a paid-off car and still have a principal investment balance at National Note.  The Receiver has not identified any investors who participated in the Free Car Program.

## VII.

## FINANCIAL ANALYSIS

   A.   **Receivership Financial Information.**  The following financial information is provided for the Reporting Period:

   1.   Bank Accounts.  The Receiver maintains two bank accounts for the operation of the Receivership: a general operating account (the "Operating Account") and an account holding earnest money deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "Real Estate Account").  The balances in these accounts as of the close of the Reporting Period are as follows:

| Account | Account Balance |
|---|---|
| Operating Account | $1,152,534.91 |
| Real Estate Account | $4,397,343.20 |
| **TOTAL** | **$5,549,878.11** |

2.      Operating Account Deposits.  The sources of funds deposited into the Operating Account during the Reporting Period are shown in the following table:

| Source | Amount In |
|---|---|
| Rents | $4,243.50 |
| Royalties, refunds | $2,768.09 |
| Settlement proceeds | $71,360.64 |
| **TOTAL** | **$78,372.23** |

3.      Operating Account Expenditures.  The following table shows the categories of operating expenses that have been paid from the Operating Account during the Reporting Period:

| Type of Expense | Amount Out |
|---|---|
| Utilities | $3,134.98 |
| Other property operating expenses[62] | $1,605.19 |
| Property insurance, taxes | $4,993.74 |
| Property appraisals/closing expenses | $10,024.66 |
| Litigation: Service of process | $5,670.03 |
| **TOTAL** | **$25,428.60** |

4.      Real Estate Account Deposits and Expenditures.  The transactions in the Real Estate Account during the Reporting Period were as follows:

| Source | Amount In | Amount Out |
|---|---|---|
| Proceeds from property sale from Autumn Ridge Lot #2 | $35,711.84 | |
| Refund of utility fee at closing | $2,000.00 | |
| Earnest money deposit | $5,000.00 | |
| **TOTAL** | **$42,711.84** | **$0.00** |

---

[62] These expenses primarily consisted of janitorial services, weed abatement, locksmith charges, and a security deposit refund.

5.    SFAR.  Attached as **Exhibit C** is a copy of the Standardized Fund

Accounting Report for the Reporting Period.

6.    Administrative Expense of Receiver and Counsel.  On April 17, 2014, the

Receiver filed a Second Interim Fee Application for Receiver and Receiver's Professionals for

Services Rendered from January 1, 2013 through June 30, 2013 (the "Second Fee

Application").[63] The Court held hearings on the Second Fee Application on May 29, 2014 and,

after the close of the current Reporting Period, on July 8, 2014.  On July 9, 2014, the Court

entered an Order approving the Second Fee Application,[64] authorizing the Receiver to pay he and

his firm $358,396.28 in fees and expense reimbursement, and Dorsey and Whitney LLP, counsel

for the Receiver, $266,546.73 in fees and expense reimbursement for the noted period.

For the Reporting Period, the Receiver and his staff have spent a total of 671.6 hours and

incurred expenses on behalf of the Receivership Estate.  Total fees and expenses incurred by the

Receiver during the Reporting Period are in the total amount of $89,772.34.  The Receiver's

legal counsel has spent approximately 309.4 hours and incurred expenses on behalf of the

Receivership Estate.  Total fees and expenses of counsel incurred during the Reporting Period

are in the total amount of $85,187.51.[65]

---

[63] Docket No. 636.

[64] Docket No. 697.

[65] A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver and the Receiver's legal counsel in prior Reporting Periods is set forth in each of the status reports.  *See* First Report, p. 59; Second Report, p. 29; Third Report, pp. 28-29; Fourth Report, p. 42; Fifth Report, pp. 33-34; Sixth Report, pp. 24-25; Seventh Report, p. 22; *see also* First Interim Fee Application, Docket No. 467.

## VIII.

### <u>NEXT STEPS</u>

The Receiver continues to make progress in administering the Receivership Estate, and he anticipates working toward a claims process and wind down in the future. The work of the Receiver and his counsel during this Reporting Period focused on: i) pursuing litigation against and obtaining settlements with persons who owe money to the Receivership Estate, ii) defending litigation from persons seeking preferential treatment from assets of the Receivership Estate, iii) seeking legal rulings on the validity of ABIs asserted against properties of the Receivership Estate, and iv) marketing properties of the Receivership Estate for sale. At this time, the Receiver anticipates addressing the following priorities in the coming months:

   A.   **<u>Litigation</u>**. In light of the large number of lawsuits filed in June 2013 and the few filed since, a significant share of legal counsel's time and the time of the Receiver will continue to be spent in litigation-related activities. Significant progress has been made on the litigation front. The number of active lawsuits has been reduced as a result of settlements, default judgments, and dismissals based on, among other things, the receipt of bankruptcy notices, leaving approximately 45 ancillary proceedings left to be litigated. Since the Receiver has attempted at every juncture, both prior to and after filing his lawsuits, to avoid the costs of litigation by making demands and attempting to work out settlements, these remaining suits will almost certainly require more time and effort typical of the litigation process, including engaging in discovery, responding to motions to dismiss and summary judgment, and proving the elements of the actions brought. While the Receiver is hopeful that these remaining cases will be resolved prior to trial, he must prepare for trial in the event favorable settlement agreements cannot be

29

obtained.

In addition to the lawsuits filed in June 2013, the Receiver also continues to gather information about and engage in discussions with other potential defendants. This includes the additional litigation filed during the Reporting Period,[66] and claims against approximately eight other potential defendants which are still being evaluated and negotiated by the Receiver prior to the filing of suit.

     **B.**     **Property Sales.**  During the Reporting Period, the Receiver obtained appraisals on several large parcels of real property and he has received purchase offers and indications of interest for some of these properties. Thus, the Receiver expects to be seeking Court approval for the sale of additional properties during the coming months.

     **C.**     **Obtaining Judicial Rulings on Validity of Interests Against Properties**. The Receiver has filed actions to obtain judicial determinations of the validity of interests that have been recorded against real properties, such as liens and ABIs. These actions are pending, and the Receiver anticipates filing additional actions with this Court in the next Reporting Period. When judicial rulings have been obtained, the Receiver expects to be able release funds held in the Real Estate Account so that the claims process can begin.

     **D.**     **Claims Process.**  If the Court determines that the ABIs and liens asserted against properties of the Receivership Estate are invalid, the Receiver anticipates filing a motion seeking authority to allow the claims process to begin. This process will involve inviting

---

[66] *See* discussion *supra* at Part V(B).

investors and other potential claimants to submit information showing the amount that they claim they are owed by National Note.

IX.

<b><u>CONCLUSION</u></b>

Solid progress was made during the Reporting Period. The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Receivership Estate so as to maximize any distribution available to investors.

DATED this 25 day of July, 2014.

WAYNE KLEIN, Receiver

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **EIGHTH STATUS REPORT**

**OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this 25 day of July, 2014,

and served via ECF on all parties who have requested notice in this case.

## CERTIFICATE OF SERVICE - MAIL, OTHER

I further certify that on the 25 day of July, 2014, I caused to be served by regular first

class United States Mail, postage fully paid, true and correct copy of the **EIGHTH STATUS**

**REPORT OF R. WAYNE KLEIN, RECEIVER** to the following:

Thomas M. Melton
Daniel J. Wadley
Paul N. Feindt
Alison J. Okinaka
SECURITIES AND EXCHANGE COMMISSION
15 W. South Temple, Suite 1800
Salt Lake City, Utah 84101

Wayne Palmer
8816 South 2240 West
West Jordan, Utah 84088


/s/ Candy Long

32