Peggy Hunt (Utah State Bar No. 6060)
Chris Martinez (Utah State Bar No. 11152)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com
        martinez.chris@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>Defendants. | **THIRD INTERIM FEE APPLICATION FOR RECEIVER AND RECEIVER'S PROFESSIONALS FOR SERVICES RENDERED FROM JULY 1, 2013 THROUGH DECEMBER 31, 2013**<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

In accordance with the Order Appointing Receiver and Staying Litigation (the "Receivership Order"),[1] R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note" or "NNU"), as well as certain subsidiaries and entities affiliated with National Note, and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this second interim "Fee Application," seeking approval by the Court of fees and expenses incurred by the Receiver, the Receiver's

---

[1]   Docket No. 9.

forensic accountants, Klein and Associates, PLLC ("Klein and Associates"), and the Receiver's legal counsel, Dorsey & Whitney LLP ("Dorsey"), for the period of July 1, 2013 through December 31, 2013 (the "Application Period"), and authorization to pay all authorized fees and expenses from unencumbered funds of the Receivership Estate. The Receiver and Klein and Associates are seeking approval of fees in the total amount of $311,939.60, and Dorsey is seeking approval of fees in the total amount of $301,985.50 and expense reimbursement in the amount of $17,244.36.

This Fee Application was provided to the United States Securities and Exchange Commission ("SEC") for review, comment and objection prior to filing. The SEC provided comments to the Receiver and the Receiver understands that there is no objection by the Commission to relief sought herein.

In support hereof, the Receiver states as follows.

## I.    BACKGROUND

1.      On June 25, 2012, this case was commenced by the SEC against Defendants Palmer and National Note in this Court. The SEC alleges, among other things, that Defendants Palmer and National Note engaged in securities fraud and operated a scheme that took over $100 million from more than 600 investors.

2.      The SEC filed several *ex parte* motions on June 25, 2012, all of which were granted by the Court. In particular, the Court entered the Receivership Order, appointing the Receiver and authorizing the Receiver to employ professionals to assist him with his duties.[2]

---

[2]    Receivership Order ¶ 58.

3.       Upon his appointment, and in accordance with the Receivership Order, the Receiver employed the Dorsey as his legal counsel and Klein and Associates as his forensic accountants, and such retention was approved by the Court.[3]  Neither the Receiver nor any of his professionals have entered into an any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

4.       On December 9, 2013, the Court entered an Order approving the Receiver's first *Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered from June 25, 2012 Through December 31, 2012*,[4] authorizing payment of $320,914.50 to Klein & Associates, and $103,730.75 to Dorsey for fees and services rendered during the applicable period, and payment of $38,841.94 to Klein & Associates, and $1,599.82 to Dorsey for reimbursement of out of pocket expenses for the same period.  These fees and costs have been paid by the Receiver as allowed pursuant to the Court's Order.

5.       On July 9, 2014 the Court entered an Order approving the Receiver's *Second Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered from January 1, 2013 Through June 30, 2013*,[5] authorizing payment of $354,736.80 in fees for services to Klein & Associates, and $254,457.25 to Dorsey for fees for services rendered during the applicable period, and payment of $3,659.48 to Klein & Associates, and $12,089.48 to

---

[3]     Docket No. 14 (Order Authorizing Receiver to Employ Professionals).

[4]     Docket No. 555.

[5]     Docket No. 697.

Dorsey for reimbursement of out of pocket expenses for the same period. These fees and costs have been paid by the Receiver as allowed pursuant to the Court's Order. No applications have been filed since that time.

6.    During the present Application Period, the Receiver and his professionals have provided actual and necessary services for the benefit of the Receivership Estate which are set forth in greater detail below. The Receiver respectfully submits that the fees and expenses requested in the Fee Application are reasonable and should be approved.

7.    As noted above, the Receiver submitted the Fee Application to the SEC for review, comment and objection prior to filing. The SEC provided comments to the Receiver, and the SEC has informed the Receiver that it has no objection to the fees and expenses as requested herein.

