Peggy Hunt (Utah State Bar No. 6060)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>Defendants. | **NINTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER**<br>*For the Quarter Ending September 30, 2014*<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this Ninth Status Report for the period July 1, 2014 through September 30, 2014 (the "Reporting Period").

# TABLE OF CONTENTS

Page

I. PROCEDURAL HISTORY ........................................................................................... 1

II. CONTINUED OPERATIONS ..................................................................................... 3

    A.      Middleton, Idaho: Two Leased Homes........................................................... 4
    B.      Brigham City, Utah: Twin Pines Apartments. ............................................... 5
    C.      Ogden, Utah: Office Building. ........................................................................ 6

III. REAL ESTATE HOLDINGS ..................................................................................... 7

    A.      Efforts to Release Liens and Other Interests Against Real Properties.................... 8
    B.      Real Property Sales Closed During the Reporting Period. .................................. 12
    C.      Real Property Sales Approved During the Reporting Period/Not Closed. ........... 15
    D.      Real Property Sales for which Court Approval Was Requested........................... 15
    E.      Offers Preliminarily Accepted on Real Properties............................................ 16
    F.      Real Properties to Relinquish—Lack of Equity.............................................. 17
    G.      Offer on Expressway Land................................................................................18
    H.      Other Efforts to Increase Net Proceeds from Property Sales..........................18

IV. NON REAL ESTATE ASSETS ................................................................................. 19

    A.      Personal Property. ........................................................................................... 20
    B.      Alleged Mineral Assets. .................................................................................. 20
    C.      Pre-Receiver Asset Transfers.......................................................................... 20

V. LITIGATION ............................................................................................................. 21

    A.      Claims Being Pursued By The Receivership Estate. ...................................... 21
    B.      New Lawsuits Filed During the Reporting Period........................................... 21
    C.      Significant LItigation Rulings.......................................................................... 23
    D.      Settlements of Litigation ................................................................................. 23
    E.      Default Judgments........................................................................................... 26
    F.      Actions Against The Receivership Estate. ...................................................... 26

VI. RECORDS OF THE RECEIVERSHIP ENTITIES .................................................. 28

    A.      Financial Report/Insolvency Expert.................................................................28
    B.      Investigative Findings......................................................................................29

VII. FINANCIAL ANALYSIS ................................................................................................. 31

    A.    Receivership Financial Information ................................................................... 31

VIII. NEXT STEPS ................................................................................................................ 33

IX. CONCLUSION ................................................................................................................. 36

# I.

# PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States

Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note

by the filing of a Complaint in the United States District Court for the District of Utah (the

"Court").[1]  The same day, the Court granted several motions filed by the SEC, including a

Temporary Restraining Order and Order to Show Cause (the "TRO"),[2] an Order Freezing Assets

and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[3] and an Order Appointing

Receiver and Staying Litigation (the "Receivership Order").[4]  Palmer later stipulated to the

imposition of a preliminary injunction and to continuation of these orders.[5]  As a result of the

Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls

National Note and the Related Entities identified in the Receivership Order.  A list of the

Receivership Entities is attached hereto as **Exhibit A**.

The SEC filed a Motion for Summary Judgment in the Civil Case on July 19, 2013,[6]

arguing that certain securities law violations had been established as a matter of law.  Palmer

opposed the SEC's Motion,[7] and thereafter he filed a variety of motions.[8]  At a hearing on July 9,

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

[6] Docket No. 377.

[7] Docket No. 473.

2014, the Court determined to set the matter for trial rather than dispose of the case through summary judgment.  As of September 30, 2014, the SEC and Palmer are finalizing discovery and submission of expert reports.  A further hearing on the status of the case will be held by the Court on February 20, 2015.

In accordance with the Receivership Order,[9] the Receiver has filed the following status reports:

- The Receiver's First Status Report and Liquidation Plan, for the period June 25, 2012 through September 30, 2012, was filed November 12, 2012 (the "First Report").[10]

- The Second Status Report, for the period October 1, 2012 through December 31, 2012, was filed on February 26, 2013 (the "Second Report").[11]

- The Third Status Report, for the period January 1, 2013 through March 31, 2013, was filed on May 2, 2013 (the "Third Report").[12]

- The Fourth Status Report, for the period April 1, 2013 through June 30, 2013, was filed on August 13, 2013 (the "Fourth Report").[13]

- The Fifth Status Report, for the period July 1, 2013 through September 30, 2013, was

---

[8] In May, the fourth law firm representing Palmer since the commencement of the Civil Case asked to withdraw as his counsel.

[9] Docket No. 9 (Receivership Order) at pp.18-20.

[10] Docket No. 73 (First Report).

[11] Docket No. 170 (Second Report).

[12] Docket No. 288 (Third Report).

[13] Docket No. 408 (Fourth Report).

filed on November 4, 2013 (the "Fifth Report").[14]

- The Sixth Status Report, for the period October 1, 2013 through December 31, 2013, was filed February 4, 2014 (the "Sixth Report").[15]

- The Seventh Status Report, for the period January 1, 2014 through March 31, 2014, was filed April 24, 2014 (the "Seventh Report").[16]

- The Eighth Status Report, for the period April 1, 2014 through June 30, 2014, was filed July 25, 2014 (the "Eighth Report").[17]

- This is the Ninth Status Report for the period of July 1, 2014 through September 30, 2014, defined above as the "Reporting Period."


## II.

## CONTINUED OPERATIONS

The Receiver is working to maximize the value of existing assets while also minimizing the expenses being incurred so as to make the largest possible distribution to those National Note investors who have not received a return of their principal investment in whole or part. As part of that effort, the Receiver has discontinued the operations of National Note and almost all of its affiliated entities, except in those limited instances that have previously been described in earlier Status Reports and as discussed immediately below, and he has attempted to minimize the

---

[14] Docket No. 510 (Fifth Report).

[15] Docket No. 598 (Sixth Report).

[16] Docket No. 639 (Seventh Report).

[17] Docket No. 710 (Eighth Report).

enterprise's historically high operating expenses going forward.  However, some of the expenses of the Receivership Estate, particularly litigation expenses, are beyond the Receiver's control. When others seek to intervene or oppose property sales, the Receiver needs to respond.

At this time, the only operations going forward are those related to several real estate holdings of the Receivership Estate.[18]  The following is a description of the Receiver's limited operation of several real estate properties which are being operated either because they are generating net income for the Receivership Estate or because their continued operation will minimize losses:

A.     **Middleton, Idaho: Two Leased Homes.**  The Receivership Estate includes two residential properties that are located in Middleton, Idaho (the "Riverbend Homes"), adjacent to a 175-acre proposed subdivision that National Note had planned under the name "Riverbend Estates," discussed in further detail at pages 25 - 26 of the First Report.[19]  During the Reporting Period, the Receiver discontinued his rental of the Riverbend Homes and began marketing these properties for sale.  The sale of one of the Riverbend Homes, located on 1st Avenue, has been approved by the Court[20] and the sale closed on October 15, 2014.[21]  The Receiver has accepted an offer to purchase the second home, located on Hawthorne Avenue, and filed a motion on

---

[18] *See* First Report, pp. 9-10, 57-58 & Second Report, Part II.A (discussing operation of Old Glory Minting Company, LLC; operations of this entity were discontinued by the Receiver in December 2012).  Certain of the real property being operated described in earlier Status Reports have now been liquidated. *See* First Report, pp. 24-53; Second Report, Part II.B; Third Report, Part II; Fourth Report, Part II; Fifth Report, Part II; Sixth Report, Part II; Seventh Report, Part II; Eighth Report, Part II.  This Report discusses only those real properties being operated during the Reporting Period.

[19] The name of the National Note affiliate that intended to develop the property is Riverbend Estates, LLC. The Receiver refers to this property as the "River Run Subdivision" in the First Report.  First Report at pp. 25-26.

[20] Docket No. 734.

[21] The results of this sale will be reported in the next Status Report.

September 1, 2014 seeking approval of the sale.[22]  A hearing to consider the motion was held on October 31, 2014, and this sale will be discussed in the next Status Report.

B.    **Brigham City, Utah: Twin Pines Apartments.**  The Twin Pines Apartments consist of buildings located in Brigham City, Utah, containing apartments which were leased to lower income tenants.  Further information about this property is set forth at pages 29 - 30 of the First Report.  As a result of the fire that was described in the Sixth Report, only 12 of the 20 units were being rented by the Receivership Estate; the building containing the other eight units was destroyed by the fire and was not rebuilt.  The insurer for the building destroyed by fire paid on the Receiver's claim against the policy.

The Twin Pines Apartments were subject to a recorded deed of trust held by the True and Marjorie Kirk Family Trust (defined below as the "Kirk Trust"),[23] which intervened in the Civil Case to enforce its alleged claim against the property.  The Receiver contested the validity and enforceability of this deed of trust.  During the Reporting Period, the Receiver reached a settlement agreement with Kirk Trust, which was approved by the Court.[24]  On September 14, 2014, after approval of the settlement agreement, the Receiver transferred title to the property to Kirk Trust and a portion of the insurance proceeds were paid to the Kirk Trust in accordance with the settlement agreement.  Also in accordance with the settlement agreement, the Receivership Estate received $172,020.02 of the insurance proceeds and will retain the net rental income that has been held by the property manager.

---

[22] Docket No. 772.

[23] *See* discussion *infra* at Part V(E)(1).

[24] Docket No. 736.

As a result of the settlement agreement, the Receiver is no longer operating this property, and the Twin Pine Apartments are no longer part of the Receivership Estate.

