Peggy Hunt (Utah State Bar No. 6060)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT 84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>Defendants. | **TENTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER**<br>*For the Quarter Ending December 31, 2014*<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of

Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National

Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the

"Receivership Entities" hereby submits this Tenth Status Report for the period October 1, 2014

through December 31, 2014 (the "Reporting Period").

# TABLE OF CONTENTS

Page

I. PROCEDURAL HISTORY ................................................................................................1

II. CONTINUED OPERATIONS.........................................................................................3

III. REAL ESTATE HOLDINGS .........................................................................................4

    A.    Efforts to Release Liens and Other Interests Against Real Properties................... 5
    B.    Real Property Sales That Closed During the Reporting Period. ............................ 9
    C.    Real Property Sales Approved During the Reporting Period/Not Closed. .......... 12
    D.    Real Property Sales for which Court Approval Was Requested.......................... 13
    E.    Offers Preliminarily Accepted on Real Properties……................................…. 14
    F.    Real Properties to Relinquish—Lack of Equity................................................. 15
    G.    Other Efforts to Increase Net Proceeds from Property Sales…......................…15

IV. NON REAL ESTATE ASSETS ....................................................................................16

    A.    Personal Property. .............................................................................................. 16
    B.    Alleged Mineral Assets...................................................................................... 16
    C.    Pre-Receiver Asset Transfers............................................................................. 17

V. LITIGATION ................................................................................................................17

    A.    Claims Being Pursued By The Receivership Estate. .......................................... 17
    B.    New Litigation Filed During the Reporting Period……... .................................. 18
    C.    Significant Litigation Rulings……...................................................................... 19
    D.    Settlements of Litigation..................................................................................... 19
    E.    Default Judgments………................................................................................... 21
    F.    Summary Judgments Motions............................................................................. 21
    G.    Actions Against The Receivership Estate…….....................................………22
    H.    American Pension Services Litigation Plan…...…….....................................…24

VI. RECORDS OF THE RECEIVERSHIP ENTITIES ...................................................25

    A.    Financial Report/Insolvency Expert…….........................................................…25
    B.    Investigative Findings……................................................................................…26

VII. FINANCIAL ANALYSIS....................................................................................30

     A.     Receivership Financial Information.................................................. 30

VIII. NEXT STEPS ............................................................................................33

IX. CONCLUSION..............................................................................................36

# I.

## **PROCEDURAL HISTORY**

On June 25, 2012, this action (the "Civil Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[1]  The same day, the Court granted several motions filed by the SEC, including a Temporary Restraining Order and Order to Show Cause (the "TRO"),[2] an Order Freezing Assets and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[4]  Palmer later stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5]  As a result of the Receivership Order, the Receiver controls the assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **Exhibit A**.

The SEC filed a Motion for Summary Judgment in the Civil Case on July 19, 2013,[6] arguing that certain securities law violations had been established as a matter of law.  Palmer

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

[6] Docket No. 377.

opposed the SEC's Motion,[7] and thereafter he filed a variety of motions.[8]  At a hearing on July 9, 2014, the Court determined to set the matter for trial rather than dispose of the case through summary judgment at that time.  A further hearing on the status of the case will be held by the Court on February 20, 2015.

In accordance with the Receivership Order,[9] the Receiver has filed the following status reports:

- The Receiver's First Status Report and Liquidation Plan, for the period June 25, 2012 through September 30, 2012, was filed November 12, 2012 (the "First Report").[10]

- The Second Status Report, for the period October 1, 2012 through December 31, 2012, was filed on February 26, 2013 (the "Second Report").[11]

- The Third Status Report, for the period January 1, 2013 through March 31, 2013, was filed on May 2, 2013 (the "Third Report").[12]

- The Fourth Status Report, for the period April 1, 2013 through June 30, 2013, was filed on August 13, 2013 (the "Fourth Report").[13]

- The Fifth Status Report, for the period July 1, 2013 through September 30, 2013, was

---

[7] Docket No. 473.

[8] In May, the fourth law firm representing Palmer since the commencement of the Civil Case asked to withdraw as his counsel.

[9] Docket No. 9 (Receivership Order) at pp.18-20.

[10] Docket No. 73 (First Report).

[11] Docket No. 170 (Second Report).

[12] Docket No. 288 (Third Report).

[13] Docket No. 408 (Fourth Report).

filed on November 4, 2013 (the "Fifth Report").[14]

- The Sixth Status Report, for the period October 1, 2013 through December 31, 2013, was filed February 4, 2014 (the "Sixth Report").[15]

- The Seventh Status Report, for the period January 1, 2014 through March 31, 2014, was filed April 24, 2014 (the "Seventh Report").[16]

- The Eighth Status Report, for the period April 1, 2014 through June 30, 2014, was filed July 25, 2014 (the "Eighth Report").[17]

- The Ninth Status Report, for the period July 1, 2014 through September 30, 2014, was filed November 11, 2014 (the "Ninth Report").[18]

- This is the Tenth Status Report for the period of October 1, 2014 through December 31, 2014, defined above as the "Reporting Period."

## II.

## CONTINUED OPERATIONS

During this Reporting Period, the Receiver wrapped up and discontinued the business operations of the Receivership Entities with the sale of the two "Riverbend Homes," located in Middleton, Idaho, that had been producing rental income.[19] The Court approved the sales of

---

[14] Docket No. 510 (Fifth Report).

[15] Docket No. 598 (Sixth Report).

[16] Docket No. 639 (Seventh Report).

[17] Docket No. 710 (Eighth Report).

[18] Docket No. 808 (Ninth Report).

[19] The Riverbend Homes are discussed in further detail in the First Report, pp. 25-26. For summaries of business operations that were continued by the Receiver, see the First Report, pp. 9-10, 57-58 & Second Report, Part II.A

both these properties[20] and the sales of these properties closed prior to the close of the Reporting Period, with the Receivership Estate receiving net sales proceeds in the amount of $166,031.20. With the sale of the Riverbend Homes, the Receiver is no longer operating any properties.

## III.

## REAL ESTATE HOLDINGS

A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report. The Receiver has determined that a majority of the real properties appear to have value for the Receivership Estate and need to be marketed for sale, some properties have no equity, and some require further investigation and analysis, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver closed the sale of eight properties and actively marketed other properties for sale. Attached hereto as **Exhibit B** is a chart setting forth the status of all real properties in the Receivership Estate as of December 31, 2014.

For purposes of this Status Report, the Receiver discusses the following in Parts A through G below:

- Part A discusses the efforts undertaken during the Reporting Period to release alleged interests recorded against the Receivership Estate's real properties;

---

(discussing operation of Old Glory Minting Company, LLC; operations of this entity were discontinued by the Receiver in December 2012). All of the real property being operated for rental income, described in earlier Status Reports, have now been liquidated, with the exception of the Ogden office building, which is no longer being rented. *See* First Report, pp. 24-53; Second Report, Part II.B; Third Report, Part II; Fourth Report, Part II; Fifth Report, Part II; Sixth Report, Part II; Seventh Report, Part II; Eighth Report, Part II; and Ninth Report, Part II.

[20] Docket Nos. 734 and 804.

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale has been requested;

- Part E identifies real properties where the Receiver has preliminarily accepted offers and intends to seek Court approval of the sales;

- Part F describes actions taken by the Receiver regarding real properties in which it does not appear that the Receivership Estate has equity;

- Part G describes other efforts of the Receiver to increase net proceeds from property sales.

A.    **Efforts to Release Liens and Other Interests Against Real Properties.**  As part of the Receiver's investigation of real property holdings of the Receivership Estate, the Receiver has identified numerous types of interests that have been asserted against many of the Receivership Estate's real properties, including at least the following types of interests, for which he has taken the following actions:

1.    Assignments of Beneficial Interests ("ABIs").  The First and Second Reports described the ABIs that have been recorded against a wide variety of the Receivership Estate's real properties purportedly in favor of certain National Note investors.[21]  If the ABIs are

---

[21] Information recently obtained from attorneys who represented National Note prior to the commencement of the Civil Case indicates that while the attorneys were urging National Note to qualify its securities for sale through a private placement memorandum ("PPM") that provided substantially greater disclosure of National Note's operations, National Note continued to sell its investments in an unregulated manner—granting ABIs to non-

deemed valid interests, a significant portion of the net sale proceeds from the sale of such real estate would be paid to ABI holders, with less money left for those investors who were not provided ABIs. The Receiver believes the ABIs are not valid interests on the property. Accordingly, the Receiver has taken the following actions:

      a.    <u>Sale of Property Free and Clear of Liens and Interests</u>:  For properties that have ABIs recorded against them, the Court has ordered, based on the Receiver's request, that the properties be sold free and clear of these alleged interests, with any interests to attach to the net proceeds of the sale. The Receiver is holding the "<u>Net Sale Proceeds</u>" of these sales in what he calls the "<u>Real Estate Account</u>," a segregated reserve account, pending a determination as to the validity of the disputed ABIs or the voluntary release of the ABIs.

      b.    <u>Voluntary Releases Requested</u>:  As of September 30, 2014, the Receiver has requested that all persons known to be holding ABIs voluntarily release them. These requests have been in two general forms: (i) letters sent to persons known to be holding ABIs against certain properties of the Receivership Estate that had been sold; and (ii) letters sent to persons identified by the Receiver as holding unreleased ABIs prior to filing litigation against them to invalidate the ABIs. As to point (ii), during the third quarter of 2014, the Receiver completed his investigation of all properties in the Receivership Estate and compiled a master list of ABIs that have been filed against each

---

accredited investors rather than limiting the sale of notes to accredited investors who were given copies of the PPM. This led to the perverse result that those who purchased notes outside the private offering also received what was purported to be collateral from National Note assets, while purchasers who received PPMs did not receive any purported collateral.

of the properties.  In this report, he identified a total of 349 ABIs that had been in existence as of the time of his appointment which had a combined stated face value of $27,729,680.24.[22]

Based on the Receiver's efforts to obtain releases consensually and avoid litigation costs, a total of 274 ABIs, with a stated face value of $21,561,653.86, have been voluntarily released as of the close of the Reporting Period.  Thus, as of the close of this Reporting Period, only 75 unreleased ABIs, with a combined stated face value of $6,168,026.38, remain.  Since the close of the Reporting Period, the Receiver has received several additional voluntary releases, and it is hoped that more will be granted so as to avoid litigation expense.

