Peggy Hunt (Utah State Bar No. 6060)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual,<br><br>Defendants. | **ELEVENTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER**<br>*For the Quarter Ending March 31, 2015*<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this Eleventh Status Report for the period January 1, 2015 through March 31, 2015 (the "Reporting Period").

# TABLE OF CONTENTS

**Page**

I. PROCEDURAL HISTORY ...................................................................................................1

II. CONTINUED OPERATIONS....................................................................................................2

III. REAL ESTATE HOLDINGS ..................................................................................................3

      A.      Efforts to Release Liens and Other Interests Against Real Properties....................4

      B.      Real Property Sales Closed During the Reporting Period. ....................................7

      C.      Real Property Sales Approved During the Reporting Period/Not Closed. ...........10

      D.      Real Property Sales for Which Court Approval Was Requested.........................10

      E.      Offers Preliminarily Accepted on Real Properties………...............................10

      F.      Real Properties to Relinquish—Lack of Equity.................................................10

      G.      Damage to Ogden Building ...………………………………………………..11

IV. MINERAL ORES ................................................................................................................12

V. LITIGATION......................................................................................................................12

      A.      Claims Being Pursued By The Receivership Estate. ..........................................12

      B.      New Litigation Filed By The Receiver During the Reporting
              Period…………..........................................................................................13

      C.      Significant Litigation Rulings…………...........................................................13

      D.      Settlements of Litigation.................................................................................14

      E.      Default Judgments and Clawback Actions………...........................................15

      F.      Status of Remaining Litigation .........................................................................15

VI. CLAIMS PROCESS.............................................................................................................16

VII. INVESTIGATIVE FINDINGS FROM RECORDS OF THE RECEIVERSHIP
ENTITIES .............................................................................................................................16

      A.      National Note's Treatment of Delinquent Loans to Non-Affiliates....................17

VIII. FINANCIAL ANALYSIS ....................................................................................................17

      A.      Receivership Financial Information...................................................................17

VIII. NEXT STEPS ...............................................................................................................20

IX. CONCLUSION....................................................................................................................21

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[1]  The same day, the Court granted several motions filed by the SEC, including a Temporary Restraining Order and Order to Show Cause (the "TRO"),[2] an Order Freezing Assets and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[4]  Palmer later stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5]  As a result of the Receivership Order, the Receiver controls the identified assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **Exhibit A**.

The SEC filed a Motion for Summary Judgment in the Civil Case on July 19, 2013,[6] arguing that certain securities law violations had been established as a matter of law.  Palmer opposed the SEC's Motion,[7] and thereafter he filed a variety of motions.  At a hearing on July 9,

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

[6] Docket No. 377.

[7] Docket No. 473.

2014, the Court determined to set the matter for trial rather than dispose of the case through summary judgment at that time.[8]  On February 24, 2015 the Court entered a scheduling order requiring that all discovery to be completed by July 29, 2015, and setting a pre-trial hearing for August 21, 2015.[9]

In accordance with the Receivership Order,[10] the Receiver has filed ten previous status reports.[11] This is the Eleventh Status Report for the period of January 1, 2015 through March 31, 2015, defined above as the "Reporting Period."

## II.

## CONTINUED OPERATIONS

The Receiver is no longer operating any businesses or rental properties of the Receivership Estate.

---

[8] On January 5, 2015, a Motion was filed by Palmer representing that he had now employed a new law firm to represent him and requesting that the Court release assets from the Receivership Estate to pay this firm and litigation costs.  The Court denied this Motion on March 4, 2015 [Docket No. 897], and the law firm withdrew as Palmer's counsel.  This was the fifth law firm to have represented Palmer.

[9] Separately, in November 2013, the SEC commenced a civil enforcement action against Palmer's cousin, Julieann Palmer Martin ("Martin") related to Martin's involvement with Palmer and National Note.  An Initial Decision in *In the Matter of Julieann Palmer Martin*, Adm. P. File No. 3-15613 (SEC filed Mar. 9, 2015), a copy of which is attached hereto as Exhibit D, was filed recently finding that Martin had violated securities laws in her activities on behalf of National Note.  The SEC requested that the Receiver provide it with information related to his investigation of National Note to assist it at trial, and the Receiver was called as a SEC witness.

