Peggy Hunt (Utah State Bar No. 6060)
**DORSEY & WHITNEY LLP**
136 South Main Street, Suite 1000
Salt Lake City, UT  84101-1685
Telephone: (801) 933-7360
Facsimile: (801) 933-7373
Email: hunt.peggy@dorsey.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, and individual, <br><br> Defendants. | **TWELFTH STATUS REPORT OF R. WAYNE KLEIN, RECEIVER** <br> *For the Quarter Ending* <br> *June 30, 2015* <br><br> 2:12-cv-00591 BSJ <br><br> The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National Note ("Related Entities"), and the assets of Wayne LaMar Palmer ("Palmer"), collectively, the "Receivership Entities" hereby submits this Twelfth Status Report for the period April 1, 2015 through June 30, 2015 (the "Reporting Period").

# TABLE OF CONTENTS

**Page**

I. PROCEDURAL HISTORY ................................................................ 1

II. CONTINUED OPERATIONS .......................................................... 2

III. REAL ESTATE HOLDINGS ........................................................ 2

    A.    Efforts to Release Liens and Other Interests Against Real Properties.................. 4
    B.    Real Property Sales Closed During the Reporting Period. ................................. 8
    C.    Real Property Sales Approved During the Reporting Period/Not Closed. ............ 8
    D.    Real Property Sales for which Court Approval Was Requested............................ 8
    E.    Offers Preliminarily Accepted on Real Properties………............................ 8
    F.    Real Properties to Relinquish—Lack of Equity.............................................. 9

IV. MINERAL ORES ........................................................................ 10

V. LITIGATION ................................................................................ 10

    A.    Claims Being Pursued By The Receivership Estate. ....................................... 10
    B.    New Litigation Filed During the Reporting Period……… ............................. 12
    C.    Significant Litigation Rulings………............................................... 13

VI. CLAIMS PROCESS .................................................................... 14

VII. INVESTIGATIVE FINDINGS ..................................................... 14

    A.    Silver Leasebacks ………………………………………….........14
    B.    Houseboat Expenses ……………………………………………...15
    C.    Delinquent Loans Owed to National Note ……………………………16

VIII. FINANCIAL ANALYSIS ........................................................... 17

    A.    Receivership Financial Information.................................................. 17

VIII. NEXT STEPS ........................................................................... 19

IX. CONCLUSION ............................................................................ 20

# I.

## PROCEDURAL HISTORY

On June 25, 2012, this action (the "Civil Case") was commenced by the United States Securities and Exchange Commission (the "SEC") against Defendants Palmer and National Note by the filing of a Complaint in the United States District Court for the District of Utah (the "Court").[1]  The same day, the Court granted several motions filed by the SEC, including a Temporary Restraining Order and Order to Show Cause (the "TRO"),[2] an Order Freezing Assets and Prohibiting Destruction of Documents (the "Asset Freeze Order"),[3] and an Order Appointing Receiver and Staying Litigation (the "Receivership Order").[4]  Palmer later stipulated to the imposition of a preliminary injunction and to continuation of these orders.[5]  As a result of the Receivership Order, the Receiver controls the identified assets of Palmer as well as manages and controls National Note and the Related Entities identified in the Receivership Order.  A list of the Receivership Entities is attached hereto as **Exhibit A**.

The SEC filed a Motion for Summary Judgment in the Civil Case on July 19, 2013,[6] arguing that certain securities law violations had been established as a matter of law.  Palmer opposed the SEC's Motion,[7] and thereafter he filed a variety of motions.  At a hearing on July 9,

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 8.

[4] Docket No. 9.

[5] Docket Nos. 41 and 42.

[6] Docket No. 377.

[7] Docket No. 473.

2014, the Court determined to set the matter for trial rather than dispose of the case through summary judgment at that time. On February 24, 2015 the Court entered a scheduling order requiring that all discovery to be completed by July 29, 2015 and setting a pre-trial hearing for August 21, 2015.

In accordance with the Receivership Order,[8] the Receiver has filed eleven previous status reports.[9] This is the Twelfth Status Report for the period of April 1, 2015 through June 30, 2015, defined above as the "Reporting Period."

## II.

## CONTINUED OPERATIONS

The Receiver is no longer operating any businesses or rental properties of the Receivership Estate.

## III.

## REAL ESTATE HOLDINGS

A significant portion of the Receivership Estate's remaining potential assets are in real estate holdings, all of which were described in the Receiver's First Report. The Receiver has determined that a majority of these real properties appear to have value for the Receivership

---

[8] Docket No. 9 (Receivership Order) at pp.18-20.

