Peggy Hunt (Utah State Bar No. 6060)
John J. Wiest (Utah State Bar No. 15767)
**GREENBERG TAURIG, LLP**
222 South Main Street, 5th Floor
Salt Lake City, UT  84101
Telephone: (801) 478-6900
huntp@gtlaw.com
wiestj@gtlaw.com

*Attorneys for Court-Appointed Receiver R. Wayne Klein*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br>       v.<br><br>NATIONAL NOTE OF UTAH, LC, a Utah Limited Liability Company and WAYNE LaMAR PALMER, an individual,<br><br>            Defendants. | **RECEIVER'S MOTION (1) TO APPROVE FINAL ACCOUNTING, FINAL FEE APPLICATIONS AND CLOSING PROCEDURES AND (2) TO TERMINATE THE RECEIVERSHIP AND DISCHARGE THE RECEIVER, AND MEMORANDUM IN SUPPORT**<br><br>2:12-cv-00591 BSJ<br><br>The Honorable Bruce S. Jenkins |

R. Wayne Klein, the Court-Appointed Receiver (the "Receiver") of National Note of Utah, LC ("National Note"), as well as certain subsidiaries and entities affiliated with National Note and the assets of Wayne LaMar Palmer ("Palmer") (collectively, the "Receivership Defendants"), hereby requests that the Court enter the *Order*, substantially in the form attached hereto as **Exhibit A**, granting this Motion and (1) approving the Receiver's final accounting and final fee applications contained herein as well as certain closing procedures outlined below, and (2) terminating the receivership and discharging the Receiver.  This Motion is supported by the

1

ACTIVE 52190645v5

Memorandum in Support contained herein.

## MEMORANDUM IN SUPPORT

I. **BACKGROUND**

    A. **Civil and Criminal Actions**

    1.    This above-captioned civil action was commenced by the United States Securities and Exchange Commission (the "SEC") on June 25, 2012, alleging that the Receivership Defendants engaged in securities fraud.[1]

    2.    After a trial in 2015, the Court found that Palmer and National Note had engaged in securities fraud and entered judgment against them imposing civil penalties in the amounts of $1,050,000.00 and $900,000.00, respectively.[2]

    3.    In addition, a grand jury indicted Palmer and his cousin, Julieann Palmer Martin, in 2015 on criminal charges.[3] Both later pled guilty.

    4.    Ms. Martin was sentenced to 16 months in prison and ordered to pay approximately $2,000,000.00 in restitution. She was released from prison on August 9, 2019.

    5.    Palmer was sentenced to 60 months in prison and ordered to pay $52.9 million in restitution. Palmer reported to prison on August 14, 2019. His restitution payments are being tracked by the United States Department of Justice (the "DOJ"). As discussed below, the Receiver has been providing the DOJ information relevant to Palmer's restitution, including information about distributions made by the Receiver, and the Receiver intends to inform the

---

[1] Docket No. 1.

[2] *See* Docket No. 1043.

[3] *See United States v. Palmer et al.,* Case No. 2:15-cr-00469 (D. Utah).

DOJ of residual cash of the receivership at its close, if any, that may be used to make restitution payments to victims of this fraud.

### B. The Receivership

6. The Court appointed the Receiver on July 25, 2012 pursuant to an *Order Appointing Receiver and Staying Litigation* (the "Receivership Order").[4] Part VIII of the Receivership Order includes a litigation stay (the "Litigation Stay").

7. Since his appointment, the Receiver has acted in good faith and diligently performed the duties prescribed by the Receivership Order.