## II.    SERVICES PERFORMED

8.    To date, the Receiver has filed the following reports with the Court: *Initial Report and Liquidation Plan*, which includes a status report for the period of June 25, 2012 through September 30, 2012;[6] *Second Status Report* for the period of October 1, 2012 through December 31, 2012;[7] *Third Status Report* for the period of January 1, 2013 through March 31, 2013;[8] *Fourth Status Report* for the period of April 1, 2013 through June 30, 2013;[9] *Fifth Status*

---

[6]    Docket No. 73.

[7]    Docket No. 170.

[8]    Docket No. 288.

[9]    Docket No. 408.

*Report* for the period of July 1, 2013 through September 30, 2013 (the "<u>Fifth Status Report</u>");[10] *Sixth Status Report* for the period of October 1, 2013 through December 31, 2013 (the "<u>Sixth Status Report</u>");[11] *Seventh Status Report* for the period of January 1, 2014 through March 31, 2014;[12] and *Eighth Status Report* for the period of April 1, 2014 through June 30, 2014 (the "<u>Eighth Status Report</u>").[13]  These Status Reports provide a comprehensive description of the services performed by the Receiver and his professionals and are incorporated herein by reference.

9.    The efforts of the Receiver and his professionals giving rise to the fees and costs incurred during and requested for this Application Period are detailed in the Fifth Status Report and the Sixth Status Report, both of which are incorporated herein by reference.

10.    In general, however, during the Application Period, the Receiver and his professionals primarily focused on the following:

A.    <u>Limited Business Operations</u>:  Attending to operational and legal issues related to the continued operation of the following properties: (1) two leased homes located in Middleton, Idaho; (2) the Twin Pines Apartments, located in Brigham City, Utah; (3) an office building located in Ogden, Utah; (4) the East Meadows mobile home

---

[10]    Docket No. 510.

[11]    Docket No. 598.

[12]    Docket No. 639.

[13]    Docket No. 710.

park located in Vernal, Utah;[14] (5) the Cedar Fort Land, located in Fairfield, Utah; (6) two units in the Expressway Business Park, located in Spanish Fork, Utah; and (7) a residence located in Temple, Georgia.

B.   <u>Disposition of Assets</u>:  The Receiver and his professionals attended to all aspects of disposing of personal and real property assets during the Application Period. All efforts in this regard are focused on minimizing expense while maximizing the value of property for the Receivership Estate.   Thus, the Receiver generally first considers whether the property in question has value for the Receivership Estate by considering the fair market value of the property (typically obtained from the advice of relevant professionals), the existence of interests asserted against the property, the validity and/or avoidability of those interests, the costs of invalidating or avoiding any interests, and costs associated with marketing and sale, including in obtaining Court approval of a proposed sale.  If it is determined that there is no equity in a property, the Receiver typically seeks authority to relinquish the property to avoid continued administrative costs.  If there is equity in the property, the Receiver evaluates the timing of and the best method for marketing and selling the property so as to maximize its value for the benefit of the Receivership Estate.

In so doing, the Receiver and his professionals engaged in at least the following tasks related to asset disposition during the Application Period:

- Attending to the investigation, analysis and, where necessary litigation of the validity

---

[14]   Operations related to this property ceased in July 2013, when the Receiver closed on an approved sale of the property.

of deeds of trust against real property of the Receivership Estate, including negotiating settlement agreements with holders of deeds of trust, and continuing litigation with other deed of trust holders;

- Evaluating the equity in numerous real properties, and seeking Court approval to relinquish properties with no equity for the Receivership Estate;

- Negotiating with a creditor with liens against the Riverbend Estates property located in Middleton, Idaho; and

- Evaluating properties for sale, marketing properties, negotiating sales, obtaining Court approval of purchase offers, attending to issues of conducting public sales (where applicable), and closing sales. As of end of the Application Period, the following is a list of real property sales that have been closed, and which were ready to close as a result of the entry of Orders approving the sales:

  ➢ *Closed Sales*: (1) 2 Elkhorn Ridge lots, located in Malad, Idaho; (2) 12 Autumn Ridge Phase I lots, located in Eagle Mountain City, Utah; (3) the East Meadows mobile home park, located in Vernal, Utah; (4) the "Outpost" property, located in Duchesne County, Utah; (5) Expressway Business Park, Unit #215, located in Spanish Fork, Utah; (7) the "Bandana Cabin," located in Duchesne County, Utah; (8) the Cottonwood Road property, located in Salt Lake City, Utah; (9) an 8-acre parcel of the Cedar Fort Land, located in Fairfield, Utah; and (10) Autumn Ridge Phase II land, located in Eagle Mountain City, Utah.

  ➢ *Court-Approved Sales:* A single-family home, located in Temple, Georgia. [15]

  ➢ As a result of the sales that closed during the Application Period, the Receivership Estate has obtained $2,746,409.35 in net sale proceeds during the Application Period. When the sales were of unencumbered property, the net sale proceeds have been deposited into the Receiver's Operating Account, and when the sale is subject to contested interests, the net sale proceeds are deposited into the Receiver's Real Estate Account. [16]

Since the end of the Application Period, the Receiver and his professionals continued to use the above methodology in liquidating property of the Receivership

---

[15]   Since the close of the Application Period, the sale of this property has closed.

[16]   *See infra* at Part III (discussing bank accounts).

Estate.

      C.     <u>Asset Analysis and Recovery and Litigation of the Ancillary Proceedings</u>.
A significant asset of the Receivership Estate are avoidance and loan collection claims against a variety of parties, as well as claims to invalidate "Assignments of Beneficial Interest" ("<u>ABIs</u>") recorded against many of the Estate's real properties.  In June 2013, just prior to the commencement of the present Application Period, the Receiver commenced approximately 140 lawsuits (collectively, the "<u>Ancillary Proceedings</u>") related to these claims.  All efforts in liquidating these claims have focused on minimizing expense while maximizing the value of property for the Receivership Estate. Thus, in filing the Ancillary Proceedings, the Receiver and his professionals engaged in the following process:

      1.     Over 225 demand letters were sent to each target defendant giving that person an opportunity to resolve the claim alleged prior to the commencement of any litigation, including by providing the Receiver with a hardship affidavit evidencing an inability to pay any judgment that might be obtained;

      2.     In response, a significant number of the target defendants contacted the Receiver prior to the filing of the Ancillary Proceedings, and in all such instances the Receiver and his professionals (a) received from the target defendants any disputed facts and investigated those facts, (b) when appropriate, determined that there was no claim against the target defendant based on the additional facts received, (c) when possible and appropriate negotiated the settlement of viable claims, including investigating claims of financial hardship based on the target defendant's hardship

affidavit so as to prevent the filing of lawsuits against persons against whom judgment would not be collectable, and (d) in some instances, collected funds turned over based on demand;

3.     In another significant number of cases, either a settlement could not be reached based on demand or the target defendant did not respond to the Receiver's demand and thus the Receiver was required to commence litigation to liquidate the Receivership Estate's claims, thus resulting in the filing of the Ancillary Proceedings or, where appropriate, the entry into Tolling Agreements;

4.     Since the filing of the Ancillary Proceedings, many defendants have reached out to the Receiver to attempt to resolve claims alleged outside of litigation, and in all such instances, the Receiver and his professionals then engaged in the process described in (2) above, and also in filing motions to approve settlement agreements negotiated and drafted. During the Application Period, the Receiver filed three motions seeking approval of settlement agreements,[17] which were approved by the Court,[18] resulting in agreements to pay $326,886.17 to the Receivership Estate, ABI releases and reduction of claims against the Estate. To date, $302,009.34 of the settlement amount has been paid; and

5.     Where there has been no indication of a potential settlement, the Receiver began the litigation process in each of the Ancillary Proceedings.