**C.**     **Ogden, Utah: Office Building.**  The Office Building is a one-hundred-year-old, three-story commercial office building located in downtown Ogden, Utah, that is co-owned with a third party (the "Co-Owner").  Further details related to the Office Building are set forth at pages 30 - 31 of the First Report.  As of May 15, 2014, all of the Office Building tenants have vacated the building.  The Receiver has turned off all unnecessary utilities and terminated building services that do not have to be maintained.

As reported in earlier Status Reports, the Co-Owner of the Office Building has been working on a plan to redevelop the Building.[25]  However, those plans have not yet resulted in commitments to fund the development or permits for the construction and, thus, the Co-Owner has agreed to allow the Receiver to begin marketing the property for sale.

The Receiver has identified 17 Assignments of Beneficial Interest in Trust Deeds, referred to herein as "ABIs," recorded against the Office Building.  As with ABIs against other properties of the Receivership Estate, the Receiver contests the validity of these ABIs, which if determined to be valid, would likely deplete any equity that may exist in the property for the Receivership Estate.[26]  Accordingly, the Receiver has sent letters to these 17 ABI holders, asking that they voluntarily release their assignments.  As of September 30, 2014, twelve of these

---

[25] *See* Sixth Status Report, p. 6; Seventh Status Report, pp.6-7.

[26] *See* discussion *infra* at Part III.A (discussing ABIs).

holders have voluntarily released their ABIs.[27]

Since this property no longer has tenants, it will not be listed in this section of future status reports, but will be discussed in the section describing properties held for sale.

## III.

## REAL ESTATE HOLDINGS

A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report and some of which also are discussed in Part II above.  The Receiver has determined that a majority of the real properties appear to have value for the Receivership Estate and need to be operated and/or marketed for sale, some properties have no equity, and some require further investigation and analysis, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver closed the sale of five properties and actively marketed other properties for sale.  Attached hereto as **Exhibit B** is a chart setting forth the status of all real properties in the Receivership Estate as of September 30, 2014.

For purposes of this Status Report, the Receiver discusses the following in Parts A through H below:

- Part A discusses the efforts undertaken during the Reporting Period to release alleged interests recorded against the Receivership Estate's real properties;

---

[27] As described below in Part V, the Receiver has filed suit against all ABI holders who have not voluntarily released their ABIs.

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale has been requested;

- Part E identifies real properties where the Receiver has preliminarily accepted offers and intends to seek Court approval of the sales;

- Part F describes actions taken by the Receiver regarding real properties in which it does not appear that the Receivership Estate has equity;

- Part G provides an update on the offer for the Expressway Land; and

- Part H describes other efforts of the Receiver to increase net proceeds from property sales.

A.   **Efforts to Release Liens and Other Interests Against Real Properties.**  As part of the Receiver's investigation of real property holdings of the Receivership Estate, the Receiver has identified numerous types of interests that have been asserted against many of the Receivership Estate's real properties, including at least the following types of interests for which he has taken the following actions:

1.   Assignments of Beneficial Interests ("ABIs").  The First and Second Reports described the ABIs that have been recorded against a wide variety of the Receivership Estate's real properties purportedly in favor of certain National Note investors.[28]  If the ABIs are

---

[28] Information recently obtained from attorneys who represented National Note prior to the commencement of the Civil Case indicates that while the attorneys were urging National Note to qualify its securities for sale through a

deemed valid interests, a significant portion of the net sale proceeds from the sale of such real estate would be paid to ABI holders, with less money left for those investors who were not provided ABIs. The Receiver believes the ABIs are not valid interests on the property. Accordingly, the Receiver has taken the following actions:

        a.      <u>Sale of Property Free and Clear of Liens and Interests</u>: For properties that have ABIs recorded against them, the Court has ordered, based on the Receiver's request, that the properties be sold free and clear of these alleged interests, with any interests to attach to the net proceeds of the sale. The Receiver is holding the net sales proceeds of these sales in what he calls the "<u>Real Estate Account</u>," a segregated reserve account, pending a determination as to the validity of the disputed ABIs.

        b.      <u>Voluntary Releases Requested</u>: Previously, upon the sale of property of the Receivership Estate, the Receiver would send a letter to each person holding ABIs against the property in question, requesting that they voluntarily release the ABIs. During the Reporting Period, the Receiver completed his investigation of all properties in the Receivership Estate and compiled a master list of ABIs that have been filed against each property, identifying a total of 349 ABIs in existence as of the time of his appointment with a combined stated face value of $27,576,639.21. Using this information, letters were served on each of the ABI holders, requesting voluntary dismissal of the ABIs. Accordingly, by the end of

---

private placement memorandum ("PPM") that provided substantially greater disclosure of National Note's operations, National Note continued to sell its investments in an unregulated manner—granting ABIs to non-accredited investors rather than limiting the sale of notes to accredited investors who were given copies of the PPM. This led to the perverse result that those who purchased notes outside the private offering also received what was purported to be a security interest in National Note assets, while purchasers who received PPMs did not receive any purported security.

the Reporting Period, letters had been served on every person holding known ABIs who have not yet released them.

Based on the Receiver's efforts to obtain releases consensually and avoid litigation costs, a total of 242 ABIs, with a stated face value of $15,733,239.46, have been released as of the close of the Reporting Period, leaving a total of 107 unreleased ABIs, with a combined stated face value of $11,843,400.21. The Receiver continues to receive releases, and it is hoped that litigation will be avoided as to a good portion of the ABIs that remained as of the end of the Reporting Period.

The released ABIs have removed interests against, not only properties that are being marketed for sale, but also the Net Sale Proceeds of properties sold by the Receiver currently held in the Real Estate Account. With regard to the latter, as of September 30, 2014, a total of $1,343,111.26 in Net Sale Proceeds held in the Real Estate Account is no longer subject to contested ABI interests. Furthermore, with the release of ABIs, some properties that had been sold are no longer subject to any contested interests and, therefore, all Net Sale Proceeds held in the Real Estate Account representing the total net equity in the property may be released. As of the close of the Reporting Period, the Receiver has calculated that a total of $1,998,747.82, which includes the $1,343,111.26 noted above, additional equity in properties that are now clear of all interest and some forfeited earnest money deposits by unsuccessful proposed buyers, should be transferred from the Real Estate Account to the Operating Account. In his most recent Fee Application, the Receiver stated his intent regarding this transfer.[29]

---

[29] Docket No. 784 (Receiver's Third Interim Fee Application).

c.   Lawsuits Filed by the Receiver Against ABI Holders:  The

Receiver has filed numerous actions seeking judgments declaring ABIs to be invalid.  Invalidity

of the ABIs is necessary to enable the Receiver to release Net Sale Proceeds currently being held

in the Real Estate Account.  Lawsuits seeking judgments invalidating ABIs have been filed in

three different contexts.  First, as described below, in June 2013, the Receiver filed lawsuits

against overpaid investors and others who received improper payments from National Note or its

affiliates.  To the extent that the Receiver's investigation has determined that these defendants

also hold ABIs, the lawsuits ask the Court to invalidate the ABIs.[30]  Second, starting in the third

quarter of 2013, the Receiver filed several lawsuits against holders of ABIs who had not

voluntarily released their ABIs against several liquidated properties.  Finally, on August 22,

2014, the Receiver filed an additional lawsuit against all remaining 130 ABI holders who had not

yet released their ABIs in response to the Receiver's requests.[31]  Since the filing of these

lawsuits, many defendants have released their ABIs thus greatly reducing litigation costs and

delay.  However, many holders have not signed releases and, as to them, litigation is pending.

2.   Deeds of Trust:  Deeds of trust have been recorded against some of the

Receivership Estate's real properties.  Several of these deeds of trust are held by National Note

investors who were overpaid (meaning they have received distributions in excess of the principal

amount of their investments).  In two instances, the Receiver has negotiated settlements releasing

---

[30] As discussed below, the Receiver filed additional lawsuits against some ABI holders who are not overpaid seeking invalidation of their ABIs as well.

[31] To the extent that property sales were subject to trust deeds, the Receiver will need to pay off those trust deeds or obtain judicial declarations that the trust deeds are not valid.  Trust deeds that have been filed against Receivership properties is discussed in the next section.

the deeds of trust prior to filing a lawsuit. Three other deeds of trust were released as part of settlement of litigation that had been filed. Finally, the Receiver has been engaged in pre-litigation settlement negotiations with the holder of a deed of trust against the "Bandanna Cabin,"[32] and he continues his investigation of deeds of trust that have been recorded against the "Overland Trails" property.[33]

      **B.**    **Real Property Sales That Closed During the Reporting Period.**  Five Court-approved real property sales were closed by the Receiver during the Reporting Period.

      1.    Twin Pines Apartments, Brigham City, Utah:[34]  This property consisted of a 20-unit apartment complex in Brigham City, Utah. As described above in Part II.B, during the Reporting Period, the Receiver settled litigation with the Kirk Trust, which held a trust deed against the Twin Pines Apartments. Pursuant to a Court-approved settlement,[35] which closed on September 14, 2014, the Receiver transferred the property and $85,000.00 of fire insurance proceeds to the Kirk Trust. The Receivership Estate retained $172,020.02 of the insurance proceeds and has retained approximately $20,000.00 in net rental income that had been collected by the Receiver's property manager. Because the settlement included the release of trust deeds and all other claims against the Receivership Estate, all Net Sale Proceeds of the transaction were deposited into the Operating Account.

---

[32] The Bandanna Cabin was sold during the last quarter of 2013. The net proceeds from the sale are being held in the Receiver's Real Estate Account pending resolution of the deed of trust on this property.

[33] *See* First Report, pp. 32, 41-42 (describing these properties).

[34] *See* First Report, p. 29 (describing this property).