The released ABIs have removed interests against not only properties that are being marketed for sale, but also the Net Sale Proceeds of properties sold by the Receiver currently held in the Real Estate Account.  With regard to the latter, during the Reporting Period, the Receiver transferred a total of $294,280.67 in Net Sale Proceeds from the Real Estate Account to the Operating Account, representing Net Sale Proceeds that were no longer subject to any outstanding ABIs or Deeds of Trust – *i.e.*, all ABIs or Deeds of Trust related to the property attributed to the Net Sale Proceeds were removed.  The Receiver believes that other Net Sale Proceeds should be transferred from the Real Estate

---

[22] These numbers exclude ABIs that had been issued in conjunction with five acres of land located on Cottonwood Lane in Salt Lake City, Utah, which land was subject to a first Deed of Trust held by First National Bank.  Because this property was abandoned to First National Bank, which foreclosed on the property, the ABIs on this property did not affect assets in the Receivership Estate. The total value of unreleased ABIs listed her differs slightly from the total discussed in the Ninth Report.  The value listed in the Ninth Report ($27,576,639.21) was incorrect due to an error in the formula used to calculate the total of ABIs.  The corrected total in this Tenth Report is the same value as reported in the Receiver's Report on Excess Net Sales Proceeds, Docket No. 864 (filed January 26, 2015).

Account to the Operating Account based on voluntary releases that have been obtained as of the close of the Reporting Period. Prior to doing so, however, the Receiver thought it appropriate to notify the Court and parties in interest. Accordingly, after the close of this Reporting Period, the Receiver filed a *Notice of Filing of Receiver's Report on Excess Net Sales Proceeds Available to the Receivership Estate as a Result of Releases of Purported Real Estate Interests*,[23] attached to which was his Report outlining the Net Sale Proceeds he intended to transfer. A hearing on the Report was held on February 3, 2015, and the Court requested that the Receiver provide further information prior to transferring any of the Net Sale Proceeds. The Receiver is working on a revised Report and he will file it shortly.

   c. <u>Lawsuits Filed by the Receiver Against ABI Holders</u>: The Receiver has filed numerous actions seeking judgments declaring ABIs to be invalid. Invalidity of the ABIs is necessary to enable the Receiver to release Net Sale Proceeds currently being held in the Real Estate Account. Lawsuits seeking judgments invalidating ABIs have been filed in several different contexts, which are summarized in the *Status Report* that the Receiver filed with the Court after the close of this Reporting Period.[24] Subsequent to the filing of these lawsuits, many defendants have released their ABIs, thus greatly reducing litigation costs and delay. However, many holders have not signed releases and, as to them, litigation is pending.

---

[23] Docket No. 864.

[24] *Status Report in Advance of January 30, 2015 Conference, filed in Klein v. Adams*, Civ. No. 2:14-cv-00614, Docket No. 298.

2.      Deeds of Trust:  Deeds of trust have been recorded against some of the Receivership Estate's real properties.  Several of these deeds of trust are held by National Note investors who were overpaid (meaning they have received distributions in excess of the principal amount of their investments).  In two instances, the Receiver has negotiated settlements releasing the deeds of trust prior to filing a lawsuit.  Three other deeds of trust were released as part of settlement of litigation that had been filed.  Finally, the Receiver has been engaged in pre-litigation settlement negotiations with the holder of a deed of trust against the "Bandanna Cabin,"[25] and he continues his investigation of deeds of trust that have been recorded against the "Overland Trails" property.[26]

**B.      Real Property Sales That Closed During the Reporting Period.**  The following eight Court-approved real property sales were closed by the Receiver during the Reporting Period.

1.      First Avenue Home, Middleton, Idaho:[27]  On August 18, 2014 the Court entered an Order approving a private sale of the first of two residential "Riverbend Homes," located adjacent to the Riverbend property in Middleton, Idaho.[28]  The sale closed on October 15, 2014, with the Receivership Estate being receiving a total of $96,461.72 in Net Sale Proceeds.  There were no ABIs or deeds of trust on this property, and therefore the Net Sale Proceeds were deposited into the Operating Account.

---

[25] The Bandanna Cabin was sold during the last quarter of 2013.  The net proceeds from the sale are being held in the Receiver's Real Estate Account pending resolution of the deed of trust on this property.

[26] *See* First Report, pp. 32, 41-42 (describing these properties).

[27] *See* First Report, p. 25 (describing this property); *see* Part I *supra* (discussing sale).

[28] Docket No. 734.  An Amended Order was entered on September 26, 2014 at Docket No. 771.

2.   <u>Hawthorne Avenue Home, Middleton, Idaho</u>:[29]  On September 30, 2014,
the Receiver filed a *Motion Seeking Authorization to Sell Hawthorne Lot Free and Clear of
Purported Interests and Subject to Higher and Better Offers*.[30]  Notice of the sale was published
by the Receiver and no higher or better offers were received.  The Court held a hearing on
October 31, 2014, and entered an Order on November 6, 2014 approving the sale.[31]  The sale
closed on November 17, 2014, and the Receivership Estate was received a total of $69,569.48 in
Net Sale Proceeds.  Because this property is subject to an ABI with a face value of $245,000.00,
the Net Sale Proceeds were deposited into the Real Estate Account.

3.   <u>Almond Heights Lots 7, 11, 12, 13, 17, & 26, Toquerville, Utah</u>:[32]  On
November 3, 2014, the Receiver filed a *Motion Seeking Authorization to Sell Almond Heights
Lots 7, 11, 12, 13, 17 & 26 Free and Clear of Purported Interests and Subject to Higher and
Better Offers*.[33]  Notice of the sales was published by the Receiver and no higher or better offers
were received.  The Court held a hearing on December 3, 2014, and entered an Order on
December 4, 2014 approving the sales.[34]  Closings on the sale of each of the Lots have taken
place as follows:

a.   <u>Lot 7</u>: The sale closed on December 18, 2014 and the Receivership
Estate received a total of $29,388.95 in Net Sale Proceeds.  There are no deeds of trust or

---

[29] *See* First Report, p. 25 (describing this property).

[30] Docket No. 772.

[31] Docket No. 804.

[32] *See* First Report, p. 47 (describing this property).

[33] Docket No. 794.

[34] Docket No. 829.

other liens on this property, so the Net Sale Proceeds were deposited into the Operating Account.

        b.    <u>Lot 11</u>: The sale closed on December 16, 2014.  The Net Sale Proceeds were in the amount of $27,152.49.  This property is subject to a trust deed securing a debt in an amount greater than the Net Sale Proceeds received. Pursuant to an agreement with the trust deed holder,[35] 75% of the Net Sale Proceeds were paid to the trust deed holder in full satisfaction of his interest in this property. The remaining 25% ($6,788.12) has been deposited into the Operating Account.

        c.    <u>Lot 12</u>: The sale closed on December 16, 2014.  The Net Sale Proceeds were in the amount of $27,151.59.  This property is subject to a trust deed securing a debt in an amount greater than the Net Sale Proceeds received. Pursuant to an agreement with the trust deed holder,[36] 75% of the Net Sale Proceeds were paid to the trust deed holder in full satisfaction of his interest in this property.  The remaining 25% ($6,787.90) has been deposited into the Operating Account.

        d.    <u>Lot  13</u>: The sale closed on December 16, 2014.  The Net Sale Proceeds were in the amount of $27,151.02.  This property is subject to a trust deed securing a debt in an amount greater than the Net Sale Proceeds received. Pursuant to an agreement with the trust deed holder,[37] 75% of the Net Sale Proceeds were paid to the

---

[35] *See Order Granting Receiver's Tenth Motion Seeking Approval of Settlement Agreements*, Docket No. 777.

[36] *Id.*

[37] *Id.*

trust deed holder in full satisfaction of his interest in this property.  The remaining 25% ($6,787.75) have been deposited in the Operating Account.

        e.    <u>Lot 17</u>: The sale closed on December 11, 2014.  The Net Sale Proceeds were in the amount of $21,752.44.  This property is subject to a trust deed securing a debt in an amount greater than the Net Sale Proceeds received. The Net Sale Proceeds were deposited into the Real Estate Account pending resolution of the amounts owed to the trust deed holder.

        f.    <u>Lot 26</u>: The sale closed on December 17, 2014.  The Net Sale Proceeds were in the amount of $27,151.02. This property is subject to a trust deed securing a debt in an amount greater than the Net Sale Proceeds received. The Net Sale Proceeds were deposited into the Real Estate Account pending resolution of the amounts owed to the trust deed holder.

**C.**    **<u>Real Property Sales Approved During the Reporting Period/Not Closed</u>.**

During the Reporting Period, there were no properties where the Court approved sales, but where the sales did not close before the end of the Reporting Period.

**D.**    **<u>Real Property Sales for Which Court Approval Was Requested</u>**.  During the Reporting Period, the Receiver sought approval to sell two properties where Court review was not yet completed as of the end of the Reporting Period, as follows:

    1.    <u>Byron Industrial Park, Lot 2, Block 2, Byron, Minnesota</u>:[38]  On October 17, 2014, the Receiver accepted an offer to purchase this vacant industrial land at a price of

---

[38] *See* First Report, p. 50 (describing this property).