[10] Docket No. 9 (Receivership Order) at pp.18-20.

[11] The Receiver's First Status Report and Liquidation Plan, for the period June 25, 2012 through September 30, 2012, was filed November 12, 2012 [Docket No. 73] (the "First Report"); the "Second Report" covered the period ending December 31, 2012 [Docket No.170]; the "Third Report" covered the period ending March 31, 2013 [Docket No. 288]; the "Fourth Report" covered the period ending June 30, 2013 [Docket No. 408]; the "Fifth Report" covered the period ending September 30, 2013 [Docket No. 510]; the "Sixth Report" covered the period ending December 31, 2013 [Docket No. 598]; the "Seventh Report" covered the period ending March 31, 2014 [Docket No. 639]; the "Eighth Report" covered the period ending June 30, 2014 [Docket No. 710]; the "Ninth Report" covered the period ending September 30, 2014 [Docket No. 808]; and the "Tenth Report" covered the period ending December 31, 2014 [Docket No. 889].

### III.

### <u>REAL ESTATE HOLDINGS</u>

A significant portion of the Receivership Estate's potential assets are in real estate holdings, all of which were described in the Receiver's First Report. The Receiver has determined that a majority of the real properties appear to have value for the Receivership Estate and need to be marketed for sale, some properties have no equity, and some require further investigation and analysis, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties.

During the Reporting Period, the Receiver closed the sale of five properties, abandoned a sixth, and actively marketed other properties for sale.  Attached hereto as **<u>Exhibit B</u>** is a chart setting forth the status of all real properties in the Receivership Estate as of March 31, 2015.

For purposes of this Status Report, the Receiver discusses the following in Parts A through G below:

- Part A discusses the efforts undertaken during the Reporting Period to release alleged interests recorded against the Receivership Estate's real properties;

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale has been requested;

- Part E identifies real properties where the Receiver has preliminarily accepted offers and intends to seek Court approval of the sales;

- Part F describes actions taken by the Receiver regarding real properties in which it does not appear that the Receivership Estate has equity;

- Part G describes damages and repairs to the Ogden property, as defined in more detail below.

     **A.**      **<u>Efforts to Release Liens and Other Interests Against Real Properties</u>.**  As has been described in prior Status Reports, as part of the Receiver's investigation of real property holdings of the Receivership Estate, the Receiver has identified numerous types of interests that have been asserted against many of the Receivership Estate's real properties, including at least the following types of interests, for which he has taken the following actions:

        1.    <u>Assignments of Beneficial Interests ("ABIs")</u>.   At the time the Receiver was appointed, 349 ABIs had been recorded against 49 properties in the Receivership Estate. These ABIs represented $32.4 million in possible claims against Receivership Properties.   The Receiver has made great progress in obtaining releases of these ABIs.  A significant majority have been released voluntarily prior to the filing of any litigation.  Other ABIs were released as part of settlement agreements entered into by the Receiver or by default judgments against ABI holders in litigation that has been commenced against those who have not agreed to release their ABIs discussed in further detail below.  As of the end of the Reporting Period, 34 ABIs[12] remain against 12 properties.[13]  These remaining ABIs represent $3,204,029.43 in purported liens

---

[12] This includes 2 ABIs held by persons whose ABIs were not known at the time the lawsuits were filed against other ABI holders.  The Receiver intends to request leave to amend his Complaint in *Klein v. Adams*, 2:14-cv.00614-BSJ (D. Utah) to name these persons as Defendants.

[13] Properties against which ABIs remain recorded are: Autumn Ridge, Clearview Business Park, Cottonwood Lane (small parcels), Elkhorn Lots #11, 12, 33, 37, and 48, Expressway Business Park, Fairfield Land, Farrell Business

against the real property.

    a.    <u>Sale of Property Free and Clear of Liens and Interests</u>:  For properties that still have ABIs recorded against them, the Receiver will continue to request that any sale of such properties be approved by the Court free and clear of these alleged interests, with any interests to attach to the net proceeds of the sale.  If ABIs are asserted, the net sales proceeds of these sales are deposited in the "<u>Real Estate Account</u>," a segregated reserve account, pending release of all ABIs against a property, an order of the Court permitting release of net sale proceeds related to properties against with ABIs remain, or a determination as to the validity of the disputed ABIs.