[9] The Receiver's First Status Report and Liquidation Plan, for the period June 25, 2012 through September 30, 2012, was filed November 12, 2012 [Docket No. 73] (the "First Report"); the "Second Report" covered the period ending December 31, 2012 [Docket No.170]; the "Third Report" covered the period ending March 31, 2013 [Docket No. 288]; the "Fourth Report" covered the period ending June 30, 2013 [Docket No. 408]; the "Fifth Report" covered the period ending September 30, 2013 [Docket No. 510]; the "Sixth Report" covered the period ending December 31, 2013 [Docket No. 598]; the "Seventh Report" covered the period ending March 31, 2014 [Docket No. 639]; the "Eighth Report" covered the period ending June 30, 2014 [Docket No. 710]; the "Ninth Report" covered the period ending September 30, 2014 [Docket No. 808]; the "Tenth Report" covered the period ending December 31, 2014 [Docket No. 889]; and the "Eleventh Report" covered the period ending March 31, 2015 [Docket No. 955].

Estate so marketing of these properties for sale should continue. In a few instances, further investigation and analysis is in process, including an analysis of the validity and enforceability of certain interests that have been asserted against the properties and investigation into the extent and impact of long-standing environmental contamination on certain properties.

During the Reporting Period, the Receiver closed the sale of one property, received funds from two properties that closed at the end of the prior reporting period, and actively marketed other properties for sale. Attached hereto as **Exhibit B** is a chart setting forth the status of all real properties in the Receivership Estate as of June 30, 2015.

For purposes of this Status Report, the Receiver discusses the following in Parts A through F below:

- Part A discusses the efforts undertaken during the Reporting Period to release alleged interests recorded against the Receivership Estate's real properties;

- Part B describes real property sales that closed during the Reporting Period;

- Part C describes real property sales that have been approved by the Court, but which have not yet closed;

- Part D identifies real properties that are subject to sale for which Court approval of the sale has been requested;

- Part E identifies real properties where the Receiver has preliminarily accepted offers and intends to seek Court approval of the sales;

- Part F describes actions taken by the Receiver regarding real properties in which it does not appear that the Receivership Estate has equity.

**A.**     __Efforts to Release Liens and Other Interests Against Real Properties__.  As has

been described in prior Status Reports, as part of the Receiver's investigation of real property

holdings of the Receivership Estate, the Receiver has identified numerous types of interests that

have been asserted against many of the Receivership Estate's real properties, including at least

the following types of interests, for which he has taken the following actions:

1.     Assignments of Beneficial Interests ("ABIs").  At the time the Receiver

was appointed, 349 ABIs had been recorded against 49 properties in the Receivership Estate,

representing approximately $32.4 million in possible claims against those properties.  The

Receiver has made significant progress in obtaining releases of these ABIs.  A large majority

were released voluntarily by ABI holders prior to the filing of any litigation.  Other ABIs were

released as part of settlement agreements entered into by the Receiver or by default judgments

against ABI holders in litigation brought by the Receiver.  As of the end of the Reporting Period,

only 15 ABIs, representing $2,335,859.40 in purported interests, remain against eight properties

known in this case as Autumn Ridge, Clearview Business Park, Elkhorn Lot numbers 11, 12 and

48, Expressway Business Park, the Fairfield Land, and Farrell Business Park.[10]  The validity of

these interests is being considered by the Court as discussed below.

a.     Sale of Property Free and Clear of Liens and Interests:  For

properties that still have ABIs recorded against them, the Receiver will continue to

request that any sale of such properties be approved by the Court free and clear of the

alleged interests, with any claimed interests to attach to the net proceeds of the sale.  If

---

[10] *See* Part IV.D of the First Report for a description of these properties.