8. The Receiver took possession, custody and control of the records and assets of the Receivership Defendants, as well as at least 36 entities affiliated with the Receivership Defendants identified in the Receivership Order as the "Palmer Entities" and assumed management of National Note and the Palmer Entities.[5]

9. The Receiver investigated the Receivership Defendants and the Palmer Entities consistent with the duties imposed under the Receivership Order. As part of this investigation, the Receiver took diligent steps to reasonably determine the nature, location and value of property held by and interest of the Receivership Defendants and the Palmer Entities.[6]

10. Bank accounts of the Receivership Defendants and the Palmer Entities were closed and over time the Receiver opened bank accounts for the Receivership Estate, including an "Operating Account", a "Real Estate Account", and a "Fee Reserve Account".[7] Additionally,

---

[4] Docket No. 9.

[5] Receivership Order ¶¶ 2, 4-21.

[6] *Id.* ¶¶ 7, 42-43.

[7] *Id.* ¶¶ 7, 35.

the Receiver gave notice to third parties of the receivership, including by filing *Notices of Receivership* in numerous jurisdictions.[8]

11.     The Receiver took actions to manage, maintain and wind-down business operations of the Receivership Estate.[9] He determined that the best way to maximize the value of certain businesses, including a minting company and rental apartments, was to operate the businesses, which the Receiver did for some time with Court approval.  At this time, all business operations have been terminated and all assets of the businesses have been liquidated.

12.     The Receiver managed the assets of the Receivership Estate in accordance with Part IX of the Receivership Order, and the specifics of this management are set forth in the *Status Reports* discussed below.  Among other things, the Receiver disposed of personal property and real property owned by National Note and the Palmer Entities, and there is no more property to liquidate.

13.     Regarding real property, the Receiver took custody and control of approximately 223 different real property parcels located in eight states and these properties were marketed for sale. Except for several properties that were abandoned after notice and Court approval, all of these properties were liquidated by the Receiver after notice and with Court approval. Some of the properties were sold in bulk sales to developers; but, most were sold in individual transactions either by public or private sale. Liquidation of the real properties produced net sales proceeds totaling approximately $8.2 million.[10]

14.     The Receiver engaged in litigation when beneficial to the Receivership Estate to,

---

[8] *Id.* ¶ 23.

[9] *Id.* ¶ 39.

[10] *Id.* ¶¶ 7, 37-39.

among other things, maximize the value of the Receivership Estate for all those investors who lost money in Palmer's fraudulent scheme.[11]

15. Litigation included invalidation of Assignments of Beneficial Interest ("ABIs") recorded against many of the real properties of the Receivership Estate prior to the Receiver's appointment. Many ABI holders claimed they had a secured interest in certain properties and thus prior right to payment from liquidation proceeds. The Receiver determined that the ABIs had no basis in law and requested that all ABI holders release their ABIs. Through this process many of ABIs were released, but ultimately the Receiver was required to file lawsuits against holders of ABIs on four groups of properties who would not voluntarily release their ABIs. As a result of default, settlement or judgment, a total of 148 ABIs were eventually released or invalidated thus allowing net liquidation proceeds from the sale of the formally encumbered properties to be distributed to investors as set forth below.

16. Litigation also included claims against those who profited from the fraudulent scheme. While some of the profits were paid back upon demand, the Receiver was required to initiate approximately 145 fraudulent transfer actions to recover profits. These actions resulted in settlements and judgments. At this time, all settlements have been satisfied, and judgments have been collected or, after notice and Court approval, abandoned or sold.

17. The Receiver made required reports to the Court,[12] including in thirty-two quarterly *Status Reports*, all of which are available on the Receivership website.[13] These Reports provide, in addition to quarterly *Standardized Fund Accounting Reports* ("SFARs"), a

---

[11] *Id.* ¶¶ 7, 42-43.

[12] *Id.* ¶¶ 54-55.