---

[17]   Docket Nos. 359, 422, and 502.

[18]   Docket Nos. 364, 425, and 506.

D.     General Litigation.  Litigation services rendered during the Application Period outside of the Ancillary Proceedings discussed above were primarily related intervention actions filed in this case, including by the True & Marjorie Kirk Family Trust, First National Bank of Layton, an ad hoc "investor group," Paul Hawkins, West Side Enterprises and Leon Harward, and Barclay Associates.

E.     Continuing Investigation:     The Receiver's investigation of the Receivership Estate continued during the Application Period.  As part of these duties, the Receiver and his professionals have engaged in at least the following tasks:

- Located and preserved books and records of the Receivership Estate;

- Reconstructed bank transactions;

- Investigated questionable transactions involving "black sand" ore, Ghanian gold, certain business ventures, and property valuations; and

- Investigated and began preparing a report summarizing facts related to the Receiver's investigation, including facts related to National Note's mismanagement and fraud, as well as facts showing that the enterprise was insolvent since at least 1995.

F.     Administration of Receivership Estate:     The Receiver and his professionals have incurred fees and expenses in administering the Receivership Estate, including at least the following: maintaining bank accounts and books and records of the Receivership Estate; receiving funds; making payments necessary to preserve assets; communicating with investors and others; monitoring a Management Agreement with HMI Management LLC; and, when requested, providing information to relevant governmental authorities.

11.     Through the actual and necessary work of the Receiver and his professionals, the Receiver has provided considerable benefit to the Receivership Estate.

### III.  BANK ACCOUNTS OF THE RECEIVERSHIP ESTATE

12.     The Receivership Estate currently has two bank accounts, designated as an
"Operating Account" and a "Real Estate Account".  The Operating Account holds funds that are
free and clear of any interests, and as of September 30, 2014, this Account had a balance in the
total amount of $1,429,186.90.  The Real Estate Account holds the net sale proceeds that have
been obtained from the liquidation of real property against which liens or ABIs have been
recorded and not yet released or found invalid, and as of September 30, 2014, this Account had a
balance in the total amount of $4,504,785.19.

13.     As set forth in the motions that have been filed related to property sales, when
properties subject to disputed interests are sold, the net sale proceeds are deposited into the Real
Estate Account.  The Receiver has been successful in negotiating the release of a significant
number of liens and ABIs against real property that has been sold.  In instances where he has
eliminated all interests against the net sale proceeds pertaining to a particular sold property, it is
the Receiver's intent to simply move the net sale proceeds from the Real Estate Account to the
Operating Account.  In instances where some, but not all, interests have been eliminated, the
Receiver intends to file a notice of intent to disburse unencumbered net sale proceeds from the
Real Estate Account to the Operating Account, with such notice being served on all parties who
hold remaining disputed interests in a property.  At this time, the Receiver anticipates
transferring $154,984.78 held in the Real Estate Account to the Operating Account inasmuch as
all disputed interests related to the net sale proceeds for Elkhorn Lot # 1 have been removed.
The Receiver also anticipates filing a notice indicating his intent to transfer approximately $1.8
million from the Real Estate Account to the Operating Account inasmuch as sufficient disputed

interests have been released resulting in the necessity of leaving only approximately $2.5 million on deposit in the Real Estate Account in the event that the remaining unreleased disputed interests are determined to be valid.

14. The Court has articulated some concern that by funding the payment of administrative expenses from the Operating Account, holders of disputed interests in net sale proceeds on deposit in the Real Estate Account are not bearing any of the expense of the receivership. The Receiver agrees with the Court's perspective, but has determined that at this point, there is not an efficient way to "charge" the money in the Real Estate Account. The Receiver believes that the ABIs, which are the majority of disputed interests involved, are invalid as a matter of law and he has filed several lawsuits related to this issue. In the event that the Receiver prevails, the issue will be moot inasmuch as all funds will be released from the Real Estate Account. If the Receiver does not prevail, he is in no way waving any rights to seek to have the holders of such interests charged a proportionate share of the costs associated with administering the Receivership Estate, including in operating, marketing and liquidating the real properties that have been sold. Moreover, by moving approximately $2.0 million in unencumbered funds from the Real Estate Account to the Operating Account, proceeds from the sales of real estate will be contributing toward payment of the administrative expenses of the Receivership Estate.