[35] Docket No. 736 (Order approving settlement).

2.    <u>Autumn Ridge Lot 2, Eagle Mountain, Utah:</u>[36]  This property consists of a developed residential building lot located in Eagle Mountain, Utah.  The Receiver received an offer to purchase this property for $39,900.00, and he filed a *Motion Seeking Authorization to Sell Autumn Ridge Lot 2 Free and Clear of Purported Interests and Subject to Higher and Better Offers*, seeking Court approval of the sale.[37]  Notice of the sale was published by the Receiver and no higher or better offers were received.  On June 27, 2014, the Court held a hearing on the Receiver's Motion, and it entered an Order on July 1, 2014 approving the sale.[38]  The sale closed July 8, 2014, and after property taxes, real estate commissions, and closing costs, the Receivership Estate received Net Sale Proceeds in the total amount of $35,635.21.  Because there are multiple ABIs recorded against this property, the Net Sale Proceeds were deposited in the Receivership Estate's Real Estate Account.

3.    <u>Autumn Ridge Lots 16 and 39, Eagle Mountain, Utah:</u>[39]  These properties consist of two developed residential building lots located in Eagle Mountain, Utah.  The Receiver received offers to purchase these lots for $39,900.00 each, and he filed a *Motion Seeking Authorization to Sell Autumn Ridge Lot 16 and 39 Free and Clear of Purported Interests and Subject to Higher and Better Offers*, seeking Court approval of the sales.[40]  Notice of the sale was published by the Receiver and no higher or better offers were received.  On July 8,

---

[36] *See* First Report, p. 26 (describing this property).

[37] Docket No. 647.

[38] Docket No. 692.

[39] *See* First Report, p. 26 (describing this property).

[40] Docket No. 668.

2014, the Court held a hearing on the Receiver's Motion, and it entered an order on July 9, 2014 approving the sale.[41]  The sales closed July 18, 2014, and after property taxes, real estate commissions, and closing costs, the Receivership Estate received net sale proceeds in the total amount of $71,806.78 ($35,903.39 for each lot).  Because there are multiple ABIs recorded against these properties, the Net Sale Proceeds were deposited in the Receivership Estate's Real Estate Account.  All properties in the Autumn Ridge subdivision have now been sold.

4.    Kanab Home, Kanab, Utah:[42]  This property consists of a partially-built home located in Kanab, Utah.  The Receiver received an offer to purchase this property for $197,000.00, and he filed a *Motion Seeking Authorization to Sell Kanab Cabin Free and Clear of Purported Interests and Subject to Higher and Better Offers*, seeking Court approval of the sale.[43]  Notice of the sale was published by the Receiver and no higher or better offers were received.  On August 26, 2014, the Court held a hearing on the Receiver's Motion, and it entered an order on August 28, 2014 approving the sale.[44]  The sale closed September 4, 2014.  The property was subject to a deed of trust held by First National Bank.  First National Bank agreed to substantially reduce the amount it required to pay off its loan in order to make a sale possible. After paying the reduced bank debt, property taxes, real estate commissions, and closing costs, the Receivership Estate received Net Sale Proceeds in the amount of $18,162.90.[45]  Because the

---

[41] Docket No. 696.

[42] *See* First Report, p. 26 (describing this property).

[43] Docket No. 726.

[44] Docket No. 746.

bank loan was paid off as part of the closing and there were no other interests asserted against the property, the Net Sale Proceeds were deposited in the Receivership Estate's Operating Account.

C.   **Real Property Sales Approved During the Reporting Period/Not Closed.**

During the Reporting Period, the Receiver sought approval to sell one property, where the sale did not close before the end of the Reporting Period.

1.   First Avenue Home, Middleton, Idaho:[46]  On June 26, 2014, the Receiver filed a *Motion Seeking Authorization to Sell Riverbend Lot 6 Free and Clear of Purported Interests and Subject to Higher and Better Offers*, seeking Court approval of the sale.[47]  Notice of the sale was published by the Receiver and no higher or better offers were received.  The Court held a hearing on August 4, 2014, and entered an order on August 18, 2014 approving the sale.[48]  The sale closed on October 15, 2014, after the close of the Reporting Period.

D.   **Real Property Sales for Which Court Approval Was Requested.**  During the Reporting Period, the Receiver sought approval to sell one property, where Court review was not yet completed as of the end of the Reporting Period, as follows.

1.   Hawthorne Avenue Home, Middleton, Idaho:[49]  On September 22, 2014, the Receiver accepted an offer to purchase this home at a price of $76,000.00, an offering price

---

[45] Final inspection of the property by the buyer revealed a substantial defect in the foundation.  First National Bank made a further concession of $22,400.00 in its payoff amount toward repairs that will be made by the buyer.  The Receiver agreed to seek Court approval to contribute $5,218.00 toward the repairs.  The Court approved this payment by an order entered on October 1, 2014. *See* Docket No. 777.

[46] *See* First Report, p. 25 (describing this property).

[47] Docket No. 680.

[48] Docket No. 734.

[49] *See* First Report, p. 25 (describing this property).

at 95% of the listing price for the property.[50]  On September 30, 2014, the Receiver filed a *Motion Seeking Authorization to Sell Hawthorne Lot Free and Clear of Purported Interests and Subject to Higher and Better Offers*, seeking Court approval of the sale.[51]  Publication of the proposed sale was approved by the Court by an order entered on October 1, 2014, after the close of the Reporting Period.[52]  A hearing was set for October 31, 2014, and the sale has now been approved.  The results of this sale will be reported in the next Status Report.

     **E.**    **Offers Preliminarily Accepted on Real Properties**.  During the Reporting Period, the Receiver received offers for the following six properties all located in Toquerville, Utah.[53]  For four of these properties, the purchase agreements were not entered into until the after the close of the Reporting Period.  Motions seeking approval of these sales were filed after the current Reporting Period and the details and results of these sales will be reported in the next Status Report. In conjunction with these sales the Receiver filed an *Ex Parte Motion Seeking Appointment of Appraisers for Almond Heights Lots and Memorandum in Support*, seeking Court approval to appoint two additional appraisers for the Almond Heights lots so as to comply with his statutory duties,[54] which Motion was approved by the Court on October 3, 2014.[55]

---

[50] The three appraisals obtained by the Receiver were for $78,000.00, $80,000.00, and $105,000.00.  The third appraisal did not include an inspection of the interior of the home.  Based on these appraisals, the Canyon County Idaho Assessor's Office reduced the tax assessment of the property to $80,000.00.  Based on the appraisals, the property was listed for sale at $80,000.00.

[51] Docket No. 772.

[52] Docket No. 778.

[53] *See* First Report, p. 47 (describing this property).

[54] Docket No. 775.

[55] Docket No. 780.

1.      <u>Almond Heights Lot #7</u>.  On September 29, 2014, the Receiver accepted an offer to purchase this building for $32,000.

2.      <u>Almond Heights Lot #11</u>.  On October 7, 2014, the Receiver accepted an offer to purchase this building lot for $32,000.

3.      <u>Almond Heights Lot #12</u>.  On October 7, 2014, the Receiver accepted an offer to purchase this building lot for $32,000.

4.      <u>Almond Heights Lot #13</u>.  On October 7, 2014, the Receiver accepted an offer to purchase this building lot for $32,000.

5.      <u>Almond Heights #26</u>.  On October 7, 2014, the Receiver accepted an offer to purchase this building lot for $32,000.

6.      <u>Almond Heights Lot #17</u>.  On September 23, 2014, the Receiver accepted an offer to purchase this building lot for $25,000.

F.      **<u>Real Properties to Relinquish—Lack of Equity</u>.**  On September 24, 2014, JPMorgan Chase Bank filed a *Motion and Memorandum to Intervene to Lift Injunction Against Real Property Collateral of JPMorgan Chase Bank, N.A,* seeking an order allowing it to intervene in the Civil Case to foreclose against Palmer's residence inasmuch as Palmer has not made mortgage payments for several years.[56]  Prior to the filing of this Motion, the Bank provided information to the Receiver showing that the amount of the debt owed by Palmer is substantially greater than the market value of the home.  The Bank agreed that to the extent net sales proceeds from a sale of the home exceed the amount that it is owed, the excess funds will

---

[56] Docket No. 767.

be paid to the Receivership Estate. Based on this information and this agreement, the Receiver has not opposed the Bank's Motion to Intervene and a hearing on the Motion is scheduled for November 10, 2014.

G. **Offer for Expressway Land.** In his Eighth Report, the Receiver identified a tentative offer to purchase approximately 30 acres of real property associated with the "Expressway Business Park," located in Spanish Fork, Utah.[57] This property is the site of a former landfill. Taking this fact and remediation required by Spanish Fork City into account, the Receiver is informed that this property has a current appraised value of $1.25 million.[58] A third party purchaser made a conditional offer to purchase this property for its appraised value, subject to the buyer's due diligence and Court approval. At the conclusion of the due diligence period, however, the buyer withdrew his offer to purchase the property. The Receiver has now renewed his marketing efforts for this property.

H. **Other Efforts to Increase Net Proceeds from Property Sales.** The Receiver continues to investigate means of increasing the Net Sale Proceeds of properties by reducing tax burdens, avoiding expense obligations that were incurred by National Note, and getting bond assessments reduced. On July 29, 2014, the Canyon County Idaho Board of Commissioners granted the Receiver's tax appeal and reduced the assessed value of the home on Hawthorne Drive, in Middleton, Idaho from $136,000.00 to $80,000.00. On September 17, 2014, the Weber County Utah Board of Equalization granted the Receiver's tax appeal and reduced the assessed value of the Ogden Office Building by $245,331.00. The Receiver has filed an appeal of the tax

---

[57] *See* Seventh Report, p. 13.