$210,000.00. Bond assessments and property taxes tied to this property total more than $200,000.00. The Receiver negotiated an agreement with the City of Byron by which the City will waive approximately $15,000.00 in assessments on the property to ensure that the sale will result in Net Sale Proceeds for the Receivership Estate. On November 18, 2014, the Receiver filed a *Motion Requesting Order Approving Public Sale of Property (Byron West Industrial Park Lot 2 Block 2*.[39] The Court held a hearing on the Receiver's Motion on November 24, 2014 at which time the Court instructed the Receiver to obtain a third appraisal on the property.[40] On December 31, 2014, the Receiver filed a *Notice of Filing of Supplemental Appraisal and Request to Submit Related Motions*.[41]

       2.   <u>Byron Industrial Park, Lot 2, Block 1, Byron, Minnesota</u>:[42] On October 20, 2014, the Receiver accepted an offer to purchase this vacant industrial land at a price of $149,000.00. On November 7, 2014, the Receiver filed a *Motion Requesting Order Approving Public Sale of Property (Byron West Industrial Park Lot 2 Block 1*.[43] The Court held a hearing on November 24, 2014 at which time the Court instructed the Receiver to obtain a third appraisal on the property.[44] On December 31, 2014, the Receiver filed a *Notice of Filing of Supplemental Appraisal and Request to Submit Related Motions*.[45]

---

[39] Docket No. 815.

[40] Docket No. 818.

[41] Docket No. 842. The third appraisal reported a value of $210,000.00 for this property.

[42] *See* First Report, p. 50 (describing this property).

[43] Docket No. 805.

[44] Docket No. 818.

[45] Docket No. 842. The third appraisal reported a value of $157,000.00 for this property.

E.    **Offers Preliminarily Accepted on Real Properties**.  During the Reporting
Period, the Receiver received offers for the following two properties:

1.    Byron Industrial Park, Lot 5, Block 1, Byron, Minnesota. [46]  On November
19, 2014, the Receiver accepted an offer to purchase this vacant industrial lot for $235,000.00.
The lot is subject to unpaid property taxes and bond assessments in the total approximate amount
of $250,000.00. The City of Byron has agreed to waive $50,000.00 in taxes and assessments to
allow the sale to proceed and result in equity to the Receivership Estate.  The Receiver obtained
a third appraisal of this property on December 19, 2014, and intends to file a Motion with the
Court seeking approval to conduct a public auction for this property during the next Reporting
Period. [47]

2.    Expressway Land, Spanish Fork, Utah.  On November 13, 2014, the
Receiver accepted a conditional offer to purchase this industrial land for $1,200,000.00, slightly
less than the appraised value of $1,250,000.00.  As part of the purchase agreement, the buyer
was given a 90-day period to conduct due diligence to determine the extent of environmental
remediation needed based on the property's former status as an unregulated landfill.  As of the
close of the Reporting Period, the buyer had notified the Receiver that it does not intend to
complete the purchase agreement.  The Receiver is in discussions with the potential buyer, the
second to back out of a purchase of the property after conducting due diligence, on possible
terms under which the buyer might make agree to purchase the property.

---

[46] *See* First Report, p. 50 (describing this property).

[47] This appraisal valued the property at $225,000.00.

F.     **Real Properties to Relinquish—Lack of Equity.**  On September 24, 2014, JPMorgan Chase Bank filed a *Motion and Memorandum to Intervene to Lift Injunction Against Real Property Collateral of JPMorgan Chase Bank, N.A,* seeking an order allowing it to intervene in the Civil Case to foreclose against Palmer's residence inasmuch as Palmer has not made mortgage payments for several years.[48]  The Court held a hearing on December 12, 2014, at which time the Bank provided information showing that the Receivership Estate likely has no equity in the home. On December 19, 2014, the Receiver filed a *Motion to Abandon Real Property in West Jordan, Utah,* indicating the Receiver's desire to abandon the home.[49]  The Court has set a hearing on these matters for January 26, 2015.

G.     **Efforts to Increase Net Sale Proceeds From Property Sales.**  The Receiver continues to investigate means of increasing the Net Sale Proceeds of properties by reducing tax burdens, avoiding expense obligations that were incurred by the Receivership Entities, and obtaining reductions of bond assessments.  On October 8, 2014, the Utah County Board of Equalization granted the Receiver's tax appeal and reduced the assessed value of three parcels property at Expressway Business Park located in Spanish Fork, Utah from $2,178,100.00 to $990,000.00, a reduction of 54.5%.

As noted in Parts III.D and E, above, similar reductions have been obtained with regard to the Byron Industrial Park located in Byron, Minnesota.  Specifically, the City of Byron has agreed to waive $15,000.00 in property taxes and bond assessments relating to one industrial property, and $50,000.00 in taxes and assessments relating to a second property.  The Receiver

---

[48] Docket No. 767.

[49] Docket No. 832.

expects to receive waivers in connection with additional lots in this development. These waivers are expected to result in equity for the Receivership Estate that would not otherwise have existed.

## IV.

## NON-REAL ESTATE ASSETS

In addition to real estate, the Receivership Estate is comprised of certain personal property described in Part A below, unrefined ore discussed in Part B below, and proceeds of lawsuits to recover transfers made by National Note prior to the Receiver's appointment discussed in Part C below.

**A.     Personal Property.**  The personal property owned by National Note has all been sold at auction or, in a few cases, through private sale.

**B.     Alleged Mineral Assets.**  As described in the Second Report,[50] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("HMI"), to assist the Receiver in investigating whether ore held by National Note has any commercial value.  The Receiver receives regular reports from HMI on its efforts to recover precious metals from this ore.  Reports received during the Reporting Period indicate that HMI continues to take concrete steps in its efforts to determine whether value can be recovered from the ore.  While the results have been discouraging, HMI believes there is sufficient justification to continue investigating the possibility that the ore has value.[51]  If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in

---

[50] Second Report, pp. 18-19.

[51] These costs are all being borne by HMI; no Receivership funds are being used in the effort to extract precious metals from this ore.

accordance with Management Agreement described in the Second Report.  The Receivership Estate expends no funds related to this matter.

C.      **Pre-Receiver Asset Transfers.**  Prior to the Receiver's appointment, National Note made certain transfers of assets which assets or their value may be recoverable for the benefit of the Receivership Estate, including but not limited to National Note's payment of false profits and commissions on investments.  The types of claims discovered by the Receiver and his course of action for recovery of these claims is discussed in the next section below.

## V.

## LITIGATION

A.      **Claims Being Pursued by the Receivership Estate.**  As described in the Fourth Report, the Receiver has filed suit to recover payments or transfers made by National Note and its affiliated entities that should be returned to the Receivership Estate.  A total of 136 lawsuits was filed in June 2013.  Copies of the complaints in these lawsuits can be found on the Receiver's website.  Investigations are ongoing and additional lawsuits have been filed since June 2013, and others may be filed.  The lawsuits filed by the Receiver seek recovery for a variety of payments that the Receiver believes were improper, including the receipt of commissions for soliciting investors, unpaid and forgiven loans made by National Note, payments to credit card companies on credit cards in the name of individuals associated with National Note, payments to employees and relatives of Palmer, and payments of false profits to investors who received more than the amount of their principal investment.  In addition, as described earlier, the Receiver has commenced litigation against holders of various types of liens against property of the Receivership Estate.  In a few instances, the Receiver has entered into

tolling agreements with a number of persons, extending the statutes of limitations to allow further investigation.

    **B.**    <u>**New Litigation Filed by the Receiver During the Reporting Period.**</u>  The following litigation was commenced by the Receiver during the Reporting Period:

    1.    <u>Lawsuit Against Secure American Gold Exchange ("SAGE")</u>:[52]  On November 26, 2014, the Receiver filed suit against SAGE, seeking the return of $112,000.00 that National Note paid to SAGE as part of a plan to purchase gold from an African source at an alleged significant discount from the prevailing market price. SAGE's company charter has now expired, but the company does own a judgment against a company in Miami, Florida to which SAGE sent the funds.  The Receiver hopes to obtain control over this judgment and discover additional information that he can use to determine whether any funds can be recovered.

    2.    <u>Amended Lawsuit Against KeyBank, U.S. Bank, N.A., and Citibank, N.A.</u>:  In 2013, the Receiver commenced an action against KeyBank, seeking recovery of monies that had been paid to it on certain credit card accounts. [53]  On October 2, 2014, KeyBank was ordered to produce documents to the Receiver relating to credit card accounts where National Note made payments, and based on that information, the Receiver identified two other banks which received funds from National Note.  Thus, on October 23, 2014, the Receiver filed an amended complaint against KeyBank, adding U.S. Bank and Citibank as defendants and seeking return of monies paid to them by National Note. As described in Part V.D below, U.S. Bank and Citibank have since reached settlements with the Receiver.

---

[52] *Klein v. Secure American Gold Exchange, LLC*, Case No. 2:14-cv-00869-BCW (D. Utah) (Wells, J.).

[53] *Klein v. KeyBank Card Service, et al.*, Case No. 2:13-cv-00589-DAK (D. Utah) (Kimball, J.).

C.    **Significant Litigation Rulings**.  During the Reporting Period, there was one

ruling of significance issued in the litigation being pursued by the Receiver:

1.    Order to Show Cause—David C. VanCampen ("VanCampen"):  On

September 22, 2014, the Receiver filed a *Motion for Order to Show Cause as to Why David C.*

*VanCampen Should Not be Held in Contempt*.[54]  The Court granted this Motion, entering an

Order requiring VanCampen to appear and show cause on October 21, 2014.[55]  A hearing

October 21, 2014 was held, but was continued at VanCampen's request until October 31, 2014.

On November 17, 2014, the Court entered an Order requiring VanCampen to pay $1,000.00 to

the Receivership Estate for VanCampen's failure to provide documents and testimony when first

requested by the Receiver.[56]  As a result of these proceedings, VanCampen was deposed which

provided substantial information about more than $250,000.00 that was delivered to Africa in

failed attempts to purchase gold.