    b.    <u>Lawsuits Filed by the Receiver Against ABI Holders</u>:  The Receiver filed numerous actions against ABI holders, seeking judgments declaring ABIs to be invalid so as to enable the Receiver to release net sale proceeds currently being held in the Real Estate Account on account of pending ABIs.  These actions are described in a *Status Report In Advance of January 30, 2015 Conference*[14] and the *Receiver's Ex Parte Motion to Consolidate and Memorandum of Law in Support Thereof*  (the "<u>Consolidation Motion</u>").[15]  The Consolidation Motion was granted by the Court[16] and, therefore, other than approximately three clawback proceedings in which overpaid investors hold ABIs, there is currently one action seeking to declare the ABIs invalid styled as *Klein v. Adams*,

---

Park, and Riverbend Estates home (Hawthorne Drive).  *See* Part IV.D of the First Report for a description of these properties.

[14] *Klein v. Adams*, 2:14-cv.00614-BSJ (D. Utah), Docket No. 298.

[15] Docket No. 874.

[16] *Order Granting Motion to Consolidate* [Docket No. 314].

2:14-cv.00614-BSJ (D. Utah) (the "ABI Action").  At a hearing held on February 2,

2015, the Court ordered that discovery in the ABI Action conclude by April 15, 2015,

and that post-discovery motions be filed by May 1, 2015.  A pretrial conference has been

scheduled for July 2, 2015.[17]

     c.    Motion to Release Unencumbered Funds:  On March 11, 2015, the

Receiver filed a *Motion Seeking Authorization to Release Real Estate Account Funds as

Set Forth in Supplemental Report and Memorandum in Support*,[18] seeking the Court's

approval to transfer $1,752,769.93 from the Real Estate Account to the Operating

Account because net sale proceeds in the Real Estate Account had become unencumbered

as a result of the release of ABIs, either voluntarily or by default judgment.  At a hearing

on April 15, 2015, the Court granted this Motion.  Further details will be provided in the

Receiver's next status report.

     2.    Deeds of Trust:  The Receiver identified 13 properties in the Receivership

Estate on which deeds of trust had been recorded at the time the Receiver was appointed. Trust

deeds against three of these properties were paid off at discounted amounts at the time of the

property sales,[19] deeds were released against three properties as part of settlements with the

---

[17] ABI Action, Docket No. 311 (Scheduling Order).

[18] Docket No. 899.  Originally, on January 26, 2015, the Receiver requested the release of approximately $1.8 million in net sale proceeds from the Real Estate Account.  *See Notice of Filing of Receiver's Report on Excess Net Sales Proceeds Available to the Receivership Estate as a Result of Release of Purported Real Estate Interests,* Docket No. 864.  At a hearing on February 3, 2015, however, the Court requested that the Receiver revise his report to incorporate certain issues identified by the Court.  As a result, the Receiver filed the Supplemental Report and noted Motion.

[19] These were the office building at 7800 South in Salt Lake City, the Kanab home, and the Indian Canyon property.

Receiver,[20] three properties having trust deeds were abandoned by the Receiver because the trust deeds (held by lenders) exceeded any value of the properties,[21] and one property is the subject of a lawsuit by the Receiver seeking invalidation of the trust deed because the lender refused to release the trust deed after the loan was completely repaid.[22] That leaves three properties where trust deeds remain which have not yet been challenged by the Receiver.[23]

      **B.**    **Real Property Sales That Closed During the Reporting Period.**  The following five Court-approved real property sales were closed by the Receiver during the Reporting Period.

      1.    <u>Byron West Industrial Park (Lot 5 Block 1), Byron, MN</u>:[24]  On January 9, 2015 the Court entered an Order approving a public sale of this commercial building lot in Byron, Minnesota.[25]  The sale closed on March 16, 2015, with the Receivership Estate receiving $6,500.00 in Net Sale Proceeds. The property taxes and assessments on this property were significantly greater than the value and the ultimate sales price.[26] This sale was able to be completed only because the City of Byron waived $65,232.72 in interest and assessments and the

---

[20] These were the Twin Pines apartments, Deer Meadows, and the Bandanna Cabin.

[21] These were Palmer's personal residence, the large Cottonwood Road parcel, and the Riverbend land.