ABIs are asserted, the net sales proceeds of these sales are deposited in the "Real Estate Account," a segregated reserve account, pending release of all ABIs against a property, an order of the Court permitting release of net sale proceeds related to properties against which ABIs remain, or a determination as to the validity of the disputed ABIs.

        b.    <u>Lawsuits Filed by the Receiver Against ABI Holders</u>:  The Receiver filed numerous actions against ABI holders, seeking judgments declaring ABIs to be invalid so as to enable the Receiver to release net sale proceeds currently being held in the Real Estate Account on account of pending ABIs.  These actions are described in a *Status Report In Advance of January 30, 2015 Conference*[11] and the *Receiver's Ex Parte Motion to Consolidate and Memorandum of Law in Support Thereof* (the "Consolidation Motion").[12]  The Consolidation Motion has been granted by the Court.[13]  Therefore, other than two clawback proceedings in which overpaid investors hold ABIs[14] and a proceeding in which a default certificate had been entered prior to the filing of the Consolidation Motion,[15] there is currently one action seeking to declare the ABIs invalid styled as *Klein v. Adams*, 2:14-cv-00614-BSJ (D. Utah) (the "ABI Action").  In the ABI Action, the Receiver has filed numerous *Motions for Summary Judgment*, oral argument

---

[11] *Klein v. Adams*, 2:14-cv-00614-BSJ (D. Utah), Docket No. 298.

[12] Docket No. 874.

[13] *Order Granting Motion to Consolidate*, Docket No. 314.

[14] *Klein v. Johnson*, 2:14-cv-00479-PMW (D. Utah) (the Receiver is currently in settlement negotiations with the Defendants); *Klein v. Stallman*, 2:13-cv-00409-DN (D. Utah) (the Court entered summary judgment against the Defendant on the clawback of false profits that the Defendant obtained from National Note).

[15] *Klein v. Harvest Time Ministries, Inc.*, 2:13-cv-742-CW (D. Utah).  In this case, a default certificate was entered on November 19, 2014. The Receiver's *Motion for Entry of Default Judgment* (Docket No. 9) filed on January 29, 2015, is still pending.

has been held, and the matters have been taken under advisement by the Court. A previously scheduled pretrial conference has been vacated. Additionally, the Court has been entering Default Judgments where appropriate. During the Reporting Period, Default Judgments have been entered against seven Defendants, resulting in the invalidation of ten ABIs.

    c. <u>Release of Unencumbered Funds</u>:  On April 15, 2015, the Court granted the Receiver's *Motion Seeking Authorization to Release Real Estate Account Funds as Set Forth in Supplemental Report and Memorandum in Support*.[16] On April 17, 2015, the Receiver transferred $1,752,769.93 in unencumbered funds from the Real Estate Account to the Receivership's Operating Account. During the Reporting Period, the Receiver made an additional three transfers of funds from the Real Estate Account to the Operating Account because all ABIs or trust deeds recorded against these properties had been released: i) on April 17, 2015, $69,569.48 in net sales proceeds from the Hawthorne Avenue property was transferred after the sole ABI asserted against the property was released; ii) on April 23, 2015, the remaining $59,000.00 in net sales proceeds from the East Meadow property was transferred to the Operating Account after a sole remaining trust deed was released; and iii) on June 30, 2015, $281,189.07 in net sale proceeds from the Cottonwood property were transferred to the Operating Account, when the last four remaining ABIs against that property were released.

    2. <u>Deeds of Trust</u>:  The Receiver identified 13 properties in the Receivership

---

[16] Docket No. 899.

Estate on which deeds of trust had been recorded at the time the Receiver was appointed.  At this time, only three properties have trust deeds recorded against them,[17]  and issues regarding the remaining ten trust deeds have been resolved.  Specifically, trust deeds against three of the properties were paid off at discounted amounts at the time of the property sales,[18] trust deeds were released against three properties as part of Court-approved settlements with the Receiver,[19] three properties having trust deeds asserted by lenders were abandoned by the Receiver after Court approval because the trust deeds exceeded any value of the properties,[20] and the last trust deed was released during the Reporting Period after the lenders holding that trust deed were sued by the Receiver based on evidence that the underlying loan had been completely paid off by National Note.[21]

---

[17] These properties are the properties known as: Overland Trails/Eagle Mountain, Utah property (where outstanding trust deeds exceed the value of the property); the Almond Heights/Toquerville, Utah property (this property is comprised of numerous lots, some of which are encumbered by trust deeds; the Court has approved an agreement with the trust deed holder allowing the Receiver to sell the encumbered lots with the sale proceeds thereof being allocated between the Receivership Estate and the trust deed holder); and the Expressway/Spanish Fork, Utah property (a trust deed encumbers a portion of the land). On the Overland Trails property, the aggregate trust deeds exceed the value of the property, but no single trust deed exceeds the value of the property. The Receiver has proposed purchasing the senior trust deed at a discount and foreclosing on the property, thereby eliminating other trust deeds and creating equity in the property. However, the Receiver has not yet reached an agreement with the senior trust deed holder. In the interim, the Receiver is spending very little time on the property and no out-of-pocket expenditures to maintain the property.