[13] http://www.kleinutah.com/index.php/receiverships/national-note-of-utah-lc.

comprehensive description of the services performed by the Receiver and his professionals in each reporting period and by this reference the *Status Reports* are incorporated herein: *Initial Report and Liquidation Plan* (June 25, 2012 through September 30, 2012);[14] *Second Status Report* (October 1, 2012 through December 31, 2012);[15] *Third Status Report* (January 1, 2013 through March 31, 2013);[16] *Fourth Status Report* (April 1, 2013 through June 30, 2013);[17] *Fifth Status Report* (July 1, 2013 through September 30, 2013);[18] *Sixth Status Report* (October 1, 2013 through December 31, 2013);[19] *Seventh Status Report* (January 1, 2014 through March 31, 2014);[20] *Eighth Status Report* (April 1, 2014 through June 30, 2014);[21] *Ninth Status Report* (July 1, 2014 to September 30, 2014);[22] *Tenth Status Report* (October 1, 2014 to December 31, 2014);[23] *Eleventh Status Report* (January 1, 2015 to March 31, 2015);[24] *Twelfth Status Report* (April 1, 2015 to June 30, 2015);[25] *Thirteenth Status Report* (July 1, 2015 to September 30,

---

[14] Docket No. 73.

[15] Docket No. 170.

[16] Docket No. 288.

[17] Docket No. 408.

[18] Docket No. 510.

[19] Docket No. 598.

[20] Docket No. 639.

[21] Docket No. 710.

[22] Docket No. 808.

[23] Docket No. 889.

[24] Docket No. 955.

[25] Docket No. 979.

ACTIVE 52190645v5

2015);[26] *Fourteenth Status Report* (October 1, 2015 through December 31, 2015);[27] *Fifteenth Status Report* (January 1, 2016 through March 31, 2016);[28] *Sixteenth Status Report* (April 1, 2016 through June 30, 2016);[29] *Seventeenth Status Report* (July 1, 2016 through September 30, 2016);[30] *Eighteenth Status Report* (October 1, 2016 through December 31, 2016); *Nineteenth Status Report* (January 1, 2017 through March 31, 2017); *Twentieth Status Report* (April 1, 2017 through June 30, 2017);[31] *Twenty-First Status Report (*July 1, 2017 through September 30, 2017);[32] *Twenty-Second Status Report* (October 1, 2017 through December 31, 2017);[33] *Twenty-Third Status Report* (January 1, 2018 through March 31, 2018); [34] *Twenty-Fourth Status Report* (April 1, 2018 through June 30, 2018);[35] *Twenty-Fifth Status Report* (July 1, 2018 through September 30, 2018);[36] *Twenty-Sixth Status Report* (October 1, 2018 through December 31, 2018);[37] *Twenty-Seventh Status Report* (January 1, 2019 through April 30, 2019);[38] *Twenty-*

---

[26] Docket No. 1045.

[27] Docket No. 1070.

[28] Docket No. 1127.

[29] Docket No. 1177.

[30] Docket No. 1216.

[31] Docket No. 1307.

[32] Docket No. 1324.

[33] Docket No. 1343.

[34] Docket No. 1373.

[35] Docket No. 1404.

[36] Docket No. 1427.

[37] Docket No. 1447.

[38] Docket No. 1451.

7

*Eighth Status Report* (May 1, 2019 through June 30, 2019);[39] *Twenty-Ninth Status Report* (July 1, 2019 through September 30, 2019);[40] *Thirtieth Status Report* (October 1, 2019 through December 31, 2019);[41] *Thirty-First Status Report* (January 1, 2020 through March 31, 2020);[42] and *Thirty-Second Status Report (*April 1, 2020 through June 30, 2020).[43]

18.     The Receiver also communicated when necessary or requested with various governmental entities related to this case, including the SEC and the DOJ.[44]

19.     A claims process devised by the Receiver was approved by the Court.  The Receiver analyzed and reconciled submitted *Proofs of Claim* and, when necessary, made filings with the Court related to the allowance of the claims asserted.  Ultimately a total of 442 *Proofs of Claim* asserting more than $47 million in losses were determined to be "Allowed Claims" against the Receivership Estate.