15. If the Court approves this Fee Application, the Receiver would pay the approved fees and expenses from the Operating Account. Given the amount requested, the Operating Account has sufficient funds to pay these fees and expenses.

## IV.   **REQUEST FOR COURT APPROVAL OF FEES AND EXPENSES**

16.     The Receivership Order provides, in relevant part, that:

> 59.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.
>
> 60.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the
>
> Court for compensation and expense reimbursement from the Receivership Estate (the "Quarterly Fee Applications").  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver will serve upon counsel for the Commission a complete copy of the proposed Application, together with all exhibits and relevant billing information in a format to be provided by Commission staff.
>
> 61.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the receivership. . . .
>
> 62.     Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court. . . .[19]

17.     The Receiver now respectfully requests that the Court enter an Order approving on an interim basis and authorizing payment from the Receivership Estate of the reasonable compensation and expenses outlined herein for the Application Period of July 1, 2013 through December 31, 2013 in the amounts set forth below.

18.     This Fee Application is supported by the following documents.  **Exhibit A** contains a summary of the fees incurred for each of the billing matters, with Exhibit A-1

---

[19]   Receivership Order ¶¶ 59-62.

containing a summary for the Receiver and Klein & Associates, and Exhibit A-2 containing a summary for Dorsey.  Detailed invoices described in the work performed by the Receiver and Dorsey on a daily basis are attached hereto as **Exhibit B**, with Exhibit B-1 containing the Receiver and his firm's invoices, and Exhibit B-2 containing Dorsey's invoices.  The invoices of the Receiver have been redacted to remove communications with counsel that are privileged.  Summaries of the expenses incurred by Dorsey are attached as **Exhibit C**.  The Receiver has not paid expenses for which he seeks reimbursement during this Application Period.

19.     The fees and out-of-pocket expenses requested are summarized as follows:

| | **RECEIVER AND KLEIN AND ASSOCIATES** | **DORSEY** |
|---|---|---|
| Fees | $389,924.50 ($77,984.90)- 20% reduction $311,939.60 | $348,717.25 ($46,731.75)-voluntary reduction $301,985.50 |
| Expenses | $0.00 | $17,244.36 |
| **TOTAL** | $311,939.60 | $319,229.86[20] |

20.     The amounts requested include voluntary reductions made by the respective professionals in an exercise of their billing judgment.  Reductions are summarized as follows:

A.     The Receiver and the staff of Klein & Associates actually billed 3,243.50 hours during the Application Period, which does not include an additional 257.60 hours

---

[20]  This amount is less than the combined amounts listed in the Fifth and Sixth Status Reports, which totaled $358,260.94. *See* Fifth Status Report, p. 24; Sixth Status Report, p. 25.  The difference reflects the fact that Dorsey's invoices as of the filing of the Fifth and Sixth Status Reports had not been finalized, all expenses for the Application Period had not yet been billed, and Dorsey had not finished voluntarily reducing its fees.

of time which are not being billed, amounting to $39,776.00 in fees in unbilled time.  *See*

**Exhibit A-1**.  Thus, the  total fee request by the Receiver in the amount of $311,939.60

does not include $39,776.00, representing the value of unbilled time or the additional

$77,984.90 representing a 20 percent discount off the billed time.  The Receiver and

Klein  &  Associates,  thus  have  made  total  voluntary  reductions  in  the  amount  of

$117,760.90.