[58] *Id.*

valuation assessed on the Expressway Business Park, located in Spanish Fork, Utah and will report on the results of that appeal in the next status report.

The Receiver also is in discussions with officials from Byron City, Minnesota related to the Byron West Industrial Park, which consists of fourteen industrial lots. He is pursuing two initiatives that are expected to increase the Net Sale Proceeds of the sale of these industrial lots. First, the Receiver plans to re-plat five of the industrial lots. The re-platting, if approved by Byron City, will avoid the need for the Receivership Estate to spend an estimated $100,000.00 to construct a road that was required by the property plat created by National Note. Second, the Byron City Council is considering the Receiver's request to waive significant portions of taxes and bond assessments owed on five of the fourteen properties so that he can obtain some equity for the Receivership Estate. If the City Council declines to reduce the taxes and bond assessments, the Receivership Estate will have negative equity in these five properties and the Receiver will abandon them.

## IV.

### NON-REAL ESTATE ASSETS

In addition to real estate, the Receivership Estate is comprised of certain personal property described in Part A below, unrefined ore discussed in Part B below, and proceeds of lawsuits to recover transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

    **A.**    **Personal Property**. With one minor exception, the personal property owned by National Note has all been sold at auction or, in a few cases, through sales directly to buyers.

During the Reporting Period, the last set of silver coins that had been located at the National Note Office Building were sold through online auctions of a third party auctioneer and the net proceeds were paid to the Receivership Estate.

**B.**   <u>**Alleged Mineral Assets.**</u>  As described in the Second Report,[59] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("<u>HMI</u>"), to assist the Receiver in investigating whether ore held by National Note has any commercial value.  The Receiver receives regular reports from HMI on its efforts to recover precious metals from this ore.  Reports received during the Reporting Period indicate that HMI continues to take concrete steps in its efforts to determine whether value can be recovered from the ore.  If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in accordance with Management Agreement described in the Second Report.

**C.**   <u>**Pre-Receiver Asset Transfers.**</u>  Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate, including but not limited to National Note's payment of false profits and commissions on investments.  The types of claims discovered by the Receiver and his intended course of action for recovery of these claims is discussed in the next section below.

---

[59] Second Report, pp. 18-19.

## V.

## LITIGATION

A.    **Claims Being Pursued by the Receivership Estate.**  As described in the Fourth

Report, the Receiver has filed suit to recover payments or transfers made by National Note and

its affiliated entities that should be returned to the Receivership Estate.  A total of 136 lawsuits

were filed in June 2013.  Copies of the complaints in these lawsuits can be found on the

Receiver's website.  Investigations are ongoing and additional lawsuits have been filed since

June 2013, and others may be filed.  The lawsuits filed by the Receiver seek recovery for a

variety of payments that the Receiver believes were improper, including the receipt of

commissions for soliciting investors, unpaid and forgiven loans made by National Note,

payments to credit card companies on credit cards in the name of individuals associated with

National Note, payments to employees and relatives of Palmer, and payments of false profits to

investors who received more than the amount of their principal investment.  In addition, as

described earlier, the Receiver has commenced litigation against holders of various types of liens

against property of the Receivership Estate.  In a few instances, the Receiver has entered into

tolling agreements with a number of persons, extending the statutes of limitations to allow

further investigation.

B.    **New Litigation Filed by the Receiver During the Reporting Period.**  The

following litigation was commenced by the Receiver during the Reporting Period:

1.    Lawsuit Against ABI Holders:[60]  As discussed above, the Receiver filed

---

[60] *Klein v. Adams, et al.*, Case No. 2:14-cv-00614-BSJ (D. Utah) (Jenkins, J.).

suit on August 22, 2014 against 130 persons holding ABIs against real property of the
Receivership Estate, seeking a judgment declaring the ABIs to be invalid.  Although the
Receiver first made demand for voluntary release of the ABIs, and numerous potential
defendants responded by releasing their ABIs, the Receiver was required to file this lawsuit due
to a lack of response to the Receiver's request or refusal to act as requested.  As of the end of the
Reporting Period, after the filing of the suit, approximately 1/3 of the defendants voluntarily
released their ABIs and, therefore, have been or will be dismissed from the lawsuit.  The
Receiver will attempt to fast-track the litigation against the remaining ABI holders in an effort to
obtain an early ruling on the validity of the ABIs.

   2. Amended Lawsuit Against Innovative Services, LLC, Michael D.
Memmott, Jr., and Sawtell Capital, LLC (collectively, "Innovative"):  On July 2, 2014, the
Receiver filed an amended lawsuit against Innovative.  The amended lawsuit seeks the return of
an additional $160,000.00 that National Note paid to a law firm, which the Receiver has
identified as having been paid at the request of Innovative and for their benefit.[61]

   3. Order to Show Cause—David C. VanCampen ("VanCampen"):  On
September 22, 2014, the Receiver filed a *Motion for Order to Show Cause as to Why David C.
VanCampen Should Not be Held in Contempt*.[62]  The Court granted this Motion on September
25, 2014, and a hearing on the Motion is scheduled during the next reporting period.[63]  The
Receiver hopes that testimony and documents from VanCampen will reveal what happened to

---

[61] *Klein v. Innovative Services, et al.*, Case No. 2:14-cv-00566-DN (D. Utah) (Nuffer, C.J.).

[62] Docket No. 763.

[63] Docket No. 768.

more than $200,000.00 sent by National Note and other entities to Ghana, Africa, ostensibly for the purchase of gold.

       4.    <u>Order to Show Cause—Wayne Scholle ("Scholle")</u>:  On July 2, 2014, the Receiver filed a *Notice of Wayne Scholle's Failure to Comply with Court Order and Renewed Motion for Order to Show Cause as to Why Wayne Scholle Should Not be Held in Contempt.*[64] The Court granted this Motion and held hearings on August 4, 2014 and August 23, 2014, ultimately deciding not to hold Scholle in contempt after Scholle paid the amounts required by the Court's earlier Order.

     **C.**    **<u>Significant Litigation Rulings</u>.**  During the Reporting Period, there were no rulings of significance issued in the Receiver's clawback cases ancillary to this Civil Case:

     **D.**    **<u>Settlements of Litigation</u>.**  The Receiver entered into several settlement agreements during the Reporting Period.  As discussed below, the Court deferred ruling on one, and approved all other agreements presented to it.

       Settlement agreements generally include an obligation to return funds to the Receivership Estate in exchange for dismissal of the Receiver's lawsuit and/or a mutual release of claims.  In some instances, the defendants sued by the Receiver have demonstrated financial hardship which would make recovery of a judgment questionable when the cost of litigation is weighed against the likelihood of collection.  The Receiver scrutinizes allegations of hardship carefully to ensure that the defendants truly merit hardship treatment, and has denied a significant percentage of the requests for hardship treatment.  But, where hardship is demonstrated, the Receiver typically

---

[64] Docket No. 690.

agrees to a settlement agreement that provides the Receivership Estate relief commensurate with the demonstrated hardship and, typically, provides for the lawsuit to be dismissed. The Receiver has made it clear to defendants that claims of financial hardship must be raised at the beginning of litigation, not after litigation costs have been incurred.

During the Reporting Period, four motions seeking approval of settlement agreements were filed by the Receiver as follows:

1. Reed Larsen Settlement Motion. On July 28, 2014, the Receiver filed *Plaintiff's Motion Seeking Approval of Settlement Agreement and Dismissal of Lawsuit with Prejudice*, seeking approval of a settlement agreement with Reed Larsen related to claims that the Receiver had asserted against him for avoidance of certain pre-receiver transfers and recovery of the same.[65] The Court held hearings on the Motion on August 7 and August 21, 2014, and at the close of the last hearing stated that it was deferring any decision on this settlement pending the receipt of additional information from the Receiver and Mr. Larsen.

2. Kirk Trust Settlement Motion. On August 18, 2014, the Receiver filed a *Motion to Approve Settlement Agreement with The True & Marjorie Kirk Family Trust*,[66] which agreement is discussed in greater detail in Part II.C. above. The settlement agreement was approved by the Court by Order entered on August 19, 2014,[67] and as a result of this settlement, all litigation with the Kirk Trust has concluded.

---

[65] 2:13cv00575BSJ, Docket No. 38.

[66] Docket No. 732.

[67] Docket No. 736. The approval order was amended at the request of the Kirk Trust at Docket No. 752.

      3.     <u>Ninth Motion to Approve Settlements</u>. On August 28, 2014, the Receiver filed his *Ninth Motion Seeking Approval of Settlement Agreements,*[68] seeking approval of three settlement agreements related to ancillary clawback litigation against investors and a credit card company. This Motion was granted by the Court by Order entered on September 2, 2014.[69] These three approved settlement agreements require payment of a total of $673,000.00 to the Receivership Estate. As of September 30, 2014, $672,000.00 of this amount has been paid.

      4.     <u>Tenth Motion to Approve Settlements</u>. On September 26, 2014, the Receiver filed his *Tenth Motion Seeking Approval of Settlement Agreements,*[70] seeking approval of an additional three settlement agreements. This Motion was granted by the Court by Order entered just after the close of the Reporting Period, on October 1, 2014.[71] One of these settlement agreements required the overpaid investor to return $9,300.00 to the Receivership Estate. As of September 30, 2014, $6,000.00 of this amount has been paid. The second settlement agreement involves a settlement with a party holding a lien against four Almond Heights lots, located in Toquerville, Utah. Under this settlement the Receivership Estate will market the lots for sale and retain 25% of the net sales proceeds of sales of the lots. Pursuant to the third settlement agreement, the Receiver agreed to pay $5,218.00 to First National Bank as a contribution to the $22,400.00 in foundation repair expenses required to close the sale of the Kanab Home.