D.    **Settlements of Litigation**.  The Receiver entered into numerous settlement

agreements during the Reporting Period.  As discussed below, the Court approved the settlement

agreements proposed by the Receiver.

Settlement agreements generally include an obligation to return funds to the Receivership

Estate in exchange for dismissal of the Receiver's lawsuit and/or a mutual release of claims.  In

some instances, the defendants sued by the Receiver have demonstrated financial hardship which

would make recovery of a judgment questionable when the cost of litigation is weighed against

---

[54] Docket No. 763.

[55] Docket No. 768.

[56] Docket No. 814.

the likelihood of collection.  The Receiver scrutinizes allegations of hardship carefully to ensure that the defendants truly merit hardship treatment, and has denied a significant percentage of the requests for hardship treatment.  But, where hardship is demonstrated, the Receiver typically agrees to a settlement agreement that provides the Receivership Estate relief commensurate with the demonstrated hardship and, typically, provides for the lawsuit to be dismissed.  The Receiver has made it clear to defendants that claims of financial hardship must be raised at the beginning of litigation, not after litigation costs have been incurred.

During the Reporting Period, the Court entered two Orders approving settlement agreements proposed by the Receiver as follows:

1.     Tenth Motion to Approve Settlements.  On September 26, 2014, the Receiver filed his *Tenth Motion Seeking Approval of Settlement Agreements,*[57] seeking approval of three settlement agreements related to clawback litigation against an overpaid investor, division of property sales proceeds with a trust deed holder, and contribution toward the expenses of repairing a home sold by the Receivership Estate.  This Motion was granted by the Court by Order entered on October 1, 2014.[58]  The clawback settlement will result in the recovery of $9,300.00 for the Receivership Estate.  The settlement with the trust deed holder resulted in the net recovery of $20,363.77.

---

[57] Docket No. 769.

[58] Docket No. 777.

2.     <u>Eleventh Motion to Approve Settlements</u>.  On December 23, 2014, the Receiver filed his *Eleventh Motion Seeking Approval of Settlement Agreements*,[59] seeking approval of nine settlement agreements. Six of these settlements were with overpaid investors. Two others were with credit card companies, and the ninth was with a recipient of a commission paid by National Note.  This Motion was granted by the Court by Order entered on December 29, 2014.[60]  These settlements require the defendants to pay a total of $238,953.27 to the Receivership Estate.  As of December 31, 2014, $149,214.00 of this amount had been paid.

E.     **Default Judgments**.  In some instances, defendants sued by the Receiver have failed to respond to the litigation commenced against them by the Receiver.  In such cases, the Receiver has sought default judgments against the defendants.  During the Reporting Period, the Receiver obtained one default judgment in a clawback action, in the amount of $11,457.16.  The Receiver also obtained default judgments against Xiaoping Su and Phillip Redd, declaring that ABIs granted to these defendants are invalid.  The Receiver has filed approximately 30 additional Motions seeking the entry of default judgments since the close of the Reporting Period.[61]

F.     **Summary Judgment Motions**.  On December 31, 2014, the Receiver filed Motions for Summary Judgment in five clawback lawsuits. These Motions seek a ruling that the following funds must be returned to the Receivership Estate as a matter of law based on facts

---

[59] Docket No. 837.

[60] Docket No. 841.

[61] In some of these cases, default certificates had been issued by the Clerk of the Court prior to the close of the Reporting Period.  Most of these Motions are in litigation brought to invalidate ABIs.

that cannot be disputed: Max Andreason ($49,636.99), Hong Shiek Chung ($16,098.55), Marilyn Corbett ($37,000.00), Robert & Lori McCool ($75,386.55), and Edda Nelson ($50,051.22). Together, these Motions seek judgments totaling $231,173.31.

      **G.**    **Actions Against the Receivership Estate**.  As described in earlier Status Reports, a number of other parties have filed motions to intervene in the Civil Case in order to assert claims to property or wanting to foreclose on properties where the lender believes its interests are not adequately protected by the Receivership Estate.  The following discusses the status of actions by other parties seeking to intervene in the Civil Case:

      1.    Complaint in Intervention Filed by the True & Marjorie Kirk Family Trust (the "Kirk Trust"):[62]  On August 19, 2014, the Court entered an order approving a settlement agreement between, among others, the Receivership Estate and intervener Kirk Trust This matter is now concluded.

      2.    Complaint in Intervention Filed by Paul Hawkins ("Hawkins"):  On October 9, 2013, the Court authorized Hawkins to intervene in this case for the limited purpose of allowing him to proceed with his claims against others, subject to the terms of a stipulation with the Receiver.[63]  Hawkins filed a lawsuit against Reed Larsen and others in federal district court, but that action was dismissed in November 2014 for lack of jurisdiction. Since that time, the Receiver and Hawkins agreed that, despite earlier agreements and representations to the Court, Hawkins would no longer attempt to pursue parties in state court.  In exchange, and based on his assessment that this was a positive development for the Receivership Estate, the Receiver

---

[62] *See* Docket No. 89.

[63] Docket No. 466.

informed Hawkins that he would be allowed to submit a claim against the Receivership Estate related to his alleged losses. In so doing, the Receiver has in no way indicated to Hawkins if his claim will be allowed or the amount of his claim. The parties anticipate that they will enter into a settlement agreement memorializing this agreement and seek Court approval of this agreement. If the Court approves this settlement, the Receiver does not anticipate further proceedings related to Hawkins' intervention.

3.    Complaint in Intervention Filed by 30 Overpaid Investors ("Overpaid Investors") And Motion to Transfer: On October 9, 2013, 30 overpaid investors sued by the Receiver filed a *Motion to Intervene*.[64] The Court denied the Motion by Order entered on November 21, 2013.[65] These Overpaid Investors later filed a *Motion to Transfer Related Cases and Supporting Memorandum*,[66] seeking to transfer 23 ancillary proceedings naming the Overpaid Investors as defendants from the judges to which they were assigned to this Court. The Court denied this Motion by Order entered on August 4, 2014.[67] Since that time, many of these defendants have now settled with the Receiver and more settlements are expected.

4.    Thoresen Lawsuit Regarding Florida Property. On August 13, 2014, the Receiver was served with a summons relating to a lawsuit filed against National Note in the state

---

[64] Docket No. 468.

[65] Docket No. 540.

[66] Docket No. 654. The Overpaid Investors had previously filed motions in each of the ancillary proceedings seeking to transfer the cases to this Court. Those motions were later withdrawn, and a single motion was filed with this Court.

[67] Docket No. 716.

of Florida by a person named Thoresen.[68]  The Receiver notified Thoresen of this Court's

Receivership Order.  Separately, the U.S. Department of Treasury removed the case to federal

court.[69]  On August 22, 2014, Thoresen dismissed his lawsuit.  No further action is expected.

     **H.**    **American Pension Services Liquidation Plan**. On April 24, 2014, the SEC filed

suit against American Pension Services ("APS"), alleging that the owners of APS had

misappropriated approximately $24 million of customer funds, and a Receiver was appointed

(the "APS Receiver").[70]  On August 22, 2014, the APS Receiver filed a proposed a plan of

liquidation ("Liquidation Plan"). The Liquidation Plan proposed to allocate the $24 million in

APS's losses among all current APS customers by holding back 10% of the stated value of the

APS accounts (based on APS records).  Customers whose accounts did not hold sufficient cash

to cover the 10% holdback would have been required to deposit cash equal to 10% of the stated

value of their respective APS accounts. As originally proposed, this would have included 293

National Note investors whose accounts at APS consisted mostly or entirely of promissory notes

from National Note.  These APS accounts listed investment balances of $16.3 million, with

actual net principal losses of $9.3 million.

     On October 20, 2014, the Receiver submitted a detailed comment letter to the APS

Receiver recommending that the Liquidation Plan be amended as to National Note investors

because the valuations of the National Note notes in the APS accounts were greatly overstated

and, thus, it would inappropriate and unfair to assess these investors with the 10% holdback/cash

---

[68] *Thoresen v. National Note of Utah, LC, et al.*, No. 14-CA-002253 (20th Judicial Cir. Ct. for Lee County, Fla.).

[69] 2:14-cv-472 (M.D. Fla) (Aug. 18, 2014).

[70] *SEC v. American Pension Services, et al.*, Case No. 2:14-cv-309 RJS (D. Utah) (Shelby, J.), Docket No. 9.

payment.  The APS Receiver subsequently proposed an amended Liquidation Plan that made some changes related to National Note investors, but the amended Plan did not appear to fully embrace the Receiver's requests related to National Note investors.  After further discussions, the APS Receiver agreed to automatically value National Note investments held in APS accounts at zero.  As a result, National Note investors who are APS customers will not be required to pay the 10% holdback fee as originally proposed in the Liquidation Plan, and will not be required to individually request a revaluation of their accounts or pay a $500 revaluation fee.  The Receiver has agreed to work with the APS Receiver to the extent necessary to effectuate the zero valuation of National Note promissory notes.

## VI.

## RECORDS OF THE RECEIVERSHIP ENTITIES

Substantial progress has been made in the Receiver's financial analysis and investigation. The Receiver believes he has located all of the internal financial records created by National Note for the different affiliated entities for the period from 1995 forward.  The Receiver also has reconstructed all banking transactions for National Note and its affiliated entities for the period from January 1, 2007 through the filing of the Civil Case, using original bank records.

A.    **Financial Report/Insolvency Expert**.  The Receiver's completed report, summarizing the results of his financial analysis, including his review of National Note's and its affiliates' financial and intercompany records, has been filed with the Court[71] and posted on the Receivership website.  On July 16, 2014, the report of the Receivership Estate's insolvency

---

[71] Docket No. 755.

expert, Lone Peak Valuation Group,[72] was issued.  This report has been filed with the Court,[73] posted on the Receivership website, and served on defendants as appropriate in numerous pending ancillary proceedings.