[22] *Klein v. David Barton, et al.*, Case No. 2:15cv00189-BSJ (D. Utah). This trust deed is on the East Meadow mobile home park in Vernal, Utah.

[23] These are Overland Trails/Eagle Mountain, UT (where outstanding trust deeds exceed the value of the property), Almond Heights/Toquerville, UT (where only some properties are encumbered by trust deeds and where the Receiver has agreements allowing him to sell some lots with the proceeds to be allocated between the Receiver and the trust deed holder), and Expressway/Spanish Fork, UT (where there is a trust deed encumbering a portion of the land).

[24] *See* First Report, p. 50 (describing this property).

[25] Docket No. 854.

[26] There were six years of unpaid property taxes and assessments. The sales price was $235,000.00. The property taxes and assessments totaled $281,348.32. The Receiver filed a "*Notice of Public Sale Results*" at Docket No. 915.

real estate broker discounted his commission by 50% (a discount of $7,050.00). There were no ABIs or deeds of trust on this property, and therefore the Net Sale Proceeds were deposited into the Operating Account.

2.  <u>Byron West Industrial Park (Lot 2 Block 1), Byron, MN</u>:[27]  On January 9, 2015 the Court entered an Order approving a public sale of this commercial building lot in Byron, Minnesota.[28]  There were six years of unpaid property taxes on this property, but unlike several other lots in this development, there were no outstanding assessments on the property. As a result, the Receivership Estate had equity in this property after paying the property taxes.  The sale closed on March 6, 2015, with the Receivership Estate receiving $98,795.03 in Net Sale Proceeds.[29] There were no ABIs or deeds of trust on this property, and therefore the Net Sale Proceeds were deposited into the Operating Account.

3.  <u>Byron West Industrial Park (Second Replat, Lot 5 Block 1), Byron, MN</u>:[30] On February 9, 2015 the Court entered an Order approving a public sale of this commercial building lot in Byron, Minnesota.[31]  The property taxes and assessments on this property were significantly greater than the value and the ultimate sales price.[32] This sale was able to be completed only because the City of Byron waived $39,706.00 in interest and assessments. The

---

[27] *See* First Report, p. 50 (describing this property).

[28] Docket No. 849.

[29] The Receiver filed a "*Notice of Public Sale Results*" at Docket No. 913.

[30] *See* First Report, p. 50 (describing this property).

[31] Docket No. 875.

[32] There were six years of unpaid property taxes and assessments. The sales price was $235,000.00. The property taxes and assessments totaled $248,092.50. The Receiver filed a "*Notice of Public Sale Results*" at Docket No. 914.

sale closed on March 24, 2015, with the Receivership Estate receiving $10,000.00 in Net Sale Proceeds. There were no ABIs or deeds of trust on this property, and therefore the Net Sale Proceeds were deposited into the Operating Account.

      4.    <u>Byron West Industrial Park (Lot 2 Block 2), Byron, MN</u>:[33]  On January 9, 2015 the Court entered an Amended Order approving a public sale of this commercial building lot in Byron, Minnesota.[34]  The property taxes and assessments on this property were significantly greater than the value and the ultimate sales price.[35] This sale was able to be completed only because the City of Byron waived $40,663.00 in interest and assessments. The sale closed on March 27, 2015, with the Receivership Estate receiving $10,000.00 in Net Sale Proceeds after the close of the Reporting Period. There were no ABIs or deeds of trust on this property, and therefore the Net Sale Proceeds will be deposited into the Operating Account.[36]

      5.    <u>Almond Heights Lot 10, Toquerville, Utah</u>:[37] After a hearing, the Court entered an Order on March 25, 2015 approving a private sale of this residential building lot.[38] The sale closed on March 31, 2015, with the Receivership Estate receiving $30,552.54 in Net Sales Proceeds after the close of the Reporting Period.  There were no ABIs or deeds of trust on

---

[33] *See* First Report, p. 50 (describing this property).

[34] Docket No. 852. The Amended Order replaced an order [Docket No. 850] that contained an inaccurate sales price in the publication notice.

[35] There were six years of unpaid property taxes and assessments. The sales price was $210,000.00. The property taxes and assessments totaled $227,324.00. The Receiver filed a "*Notice of Public Sale Results*" at Docket No. 916.