[18] These properties are the properties known as the office building located at 7800 South in Salt Lake City, Utah; the Kanab Utah home; and the Indian Canyon property.

[19] These properties are the properties known as the Twin Pines apartments; Deer Meadows; and the Bandanna Cabin.

[20] These properties are the properties known as Palmer's personal residence; the large Cottonwood Road parcel; and the Riverbend land.

[21] *Klein v. Barton, et al.*, Case No. 2:15-cv-00189-BSJ (D. Utah) (trust deed against East Meadow mobile home park locate in Vernal, Utah was released and case was dismissed).

**B.**      <u>**Real Property Sales That Closed During the Reporting Period.**</u>   One Court-approved real property sale of Almond Heights Lot 25[22] was closed by the Receiver during the Reporting Period.   On May 18, 2015, the Court entered an Order approving a private sale of this residential building lot.[23] The sale closed on May 21, 2015, with the Receivership Estate receiving $29,216.54 in Net Sales Proceeds.  This property is subject to a disputed deed of trust, and therefore the Net Sales Proceeds were deposited into the Real Estate Account.[24]

**C.**      <u>**Real Property Sales Approved During the Reporting Period/Not Closed.**</u>

During the Reporting Period, there were no properties where the Court approved sales, but where the sales did not close before the end of the Reporting Period.

**D.**      <u>**Real Property Sales for Which Court Approval Was Requested**</u>.  During the Reporting Period, there were no properties where Receiver sought approval to sell properties where Court review was not yet completed as of the end of the Reporting Period.

**E.**      <u>**Offers Preliminarily Accepted on Real Properties**</u>.  During the Reporting Period, the Receiver received offers for four properties where the process of Court approval has commenced:

1.      <u>Byron Industrial Park, Lot 1, Block 3</u>.[25] On June 18, 2015, the Receiver accepted an offer to purchase this vacant industrial lot for $137,500.00. The lot is subject to unpaid property taxes. The offer was subject to the buyer's ability to obtain financing and

---

[22] *See* First Report, p. 47 (describing this property).

[23] Docket No. 906.

[24] This deed of trust, in the amount of $30,000.00 is held by Kristine S. Olson.

[25] *See* First Report, p. 50 (describing this property).

municipal approval for the buyer's intended use of the property. On July 9, after the end of the Reporting Period, the proposed buyer canceled his offer based on the buyer's belief that conditions imposed by the municipality on the use of the property would make the property unsuitable for him.  The Receiver thus has recommenced marketing this property for sale.

   2. <u>Almond Heights Lot F</u>.[26] On June 15, 2015, the Receiver accepted an offer to purchase this residential building lot for $31,000.00. The lot is subject to unpaid property taxes, but has no other ABIs or trust deeds recorded against it.  After the end of the Reporting Period, the Receiver filed a motion seeking Court approval to conduct a private sale of this property.[27] This sale will be described in the next Status Report.

   3. <u>Almond Heights Lots 23 and 24</u>.[28] On June 17, 2015, the Receiver accepted offers for the sale of lots 23 and 24, subject to due diligence conditions and municipal approval of building plans.  After a survey was performed, the buyers discovered that the slope of lot 23 would make home construction significantly more expensive. As a result, the buyer and Receiver negotiated a new sales price for lot 23. The purchase agreements ultimately agreed to by the Receiver provide for the sale of lot 23 at a price of $24,000.00 and the sale of lot 24 for a price of $29,925.00.  All conditions have now been removed by the buyer and the Receiver has filed a motion seeking Court approval of the private sale of these two lots which he will report on in the next Status Report.

   F. <u>**Real Properties to Relinquish—Lack of Equity**</u>.  There were no properties

---

[26] *See* First Report, p. 47 (describing this property).

[27] Docket No. 961.

[28] *See* First Report, p. 47 (describing this property).

where the Receiver sought Court approval to abandon during the Reporting Period.

## IV.

## MINERAL ORES

As described in the Second Report,[29] the Receiver entered into a Management Agreement with HMI Management LLC, an entity controlled by a group of investors ("HMI"), that allows the investors to investigate whether ore held by National Note has any commercial value. At the suggestion of the Court, the Receiver has hired a university geology professor to provide an appraisal of the value of the ores. The Receiver is informed that initial testing results from independent laboratories suggest that the ores do not contain significant amounts of precious metals. A report and appraisal on the ore is expected to be delivered to the Receiver in late July and will be discussed in the next Status Report.