20.     The Receiver obtained approval of a *Plan of Distribution*[45] and made three distributions pursuant to the "Approved Methodology" authorized by the Court as part of that Plan, distributing a total of $7,796,738.19 as set forth in **Exhibit B** (the "Distribution Report") and as described below.

---

[39] Docket No. 1456.

[40] Docket No. 1457.

[41] Docket No. 1462.

[42] Docket No. 1471.

[43] Docket No. 1480.

[44] *See* Receivership Order ¶ 25.

[45] Docket No. 1231; *see* Receivership Order ¶ 52.

ACTIVE 52190645v5

  a. Pursuant to the Approved Methodology and the Court's *Order Granting Receiver's Motion for Approval of (1) Proposed Distribution Methodology and Plan of Distribution, and (2) Proposed Initial Distribution as Modified* (the "Initial Order"),[46] the Receiver made an initial distribution on November 10, 2016 of (a) $1,502,474.46 to all 442 holders of Allowed Claims on a *pro rata* basis as a one-time payment, and (b) $3,020,962.37 to 214 holders of Allowed Claims eligible for a distribution under a "rising tide" methodology – this distribution was to investors who had previously received less than a 20.05% return on their "Net Principal Investment." Additionally, $26,507.28 was later made to five additional investors on account of settlements of objections and late-filed Proofs of Claim. All checks issued pursuant to this initial distribution were cashed and there are no more distributions to be made under the Initial Order.

  b. Pursuant to the Approved Methodology and the Court's *Order Granting Receiver's Amended Motion Seeking Authorization to Make Second Distribution* (the "Second Distribution Order"),[47] the Receiver made a second distribution on June 29, 2018, disbursing a total of $2,034,801.34 to 228 holders of Allowed Claims eligible for a distribution under the rising tide methodology – this distribution was to investors who had previously received less than a 27.59% return on their Net Principal Investment. All checks issued pursuant to this second distribution were cashed and there are no more distributions to be made under the Second Distribution Order.

  c. Pursuant to the Approved Methodology and the Court's *Order Granting Receiver's Motion Seeking Authorization to Make Third and Final Distribution* (the

---

[46] Docket No. 1231.

[47] Docket No. 1400.

ACTIVE 52190645v5

"Third Distribution Order"),[48] the Receiver made a third and final distribution on June 10, 2020, disbursing a total of $1,238,500.02 to 239 holders of Allowed Claims eligible for a distribution under the rising tide methodology – this final distribution was to investors who had previously received less than a 31.35% of their Net Principal Investment. All checks issued pursuant to the final distribution were cashed and there are no more distributions to be made under the Third Distribution Order.

## II. RELIEF REQUESTED

21. After diligent and good faith efforts over the past eight years, the Receiver believes he has now completed his liquidation of property of the Receivership Estate, and a receivership in this action is no longer necessary to preserve the property or to protect the rights of the parties involved in this action.

22. The Receiver knows of no good reason not to close the receivership and discharge him of his duties and thus the Receiver makes the present Motion seeking an Order substantially in the form of that attached hereto as **Exhibit A**:

    a. Confirming the Receiver's *Final Financial Report and Accounting* set forth herein, and authorizing the Receiver's distribution of residual cash, if any, as discussed in Part III below;

    b. Approving the Receiver's final request for fees and reimbursement of expenses and approving all previous fees and expenses approved on an interim basis as outlined in Part IV below;

    c. Approving the destruction of documents and other closing procedures as discussed in Part V below; and

---

[48] Docket No. 1478.

d. Terminating the receivership and discharging the Receiver as set forth in Part VI below.

23. The Receiver has provided a copy of this Motion to the SEC and is informed that the SEC has no objection to the relief sought.

### III. FINAL FINANCIAL REPORT AND TREATMENT OF RESIDUAL CASH

24. Distributions of cash made by the Receiver in the ordinary course of administering the Receivership Estate or as allowed by the Court are outlined in SFARs for each quarter commencing in July 2012 through June 20, 2020. These SFARs are attached to the *Status Reports* discussed above and incorporated herein. An SFAR for the period from July 1, 2020 through August 31, 2020 is attached hereto as **Exhibit C**.