      B.     In an exercise of its billing judgment, Dorsey has voluntarily reduced its

actual billed fees in the total amount of $46,731.75.  *See* **Exhibit A-2**.  This reduction

does not include the additional unbilled time of Ms. Hunt, which in many instances, has

not been billed to oversee aspects of this case.

21.     The services of the Receiver and his firm for the Application Period are detailed

in the invoices attached hereto as Exhibit B-1.

22.     The services of Dorsey for the Application Period are detailed in the invoices

attached hereto as Exhibit B-2.  To account for its time, Dorsey professionals billed time for

services rendered during the Application Period to five separate primary matters, and invoices

for each matter are attached as part of Exhibit B-1, as follows:

     Exhibit B-1, Tab A:  Matter 1 – Case Administration – which includes legal

services rendered in assisting the Receiver with his administration of the Receivership

Estate.

     Exhibit B-1, Tab B:  Matter 2 – Litigation -- which includes legal services

rendered to assist the Receiver with litigation that has been filed by or against the

Receivership Estate.   While services rendered with regard to specific Ancillary

Proceedings described in ¶ 10.C above are, on a whole, accounted for in separate billing matters and invoiced separately (see Tab B-1(E)), this Matter 2 incorporates services rendered in relation to intervention matters, litigation filed in the Enforcement Action, and litigation-related services that may relate to, but do not necessarily pertain to any single one of the Ancillary Proceedings.

Exhibit B-1, Tab C:   Matter 3 - Asset Disposition: -- which includes all legal services rendered in relation to the disposition of property of the Receivership Estate, including advising the Receiver on issues related to the Receivership Estate's interests in real property and marketing, preparing all necessary pleadings and notices necessary for private and public sales, preparing for and attending hearings on motions seeking approval of sale procedures and sales, and assisting the Receiver with issues related to the closing of sales and transfer of properties sold.

Exhibit B-1, Tab D:   Matter 5 – Asset Analysis and Recovery[21] -- which includes legal services rendered to assist the Receiver with the evaluation and, when appropriate, recovery of property of the Receivership Estate, including analysis of and commencement of the litigation claims.

Exhibit B-1, Tab E:   Ancillary Proceeding Invoices – in addition to the services described above, Dorsey opened separate billing matters for most of the Ancillary Proceedings discussed in ¶10.C above.   Each of these matters was opened after a complaint was filed and served and services specific to the proceeding were first

---

[21]   No time was billed to Matter 4 during the Application Period, which involves claims analysis.  These issues have not yet arisen in this case.

16

rendered.   Dorsey professionals have billed time to individual matter numbers for services specifically related to each of the Ancillary Proceedings that have been filed and separate invoices have been generated for each of these matters.   In instances where a complaint was filed, but it was not served or the matter was dismissed or settled before it was served, a new matter was not opened, but rather time was billed to Matter 2.

23.   In compliance with ¶ 60 of the Receivership Order, the Fee Application, including the invoices in **Exhibit B** and **Exhibit C**, were provided to the SEC and after review and comment, the SEC has no objection to the fees and expenses requested.

24.   All expenses for which reimbursement is sought are actual and necessary expenses that were incurred by Dorsey on behalf of the Receivership Estate.   None of the expenses are billed a premium, but rather are billed at Dorsey's actual cost.

25.   As discussed in the Receiver's earlier fee applications,[22] the Receiver has not filed Quarterly Fee Applications as authorized under ¶ 60 of the Receivership Order quoted above because he felt it was necessary to first increase the amount on deposit in the Operating Account from which such fees and expenses will be paid.   Rather, accruing fees and expenses have been disclosed on an ongoing basis to the Court, the SEC and parties in interest in each of the Status Reports discussed above, with the most recent being set forth in the Eighth Status Report,[23] and in the two prior interim fee applications that have been filed to date, covering periods from June

---

[22]   *See supra* ¶¶ 4 and 5.

[23]   Eighth Status Report, at p. 28.   Fees and expenses for the current Application Period are set forth in the Fifth Status Report, at p. 33-34, and Sixth Status Reports, at pp. 24-25.