---

[68] Docket No. 748.

[69] Docket No. 753.

[70] Docket No. 769.

[71] Docket No. 777.

**E.     Default Judgments**.  In some instances, defendants sued by the Receiver have failed to respond to the litigation commenced against them by the Receiver.  In such cases, the Receiver has begun to seek default judgments against the defendants.  During the Reporting Period, the Receiver obtained three default judgments, in the total amount of $31,039.77.  The Receiver is in the process of researching the viability of collection of these judgments.  In addition, one of the default judgments also voided the ABI held by the investors.

**F.     Actions Against the Receivership Estate**.  As described in earlier Status Reports, a number of other parties have filed motions to intervene in the Civil Case in order to assert claims to property or wanting to foreclose on properties where the lender believes its interests are not adequately protected by the Receivership Estate.  The following has occurred during the Reporting Period with regard to actions that have been commenced in the Civil Case relating to intervention by other parties:

      1.      Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust (the "Kirk Trust"):[72]  The Court permitted the Kirk Trust to intervene in the Civil Case to assert rights related to certain property identified in the First Report as the "Twin Pines Apartments."[73] The Receiver disputed that the Kirk Trust has a secured interest in the property, and asserted affirmative claims against the Kirk Trust.  On August 19, 2014, the Court entered an order approving a settlement between the parties.  This matter is now concluded.

      2.      Complaint in Intervention Filed by Paul Hawkins ("Hawkins"):  On October 9, 2013, the Court entered an Order authorizing Hawkins to intervene for the limited

---

[72] *See* Docket No. 89.

[73] *See* First Report at pp. 29-30; *see also* discussion *supra* at Part II(B).

purpose of allowing him to proceed with his claims against others, subject to the terms of a stipulation with the Receiver.[74]  The Receiver was not required to take any action on this matter during the Reporting Period.

       3.    <u>Complaint in Intervention Filed by 30 Overpaid Investors ("Overpaid Investors") And Motion to Transfer</u>:  On October 9, 2013, a *Motion to Intervene* was filed by 30 Overpaid Investors sued by the Receiver, seeking to intervene in the Civil Case to assist Palmer in his claims that National Note was not operated as a Ponzi scheme.[75]  The Receiver objected to this Motion,[76] and after a hearing on November 21, 2013, the Court entered an Order denying the Motion.[77]

       Separately, after the Motion to Intervene was denied, these Overpaid Investors filed a *Motion to Transfer Related Cases and Supporting Memorandum*,[78] seeking to transfer 23 ancillary proceedings naming the Overpaid Investors as defendants from the judges to which they were assigned to this Court.  On August 4, 2014, the Court entered an Order denying this Motion.[79]

       4.    <u>Thoresen Lawsuit Regarding Florida Property</u>.  On August 13, 2014, the Receiver was served with a summons relating to a lawsuit filed against National Note in the state

---

[74] Docket No. 466.

[75] Docket No. 468.

[76] Docket No. 498.

[77] Docket No. 540.

[78] Docket No. 654.  The Overpaid Investors had previously filed motions in each of the ancillary proceedings seeking to transfer the cases to this Court.  Those motions were later withdrawn, and a single motion was filed with this Court.

[79] Docket No. 716.

of Florida.[80]  The Receiver immediately sent Thoresen a copy of this Court's Receivership

Order, requesting that Thoresen dismiss National Note from his action.  Separately, the U.S.

Department of Treasury removed the case to federal court.[81]  On August 22, 2014, Thoresen

dismissed his lawsuit.

## VI.

## RECORDS OF THE RECEIVERSHIP ENTITIES

Substantial progress has been made in the Receiver's financial analysis and investigation.

The Receiver believes he has located all of the internal financial records created by National

Note for the different affiliated entities for the period from 1995 forward.  The Receiver also has

reconstructed all banking transactions for National Note and its affiliated entities for the period

from January 1, 2007 through the filing of the Civil Case using original bank records.

A.    **Financial Report/Insolvency Expert.**  The Receiver's completed report,

summarizing the results of his investigation, including his review of National Note's and its

affiliates' financial and intercompany records, has been filed with the Court[82] and posted on the

Receivership website.  On July 16, 2014, the report of the Receivership Estate's insolvency

expert, Lone Peak Valuation Group,[83] was issued.  This report has been filed with the Court,[84]

---

[80] *Thoresen v. National Note of Utah, LC, et al.*, No. 14-CA-002253 (20th Judicial Cir. Ct. for Lee County, Fla.).

[81] 2:14-cv-472 (M.D. Fla) (Aug. 18, 2014).

[82] Docket No. 755.

[83] *See* Docket No. 660 (*Order Granting Receiver's Motion For Employment of Lone Peak Valuation Group as Insolvency Expert*).

[84] Docket No. 756.

posted on the Receivership website, and served as appropriate in numerous pending ancillary proceedings.

      **B.**    **Investigative Findings**.  During the Reporting Period, the Receiver obtained additional information as part of his investigation of various aspects of National Note's operations prior to the commencement of the Civil Case, as follows.

           1.    Role of Prior National Note Attorneys:  On July 31, 2014, Palmer filed a notice with the Court waiving any claim of attorney-client privilege relating to legal work performed for National Note by two law firms prior to the commencement of the Civil Case.  As a result of that waiver, the Receiver participated in depositions of two of National Note's former attorneys on September 10 and 11, 2014.  The deposition of a third former attorney was taken in late October 2014 and the Receiver is still seeking to depose a fourth attorney.  The Receiver is currently evaluating the information he obtained from those depositions.

           2.    Analysis of Foreclosures and Bankruptcies by National Note Borrowers:  Due to Palmer's waiver of any claim of attorney-client privilege relating to legal work performed by one of his law firms, the Receiver was able to review the law firm's files.  As part of this review, the Receiver found that many entities who borrowed money from National Note defaulted on their loans.  In many instances, National Note was attempting to foreclose on the loans, or the borrower had filed bankruptcy.  The high incidence of foreclosures and bankruptcies supports the findings in the Receiver's financial report and in the insolvency expert report that many of the loans by National Note to non-affiliated borrowers were in default.  However, despite this fact, National Note continued to carry almost all those loans on its books at face value and did not disclose to investors the high rate of defaults by its borrowers.

3.      Interest Paid in Silver:  Beginning in late 2009, National Note told investors that they could choose to be paid interest on their promissory notes in silver coins, instead of cash.  The Receiver has found that approximately 28 investors chose this option, receiving approximately $267,000.00 in silver coins.  The silver coins were manufactured by Old Glory Mint, a company affiliated with National Note.  It appears that National Note paid Old Glory Mint for the silver that Old Glory Mint sent to National Note customers.  Because National Note paid Old Glory for the costs of the coins sent, there was no financial advantage to National Note or Old Glory by paying interest in silver, rather than cash.  Indeed, the administrative costs of identifying investors wanting silver, ordering the minting of coins, transferring funds between National Note and Old Glory, and shipping costs were all borne by National Note.

4.      Fraudulent Reimbursements:  The Receiver analyzed expense reimbursements paid to a key employee of National Note.  He found that the employee was reimbursed for expenses that had actually been charged to credit cards whose bills were paid by National Note.  The employee charged expenses to the credit card then submitted the receipts for those charges to National Note and was reimbursed in cash for the amount of those receipts.  As much as $280,598.30 may have been improperly paid to this employee as reimbursement for expenses that were not actually paid by the employee.  The Receiver has not been able to determine if Palmer was aware of these fraudulent reimbursements.

# VII.

## FINANCIAL ANALYSIS

**A.**     **Receivership Financial Information**.  The following financial information is provided for the Reporting Period:

1.     Bank Accounts.  The Receiver maintains two bank accounts for the operation of the Receivership: a general operating account (the "Operating Account") and an account holding earnest money deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "Real Estate Account").  The balances in these accounts as of the close of the Reporting Period are as follows:

| Account | Account Balance |
|---|---|
| Operating Account | $1,429,186.90 |
| Real Estate Account | $4,504,785.19 |
| **TOTAL** | **$5,933,972.09** |

2.     Operating Account Deposits.  The sources of funds deposited into the Operating Account during the Reporting Period are shown in the following table:

| Source | Amount In |
|---|---|
| Rents (less security deposit return) | $1,241.00 |
| Asset sales | $78.26 |
| Real estate sales proceeds[85] | $195,460.25 |
| Settlement proceeds | $725,050.00 |
| **TOTAL** | **$921,829.51** |

3.     Operating Account Expenditures.  The following table shows the categories of operating expenses that have been paid from the Operating Account during the

---

[85] This amount reflects Net Sale Proceeds that were not subject to liens or ABIs.  These were funds deposited into the Operating Account.

Reporting Period:

| Type of Expense | Amount Out |
|---|---|
| Utilities, insurance, operating expenses | $4,511.34 |
| Property appraisals | $13,175.00 |
| Publication of notice, closing costs | $1,688.40 |
| Tax filing fees, receivership expenses | $859.77 |
| **TOTAL** | **$20,234.51** |

4.    Real Estate Account Deposits and Expenditures.  The transactions in the

Real Estate Account during the Reporting Period were as follows:

| Source | Amount In | Amount Out |
|---|---|---|
| Proceeds from sale of Autumn Ridge Lot #2[86] | $35,635.21 | |
| Proceeds from sale of Autumn Ridge Lots #16, #39 | $71,806.78 | |
| **TOTAL** | **$107,441.99** | **$0.00** |

5.    SFAR.  Attached as **Exhibit C** is a copy of the Standardized Fund

Accounting Report for the Reporting Period.