    **B.**    **Investigative Findings**.  During the Reporting Period, the Receiver obtained additional information as part of his investigation of various aspects of National Note's operations prior to the commencement of the Civil Case, as follows.

    1.    <u>Interest Charges Recorded by National Note</u>:  In the process of reviewing National Note's accounts receivable, the Receiver discovered some extreme examples of the steps National Note took to record phantom income.  For example, in November and December 1999, National Note loaned $22,600.00 to an auto body business in Manti, Utah.  The business repaid the loan in January 2000, with interest.  However, National Note recorded on its books that a $2,112.93 late fee was still owed in January 2000.  By 2012, National Note had charged and reported as income over $100,000.00 in late fees on this loan.  It does not appear that National Note ever took any action to collect this receivable.

    2.    <u>Transactions With Officers and Affiliates</u>.  The Receiver continues to discover financial transactions recorded on the books of National Note that appear to have been entered solely for the purpose of making the financial condition of the companies look better than they were.  For example, in 2008, an investor paid $5,000.00 to National Note.  Reed Larsen also paid $20,000.00 to National Note.  The investor was credited with a $25,000.00

---

[72] *See* Docket No. 660 (*Order Granting Receiver's Motion For Employment of Lone Peak Valuation Group as Insolvency Expert*).

[73] Docket No. 756.

investment.  The $20,000.00 in Larsen's cash was sent to the Homeland Funding affiliate.  Three days later, Homeland Funding paid Larsen the amount he had paid to National Note, but the investor account remained credited for the entire $25,000.00.

3.     <u>Method of Soliciting Funds from Investors</u>. In 2004, National Note was the subject of a preliminary investigation by the Utah Division of Securities.  National Note, through its attorneys, persuaded the Division to close its investigation based on two promised actions: i) that National Note had collateralized all prior investments with real estate, and ii) that in the future, National Note would only accept investors pursuant to a private placement offering that would be filed with the Division, and that all future investors would be "accredited," meaning they would have over $250,000.00 in assets and net income.  The Receiver analyzed the method by which investors came to National Note after these promises were made and found the following:

a.     By the end of 2006, National Note had collected $41.1 million through the issuance of promissory notes, but had only issued ABIs with a total value of $2.2 million. Thus, less than 6% of the monies taken from investors had been "collateralized" -- a tiny proportion of the amounts that National Note told regulators would be collateralized.

b.     On September 27, 2007, National Note filed notice with the Division to qualify National Note to sell promissory notes to accredited investors. After this point, National Note continued selling promissory notes to non-accredited investors, granting an additional 293 ABIs with reported values of $18.4 million.

c.      After September 27, 2007, National Note raised at least $30.9 million from 312 investors who had been issued private placement memoranda. These investors were not given ABIs.  This led to the perverse result that National Note gave "collateral" to non-accredited investors whose investments were not made in compliance with securities laws while the accredited investors, who were being solicited though the official offering, were given no "collateral."

4.      <u>Purchasing African Gold</u>.  To date, the Receiver has identified four different ventures by which National Note and its managers were attempting to purchase gold from sources in Africa.  This is the information that has been provided to the Receiver to date:

a.      <u>General Maliko</u>. In 2011, representatives of one of the Receivership Entities—Homeland Holding Corporation ("<u>HHC</u>")--made two trips to Ghana with plans to purchase gold from "<u>General Maliko</u>," a person reporting to be a general in the Ghanian army.  The General said he would sell 100 kilograms of gold to HHC for $36,500.00 per kilogram—a 25% discount from the prevailing market price. General Maliko claimed that his status with the United Nations would allow him to ship the gold to the United States on United Nations' aircraft, bypassing customs and avoiding the payment of export fees and duties.  When the HHC representatives arrived in Ghana on the first trip, they were told that the United Nations flight would not be available.  The representatives paid $78,000.00 to an export house which was claimed to be holding the gold.  The representatives then returned to the United States to obtain additional funds. On the second trip, the representatives paid another $95,000.00 for storage, shipping, and

export fees that supposedly were required for the transport of the gold, [74] and purchased an airline ticket for General Maliko.  The HHC representatives accompanied the gold to the airport, where it was to be loaded on the airplane bringing both the representatives and General Maliko to the United States.  When the airplane landed, however, neither the gold nor General Maliko was on the airplane.

b. "The Gold Shop." During the first trip to Ghana, the representatives paid $8,000.00 to purchase approximately ½ kilogram of "gold dust" from a business in Accra called "The Gold Shop."  On the second trip, the representatives delivered an additional $100,000.00 in cash to The Gold Shop, to have gold shipped to the United States.  No gold was ever received from The Gold Shop.

c. Weblet Resources Company.  In 2010, National Note had investigated another gold supplier called "Weblet Resources Company," also in Ghana, which claimed it would sell gold for ½ of the prevailing market price. The Receiver has not found that National Note sent any funds to Weblet Resources Company.

d. Secure American Gold Exchange ("SAGE"). National Note planned to purchase $1 million in gold through SAGE, and made an initial payment to SAGE in the amount of $112,000.00.  It appears that these funds were then sent to a broker in Miami, Florida.  No gold was ever received from the Miami broker or SAGE. As noted above in Part V.B, the Receiver filed suit against SAGE in November 2014.

---

[74] Some of the monies paid to the export house came from sources other than National Note and its affiliates.

# VII.

## FINANCIAL ANALYSIS

A.    **Receivership Financial Information**.  The following financial information is provided for the Reporting Period:

1.    Bank Accounts.  The Receiver maintains two bank accounts for the operation of the Receivership: a general operating account (the "Operating Account") and an account holding earnest money deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "Real Estate Account").  The balances in these accounts as of the close of the Reporting Period are as follows:

| Account | Account Balance |
|---|---|
| Operating Account[75] | $1,325,283.98 |
| Real Estate Account | $4,412,357.56 |
| **TOTAL** | **$5,737,641.54** |

2.    Operating Account Deposits.  The sources of funds deposited into the Operating Account during the Reporting Period are shown in the following table:

---

[75] Pursuant to the Court's *Order Approving the Receiver's Third Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered from July 1, 2013 through December 31, 201,* Docket No. 828, the Receiver has established a separate savings account tied to the Operating Account in which he is holding 20% of the professional fees incurred by him and his counsel.  Money to open this account was transferred from the Operating Account. This account has a current balance of $122,785.02.

| Source | Amount In |
|---|---|
| Rents[76] | $21,088.01 |
| Refunds[77] | $955.71 |
| Real estate sales proceeds[78] | $359,040.01 |
| Settlement agreement proceeds | $176,157.17 |
| **TOTAL** | **$557,240.90** |

3.     Operating Account Expenditures.  The following table shows the categories of operating expenses that have been paid from the Operating Account during the Reporting Period:

| Type of Expense | Amount Out |
|---|---|
| Utilities, insurance, operating expenses | $3,307.20 |
| Property appraisals | $11,200.00 |
| Publication of notice, closing expenses | $6,574.74 |
| Property taxes | $2,335.45 |
| Tax filing fees, receivership expenses[79] | $6,556.99 |
| **TOTAL** | **$29,974.38** |

4.     Real Estate Account Deposits and Expenditures.  The transactions in the Real Estate Account during the Reporting Period were as follows:

---

[76] This amount represents the final net rental income that had been held by the property manager for the Twin Pines Apartments.  Currently none of the properties in the Receivership Estate are being rented.

[77] These are utility and insurance refunds from properties that were sold.

[78] This amount reflects Net Sale Proceeds from the sale of the first Riverbend Home, Almond Heights Lot 7, and Almond Heights Lots 11-13 (after paying 75% of the Net Sale Proceeds to the trust deed holder—*see* above).  This amount also includes funds transferred from the Real Estate Account from earnest money deposits for three property sales that have closed and Net Sale Proceeds for two sales that closed previously—where all liens and ABIs were subsequently released (Elkhorn #1 and Expressway #305). The Net Sale Proceeds from these two prior sales totaled $198,675.57.

[79] Two expenses made up the majority of this category: $4,154.78 in tax preparation fees, and $1,068.00 in annual storage unit costs.

| Source/Destination | Amount In | Amount Out[80] |
|---|---|---|
| Almond Heights Lot 7, deposit | $2,000.00 | $2,000.00 |
| Riverbend Home, Net Sale Proceeds | $69,569.48 | |
| Almond Heights Lot 17, Net Sale Proceeds | $21,752.44 | |
| Wells Fargo Bank: wire transfer fees | | $75.00 |
| Almond Heights Lots 11-13, Net Sale Proceeds | $81,455.10 | $81,455.10 |
| Almond Heights Lot 26, Net Sale Proceeds | $27,151.02 | |
| Operating Account: Riverbend Home, deposit | | $5,000.00 |
| Operating Account: Elkhorn Lot 1, deposit and Net Sale Proceeds | | $149,984.78 |
| Operating Account: Expressway Unit #305, deposit and Net Sales Proceeds | | $55,840.79 |
| **TOTAL** | **$201,928.04** | **$294,355.67** |

5.      SFARAttached as **Exhibit C** is a copy of the Standardized Fund

Accounting Report for the Reporting Period.Administrative Expenses of Receiver and Counsel.

On December 4, 2014, the Court entered an *Order Approving the Receiver's Third Interim Fee*

*Application for Receiver and Receiver's Professionals for Services Rendered from July 1, 2013*

*through December 31, 2013.*[81]  Pursuant to this authorization, $311,939.60 in fees and expense

reimbursement was approved for the Receiver and $301,985.50 in fees and $17,244.36 in

expense reimbursement was approved for Dorsey & Whitney LLP, counsel for the Receiver. The

Court allowed the fees and expenses requested, authorized payment of the expenses to Dorsey &

Whitney LLP, and approved payment of the fees requested and allowed, subject to a 20%

holdback.  Accordingly, $258,832.76 was paid to Dorsey & Whitney LLP on December 4, 2014,

and $249,551.68 was paid to the Receiver on December 9, 2014. The 20% holdback, in the

---

[80] With the exception of the wire transfer fees, all these withdrawals were transfers to the Operating Account.