[36] The property closed within the Reporting Period but the sales proceeds were not received until after the end of the quarter. This deposit will be reflected in the financial summary of the next status report.

[37] *See* First Report, p. 47 (describing this property).

[38] Docket No. 906.

this property, and therefore the Net Sales Proceeds will be deposited into the Operating Account.[39]

      **C.**      **<u>Real Property Sales Approved During the Reporting Period/Not Closed</u>.**

During the Reporting Period, there were no properties where the Court approved sales, but where the sales did not close before the end of the Reporting Period.  The sales of the Bryon, Minnesota lot and the Almond Heights lot discussed in paragraphs 4 and 5 immediately above, closed prior to the close of the Reporting Period, but Net Sale Proceeds were received after the end of the Reporting Period.

      **D.**      **<u>Real Property Sales for Which Court Approval Was Requested</u>**.  During the Reporting Period, there were no properties where Receiver sought approval to sell properties where Court review was not yet completed as of the end of the Reporting Period.

      **E.**      **<u>Offers Preliminarily Accepted on Real Properties</u>**.  During the Reporting Period, the Receiver received no offers for properties where the process of Court approval has commenced.

      **F.**      **<u>Real Properties to Relinquish—Lack of Equity</u>.**  On December 12, 2014 and January 26, 2015, the Court held hearings to consider whether the Receivership Estate was likely to have any equity in Palmer's personal residence in West Jordan, Utah.[40] On January 30, 2015, the Court granted the Receiver's motion to abandon the Receivership Estate's interest in Palmer's personal residence based on a determination that the total mortgages on the home were

---

[39] The property closed within the Reporting Period but the sales proceeds were not received until after the end of the quarter. This deposit will be reflected in the financial summary of the next status report.

[40] *See* First Report, p. 38 (describing this property).

equal to or higher than the value of the home, leaving no equity in the property for the Receivership Estate.[41]

      G.    **Damage to Ogden Building**. On January 4, 2015, several water pipes on the top floor of the Ogden office building froze and burst as a result of one of the furnaces failing. This caused water to flood the three floors and basement of the building, causing significant damage. Because the building was not more than 69% occupied (and had never met that level of occupancy when National Note managed the building), the damage was not covered by insurance on the building. The Receiver obtained bids of $54,000.00 and $83,000.00 from commercial contractors to repair the water damage. Instead, the Receiver chose to use workers arranged by the listing broker to do most of the cleanup. In the process, the Receiver paid specialty contractors to repair all furnaces, repair plumbing, and clear drains to the street. The workers arranged by the listing broker repaired water leaks that had existed for many years and the Receiver believes all water leaks have been repaired. The total repairs cost approximately $17,000.00. The Receiver believes that the repaired and cleaned-up building will make the building more attractive to buyers than it was before the water damage. During the Reporting Period, there were two instances of break-ins at the Ogden building, through an external door and a window.

---

[41] Docket No. 869.

# IV.

## MINERAL ORES

As described in the Second Report,[42] the Receiver entered into a Management Agreement with HMI Management LLC, controlled by a group of investors ("HMI"), to investigate whether ore held by National Note has any commercial value.  The Receiver continues to receive reports from HMI on its efforts to recover precious metals from this ore. Reports received indicate that HMI continues to take concrete steps in its efforts to determine whether value can be recovered from the ore.  While the results have been discouraging, HMI believes there is sufficient justification to continue investigating the possibility that the ore has value.[43]  If net proceeds are obtained from the processing of this ore, a share of the profits will be paid to the Receivership Estate in accordance with Management Agreement described in the Second Report.  The Receivership Estate expends no funds related to this matter.

# V.

## LITIGATION

**A.**     **Claims Being Pursued by the Receivership Estate.**  As described in the Fourth Report, the Receiver has filed suit to recover payments or transfers made by National Note and its affiliated entities that should be returned to the Receivership Estate.  A total of 136 lawsuits were filed in June 2013 and four additional lawsuits have been filed since that time.  Copies of the complaints in these lawsuits can be found on the Receiver's website.  Investigations are

---

[42] Second Report, pp. 18-19.

[43] These costs are all being borne by HMI; no Receivership funds are being used in the effort to extract precious metals from this ore.

ongoing and additional lawsuits may be filed.