## V.

## LITIGATION

Litigation commenced by the Receiver since his appointment has involved the ABI Action asserted against holders of ABIs, discussed in Part III.A.1.b above, litigation to invalidate, when appropriate, trust deeds asserted against real properties of the Receivership Estate, discussed in Part III.A.2 above, lawsuits to claw back false profits paid to investors, and lawsuits to collect assets of the Receivership Estate.

**A.**      **Clawback Claims Being Pursued by the Receivership Estate.**  As described in the Fourth Report, the Receiver has filed suit to recover payments or transfers made by National Note and its affiliated entities that should be returned to the Receivership Estate. A total of 136

---

[29] Second Report, pp. 18-19.

lawsuits were filed in June 2013 and 4 additional lawsuits have been filed since that time. Copies of the complaints in these lawsuits can be found on the Receiver's website. The Receiver's investigation is ongoing and additional lawsuits may be filed.

      1.     <u>Status of Clawback Actions</u>. As of the close of the Reporting Period, only 21 of the total 140 lawsuits are still pending. Many of these actions have been resolved through Court-approved settlement agreements or the entry of default judgments. The status of the 21 remaining suits is summarized as follows:

      a.     <u>Summary Judgment</u>. The Receiver has filed Motions for Summary Judgment in 13 of the lawsuits. To date, three of these Motions have been disposed of in the Receiver's favor as follows: *Klein v. Chung*;[30] *Klein v. McDonald*;[31] and an Order Granting Partial Summary Judgment against the Estate of Michael D. Memmott Jr. and Sawtell Capital in *Klein v. Innovative Services et al*.[32] Since the close of the Reporting Period, the Receiver has been informed that Orders granting additional Motions will be entered, and these matters will be reported in the next Status Report.

      b.     <u>Scheduling Orders/Trial Dates Set</u>. Scheduling Orders have been entered in four of the remaining cases. In these cases, trial dates have been set, with the dates of trial ranging from September 2015 to April 2016.

---

[30] Case No. 2:13-cv-00467-DBP (filed May 11, 2015). The amount of false profits paid to Mr. Chung was $16,098.55. Mr. Chung did not dispute $3,325.00 of the amount, and the Court granted the Receiver summary judgment on the balance. After a settlement conference, a settlement was reached pursuant to which Chung will pay a total of $11,000.00.

[31] Case No. 2:13-cv-00498-TS (filed June 18, 2015) (judgment in the amount of $10,283.44).

[32] Case No. 2:13-cv-00566-DN (filed June 24, 2015) (judgment in the amount of $278,948.00).

      c.     <u>Other</u>.  The remaining four cases are in settlement discussion, being amended, or stayed due to the filing of a bankruptcy petition. [33]

      2.     <u>Default Judgments in Clawback Actions</u>.  Since the commencement of the clawback actions, the Receiver has obtained a total of 14 Default Judgments.  During the Reporting Period, the Receiver obtained two of these Default Judgments: on April 15, 2015, Default Judgment was entered against Mark S. Flynn in the amount of $24,322.92;[34] and on May 4, 2015, Default Judgment was entered against Lawrence Lloyd in the amount of $10,921.70.[35] The Receiver is taking appropriate steps to execute on these Judgments as well as others that he has obtained in earlier Reporting Periods.

**B.**     **<u>New Litigation During the Reporting Period</u>.**  During the Reporting Period, the following new matters were commenced or modified:

      1.     <u>Lawsuit Against Brett Romney</u>. On May 12, 2015, after demands for payment were ignored, the Receiver filed a small claims action in state court against Brett Romney seeking $4,410.31 owed for assets he purchased at an auction of the assets of Old Glory

---

[33] In *Klein v. Berger*, 2:13-cv-00526 (D. Utah), the parties recently entered into a settlement which will be reported in the next Status Report. In *Klein v. Johnson*, 2:14-cv-00479 (D. Utah), the parties are finalizing the terms of a settlement which is expected to be reported on in the next status report. In *Klein v. Kleen Water*, 2:13-cv-00550 (D. Utah), the Receiver has filed a Motion to Amend the Complaint, and it is anticipated that a Scheduling Order will be entered after a ruling is made on that Motion. In *Klein v. Christy Palmer*, 2:13-cv-00581 (D. Utah), the litigation is stayed based on a bankruptcy filing by Mrs. Palmer. Based on recent developments in the bankruptcy proceeding, the bankruptcy case might be dismissed and this litigation may resume.