25. Distributions of cash to investors authorized by the Court and outlined above are detailed in the Distribution Report attached hereto as **Exhibit B**. This Distribution Report was attached to the *Motion Seeking Authorization to Make Third and Final Distribution and Memorandum of Law in Support* (the "Final Distribution Motion")[49] and includes a summary of distributions pursuant to the Initial Order, the Second Distribution Order and the Third Distribution Order. Thus, all distributions to investors are outlined in Exhibit B.

26. As discussed above, all final distributions have now been cashed. The total assets and liabilities of the Receivership Estate as of September 18, 2020 are $32,953.46 in cash.

27. On May 19, 2020, the Receiver filed the Final Distribution Motion, and as part of calculating the funds available for final distribution, provided a "Closure Budget", forecasting for the Court the administrative expenses the Receiver estimated would accrue in finalizing his

---

[49] *See* Docket No. 1475, Exh. A.

administration of and in terminating the receivership.[50]

28. Taking into account the Closure Budget and the actual expenditures incurred, the Receiver anticipates that there are sufficient funds to pay legal fees and expenses incurred since January 1, 2020, the costs of closing the receivership, and some or all of the Receiver's outstanding fees and expenses.

    a. <u>Legal Fees</u>. The Receiver will pay actual, necessary and reasonable fees and out-of-pocket expenses incurred by his legal counsel for the period of January 1, 2020 through September 18, 2020, totaling $10,070.50. The Receiver obtained approval to employ Dorsey & Whitney LLP ("<u>Dorsey</u>"), and then as of April 5, 2020, Greenberg Traurig, LLP ("<u>GT</u>") as his counsel.[51] To date, the Court has allowed Dorsey its requested fees and expenses, with some adjustments, from the commencement of the receivership through December 31, 2019. The Closure Budget anticipates that Dorsey will request $1,353.00 for its services and expenses for the period of January 1, 2020 through April 5, 2020, when lead counsel Peggy Hunt left the firm, and an invoice for these services is attached hereto as **Exhibit D**. The Closure Budget also estimates a total of $18,000.00 in additional fees and expenses to be incurred by counsel from April 5, 2020 through receivership termination.[52] GT has incurred a total of $8,717.50 in fees for the period of April 5, 2020 through September 18, 2020, and has estimated $500 in fees that may be incurred in conjunction with this Motion and residual legal services related to closing of the Receivership Estate. An invoice for these services, including the estimated

---

[50] Docket No. 1475, ¶ 14.

[51] *See* Receivership Order ¶¶ 7, 58; *see* Docket Nos. 1472 and 1473.

[52] *See* Docket No. 1475, ¶ 14.

$500, is attached hereto as **Exhibit E**. GT has agreed to waive any fees or expenses to the extent such fees and expenses are greater than $500 as estimated in Exhibit D. To the extent the full $500 is not incurred, GT will only seek payment of its actual time through September 18, 2020 plus that portion of the $500 that is actually incurred.

   b. <u>Expenses Associated with Closing the Estate</u>. Next, the Receiver proposes to pay expenses associated with the closure of the receivership, including preparation of 2019 and final 2020 tax returns, filing fees, postage, storage and document destruction costs. The Closure Budget estimated these costs to be in the amount of $4,368.00.[53] Since May 19, 2020, distribution postage and storage has totaled $872.00. The Receiver does not anticipate federal or state tax liabilities (other than a Utah tax return filing fee), and assuming this is the case, the Receiver estimates that tax preparation and document destruction will be in the amount of approximately $4,600.00.