25, 2012 through June 31, 2013.[24]

26.     As of this date, while fees and expenses have been disclosed, they have not been requested or paid for the ending six months of 2013, or through 2014.  As set forth in the second interim Fee Application, the Receiver is filing this third interim Fee Application for the period of July 1, 2013 through December 31, 2013, and once 2013 fees and expenses have been reviewed and approved by the Court, the Receiver will thereafter file a fourth interim fee application for all fees and costs incurred through 2014.  Thereafter, the Receiver and his counsel expect to file fee requests quarterly.  The Receiver has discussed this plan with the SEC and it consents thereto.

27.     The SEC has not requested a holdback of fees and expenses in this case.  The Receiver respectfully submits that a holdback of fees is not appropriate in this case because the Receiver and his professionals have voluntarily waived a significant amount of fees that were actually earned, a waiver has not been requested by the SEC, and the Receiver and his professionals already have deferred payment of significant amounts of their actual and necessary fees and expenses.

28.     The Receiver and his professionals understand that the authorization and payment of fees and expenses is interim in nature.  All fees and expenses allowed on an interim basis will be subject to final review at the close of the case and the discharge of the Receiver when the Receiver files a final accounting and final fee application.

---

[24]   *See supra* ¶¶ 4 and 5.

## V.   CONCLUSION

29.    The Receiver respectfully submits this Fee Application and requests that the Court enter an Order approving the actual and necessary fees and expenses incurred on behalf of and for the benefit of the Receivership Estate.  For all of the reasons stated, the Receiver submits that he and his professionals have provided a significant benefit to the Receivership Estate. During the Application Period alone, at least $2,746,409.35 in net real estate sale proceeds were obtained and settlements requiring the payment of $326,886.17 were entered into by the Receiver and approved by the Court.

30.    There are sufficient funds in the Operating Account to pay the fees and expenses requested herein.[25]

31.    Thus, the Reviver respectfully requests that the Court enter an Order approving this Fee Application, allowing the fees and expenses requested herein, and authorizing the Receiver's payment of the same.  The Receiver and Klein and Associates are seeking approval of fees in the total amount of $311,939.60, and Dorsey is seeking approval of fees in the total amount of $301,985.50 and expense reimbursement in the amount of $17,244.36.

---

[25]    *See supra* Part III.

32.      A proposed Order is attached hereto as **Exhibit D**.

DATED this 15th day of October, 2014.

_____
R. Wayne Klein
*Receiver*

**DORSEY & WHITNEY LLP**

___/s/Peggy Hunt_____
Peggy Hunt
Chris Martinez
*Attorneys for the Reciever*

32.     A proposed Order is attached hereto as **Exhibit D**.

DATED this 15th day of October, 2014.

R. Wayne Klein
*Receiver*

**DORSEY & WHITNEY LLP**

_/s/Peggy Hunt_
Peggy Hunt
Chris Martinez
*Attorneys for the Reciever*

## CERTIFICATE OF SERVICE

I hereby certify that the above **THIRD INTERIM FEE APPLICATION FOR RECEIVER AND RECEIVER'S PROFESSIONALS FOR SERVICES RENDERED FROM JULY 1, 2013 THROUGH DECEMBER 31, 2013** was filed with the Court on this 15th day of October, 2014, and served via ECF on all parties who have requested notice in this case.

_/s/ Candy Long_

## CERTIFICATE OF SERVICE – MAIL, OTHER

I hereby certify that on the 15th day of October, 2014, I caused to be served by regular first class United States Mail, postage fully paid, a true and correct copy of the **THIRD INTERIM FEE APPLICATION FOR RECEIVER AND RECEIVER'S PROFESSIONALS FOR SERVICES RENDERED FROM JULY 1, 2013 THROUGH DECEMBER 31, 2013** to the following:

Wayne Plamer
8816 South 2240 West
West Jordan, Utah 84088

_/s/ Candy Long_