6.    Administrative Expenses of Receiver and Counsel.  On July 9, 2014, the

Court entered an *Order Approving the Reviver's Second Interim Fee Application for Receiver*

*and Receiver's Professionals for Services Rendered from January 1, 2013 through June 30,*

*2013*.[87]  Pursuant to this authorization, $266,546.73 in fees and expense reimbursement was paid

to the Receiver and $358,396.28 in fees and expense reimbursement was paid to Dorsey and

Whitney LLP, counsel for the Receiver.  The Receiver's *Third Interim Fee Application for*

*Receiver and Receiver's Professionals for Services Rendered from July 1, 2013 through*

---

[86] The Eighth Status Report incorrectly listed proceeds from the sale of Autumn Ridge Lot #2 in this category.  The amount of Net Sale Proceeds reported in the Eighth Status Report was for the sale of Autumn Ridge Lot #3.

[87] Docket No. 697.

*December 31, 2013* was filed after the close of the Reporting Period, on October 15, 2014.[88]

For the current Reporting Period, the Receiver and his staff have spent a total of 1,013.2 hours on behalf of the Receivership Estate. Total fees incurred by the Receiver during the Reporting Period are in the total amount of $130,038.50. The Receiver's legal counsel's total fees and expenses incurred during the Reporting Period are in the total amount of $120,940.49.[89]

## VIII.

## NEXT STEPS

The Receiver continues to make progress in administering the Receivership Estate. The work of the Receiver and his counsel during this Reporting Period focused on: i) pursuing litigation against and obtaining settlements with persons who owe money to the Receivership Estate, ii) defending litigation from persons seeking preferential treatment from assets of the Receivership Estate, iii) seeking legal rulings on the validity of ABIs asserted against properties of the Receivership Estate, iv) marketing properties of the Receivership Estate for sale, and v) preparing to commence a claims process. At this time, the Receiver anticipates addressing the following priorities in the coming months:

1.  <u>Litigation</u>. In light of the large number of lawsuits filed in June 2013 and since, a significant share of legal counsel's time and the time of the Receiver will continue to be spent in litigation-related activities. Significant progress has been made. The number of active

---

[88] Docket No. 784.

[89] A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver and the Receiver's legal counsel in prior Reporting Periods is set forth in each of the status reports. *See* First Report, p. 59; Second Report, p. 29; Third Report, pp. 28-29; Fourth Report, p. 42; Fifth Report, pp. 33-34; Sixth Report, pp. 24-25; Seventh Report, p. 22; Eighth Report, p. 29; *see also* First Interim Fee Application, Docket No. 467 and Second Interim Fee Application, Docket No. 636.

lawsuits has been reduced as a result of settlements, default judgments, and dismissals based on, among other things, the receipt of bankruptcy notices, leaving approximately 42 ancillary proceedings left to be litigated.  Since the Receiver has attempted at every juncture, both prior to and after filing his lawsuits, to avoid the costs of litigation by making demands and attempting to work out settlements, these remaining suits will almost certainly require more time and effort typical of the litigation process, including engaging in discovery, responding to motions to dismiss and summary judgment, and proving the elements of the actions brought.  While the Receiver is hopeful that these remaining cases will be resolved prior to trial, he must prepare for trial in the event favorable settlement agreements cannot be obtained.

In addition to the lawsuits filed, the Receiver also continues to gather information about and engage in discussions with other potential defendants.  This includes the additional litigation filed during the Reporting Period,[90] and claims against approximately eight other potential defendants which are still being evaluated and negotiated by the Receiver prior to the filing of suit.

2.   Property Sales.  During the Reporting Period, the Receiver obtained appraisals on numerous additional parcels of real property and he has received purchase offers and indications of interest for some of these properties.  Thus, the Receiver expects to be seeking Court approval for the sale of additional properties during the coming months.  The Receiver will continue investigating ways to reduce the expenses of real properties so as to maximize their value for the Receivership Estate.

---

[90] See discussion supra at Part V(B).

3.    <u>Obtaining Judicial Rulings on Validity of ABIs</u>.  The Receiver has now filed court actions against all holders of all outstanding ABIs.  Through this litigation, the Receiver hopes to obtain judicial determinations in the near future of the validity of these interests.  The Receiver will continue his efforts to secure voluntary releases of outstanding ABIs.  Based on the number of ABIs already released, the Receiver plans to notify the Court of his intention to release unencumbered funds from the Real Estate Account so a claims process can be initiated.  When judicial rulings on the ABIs have been obtained, the Receiver expects to be able release the balance of funds held in the Real Estate Account for distribution through the claims process.

4.    <u>Claims Process</u>.  Based on the number of ABIs voluntarily released during the Reporting Period, the Receiver has determined that approximately $2 million of funds in the Real Estate Account may be released and transferred to the Operating Account.  With these funds and monies in the Operating Account, the Receiver believes there will be sufficient funds to make a distribution to investors.  Accordingly, the Receiver has prepared a proposed structure for, and proposed document forms to be used in, a claims process.  He has notified the SEC of his intent to seek court approval to commence a claims process and invited the SEC's comments on the proposed claims process.

# IX.

## CONCLUSION

Solid progress was made during the Reporting Period. The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Receivership Estate so as to maximize any distribution available to investors.

DATED this 11TH day of November, 2014.

WAYNE KLEIN, Receiver

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the above **NINTH STATUS REPORT OF**

**R. WAYNE KLEIN, RECEIVER** was filed with the Court on this _11th_ day of November,

2014, and served via ECF on all parties who have requested notice in this case, including the

Securities and Exchange Commission.

/s/ Peggy Hunt

# EXHIBIT A

# NATIONAL NOTE OF UTAH, LC
## Additional Companies Included in the Receivership Order

Bonneville Minerals, LLC

Centennial Aviation, LLC

The Corner Corporation

DPLM LLC

Elkhorn Ridge, LLC

Expressway Business Park Owners
Organization, LLC

Farrell Business Park Association

Freedom Minerals I, LLC

Freedom Minerals II LLC

HSB Technologies, LLC

Homeland Development I, LLC

Homeland Development II, LLC

Homeland Funding Corp.

Homeland Holding Corp.

Homeland Minerals, LLC

Homeland Mortgage, Inc.

Homeland Mortgage, L.C.

Indian Canyon, LLC

Koala T. Investments LLC

Land, Utah, LC

Made Art Licensing, LLC

Montana One, LLC

ND I, LLC

NPL America LLC

Network Leisure Shoppes, Inc.

Note Systems, Inc.

Old Glory Minting Company LLC

Qvation 106, LLC

Passport Properties, L.C.

Pedigree Properties

Presidential Utah Properties LC

Prime Wave I, LLC

The Property Company, LLC

Real Estate Finance Institute, Inc.

Riverbend Estates LC

Spanish Fork Development, LLC

Territory Land Company, Inc.

Top Flight, LLC

Traditions in Timber

Twin Pines Property, LC

Vision Land, LLC

# EXHIBIT B

## REAL PROPERTIES--STATUS

As of 9/30/14.  Investigation Ongoing.  All Information Subject to Change.

The numbers in the first column correspond with numbers of these properties as described in the Receiver's First Status Report.

### PROPERTIES CURRENTLY IN RECEIVERSHIP ESTATE

| | Property Name | Location | Listing Price | Sales Price | Net Sale Proceeds | Status |
|---|---|---|---|---|---|---|
| 2 | Single family home: 1st Avenue | Middleton, ID | 115,000 | 105,000 | | Sale approved [Docket No. 734].  Awaiting sale closing |
| | Single family home: Hawthorne Ave. | Middleton, ID | 80,000 | 76,000 | | Motion for sale filed [Docket No. 772].  Awaiting sale approval |
| 3 | Elkhorn Ridge Estates-42 Building Lots | Malad, ID | | | | Marketed for sale with broker; several lots sold (described below) |
| 4 | Elkhorn Ridge-4 Undeveloped Parcels | Malad, ID | | | | Property split approved [Docket No. 289]  Listed for sale with broker |
| 7 | Ogden Office Building | Ogden, UT | N.A. | | | Building is vacant; waiting to see if co-owner will develop property |
| 10 | Deer Meadows | Duchesne Co., UT | 72,000 | | | Marketed for sale through broker; lien released in settlement |
| 17 | Palmer Residence | West Jordan, UT | N.A. | | | Motion to intervene by lender seeking to foreclose [Docket No. 767] |
| 20 | Overland Trails | Eagle Mtn., UT | | | | Property being evaluated for equity and sale |
| 21 | Cedar Fort Land (Fairfield)-85 Acres | Fairfield, UT | 255,000 | | | Property is listed for sale with broker |
| 23 | Expressway Business Park-Land | Spanish Fork, UT | 1,250,000 | | | Buyer who made preliminary offer withdrew offer after due diligence |
| 25 | Almond Heights-21 Building Lots | Toquerville, UT | 842,000 | | | |
| | Lot #7 | | 38,000 | 32,000 | | Offer received; plan to file motion for Court approval of sale |
| | Lot #11 | | 37,050 | 32,000 | | Offer received; plan to file motion for Court approval of sale |
| | Lot #12 | | 38,000 | 32,000 | | Offer received; plan to file motion for Court approval of sale |
| | Lot #13 | | 37,050 | 32,000 | | Offer received; plan to file motion for Court approval of sale |
| | Lot #17 | | 30,400 | 24,000 | | Offer received; plan to file motion for Court approval of sale |
| | Lot #26 | | 34,200 | 32,000 | | Offer received; plan to file motion for Court approval of sale |
| 29 | Bear Grove Industrial Park-14 Lots | Byron, MN | 1,675,200 | | | Property is listed for sale with broker; property encumbered by bond |
| | Parcel #8516 | | | | | Offer received; discussions with city on reducing bond assessment |
| | Parcel #8512 | | | | | Offer received; discussions with city on reducing bond assessment |