[81] Docket No. 828.

amount of $122,785.02, is being held in a separate Receivership savings account pending further approval by the Court.

For the current Reporting Period, the Receiver and his staff have spent a total of 664.5 hours on behalf of the Receivership Estate. Total fees incurred by the Receiver during the Reporting Period are in the total amount of $87,920.50. The Receiver's legal counsel's total fees and expenses incurred during the Reporting Period are in the total amount of $152,024.09.[82]

## VIII.

## NEXT STEPS

The Receiver continues to make progress in administering the Receivership Estate. The work of the Receiver and his counsel during this Reporting Period focused on: i) pursuing litigation against and obtaining settlements with persons who owe money to the Receivership Estate, ii) obtaining ABI releases, iii) seeking legal rulings on the validity of ABIs asserted against properties of the Receivership Estate, iv) marketing properties of the Receivership Estate for sale, and v) preparing to commence a claims process. At this time, the Receiver anticipates addressing the following priorities in the coming months:

1.  Litigation. In light of the large number of lawsuits filed in June 2013 and since, a significant share of legal counsel's time and the time of the Receiver will continue to be spent in litigation-related activities. Significant progress has been made. The number of active

---

[82] A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver and the Receiver's legal counsel in prior Reporting Periods is set forth in each of the status reports. *See* First Report, p. 59; Second Report, p. 29; Third Report, pp. 28-29; Fourth Report, p. 42; Fifth Report, pp. 33-34; Sixth Report, pp. 24-25; Seventh Report, p. 22; Eighth Report, p. 29; Ninth Report, p. 33; *see also* First Interim Fee Application, Docket No. 467; Second Interim Fee Application, Docket No. 636; and Third Interim Fee Application, Docket No. 828.

lawsuits has been reduced as a result of settlements, default judgments, and dismissals based on, among other things, the receipt of bankruptcy notices. This leaves approximately 29 clawback proceedings, 2 other collection lawsuits, and the validity of approximately 75 ABIs left to be litigated.

Since the Receiver has attempted at every juncture, both prior to and after filing his lawsuits, to avoid the costs of litigation by making demands and attempting to work out settlements, these remaining suits will almost certainly require more time and effort typical of the litigation process, including engaging in discovery, responding to motions to dismiss and summary judgment, and proving the elements of the actions brought. While the Receiver is hopeful that these remaining cases will be resolved prior to trial, he must prepare for trial in the event favorable settlement agreements cannot be obtained.

In addition to the lawsuits filed, the Receiver also continues to gather information about and engage in discussions with other potential defendants. This includes the additional litigation filed during the Reporting Period,[83] and claims against a few other potential defendants which are still being evaluated and negotiated by the Receiver prior to the filing of suit.

2.    Property Sales. During the Reporting Period, the Receiver obtained appraisals on numerous additional parcels of real property and he has received purchase offers and indications of interest for some of these properties. Thus, the Receiver expects to be seeking Court approval for the sale of additional properties during the coming months. The Receiver will

---

[83] *See* discussion *supra* at Part V.B.

continue investigating ways to reduce the expenses of real properties so as to maximize their value for the Receivership Estate.

   3.   <u>Obtaining Judicial Rulings on Validity of ABIs</u>.  The Receiver has now filed court actions against all known holders of all outstanding ABIs.  Through this litigation, the Receiver hopes to obtain judicial determinations in the near future of the validity of these interests.  The Receiver will continue his efforts to secure voluntary releases of outstanding ABIs.  Based on the number of ABIs already released, the Receiver plans to notify the Court of his intention to release unencumbered funds from the Real Estate Account so a claims process can be initiated.  When judicial rulings on the ABIs have been obtained, the Receiver expects to be able release the balance of funds held in the Real Estate Account for distribution through the claims process.

   4.   <u>Claims Process</u>.  Based on the number of ABIs voluntarily released during the Reporting Period, the Receiver has determined that significant funds may be released and transferred to the Operating Account.  As discussed above, the Receiver intends to file a Motion with the Court reporting on the amount that should be transferred and requesting authority to do so.  With these transferred funds added to monies already in the Operating Account, the Receiver believes there will be sufficient funds to make a distribution to investors.  Accordingly, the Receiver has prepared a proposed structure for, and proposed forms to be used in, a claims process.  The SEC has provided comments on the proposed claims process and the Receiver hopes to commence a claims process in the upcoming reporting period.

## IX.

## CONCLUSION

Solid progress was made during the Reporting Period.  The Receiver intends to continue to efficiently administer the estate in a manner that maximizes the value of the Receivership Estate so as to maximize any distribution available to investors.

DATED this 26ᵗʰ day of February, 2015.

WAYNE KLEIN, Receiver

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED the above **TENTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this 26th day of February, 2015, and served via ECF on all parties who have requested notice in this case, including the Securities and Exchange Commission.

IT IS FURTHER CERTIFIED that the above **TENTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** was served via U.S. Mail, first class, postage prepaid, on the following:

> Wayne Palmer
> 8816 South 2240 West
> West Jordan, UT 84088

/s/ Candy Long

# EXHIBIT A

## NATIONAL NOTE OF UTAH, LC
### Additional Companies Included in the Receivership Order

Bonneville Minerals, LLC

Centennial Aviation, LLC

The Corner Corporation

DPLM LLC

Elkhorn Ridge, LLC

Expressway Business Park Owners
Organization, LLC

Farrell Business Park Association

Freedom Minerals I, LLC

Freedom Minerals II LLC

HSB Technologies, LLC

Homeland Development I, LLC

Homeland Development II, LLC

Homeland Funding Corp.

Homeland Holding Corp.

Homeland Minerals, LLC

Homeland Mortgage, Inc.

Homeland Mortgage, L.C.

Indian Canyon, LLC

Koala T. Investments LLC

Land, Utah, LC

Made Art Licensing, LLC

Montana One, LLC

ND I, LLC

NPL America LLC

Network Leisure Shoppes, Inc.

Note Systems, Inc.

Old Glory Minting Company LLC

Ovation 106, LLC

Passport Properties, L.C.

Pedigree Properties

Presidential Utah Properties LC

Prime Wave I, LLC

The Property Company, LLC

Real Estate Finance Institute, Inc.

Riverbend Estates LC

Spanish Fork Development, LLC

Territory Land Company, Inc.

Top Flight, LLC

Traditions in Timber

Twin Pines Property, LC

Vision Land, LLC

# EXHIBIT B

# REAL PROPERTIES—STATUS

As of 12/31/14. Investigation Ongoing. All information subject to Change.

The numbers in the first column correspond with numbers of these properties as described in the Receiver's First Status Report.

## PROPERTIES CURRENTLY IN RECEIVERSHIP ESTATE

| Property Name | Location | Listing Price | Sales Price | Net Sale Proceeds | Status |
|---|---|---|---|---|---|
| 3 Elkhorn Ridge Estates-42 Building Lots | Malad, ID | | | | Marketed for sale with broker; several lots sold (described below) |
| 4 Elkhorn Ridge-4 Undeveloped Parcels | Malad, ID | | | | Property split approved [Docket No. 289] Listed for sale with broker |
| 7 Ogden Office Building | Ogden, UT | N.A. | | | Building is vacant; property is being marketed through broker |
| 10 Deer Meadows | Duchesne Co., UT | 72,000 | | | Marketed for sale through broker; lien released in settlement |
| 17 Palmer Residence | West Jordan, UT | N.A. | | | Motion to intervene by lender seeking to foreclose [Docket No. 767] |
| 20 Overland Trails | Eagle Mtn., UT | | | | Property being evaluated for equity and sale |
| 21 Cedar Fort Land (Fairfield)-85 Acres | Fairfield, UT | 255,000 | | | Property is listed for sale with broker |
| 23 Expressway Business Park-Land | Spanish Fork, UT | 1,250,000 | | | Second buyer withdrew preliminary offer following due diligence |
| 25 Almond Heights-15 Building Lots | Toquerville, UT | 842,000 | | | Property is listed for sale with broker; property encumbered by bond |
| 29 Bear Grove Industrial Park-12 Lots | Byron, MN | 1,675,200 | | | Motion for sale filed [Docket No. 815] Awaiting sale approval |
| Parcel #8516 | | 281,500 | 210,000 | | Motion for sale filed [Docket No. 805] Awaiting sale approval |
| Parcel #8509 | | 156,700 | 149,000 | | Motion for sale filed [Docket No. 300] Sale approved 6/5/13 |
| Parcel #8512 | | 305,000 | | | Offer received; plan to file motion for Court approval of sale |