**B.**      **New Litigation Filed by the Receiver During the Reporting Period.**   The

following litigation was commenced by the Receiver during the Reporting Period:

1.      Lawsuit Against David Barton ("Barton"):[44]   On March 24, 2015, the

Receiver filed suit against Barton, seeking a declaratory judgment that the deed of trust that

Barton holds on the East Meadow Mobile Home Park in Vernal, Utah has been paid in full and is

invalid. If the Receiver succeeds in this litigation, $59,000.00 in proceeds from the sale of the

East Meadow property can be released from the Real Estate Account.

**C.**      **Significant Litigation Rulings**.   During the Reporting Period, there were several

rulings of significance issued in the litigation being pursued by the Receiver:

1.      Palmer Motion to Release Receivership Assets:   On January 6, 2015,

newly-retained attorneys for Palmer filed a motion asking the Court to release assets from the

Receivership Estate to pay Palmer's litigation costs, including attorney's and expert witness

fees.[45]   The Court held a hearing on February 3, 2015 and issued an order on March 4, 2015

denying Palmer's motion.[46]

2.      ABI Default Judgments:   During the Reporting Period, the Court entered

default judgments in *Klein v. Adams et al.*, declaring ABIs held by 26 Defendants are invalid. As

noted above in Part III.A, as of the close of the Reporting Period, only 34 of the 148 ABIs still

remain pending.

---

[44] *Klein v. Barton*, Case No. 2:15-cv-00189-BSJ (D. Utah) (Jenkins, J.).

[45] Docket Nos. 859 & 863.

[46] Docket No. 897.

       3.      <u>Order to Compel (Stallman)</u>: On March 20, 2015, an Order was entered in *Klein v. Stallman*[47] against Defendant Terry Stallman, granting the Receiver's Motion to Compel, requiring Stallman to provide discovery responses, and ordering the Stallman to show cause why he should not be required to pay the Receivers' costs.[48]

       4.      <u>Second Order to Show Cause (VanCampen)</u>: On March 18, 2015, the Receiver filed his *Second Motion for Order to Show Cause as to Why David C. VanCampen Should Not be Held in Contempt*[49] as a result of VanCampen's failure to comply with the Court's prior Order requiring him to costs incurred by the Receiver. The Court granted this Motion and on March 20, 2015, entered an *Order to Show Cause* to VanCampen ordering him to appear on April 15, 2015.[50]

      **D.**      **<u>Settlements of Litigation</u>.**  During the Reporting Period, the Court entered an Order approving settlement agreements proposed by the Receiver as follows:

       1.      <u>Twelfth Motion to Approve Settlements</u>.  On March 2, 2015, the Receiver filed his *Twelfth Motion Seeking Approval of Settlement Agreements,*[51] seeking approval of nine settlement agreements related to clawback litigation against overpaid investors, recovery of funds paid to a credit card company, release of a deed of trust, and terminating litigation against a Receivership Entity.  This Motion was granted by the Court by Order entered on March 5,

---

[47] Case No. 2:13-cv-00409 (D. Utah) (Nuffer, C.J.).

[48] *Id.*, Docket No. 19.

[49] Docket No. 901.

[50] Docket No. 905.

[51] Docket No. 893.

2015.[52]  These settlements will bring a total of $494,098.88 to the Receivership Estate.  As of

March 31, 2015, $341,098.88 of this amount had been received.  These settlements also resulted

in the release of two ABIs with a face value of $145,000.00, and a deed of trust stated to be in

the amount of $250,000.00.

   **E.** **Default Judgments in Clawback Actions**.  When Defendants sued by the

Receiver have failed to respond to a properly served complaint, the Receiver has sought the entry

of Default Judgments.  This process is ongoing.  During the Reporting Period, the Receiver

obtained two Default Judgments in clawback actions: a January 9, 2015 Default Judgment

against Aaron Olsen and Utah Land Banks in the amount of $178,945.73; and a March 19, 2015

Default Judgment against Jeff Baclet in the amount of $5,221.92.  Once Default Judgments are

obtained, the Receiver will take appropriate steps to execute on the Judgments.

   **F.** **Status of Remaining Litigation**.  The Receiver filed approximately 140 lawsuits

seeking recovery of funds from overpaid investors or persons and entities who received funds

improperly from National Note.  As of the close of the Reporting Period, 32 of these lawsuits are

still pending, and their status is summarized as follows:

   1. <u>Summary Judgment</u>. The Receiver has filed Motions for Summary

Judgment in 5 of the lawsuits.