[34] *Klein v. Flynn*, 2:13-cv-00473-TC (D. Utah).

[35] *Klein v. Lloyd*, 2:13-cv-00552-CW (D. Utah).

Mint, LLC ("Old Glory Mint").[36]  On June 18, 2015, Romney paid $4,560.31, the full amount

sought in the lawsuit, along with court fees and costs.  This case has now been dismissed.

       2.     ABI Action Amended.  On May 11, 2015, the Court entered an Order

granting the Receiver's motion to amend the ABI Action to add two additional defendants

holding ABIs that had not been identified at the time the original ABI Action was filed.[37]  The

status of the ABI Action is noted in Part III.A.1.b above.

     **C.**     **Settlement of Litigation.**  During the Reporting Period, the following matters

occurred related to the settlement of claims and causes of action:

       1.     Settlement with Reed Larsen.  After a hearing held on May 11, 2015, the

Court entered an Order[38] approving a settlement agreement with Reed Larsen ("Larsen") and

companies controlled by Larsen which, in material part, requires Larsen to pay $25,000.00 to the

Receivership Estate, waive $308,969 in claims Larsen asserted against the Receivership Estate,

and to cooperate with the Receiver in providing information to assist the Receiver in his

investigation.  To date, Larsen has paid $20,000.00, and has provided information to the

Receiver.  Some of the information learned from Larsen is discussed below.

       2.     Other Settlements.  The Receiver entered into a total of seven settlement

agreements during the Reporting Period.  A Motion seeking approval of these settlements was

filed after the close of the Reporting Period on July 7, 2015 and an Order was entered by the

---

[36] *Klein v. Romney*, Case No. 158400503 (Salt Lake City Justice Ct., June 4, 2015).

[37] *Klein v. Adams*, Docket No. 394.

[38] Docket No. 950.

Court on July 9, 2015 approving the settlement agreements.[39]  These settlements will be discussed in the next Status Report.

**VI.**

**CLAIMS PROCESS**

On June 23, 2015, the Receiver filed an *Amended Motion Seeking Approval of Proposed Claim Procedures and Accompanying Forms and Memorandum in Support*, seeking Court approval to begin a claims process ("Claims Motion").[40]  A hearing on the Claims Motion is scheduled for August 25, 2015.

**VII.**

**INVESTIGATIVE FINDINGS FROM RECORDS OF THE RECEIVERSHIP ENTITIES**

During the Reporting Period, the Receiver obtained additional information and conducted additional analysis as part of his investigation of various aspects of National Note's operations prior to the commencement of the Civil Case, as follows:

A.      **Silver Leaseback Agreements**: Information and documents provided by Larsen reveal that prior to the Receiver's appointment Old Glory Mint obtained possession of a total of 18,561.4 ounces of silver from 4 customers pursuant to "leaseback" agreements.[41]  Under these agreements, Old Glory Mint was to store these customers' silver for a period of time and pay interest to them based on the value of the silver.  The leaseback agreements also allowed Old Glory Mint to temporarily use the silver, but it was to promptly replace the silver used.

---

[39] Docket No. 966.

[40] Docket No. 957.

[41] Glory Mint also "leased" 40 ounces of gold from an affiliated company, HSb, which gold was returned to HSb prior to the Receiver's appointment.

Old Glory Mint used 79.1% of this "leased" silver (14,689.4 ounces) on the same day it was delivered by the customers to the Mint for storage. Only 1,911 (approximately 10.3%) of the "stored" silver was eventually returned to the four customers. It does not appear that Old Glory Mint replaced the silver that was used, which is estimated to have a value of $455,721 as of the date of the Receiver's appointment. Rather, funds obtained from the use of the silver were used to meet other Old Glory Mint obligations. According to Larsen, the silver was used to make up for losses that Old Glory Mint suffered in a failed attempt to purchase discounted "Ghana" gold through a Miami, Florida company using Secure American Gold Exchange, LLC ("SAGE"), a company based in Provo, Utah.[42]