   c. <u>Receiver Fees</u>. Next, to the extent that funds remain after paying legal fees and closure expenses, the Receiver proposes to pay his fees and expenses for the period of January 1, 2020 to September 18, 2020, as outlined in invoice attached hereto as **Exhibit F**. The Closure Budget disclosed a total of $11,772.50 for the Receiver's services through the close of the receivership, which included (i) $7,897.50 in fees and expenses that had already been incurred for the period of January 1, 2020 to April 2020, and (ii) $3,875.00 in fees and expenses for the Receiver to take actions after the entry of the Third Distribution Order in making distributions and closing the Receivership Estate.[54] As set forth in Exhibit E, the Receiver's total fees and expenses year to date

---

[53] *Id.*

[54] *Id.*

ACTIVE 52190645v5

have been higher than anticipated and total $16,140.00. Accordingly, the Receiver expects there will be sufficient funds to pay only a portion of this amount.

        d.    <u>Residual</u>. The Closure Budget had a contingency reserve of $52.80 after making the third and final distributions to holders of Allowed Claims and paying the expenses outlined above.[55] To the extent that there are sufficient funds to pay the expenses as prioritized in paragraphs (a) through (d) above, the Receiver will pay any residual cash to the Court's Clerk of Court to supplement Palmer's criminal restitution distributions to National Note victims. He will notify the DOJ of any such deposit.

## IV. **FINAL FEE APPLICATION**

29.    The Receiver and his Retained Professionals – his accountants, Klein & Associates; Dorsey and GT, his general counsel; and Manning Curtis Bradshaw & Bednar, as special conflicts counsel, each filed *Interim Fee Applications* in accordance with Part XIV of the Receivership Order or Court instructions for services provided from the date of appointment through December 31, 2019. The Court entered *Orders* related to the Interim Fee Applications as outlined in the *Status Reports* outlined above and incorporated herein. Each Order was entered after a hearing at which time the Court considered, among other things, the necessity of the services rendered and the expenses incurred, the reasonableness of the requested fees and expenses requested, and the benefit of fees and expenses to the Receivership Estate. The Receiver has paid only those fees and expenses allowed by the Court to date, and all such payments are outlined in the *Status Reports* and in the SFARs attached thereto.

30.    As set forth above, the Receiver, Dorsey and GT have incurred fees and out-of-pocket expenses for the period of January 1, 2020 through September 18, 2020, which have not

---

[55] *Id.*

yet been submitted to the Court for approval. Specifically:

    a.    Dorsey's fees and out of pocket expenses for the period of January 1, 2020 through April 1, 2020, are outlined in the invoice attached hereto as **Exhibit D**. Dorsey worked for a total of 4.9 hours and has incurred fees in the amount of $1,344.00 plus $9.00 in expenses, for a total amount of $1,353.00.

    b.    GT's fees and out-of-pocket expenses for the period of April 5, 2020 through September 18, 2020 are outlined in the invoice attached hereto as **Exhibit E**. GT worked a total of 20.80 hours and has incurred fees in the total amount of $8,717.50. There were no out-of-pocket expenses.

    c.    The Receiver has performed 69.2 hours of billable work and his staff at Klein & Associates have performed 7.3 hours of billable work from January 1, 2020 to September 18, 2020, which is outlined in the invoice attached hereto as **Exhibit F**. The Receiver and Klein & Associates are requesting fees of the total amount of $16,680.00. The Receiver and his staff also performed an additional 8.0 hours of work on this case which was not billed, which work is valued at $1,712.50.

31.    All fees and expenses incurred for the period of January 1, 2020 through September 18, 2020, are actual and were necessary for the effective administration of the Receivership Estate. The services rendered and the expenses advanced for this period served to benefit the Receivership Estate, including in obtaining approval of and making the third and final distribution.