### PROPERTIES SOLD OR RELEASED

| | Property Name | Location | Listing Price | Sales Price | Net Sale Proceeds | Status |
|---|---|---|---|---|---|---|
| 1 | River Run/Riverbend Subdivision-Land | Middleton, ID | N.A. | N.A. | N.A. | No equity.  Court approved release of property to lender [Dkt. No. 590] |
| 3 | Elkhorn Ridge Estates-47 Building Lots | Malad, ID | N.A. | N.A. | N.A. | Marketed for sale with broker; several lots sold (described below) |
| | Lot #1 | | 135,000 | 155,000 | 142,834.78 | Sale approved [Docket No. 419]  Sale closed 8/29/13 |
| | Lot #2 | | 35,000 | 31,500 | 27,725.00 | Sale approved [Docket No. 492]  Sale closed 12/6/13 |
| | Lot #4 | | 35,000 | 35,000 | 30,893.21 | Sale approved [Docket No. 231]  Sale closed 4/26/13 |
| | Lot #5 | | 80,000 | 80,000 | 71,803.14 | Sale approved [Docket No. 231]  Sale closed 4/8/13 |
| | Lot #48 | | 80,000 | 80,000 | 73,620.84 | Sale approved [Docket No. 231]  Sale closed 4/9/13 |
| 5 | Manhattan Grille Condominum | Manhattan, MT | 49,000 | 51,000 | 45,933.32 | Sale approved [Docket No. 300]  Sale closed 6/5/13 |
| 6 | Twin Pines Apartments | Brigham City, UT | N.A. | | 172,020.02 | Sale approved [Docket No. 736].  Sale closed 9/14/14. |
| 8 | Summit Park Lot | Summit Park, UT | 40,000 | 37,500 | 32,477.61 | Court approved sale [Docket No. 135]  Sale closed 1/24/13 |
| 9 | Bandanna Cabin | Fruitland, UT | 260,000 | 260,000 | 226,374.07 | Sale at auction approved [Docket No. 341]  Sale closed 10/24/13 |
| 11 | Outpost/Indian Canyon | Duchesne Co., UT | N.A. | 148,222.56 | 134,068.12 | Sale approved [Docket No. 269]  Sale closed 8/21/13 |
| 12 | East Meadows Mobile Home Park | Vernal, UT | N.A. | 1,025,000 | 979,620.29 | Sale approved [Docket No. 292]  Sale closed 7/29/13 |
| 13 | Quail Hollow Apartments | Vernal, UT | N.A. | N.A. | N.A. | Determined not owned by Receivership Estate |
| 14 | Residential Building Lots at 900 West | Salt Lake City, UT | N.A. | 70,000 | 65,295.00 | Sale approved [Docket No. 263]  Sale closed 5/8/13 |
| 15 | Cottonwood Road Property-4 acres | Salt Lake City, UT | N.A. | N.A. | N.A. | No equity; court approved release of property to lender [Dkt. No. 179] |

| # | Property | Location | | | | Status |
|---|---|---|---|---|---|---|
| 15 | Cottonwood Road Property-1 acre | Salt Lake City, UT | N.A. | 291,000 | 279,189.07 | Sale at auction approved [Docket No. 495] Sale closed 11/8/13 |
| 16 | National Note Office Building | West Jordan, UT | 285,000 | 285,000 | 55,903.09 | Sale approved [Docket No. 161] Sale closed 3/19/13 |
| 18 | Star Pointe Development | Salt Lake City, UT | N.A. | N.A. | 70,000.00 | Court approved settlement agreement with lender [Docket No. 608] |
| 19 | Autumn Ridge Subdivision-Phase I | Eagle Mtn., UT | N.A. | N.A. | N.A. | |
| | Phase I-Lot #2 | | 37,000 | 39,900 | 35,635.21 | Sale approved [Docket No. 692]. Sale closed 7/8/14 |
| | Phase I-Lot #3 | | 37,000 | 39,900 | 35,711.84 | Sale approved [Docket No. 644] Sale closed 5/11/14 |
| | Phase I-Lot #4 | | 37,000 | 37,000 | 30,821.91 | Sale approved to builders [Docket No. 293] Sale closed 6/3/13 |
| | Phase I-Lot #8 | | 37,000 | 37,000 | 31,554.15 | Sale approved to builders [Docket No. 293] Sale closed 5/31/13 |
| | Phase I-Lot #54 | | 37,000 | 37,000 | 31,554.16 | Sale approved to builders [Docket No. 293] Sale closed 5/31/13 |
| | Phase I-Lot #41 | | 37,000 | 37,000 | 30,857.73 | Sale approved to builders [Docket No. 293] Sale closed 8/14/13 |
| | Phase I-Lot #40 | | 37,000 | 37,000 | 30,911.96 | Sale approved to builders [Docket No. 293] Sale closed 9/25/13 |
| | Phase I-Lot #33 | | 37,000 | 37,000 | 30,775.92 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #6 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #7 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #11 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #16 | | 37,000 | 39,900 | 35,903.39 | Sale approved [Docket No. 696]. Sale closed 7/18/14 |
| | Phase I-Lot #21 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #30 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #39 | | 37,000 | 39,900 | 35,903.39 | Sale approved [Docket No. 696]. Sale closed 7/18/14 |
| | Phase I-Lot #51 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #52 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #55 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase I-Lot #60 | | 37,000 | 37,000 | 31,355.89 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| | Phase II-62 Building Lots | | N.A. | 538,000 | 446,610.24 | Sale approved [Docket No. 460] Sale closed 10/1/13 |
| 21 | Cedar Fort Land (Fairfield)-8 acres | Fairfield, UT | 24,000 | 25,000 | 22,274.21 | Sale at auction approved [Docket No. 458] Sale closed 11/14/13 |
| 22 | Expressway Business Park | Spanish Fork, UT | N.A. | N.A. | N.A. | |
| | Unit #109 | | N.A. | N.A. | N.A. | No equity; court approved release to lender [Docket No. 241] |
| | Unit #305 | | 65,000 | 69,000 | 55,840.79 | Court approved sale at auction [Docket No. 270] Sale closed 6/27/13 |
| | Unit #204 | | N.A. | N.A. | N.A. | No equity; court approved release to lender [Docket No. 364] |
| | Unit #215 | | N.A. | 127,500 | 112,965.27 | Sale approved at auction [Docket No. 393] Sale closed 10/30/13 |
| 24 | Gooseberry Cabin | Fairview, UT | N.A. | N.A. | N.A. | No equity; Court approved release to lender [Docket No. 125] |
| 26 | Kanab Home | Kanab, UT | 199,000 | 197,000 | 18,162.90 | Sale approved [Docket No. 746]. Sale closed 9/4/14 |
| 27 | Farrell Business Park-12 Units | Gilbert, AZ | N.A. | N.A. | N.A. | Offers received; Court approved sales at auction |
| | Unit 103 | | 76,631 | 101,631 | 83,997.05 | Court approved sale at auction [Docket No. 202] Sale closed 5/31/13 |
| | Unit 104 | | 76,631 | 101,631 | 83,997.05 | Court approved sale at auction [Docket No. 202] Sale closed 5/31/13 |
| | Unit 105 | | 80,000 | 92,000 | 70,392.98 | Court approved sale at auction [Docket No. 203] Sale closed 5/21/13 |
| | Unit 106 | | 80,000 | 97,000 | 74,832.11 | Court approved sale at auction [Docket No. 204] Sale closed 6/7/13 |
| | Unit 107 | | 80,000 | 90,000 | 67,699.81 | Court approved sale at auction [Docket No. 205] Sale closed 6/7/13 |
| | Unit 109 | | 80,000 | 80,000 | 59,194.91 | Court approved sale at auction [Docket No. 206] Sale closed 5/16/13 |
| | Unit 110 | | 80,000 | 80,000 | 59,194.91 | Court approved sale at auction [Docket No. 206] Sale closed 5/16/13 |
| | Unit 111 | | 80,000 | 80,000 | 59,194.92 | Court approved sale at auction [Docket No. 206] Sale closed 5/16/13 |
| | Unit 113 | | 80,000 | 107,000 | 85,094.45 | Court approved sale at auction [Docket No. 207] Sale closed 6/3/13 |
| | Unit 114 | | 80,000 | 107,000 | 85,094.45 | Court approved sale at auction [Docket No. 207] Sale closed 6/3/13 |
| | Unit 115 | | 80,000 | 80,000 | 59,288.00 | Court approved sale at auction [Docket No. 208] Sale closed 6/11/13 |
| | Unit 116 | | 80,000 | 80,000 | 59,288.00 | Court approved sale at auction [Docket No. 208] Sale closed 6/11/13 |
| 28 | Clearview Business Park-8 Units | Mesa, AZ | 415,954 | 737,000 | 591,295.43 | Court approved sale at auction [Docket No. 177] Sale closed 5/10/13 |
| 30 | Georgia Single Family Residence | Temple, GA | 135,000 | 125,000 | 106,843.83 | Sale approved [Docket No. 553] Sale closed 1/10/14 |
| 31 | Chicago Single Family Residence | Chicago, IL | N.A. | N.A. | N.A. | No value; court approved abandonment [Docket No. 434] Order 9/10/13 |

| | | | N.A. | N.A. | N.A. | |
|---|---|---|---|---|---|---|
| 32 | Cleveland Single Family Residence | Cleveland, OH | N.A. | N.A. | N.A. | No value; court approved abandonment [Docket No. 434] Order 9/10/13 |
| 33 | Cleveland Building Lot | Cleveland, OH | N.A. | N.A. | N.A. | No value; court approved abandonment [Docket No. 434] Order 9/10/13 |
| 34 | Toledo Single Family Residence | Toledo, OH | N.A. | N.A. | N.A. | No value; court approved abandonment [Docket No. 434] Order 9/10/13 |
| | | | | | | |
| | Total | | 3,494,216 | 6,178,584 | 5,220,851.22 | |