## PROPERTIES SOLD OR RELEASED

| Property Name | Location | Listing Price | Sales Price | Net Sale Proceeds | Status |
|---|---|---|---|---|---|
| 1 River Run/Riverbend Subdivision-Land | Middleton, ID | N.A. | N.A. | N.A. | No equity, Court approved release of property to lender [Dkt. No. 590] |
| 2 Riverbend Home 1 | Middleton, ID | 115,000 | 105,000 | 96,461.72 | Sale approved [Docket No. 734], Sale closed 10/15/14 |
| Riverbend Home 2 | Middleton, ID | 80,000 | 76,000 | 69,569.48 | Sale approved [Docket No. 804], Sale closed 11/17/14 |
| 3 Elkhorn Ridge Estates-47 Building Lots | Malad, ID | N.A. | N.A. | N.A. | Marketed for sale with broker; several lots sold (described below) |
| Lot #1 | | 135,000 | 155,000 | 142,834.78 | Sale approved [Docket No. 419] Sale closed 8/29/13 |
| Lot #2 | | 35,000 | 31,500 | 27,725.00 | Sale approved [Docket No. 419] Sale closed 12/6/13 |
| Lot #4 | | 35,000 | 35,000 | 30,893.21 | Sale approved [Docket No. 231] Sale closed 4/26/13 |
| Lot #5 | | 80,000 | 35,000 | 71,803.14 | Sale approved [Docket No. 231] Sale closed 4/8/13 |
| Lot #48 | | 80,000 | 80,000 | 73,620.84 | Sale approved [Docket No. 231] Sale closed 4/9/13 |
| Lot #48 | | 49,000 | 51,000 | 45,933.32 | Sale approved [Docket No. 300] Sale closed 6/5/13 |
| 5 Manhattan Grille Condominium | Manhattan, MT | N.A. | | 172,020.02 | Sale approved [Docket No. 736], Sale closed 9/14/14 |
| 6 Twin Pines Apartments | Brigham City, UT | 40,000 | 37,500 | 32,477.61 | Sale approved [Docket No. 135] Sale closed 1/24/13 |
| 8 Summit Park Lot | Summit Park, UT | 260,000 | 260,000 | 226,374.07 | Court approved sale [Docket No. 341] Sale closed 10/24/13 |
| 9 Bandanna Cabin | Fruitland, UT | N.A. | 148,222.56 | 134,068.12 | Sale at auction approved [Docket No. 269] Sale closed 8/21/13 |
| 11 Outpost/Indian Canyon | Duchesne Co., UT | N.A. | 1,025,000 | 979,620.29 | Sale approved [Docket No. 292] Sale closed 7/29/13 |
| 12 East Meadows Mobile Home Park | Vernal, UT | N.A. | | N.A. | |
| 13 Quail Hollow Apartments | Vernal, UT | N.A. | | | Determined not owned by Receivership Estate |
| 14 Residential Building Lots at 900 West | Salt Lake City, UT | N.A. | 70,000 | 65,295.00 | Sale approved [Docket No. 263] Sale closed 5/8/13 |
| 15 Cottonwood Road Property-4 acres | Salt Lake City, UT | N.A. | | | No equity, court approved release of property to lender [Dkt. No. 179] |
| 15 Cottonwood Road Property-1 acre | Salt Lake City, UT | N.A. | 291,000 | 279,189.07 | Sale at auction approved [Docket No. 495] Sale closed 11/8/13 |
| 16 National Note Office Building | West Jordan, UT | 285,000 | 285,000 | 55,903.09 | Sale approved [Docket No. 161] Sale closed 3/19/13 |
| 18 Star Pointe Development | Salt Lake City, UT | N.A. | | 70,000.00 | Court approved settlement agreement with lender [Docket No. 608] |
| 19 Autumn Ridge Subdivision-Phase I | Salt Lake City, UT | N.A. | N.A. | N.A. | Sale approved [Docket No. 692], Sale closed 7/8/14 |
| Phase I-Lot #2 | Eagle Mtn., UT | 37,000 | 39,900 | 35,635.21 | |

| | | | | | |
|---|---|---|---|---|---|
| Phase I-Lot #3 | | 37,000 | 39,900 | 35,711.84 | Sale approved [Docket no. 644] Sale closed 5/1/14 |
| Phase I-Lot #4 | | 37,000 | 37,000 | 30,821.91 | Sale approved to builders [Docket No. 293] Sale closed 6/3/13 |
| Phase I-Lot #8 | | 37,000 | 37,000 | 31,554.15 | Sale approved to builders [Docket No. 293] Sale closed 5/31/13 |
| Phase I-Lot #54 | | 37,000 | 37,000 | 31,554.16 | Sale approved to builders [Docket No. 293] Sale closed 5/31/13 |
| Phase I-Lot #41 | | 37,000 | 37,000 | 30,857.73 | Sale approved to builders [Docket No. 293] Sale closed 8/14/13 |
| Phase I-Lot #40 | | 37,000 | 37,000 | 30,911.96 | Sale approved to builders [Docket No. 293] Sale closed 9/25/13 |
| Phase I-Lot #6 | | 37,000 | 37,000 | 30,775.92 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| Phase I-Lot #33 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| Phase I-Lot #7 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| Phase I-Lot #51 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| Phase I-Lot #52 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| Phase I-Lot #55 | | 37,000 | 37,000 | 31,355.85 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| Phase I-Lot #30 | | 37,000 | 37,000 | 31,355.89 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| Phase I-Lot #39 | | 37,000 | 37,000 | 35,903.39 | Sale approved [Docket No. 696]. Sale closed 7/18/14 |
| Phase I-62 Building Lots | | 538,000 | | 446,610.24 | Sale approved to builders [Docket No. 293] Sale closed 10/31/13 |
| 21. Cedar Fort Land (Fairfield)-8 acres | Fairfield, UT | 24,000 | 25,000 | 22,274.21 | Sale at auction approved [Docket No. 458] Sale closed 11/14/13 |
| 22 Expressway Business Park | Spanish Fork, UT | N.A. | N.A. | N.A. | |
| Unit #204 | | N.A. | N.A. | N.A. | No equity, court approved release to lender [Docket No. 270]. Sale closed 6/27/13 |
| Unit #215 | | N.A. | N.A. | N.A. | No equity, court approved release to lender [Docket No. 364] |
| Unit #305 | | N.A. | 127,500 | 112,985.27 | Sale approved at auction [Docket No. 393]. Sale closed 10/30/13 |
| Unit #109 | | N.A. | N.A. | N.A. | No equity. Court approved release to lender [Docket No. 125] |
| 24 Gooseberry Cabin | Fairview, UT | 65,000 | 69,000 | 55,840.79 | Sale at auction approved [Docket No. 460]. Sale closed 7/18/14 |
| 25 Almond Heights-21 Building Lots | Toquerville, UT | 842,000 | | | |
| Lot #7 | | 38,000 | 32,000 | 29,388.95 | Sale approved [Docket No. 829]. Sale closed 12/18/14 |
| Lot #11 | | 37,050 | 32,000 | 6,788.12 | Sale approved [Docket No. 829]. Sale closed 12/16/14 |
| Lot #12 | | 38,000 | 32,000 | 6,787.90 | Sale approved [Docket No. 829]. Sale closed 12/16/14 |
| Lot #13 | | 37,050 | 32,000 | 6,787.75 | Sale approved [Docket No. 829]. Sale closed 12/16/14 |
| Lot #17 | | 30,400 | 24,000 | 21,752.44 | Sale approved [Docket No. 829]. Sale closed 12/17/14 |
| Lot #26 | | 34,200 | 32,000 | 27,151.02 | Sale approved [Docket No. 829]. Sale closed 12/17/14 |
| 26 Kanab Home | Kanab, UT | 199,000 | 197,000 | 18,162.90 | Sale approved [Docket No. 746]. Sale closed 9/4/14 |
| 27 Farrell Business Park-12 Units | Gilbert, AZ | N.A. | N.A. | N.A. | |
| Unit 103 | | 76,631 | 101,631 | 83,997.05 | Court approved sale at auction [Docket No. 202]. Sale closed 5/31/13 |
| Unit 104 | | 76,631 | 101,631 | 83,997.05 | Court approved sale at auction [Docket No. 202] Sale closed 6/3/13 |
| Unit 105 | | 80,000 | 92,000 | 70,392.98 | Court approved sale at auction [Docket No. 203] Sale closed 5/21/13 |
| Unit 106 | | 80,000 | 97,000 | 74,832.11 | Court approved sale at auction [Docket No. 204] Sale closed 6/7/13 |
| Unit 107 | | 80,000 | 90,000 | 67,699.81 | Court approved sale at auction [Docket No. 205] Sale closed 6/7/13 |
| Unit 109 | | 80,000 | 80,000 | 59,194.91 | Court approved sale at auction [Docket No. 206] Sale closed 5/16/13 |
| Unit 110 | | 80,000 | 80,000 | 59,194.91 | Court approved sale at auction [Docket No. 206] Sale closed 5/16/13 |
| Unit 111 | | 80,000 | 80,000 | 59,194.92 | Court approved sale at auction [Docket No. 206] Sale closed 5/16/13 |
| Unit 111 | | 80,000 | 107,000 | 85,094.45 | Court approved sale at auction [Docket No. 206] Sale closed 5/16/13 |
| Unit 113 | | 80,000 | 85,000 | 85,094.45 | Court approved sale at auction [Docket No. 207] Sale closed 6/3/13 |
| Unit 114 | | 80,000 | 107,000 | 85,094.45 | Court approved sale at auction [Docket No. 207] Sale closed 6/3/13 |
| Unit 115 | | 80,000 | 80,000 | 59,288.00 | Court approved sale at auction [Docket No. 208] Sale closed 6/11/13 |
| Unit 116 | | 80,000 | 80,000 | 59,288.00 | Court approved sale at auction [Docket No. 208] Sale closed 6/11/13 |
| 28 Clearview Business Park-8 Units | Mesa, AZ | 415,954 | 737,000 | 591,295.43 | Court approved sale at auction [Docket No. 208] Sale closed 5/10/13 |

| | | | | | Sale approved [Docket No. 553] Sale closed 1/10/14 |
|---|---|---|---|---|---|
| 30 Georgia Single Family Residence | Temple, GA | 135,000 | 125,000 | 106,843.83 | |
| 31 Chicago Single Family Residence | Chicago, IL | N.A. | N.A. | N.A. | No value; court approved abandonment [Docket No. 434] Order 9/10/13 |
| 32 Cleveland Single Family Residence | Cleveland, OH | N.A. | N.A. | N.A. | No value; court approved abandonment [Docket No. 434] Order 9/10/13 |
| 33 Cleveland Building Lot | Cleveland, OH | N.A. | N.A. | N.A. | No value; court approved abandonment [Docket No. 434] Order 9/10/13 |
| 34 Toledo Single Family Residence | Toledo, OH | N.A. | N.A. | N.A. | No value; court approved abandonment [Docket No. 434] Order 9/10/13 |
| Total | | 4,745,916.00 | 6,543,583.92 | 5,485,538.60 | |