   2. <u>Motions for Default Judgment</u>. The Receiver has filed Motions for Entry

of Default Judgment in 4 of the lawsuits.

---

[52] Docket No. 898.

3.      <u>Scheduling Orders/Trial Dates Set</u>. Scheduling Orders have been entered in 13 of the cases.  In 10 of these cases, trial dates have been set, with the dates of trial ranging from September 2015 to April 2016.

4.      <u>Attempting Service</u>. The Receiver is still attempting to find the Defendants in 2 of the lawsuits so that he may complete service.

5.      <u>Other</u>.  The remaining 8 cases are in various stages of litigation or settlement discussion.

## VI.

## <u>CLAIMS PROCESS</u>

On February 27, 2015, the Receiver filed a motion seeking Court approval to begin a claims process ("<u>Claims Motion</u>").[53]  Based on suggestions by the Court since the filing of the Claims Motion, the Receiver is reviewing the proposed claims form and will submit a revised claim motion in the never future.

## VII.

## <u>INVESTIGATIVE FINDINGS FROM RECORDS OF THE RECEIVERSHIP ENTITIES</u>

During the Reporting Period, the Receiver obtained additional information and conducted additional analysis as part of his investigation of various aspects of National Note's operations prior to the commencement of the Civil Case, as follows:

---

[53] Docket No. 892.

**A.** **National Note's Treatment of Delinquent Loans to Non-Affiliates**: As part of his analysis of loans receivable still carried as assets on National Note's books when the Receiver was appointed, the Receiver has found wide divergence in how National Note treated delinquent loans. In some cases, National Note continued accruing interest on the delinquent loans, with some loans National Note stopped accruing interest but kept the loans on the books, and in other instances National Note made accounting entries showing that loan payments were made (when they had not been) and the company treated those fictitious loan payments as income received. The Receiver hopes to report on his findings in the next Status Report.

## VIII.

## FINANCIAL ANALYSIS

**A**. **Receivership Financial Information**.  The following financial information is provided for the Reporting Period:

       1.    Bank Accounts.  The Receiver maintains two bank accounts for the operation of the Receivership: a general operating account (the "Operating Account") and an account holding earnest money deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "Real Estate Account").  The balances in these accounts as of the close of the Reporting Period are as follows:

| Account | Account Balance |
|---|---|
| Operating Account[54] | $1,930,691.01 |
| Real Estate Account | $4,185,983.49 |
| **TOTAL** | **$6,116,674.50** |

2.     <u>Operating Account Deposits</u>.  The sources of funds deposited into the

Operating Account during the Reporting Period are shown in the following table:

| Source | Amount In |
|---|---|
| Settlement Agreement proceeds | $383,679.24 |
| Real estate sales proceeds[55] | $115,295.03 |
| Transfer from Real Estate Account[56] | $226,374.07 |
| Royalties and refund[57] | 4,368.79 |
| **TOTAL** | **$729,717.13** |

3.     <u>Operating Account Expenditures</u>.  The following table shows the

categories of operating expenses that have been paid from the Operating Account during the

Reporting Period:

---

[54] Pursuant to the Court's *Order Approving the Receiver's Third Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered from July 1, 2013 through December 31, 201,* Docket No. 828, the Receiver has established a separate Savings Account tied to the Operating Account in which he is holding 20% of the professional fees incurred by him and his counsel.  Money to open this Savings Account was transferred from the Operating Account. This Savings Account has a current balance of $122,802.17, and is in addition to the amounts reported above.

[55] This amount reflects Net Sale Proceeds obtained from the sale of the Minnesota properties discussed in Part III.B(1)-(4) above.

[56] *See* discussion *infra* in Part VIII.A.4.