**B.** **Houseboat Expenses**: Several years before the Receiver was appointed, Larsen purchased a houseboat located at Lake Powell, Utah, which needed significant structural repairs. Larsen claims that Palmer told Larsen that Palmer wanted to make the houseboat restoration a project of National Note affiliate, Homeland Funding, LLC ("Homeland"), and at least a portion of the ownership of the houseboat was transferred to Homeland. According to Larsen, Homeland was to finance the houseboat's renovation, the houseboat would be sold, and Homeland would receive 50% of the sale profits. Homeland hired Titus Boats LLC ("Titus Boats")[43] to renovate the houseboat at a discounted rate, but according to Larsen, the work was slow and expensive, even at Titus Boats' discounted rates. When the repairs were about 50%

---

[42] National Note appears to have transferred more than $1 million to SAGE for this transaction and had no written contract related to the transaction. The Receiver has sued SAGE. See Klein v. Secure America Gold Exchange, LLC, 2:14-cv-00869-DN (D. Utah). This gold transaction is a different transaction than the attempts by Larsen to purchase gold directly from "General Maliko" in Ghana, described in the Tenth Report at pp. 28-29.

[43] Larsen later became a partner in Titus Boats. At the time the Receiver was appointed, Titus Boats had ceased operations. Titus Boats is a party to the settlement agreement with Larsen approved by the Court discussed above.

complete, Homeland no longer had sufficient revenues to fund the project.  At that point, a one-third interest in the boat was sold to another person, who provided funding for additional repairs. Eventually, in 2012, title to the houseboat was transferred to this person to cover the costs of the repairs which, according to Larsen, exceeded its value at the time.

        **C.**    **<u>Financial Treatment of Delinquent Loans Owed by Non-Affiliates</u>**: At the time the Receiver was appointed, NNU's financial records listed 226 loans owed to NNU, having an aggregate stated value of $8,593,136.89, which loans had been non-performing for years. This means that $8.5 million of assets listed on NNU's books were phantom assets.  Analysis of these loans reveals the following:

        &bull;    By as early as 1995, ten of these loans had stopped performing.  Another 131 loans had become non-performing between 1996 and 2000.  A further 26 loans had been delinquent for at least five years at the time of the Receiver's appointment.

        &bull;    Fifty of these loans had been marked on some records as being paid off, yet National Note still listed $1.7 million on its balance sheet as being owed on these loans.

        &bull;    114 of the loans were made at interest rates below the 18% that National Note claimed it was earning on monies loaned to others.  Of these loans, 24 were actually had a 0% interest rate, and on all of these low-interest loans, 79% of the principal was still owed to NNU as of the commencement of the Civil Action.  These loans went delinquent on an average of 3.7 months after the loans were made.

        &bull;    There were 11 loans where no payments were made by borrowers and another 111 loans where the loans became delinquent within 6 months after being made.

# VIII.

## FINANCIAL ANALYSIS

A.    **Receivership Financial Information**. The following financial information is provided for the Reporting Period:

     1.    <u>Bank Accounts</u>. The Receiver maintains two bank accounts for the operation of the Receivership: a general operating account (the "<u>Operating Account</u>") and an account holding earnest money deposits on real estate purchases and the net proceeds of real estate sales to which disputed interests have attached (the "<u>Real Estate Account</u>"). The balances in these accounts as of the close of the Reporting Period are as follows:

| Account | Account Balance |
|---|---|
| Operating Account[44] | $4,220,076.97 |
| Real Estate Account | $2,052,882.78 |
| **TOTAL** | **$6,272,959.75** |

     2.    <u>Operating Account Deposits</u>. The sources of funds deposited into the Operating Account during the Reporting Period are shown in the following table:

| Source | Amount In |
|---|---|
| Settlement Agreement proceeds | $85,756.91 |
| Real estate sales proceeds[45] | $40,552.54 |
| Transfer from Real Estate Account[46] | $2,162,528.48 |

---

[44] Pursuant to the Court's *Order Approving the Receiver's Third Interim Fee Application for Receiver and Receiver's Professionals for Services Rendered from July 1, 2013 through December 31, 201,* Docket No. 828, the Receiver has established a separate Savings Account tied to the Operating Account in which he is holding 20% of the professional fees incurred by him and his counsel. Money to open this Savings Account was transferred from the Operating Account. This Savings Account has a current balance of $122,817.48, and is in addition to the amounts reported above.

[45] This amount reflects Net Sale Proceeds obtained from the sale of the properties discussed above in Part III.B.