32.    Accordingly, the Receiver requests that the Court enter the proposed *Order* and approve (a) the fees and expenses for the period of January 1, 2020 through September 18, 2020, which have not previously been submitted to the Court, and (b) all fees and expenses that have

been incurred in this case.[56]

V. DESTRUCTION OF RECORDS AND APPROVAL OF POST-TERMINATION ORDER PROCEDURES

33. The Receiver asks the Court to enter the proposed *Order* attached as **Exhibit A** providing, among other things, the following procedures regarding termination of the receivership:

    a. Record Destruction: Any interested party that wishes to take custody and control of non-privileged records currently in the possession of the Receiver, and who demonstrates a legitimate interest in the records and an intent to protect confidential information contained in those records, has thirty (30) days after the Court's entry of the *Order* terminating the receivership to make arrangements with the Receiver, at the interested party's own expense, to take control of the records. If no qualifying party asserts a valid claim to the records within thirty (30) days after entry of said *Order*, the Receiver is authorized to destroy the records.

    b. Discharge of Receiver: The Receiver will be discharged and the Receivership Estate will be closed.

    c. Limitation of Liability: The Receiver and his agents, acting within the scope of such agency including Retained Professionals as defined it the Receivership Order ("Retained Personnel"), shall be entitled to rely on all outstanding rules of law and orders of this Court and shall not be liable to anyone for their good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and

---

[56] *See* Receivership Order ¶¶ 61, 65.

ACTIVE 52190645v5

responsibilities as Receiver or Retained Personnel nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.[57]

   d. <u>Litigation Stay</u>: The Litigation Stay previously included at Part VIII of the Receivership Order shall remain in place to prevent further post-discharge expenses by the Receiver after entry of the *Order* terminating the receivership.

   e. <u>Retention of Jurisdiction</u>: This Court shall retain jurisdiction over any action filed against the Receiver, his staff, and/or Retained Personnel based upon acts or omissions committed in their representative capacities.

   f. <u>Closing Authorization</u>: The Receiver is allowed to take those ordinary actions that he deems advisable, in his discretion, in closing this matter, including filing interim and final tax returns for the Receivership Estate, destroying records of the Receivership Estate consistent with the Order terminating the receivership, paying authorized expenses associated with the closing of the Estate, paying any remainder funds to the Clerk of Court to supplement restitution payments owed by Palmer, and closing bank accounts of the Receivership Estate.

## VI. TERMINATION OF THE RECEIVERSHIP AND DISCHARGE OF THE RECEIVER

34. The Receiver believes he has now completed his liquidation of property of the Receivership Estate, and a receivership in this action is no longer necessary to preserve the property or to protect the rights of the parties involved in this action.

---

[57] *See* Receivership Order ¶ 49.

35. The Receiver knows of no good reason not to terminate the receivership and discharge him of his duties.

36. Accordingly, the Receiver respectfully requests that the Court enter the proposed Order attached hereto as **Exhibit A**, terminating the receivership and discharging the Receiver.

## VII. CONCLUSION

For the reasons set forth herein, the Receiver requests that the Court enter the proposed *Order* attached hereto as **Exhibit A** confirming the Receiver's final financial report and accounting, allowing all professional fees and authorizing the payment of outstanding fees and expenses; authorizing the outlined closing procedures; terminating the receivership and discharging the Receiver; and granting any other relief to which the Receiver is entitled.

The SEC has informed the Receiver that it supports this Motion.

DATED this 21st day of September, 2020.

                                        **GREENBERG TAURIG LLP**

                                        */s/ Peggy Hunt*
                                        Peggy Hunt
                                        John J. Wiest
                                        *Attorneys for the Receiver*

ACTIVE 52190645v5

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the above **RECEIVER'S MOTION (1) TO APPROVE FINAL ACCOUNTING, FINAL FEE APPLICATIONS AND CLOSING PROCEDURES, AND (2) TO TERMINATE THE RECEIVERSHIP AND DISCHARGE THE RECEIVER, AND MEMORANDUM IN SUPPORT** was filed with the Court on this 21st day of September, 2020, and served via ECF on all parties who have requested notice in this case.

/s/ Candy Long