# EXHIBIT C

Wayne Klein, Receiver for National Note of Utah
10 Exchange Place, Ste. 502
Salt Lake City, UT 84111
801-456-4593

# STANDARDIZED FUND ACCOUNTING REPORT

## Civil – Receivership Fund

## Fund Name: SEC v. National Note of Utah
## Civil Court Docket No. 2:12-CV-00591 BSJ

Reporting Period 06/01/2014 to 09/30/2014

## Standardized Fund Accounting Report for National Note of Utah - Cash Basis
Receivership; Civil Court Docket No. 2:12-CV-00591 BSJ
Reporting Period 07/01/2014 to 09/30/2014

**Fund Accounting (See Instructions):**

| | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| Line 1 | Beginning Balance (As of 07/01/2014): | $5,549,878.11 | | |
| | *Increases in Fund Balance:* | | | |
| Line 2 | **Business Income** | $1,425.00 | | |
| Line 3 | **Cash and Securities** | $0.00 | | |
| Line 4 | **Interest/Dividend Income** | $0.00 | | |
| Line 5 | **Business Asset Liquidation** | $297,703.17 | | |
| Line 6 | **Personal Asset Liquidation** | $0.00 | | |
| Line 7 | **Third-Party Litigation Income** | $725,050.00 | | |
| Line 8 | **Miscellaneous - Other** | $5,277.33 | | |
| | **Total Funds Available (Lines 1 - 8)** | | $6,579,333.61 | |
| | *Decreases in Fund Balance:* | | | |
| Line 9 | **Disbursements to Investors** | $0.00 | | |
| Line 10 | **Disbursements for Receivership Operations** | | | |
| Line 10a | *Disbursements to Receiver or Other Professionals* | $358,396.28 | | |
| Line 10b | *Business Asset Expenses* | $20,418.51 | | |
| Line 10c | *Personal Asset Expenses* | $0.00 | | |
| Line 10d | *Investment Expenses* | $0.00 | | |
| Line 10e | *Third-Party Litigation Expenses* | | | |
| | 1. Attorney Fees | $254,457.25 | | |
| | 2. Litigation Expenses | $12,089.48 | | |
| | *Total Third-Party Litigation Expenses* | $266,546.73 | | |
| Line 10f | *Tax Administrator Fees and Bonds* | $0.00 | | |
| Line 10g | *Federal and State Tax Payments* | $0.00 | | |
| | **Total Disbursements for Receivership Operations** | $645,361.52 | | |
| Line 11 | **Disbursements for Distribution Expenses Paid by the Fund:** | | | |
| Line 11a | *Distribution Plan Development Expenses:* | | | |
| | 1. Fees: | $0.00 | | |
| | Fund Administrator | | | |
| | Independent Distribution Consultant (IDC) | | | |
| | Distribution Agent | | | |
| | Consultants | | | |
| | Legal Advisers | | | |
| | Tax Advisers | | | |
| | 2. Administrative Expenses | $0.00 | | |
| | 3. Miscellaneous | $0.00 | | |
| | *Total Plan Development Expenses* | $0.00 | | |
| Line 11b | *Distribution Plan Implementation Expenses:* | | | |
| | 1. Fees: | $0.00 | | |
| | Fund Administrator | | | |
| | IDC | | | |
| | Distribution Agent | | | |
| | Consultants | | | |

|  |  | | |
|---|---|---|---|
| | Legal Advisers | | |
| | Tax Advisers | | |
| | 2. Administrative Expenses | $0.00 | |
| | 3. Investor Identification: | $0.00 | |
| | Notice/Publishing Approved Plan | | |
| | Claimant Identification | | |
| | Claims Processing | | |
| | Web Site Maintenance/Call Center | | |
| | 4. Fund Administrator Bond | $0.00 | |
| | 5. Miscellaneous | $0.00 | |
| | 6. Federal Account for Investor Restitution | $0.00 | |
| | (FAIR) Reporting Expenses | $0.00 | |
| | *Total Plan Implementation Expenses* | $0.00 | |
| | **Total Disbursements for Distribution Expenses Paid by the Fund** | $0.00 | |
| Line 12 | **Disbursements to Court/Other:** | | |
| | *Investment Expenses/Court Registry Investment* | | |
| Line 12a | *System (CRIS) Fees* | $0.00 | |
| Line 12b | *Federal Tax Payments* | $0.00 | |
| | **Total Disbursements to Court/Other** | $0.00 | |
| | **Total Funds Disbursed (Lines 9 - 12):** | | $645,361.52 |
| Line 13 | **Ending Balance (As of 09/30/2014):** | | $5,933,972.09 |
| Line 14 | **Ending Balance of Fund - Net Assets:** | | |
| Line 14a | *Cash & Cash Equivalents* | $5,933,972.09 | |
| Line 14b | *Investments* | $0.00 | |
| Line 14c | *Other Assets or Uncleared Funds* | $0.00 | |
| | **Total Ending Balance of Fund - Net Assets** | | $5,933,972.09 |

| Other Supplemental Information: | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| | *Report of Items NOT To Be Paid by the Fund:* | | | |
| Line 15 | **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | | | |
| Line 15a | *Plan Development Expenses Not Paid by the Fund:* | | | |
| | 1. Fees: | $0.00 | | |
| | Fund Administrator | | | |
| | IDC | | | |
| | Distribution Agent | | | |
| | Consultants | | | |
| | Legal Advisers | | | |
| | Tax Advisers | | | |
| | 2. Administrative Expenses | $0.00 | | |
| | 3. Miscellaneous | $0.00 | | |
| | *Total Plan Development Expenses Not Paid by the Fund* | $0.00 | | |
| Line 15b | *Plan Implementation Expenses Not Paid by the Fund:* | | | |
| | 1. Fees: | $0.00 | | |
| | Fund Administrator | | | |

| | | |
|---|---|---|
| | IDC | |
| | Distribution Agent | |
| | Consultants | |
| | Legal Advisers | |
| | Tax Advisers | |
| | 2. Administrative Expenses | $0.00 |
| | 3. Investor Identification: | $0.00 |
| | Notice/Publishing Approved Plan | |
| | Claimant Identification | |
| | Claims Processing | |
| | Web Site Maintenance/Call Center | |
| | 4. Fund Administrator Bond | $0.00 |
| | 5. Miscellaneous | $0.00 |
| | 6. FAIR Reporting Expenses | $0.00 |
| | *Total Plan Implementation Expenses Not Paid by the Fund* | $0.00 |
| Line 15c | *Tax Administrator Fees and Bonds Not Paid by the Fund* | $0.00 |
| | **Total Distributions for Plan Administration Expenses Not Paid by the Fund** | $0.00 |
| | | |
| **Line 16** | **Disbursements to Court/Other Not Paid by the Fund:** | |
| Line 16a | *Investment Expenses/Court Registry Investment System (CRIS) Fees* | $0.00 |
| Line 16b | *Federal Tax Payments* | $0.00 |
| | | |
| | Total Disbursements to Court/Other Paid by the Fund: | $0.00 |
| | | |
| **Line 17** | **DC & State Tax Payments** | $0.00 |
| **Line 18** | **No. of Claims:** | |
| Line 18a | *# of Claims Received This Reporting Period* | 0 |
| Line 18b | *# of Claims Received Since Inception of Fund* | 0 |
| **Line 19** | **No. of Claimants/Investors:** | |
| Line 19a | *# of Claimants/Investors Paid This Reporting Period* | 0 |
| Line 19b | *# of Claimants/Investors Paid Since Inception of Fund* | 0 |

Receiver:

By: _Wayne Klein_ (signature)

_Wayne Klein_ (printed name)

_Receiver_ (title)

Date: _November 10, 2014_

| NNU SFAR - 3rd Quarter 2014 | | | | | |
|---|---|---|---|---|---|
| **Line Breakdown** | | | | | |
| | Line 2 | Line 5 | Line 6 | Line 7 | Line 8 | Total |
| Rent Received | $1,425.00 | | | | |
| Overpaid Investors | | | | $725,050.00 | |
| National Note | | $190,261.18 | | | |
| Real Estate Holding | | $107,441.99 | | | |
| Royalties Received | | | | | $0.00 |
| Refunds | | | | | $5,277.33 |
| Advances by Receiver | | | | | |
| | $1,425.00 | $297,703.17 | $0.00 | $725,050.00 | $5,277.33 | $1,029,455.50 |

| | Line 10a | Line 10b | Line 10g | Line 10e-1 | Line 10e-2 | Total |
|---|---|---|---|---|---|---|
| Receivership Expenses | $358,396.28 | $20,418.51 | $0.00 | $254,457.25 | $12,089.48 | |
| Refund Deposit from Prior Period | | $0.00 | | | | |
| Adjustment - NNU Account | | | | | | |
| | $358,396.28 | $20,418.51 | $0.00 | $254,457.25 | $12,089.48 | $645,361.52 |

| | Line 14a |
|---|---|
| National Note | $1,429,186.90 |
| Real Estate Holding | $4,504,785.19 |
| | $5,933,972.09 |

Created by James Shupe on 10/27/2014
Updated by James Shupe on 10/28/2014