# EXHIBIT C

Wayne Klein, Receiver for National Note of Utah
10 Exchange Place, Ste. 502
Salt Lake City, UT 84111
801-456-4593

# STANDARDIZED FUND ACCOUNTING REPORT

## Civil – Receivership Fund

Fund Name: SEC v. National Note of Utah
Civil Court Docket No. 2:12-CV-00591 BSJ

Reporting Period 10/01/2014 to 12/31/2014

**Standardized Fund Accounting Report for National Note of Utah - Cash Basis**
Receivership; Civil Court Docket No. 2:12-CV-00591 BSJ
Reporting Period 10/01/2014 to 12/31/2014

Fund Accounting (See Instructions):

| | | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| Line 1 | Beginning Balance (As of 10/01/2014): | $5,933,972.09 | | |
| | *Increases in Fund Balance:* | | | |
| Line 2 | Business Income | $21,088.01 | | |
| Line 3 | Cash and Securities | $0.00 | | |
| Line 4 | Interest/Dividend Income | $1.85 | | |
| Line 5 | Business Asset Liquidation | $266,687.38 | | |
| Line 6 | Personal Asset Liquidation | $0.00 | | |
| Line 7 | Third-Party Litigation Income | $176,157.17 | | |
| Line 8 | Miscellaneous - Other | $955.71 | | |
| | Total Funds Available (Lines 1 - 8) | | $6,398,862.21 | |
| | *Decreases in Fund Balance:* | | | |
| Line 9 | Disbursements to Investors | $0.00 | | |
| Line 10 | Disbursements for Receivership Operations | | | |
| Line 10a | *Disbursements to Receiver or Other Professionals* | $249,551.68 | | |
| Line 10b | *Business Asset Expenses* | $30,049.38 | | |
| Line 10c | *Personal Asset Expenses* | $0.00 | | |
| Line 10d | *Investment Expenses* | $0.00 | | |
| Line 10e | *Third-Party Litigation Expenses* | | | |
| | 1. Attorney Fees | $241,588.40 | | |
| | 2. Litigation Expenses | $17,244.36 | | |
| | *Total Third-Party Litigation Expenses* | $258,832.76 | | |
| Line 10f | *Tax Administrator Fees and Bonds* | $0.00 | | |
| Line 10g | *Federal and State Tax Payments* | $0.00 | | |
| | **Total Disbursements for Receivership Operations** | $538,433.82 | | |
| Line 11 | **Disbursements for Distribution Expenses Paid by the Fund:** | | | |
| Line 11a | *Distribution Plan Development Expenses:* | | | |
| | 1. Fees: | $0.00 | | |
| | Fund Administrator | | | |
| | Independent Distribution Consultant (IDC) | | | |
| | Distribution Agent | | | |
| | Consultants | | | |
| | Legal Advisers | | | |
| | Tax Advisers | | | |
| | 2. Administrative Expenses | $0.00 | | |
| | 3. Miscellaneous | $0.00 | | |
| | *Total Plan Development Expenses* | $0.00 | | |
| Line 11b | *Distribution Plan Implementation Expenses:* | | | |
| | 1. Fees: | $0.00 | | |
| | Fund Administrator | | | |
| | IDC | | | |
| | Distribution Agent | | | |
| | Consultants | | | |

|  |  | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| | Legal Advisers | | | |
| | Tax Advisers | | | |
| | 2. Administrative Expenses | $0.00 | | |
| | 3. Investor Identification: | $0.00 | | |
| |    Notice/Publishing Approved Plan | | | |
| |    Claimant Identification | | | |
| |    Claims Processing | | | |
| |    Web Site Maintenance/Call Center | | | |
| | 4. Fund Administrator Bond | $0.00 | | |
| | 5. Miscellaneous | $0.00 | | |
| | 6. Federal Account for Investor Restitution | $0.00 | | |
| | (FAIR) Reporting Expenses | $0.00 | | |
| | *Total Plan Implementation Expenses* | $0.00 | | |
| | **Total Disbursements for Distribution Expenses Paid by the Fund** | $0.00 | | |
| Line 12 | **Disbursements to Court/Other:** | | | |
| | *Investment Expenses/Court Registry Investment* | | | |
| Line 12a | *System (CRIS) Fees* | $0.00 | | |
| Line 12b | *Federal Tax Payments* | $0.00 | | |
| | **Total Disbursements to Court/Other** | $0.00 | | |
| | **Total Funds Disbursed (Lines 9 - 12):** | | $538,433.82 | |
| Line 13 | **Ending Balance (As of 12/31/2014):** | | | $5,860,428.39 |
| Line 14 | **Ending Balance of Fund - Net Assets:** | | | |
| Line 14a | *Cash & Cash Equivalents* | $5,860,428.39 | | |
| Line 14b | *Investments* | $0.00 | | |
| Line 14c | *Other Assets or Uncleared Funds* | $0.00 | | |
| | **Total Ending Balance of Fund - Net Assets** | | | $5,860,428.39 |

**Other Supplemental Information:**

|  |  | Detail | Subtotal | Grand Total |
|---|---|---|---|---|
| | *Report of Items NOT To Be Paid by the Fund:* | | | |
| Line 15 | **Disbursements for Plan Administration Expenses Not Paid by the Fund:** | | | |
| Line 15a | *Plan Development Expenses Not Paid by the Fund:* | | | |
| | 1. Fees: | $0.00 | | |
| |    Fund Administrator | | | |
| |    IDC | | | |
| |    Distribution Agent | | | |
| |    Consultants | | | |
| |    Legal Advisers | | | |
| |    Tax Advisers | | | |
| | 2. Administrative Expenses | $0.00 | | |
| | 3. Miscellaneous | $0.00 | | |
| | *Total Plan Development Expenses Not Paid by the Fund* | $0.00 | | |
| Line 15b | *Plan Implementation Expenses Not Paid by the Fund:* | | | |
| | 1. Fees: | $0.00 | | |
| |    Fund Administrator | | | |

|  | IDC |  |
|---|---|---|
|  | Distribution Agent |  |
|  | Consultants |  |
|  | Legal Advisers |  |
|  | Tax Advisers |  |
|  | 2. Administrative Expenses | $0.00 |
|  | 3. Investor Identification: | $0.00 |
|  | Notice/Publishing Approved Plan |  |
|  | Claimant Identification |  |
|  | Claims Processing |  |
|  | Web Site Maintenance/Call Center |  |
|  | 4. Fund Administrator Bond | $0.00 |
|  | 5. Miscellaneous | $0.00 |
|  | 6. FAIR Reporting Expenses | $0.00 |
|  | *Total Plan Implementation Expenses Not Paid by the Fund* | $0.00 |
|  | *Tax Administrator Fees and Bonds Not Paid by the Fund* | $0.00 |
| Line 15c | Fund |  |
|  | **Total Distributions for Plan Administration Expenses Not Paid by the Fund** | $0.00 |
| Line 16 | **Disbursements to Court/Other Not Paid by the Fund:** |  |
|  | *Investment Expenses/Court Registry Investment System (CRIS) Fees* | $0.00 |
| Line 16a |  |  |
| Line 16b | *Federal Tax Payments* | $0.00 |
|  | **Total Disbursements to Court/Other Paid by the Fund:** | $0.00 |
| Line 17 | **DC & State Tax Payments** | $0.00 |
| Line 18 | **No. of Claims:** |  |
| Line 18a | *# of Claims Received This Reporting Period* | 0 |
| Line 18b | *# of Claims Received Since Inception of Fund* | 0 |
| Line 19 | **No. of Claimants/Investors:** |  |
| Line 19a | *# of Claimants/Investors Paid This Reporting Period* | 0 |
| Line 19b | *# of Claimants/Investors Paid Since Inception of Fund* | 0 |

Receiver: *Wayne Klein Receiver for National Note*

By: *(signature)* Wayne Klein
(signature)

Wayne Klein
(printed name)

Receiver
(title)

Date: 2/26/15

### NNU SFAR - 4th Quarter 2014
### Line Breakdown

| | Line 2 | Line 4 | Line 5 | Line 6 | Line 7 | Line 8 | Total |
|---|---|---|---|---|---|---|---|
| Rent Received | $21,088.01 | | | | | | |
| Overpaid Investors | | | | | $176,157.17 | | |
| National Note | | | $64,759.34 | | | | |
| Real Estate Holding | | | $201,928.04 | | | | |
| Royalties Received | | | | | | $0.00 | |
| Interest | | $1.85 | | | | | |
| Refunds | | | | | | $955.71 | |
| Advances by Receiver | | | | | | | |
| | $21,088.01 | $1.85 | $266,687.38 | $0.00 | $176,157.17 | $955.71 | $464,890.12 |

| | Line 10a | Line 10b | Line 10g | Line 10e-1 | Line 10e-2 | | Total |
|---|---|---|---|---|---|---|---|
| Receivership Expenses | $249,551.68 | $30,049.38 | $0.00 | $241,588.40 | $17,244.36 | | |
| Refund Deposit from Prior Period | | $0.00 | | | | | |
| Adjustment - NNU Account | | | | | | | |
| | $249,551.68 | $30,049.38 | $0.00 | $241,588.40 | $17,244.36 | $0.00 | $538,433.82 |

| | Line 14a |
|---|---|
| National Note | $1,325,283.96 |
| Savings | $122,786.87 |
| Real Estate Holding | $4,412,357.56 |
| | $5,860,428.39 |

Created by James Shupe on 1/13/2015