[57] An oil and gas partnership made a final distribution in the amount of $4,345.43, and an electricity refund in the amount of $23.36 was received.

| Type of Expense | Amount Out |
|---|---|
| Utilities, insurance, operating expenses | $6,271.35 |
| Publication of property sale notices | $2,067.60 |
| Repairs (Ogden water damage) | $16,462.21 |
| Settlement payment (MC Realty) | $64,000.00 |
| Other[58] | $136.98 |
| **TOTAL** | **$88,938.14** |

4. <u>Real Estate Account Deposits and Withdrawals</u>.  No properties were sold during the Reporting Period that had interests claimed against them and, accordingly, no deposits were made into the Real Estate Account—all net sale proceeds from the sale of the real properties during this Reporting Period were deposited in the Operating Account.  One withdrawal was made in the amount of $226,374.07, and as noted above, these funds were transferred to the Operating Account.  The reason for this withdrawal was that due to an approved Settlement Agreement, all interests against the Bandana Cabin were removed from the property and thus the sale proceeds attributed to that sale were no longer encumbered.

5. <u>SFAR</u>.  Attached as **Exhibit C** is a copy of the Standardized Fund Accounting Report for the Reporting Period.

6. <u>Administrative Expenses</u>.  On March 31, 2015, the Court held a hearing on the Fee Application of Manning Curtis Bradshaw & Bednar, who represented the Receiver as Conflicts Counsel in several ancillary clawback actions.  At the hearing, the Court approved payment of $35,371.94,[59] and an Order was entered on March 31, 2015.[60]  Payment of these allowed fees and expenses was made after the entry of the Order approving the Fee Application,

---

[58] This includes wire transfer fees, overnight shipping, corporate renewals, and tax filing fees.

[59] Docket No. 891.

[60] Docket No. 912.

and will be reported in the next Status Report.  The work of this conflict counsel has concluded and this is the only payment that will be made to this firm.

For the current Reporting Period, the Receiver and his staff have spent a total of 566.2 hours on behalf of the Receivership Estate.  Total fees incurred by the Receiver during the Reporting Period are in the total amount of $75,165.50.  The Receiver's legal counsel's total fees and expenses incurred during the Reporting Period are in the total amount of $140,274.35.[61]

## IX.

## NEXT STEPS

At this time, the Receiver anticipates addressing the following priorities in the coming months:

1.    Claims Process.  As described in Part VI, above, the Receiver has requested Court approval to begin the claims process.

2.    Non-ABI Litigation.  As noted above in Part V above, as of the close of the Reporting Period, the number of ancillary proceedings still actively being litigated was down to 32. The amount of time the Receiver and his counsel spend on litigation-related activities overall is expected to decline as matters are settled or decided.  However, the time required to be spent on each of the remaining cases is expected to continue or increase, especially as cases are prepared for trial.  The Receiver may file additional lawsuits with potential defendants with

---

[61] A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver and the Receiver's legal counsel in prior Reporting Periods is set forth in each of the status reports.  *See* First Report, p. 59; Second Report, p. 29; Third Report, pp. 28-29; Fourth Report, p. 42; Fifth Report, pp. 33-34; Sixth Report, pp. 24-25; Seventh Report, p. 22; Eighth Report, p. 29; Ninth Report, p. 33; Tenth Report, p. 33 *see also* Orders approving First Interim Fee Application, Docket No. 555; Second Interim Fee Application, Docket No. 697; and Third Interim Fee Application, Docket No. 828.

whom he has entered tolling agreements if settlement negotiations are not fruitful.

        3.     ABI Litigation. As of the close of the Reporting Period, only 34

Defendants in the *Adams* case remained, and the Receiver believes that this number will decrease

as settlements are negotiated. Significant time will be required in the next Reporting Period as

the Receiver prepares Motions for Summary Judgment and argument on the same.

        4.     Property Sales. The Receiver will continue his efforts to sell additional

real estate properties in the Receivership Estate. It is anticipated that the sale of some of these

remaining properties, especially those with challenges, will take some additional time.

## X.

## CONCLUSION

Solid progress was made during the Reporting Period. The Receiver looks forward to

moving to the next stage of the Receivership by commencing a claims process so recovered

funds can be returned to investors.

DATED this 19th day of June, 2015.

*Wayne Klein*

WAYNE KLEIN, Receiver

<u>**CERTIFICATE OF SERVICE**</u>

IT IS HEREBY CERTIFIED that service of the above **ELEVENTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this 19th day of June, 2015, and served via ECF on all parties who have requested notice in this case.  A copy was also served on Wayne Palmer by U.S. Mail, postage prepaid at:

Wayne Palmer
8816 South 2240 West
West Jordan, UT 84088

/s/ Monica Posada