[46] *See* discussion *infra* in Part III.A.1.c.

| | |
|---|---|
| Asset sale, contempt payment, interest | $5,919.41 |
| **TOTAL** | **$2,294,757.34** |

3.    <u>Operating Account Expenditures</u>.  The following table shows the categories of operating expenses that have been paid from the Operating Account during the Reporting Period:

| Type of Expense | Amount Out |
|---|---|
| Utilities, insurance, property expenses | $3,152.63 |
| Publication of property sale notices | $296.16 |
| Miscellaneous operating expenses | $2,208.59 |
| **TOTAL** | **$5,657.38** |

4.    <u>Real Estate Account Deposits and Withdrawals</u>.  One property was sold during the Reporting Period that had interests claimed against it.  As reported in Part III.B.1, above, the net proceeds of $29,216.54 were deposited into the Real Estate Account.  A total of $2,162,528.48 was transferred from the Real Estate Account to the Operating Account in situations where all existing ABIs or trust deeds were released or based on Court approval because the amount of funds in the Real Estate account exceeded the amount need to satisfy claims that had not been released.[47]

5.    <u>SFAR</u>.  Attached as **<u>Exhibit C</u>** is a copy of the Standardized Fund Accounting Report for the Reporting Period.

6.    <u>Administrative Expenses</u>.  On June 19, 2015, the Receiver filed a *Fourth Interim Fee Application* for services rendered by the Receiver and his professionals in 2014. A hearing on this Application is currently scheduled for August 25, 2015.

For the current Reporting Period, the Receiver and his staff have spent a total of 347.9

---

[47] *See* Part III.A.1.c, above.

hours on behalf of the Receivership Estate.  Total fees incurred by the Receiver during the

Reporting Period are in the total amount of $50,625.00.  The Receiver's legal counsel's total fees

and expenses incurred during the Reporting Period are in the total amount of $142,203.26.[48]

### IX.

### <u>NEXT STEPS</u>

At this time, the Receiver anticipates addressing the following priorities in the coming

months:

> 1.      <u>Claims Process</u>.  As described in Part VI, above, the Receiver has filed the

Claims Motion.  If the Court grants the Claims Motion, the Receiver will commence the claims

process.

> 2.      <u>Non-ABI Litigation</u>.  As noted in Part V above, as of the close of the

Reporting Period, the number of ancillary proceedings still actively being litigated was down to

21. The amount of time the Receiver and his counsel spend on litigation-related activities overall

is expected to decline as more matters are settled or decided.  However, the Receivership is now

at the point where some of the cases that have not settled might not settle. The time required to

be spent on each of these remaining cases is expected to continue or increase, especially as cases

are prepared for trial.  The Receiver may file additional lawsuits with potential defendants with

whom he has entered tolling agreements if settlement negotiations are not fruitful.

---

[48] A summary of fees and expenses that have been incurred on behalf of the Receivership Estate by the Receiver and the Receiver's legal counsel in prior Reporting Periods is set forth in each of the status reports. *See* First Report, p. 59; Second Report, p. 29; Third Report, pp. 28-29; Fourth Report, p. 42; Fifth Report, pp. 33-34; Sixth Report, pp. 24-25; Seventh Report, p. 22; Eighth Report, p. 29; Ninth Report, p. 33; Tenth Report, p. 33; Eleventh Report, p. 19-20; *see also* Orders approving First Interim Fee Application, Docket No. 555; Second Interim Fee Application, Docket No. 697; and Third Interim Fee Application, Docket No. 828.

not fruitful.

     3.    <u>ABI Action</u>.  As of the close of the Reporting Period, only 15 Defendants in the ABI Action remain, and the Receiver believes that this number will decrease.  The Receiver will continue to file motions for summary judgment or for default judgment, as appropriate.

     4.    <u>Property Sales</u>.  The Receiver will continue his efforts to sell additional real estate properties in the Receivership Estate. There are some favorable indications that multiple properties will be sold after the close of the Reporting Period.  It is anticipated that the sale of some of these remaining properties, especially those with environmental problems, will take some additional time.

## X.

## <u>CONCLUSION</u>

Solid progress was made during the Reporting Period.  The Receiver looks forward to moving to the next stage of the Receivership by commencing a claims process so recovered funds can be returned to investors.

DATED this 5th day of August, 2015.

WAYNE KLEIN, Receiver

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **TWELFTH STATUS REPORT**

**OF R. WAYNE KLEIN, RECEIVER** was filed with the Court on this 5th day of August, 2015,

and served via ECF on all parties who have requested notice in this case.  A copy was also

served on Wayne Palmer by U.S. Mail, postage prepaid at:

Wayne Palmer
8816 South 2240 West
West Jordan, UT 84088

/s/ Candy Long